RECORD NO. 14-1450

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

POWER FUELS, LLC,

*Petitioner,*

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
AND SECRETARY OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION,

*Respondents.*

ON PETITION FOR REVIEW FROM
THE FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

**PETITIONER'S OPENING BRIEF**

Wade W. Massie
Seth M. Land
PENN, STUART & ESKRIDGE
208 East Main Street
Post Office Box 2288
Abingdon, Virginia 2421-2288
Telephone: (276) 623-4422
Facsimile: (276) 628-5621
wmassie@pennstuart.com

*Counsel for Petitioner Power Fuels, LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1450__      Caption: __Power Fuels, LLC v. Federal Mine Safety and Health Review Comm'n__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Power Fuels, LLC__
(name of party/amicus)

_____

who is _____petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Wade W. Massie _____    Date: _____ May 14, 2014 _____

Counsel for: Petitioner _____

## CERTIFICATE OF SERVICE
*****************************

I certify that on _____ May 14, 2014 _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Wade W. Massie _____    _____ May 14, 2014 _____
        (signature)                              (date)

- 2 -

TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF ISSUES .................................................................... 2

STATEMENT OF CASE ...................................................................... 2

    A.   *Procedural History* ........................................................ 2

    B.   *Statement of Facts* ........................................................ 3

SUMMARY OF ARGUMENT .................................................................. 8

ARGUMENT ................................................................................ 9

    A.   *Standard of Review* ...................................................... 9

    B.   *Under the Mine Act, "Work of Preparing the Coal" Includes Only Those Coal Preparation Activities that Are Usually Done by Mine Operators* ....................................................... 9

    C.   *The Activities of Power Fuels Are Not "Work of Preparing the Coal" Because They Are Not the Type Usually Done by the Mine Operator* ............................................... 15

    D.   *To the Extent that the ALJ Made Contrary Findings of Fact, Such Findings Are Not Supported by Substantial Evidence* ................................................. 20

CONCLUSION ............................................................................ 22

i

STATEMENT REGARDING ORAL ARGUMENT .................................. 22

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................... 23

CERTIFICATE OF SERVICE .................................................... 24

ADDENDUM:  STATUTES INVOLVED .................................................. 25

TABLE OF AUTHORITIES

Cases:

*Collins v. Dir., OWCP,*
  795 F.2d 368 (4th Cir. 1986) ....................................................... 12

*Eplion v. Dir., OWCP,*
  794 F.2d 935 (4th Cir. 1986) ....................................... 11, 12, 19

*Herman v. Associated Elec. Coop,. Inc.,*
  172 F.3d 1078 (8th Cir. 1999) ..................................................... 12

*Kinder Morgan Operating, L.P. "C" v. Chao,*
  78 Fed. Appx. 462 (6th Cir. 2003) ............................................. 14

*Norfolk & W. Ry. Co. v. Roberson,*
  918 F.2d 1144 (4th Cir. 1990) ..................................................... 11

*RNS Servs., Inc. v. Sec'y of Labor,*
  115 F.3d 182 (3d Cir. 1997) ......................................................... 13

*Roberts v. Weinberger,*
  527 F.2d 600 (4th Cir. 1975) ................................................. 11, 12

*Sheets v. Moore,*
  97 F.3d 164 (6th Cir. 1996) ......................................................... 14

*Thorn v. Itmann Coal Co.,*
  3 F.3d 713 (4th Cir. 1993) ............................................................. 9

*United Energy Servs., Inc. v. Fed. Mine Safety & Health Admin.,*
  35 F.3d 971 (4th Cir. 1994) .................................... 9, 11, 17, 18

iii

Statutes:

30 U.S.C. § 802(h)(1) ................................................................... 8, 10

30 U.S.C. § 802(i) ................................................... 9, 10, 11, 14, 16

30 U.S.C. § 803 ................................................................................. 9

30 U.S.C. § 816(a) ..................................................................... 1, 2, 3

30 U.S.C. § 816(a)(1) ....................................................................... 9

30 U.S.C. § 823(d)(1) ....................................................................... 1

Rules:

Fed. R. App. P. 15 ....................................................................... 1, 3

Petitioner Power Fuels, LLC ("Power Fuels"), by counsel, respectfully submits the following opening brief.

I.     JURISDICTIONAL STATEMENT

Jurisdiction over this petition exists pursuant to 30 U.S.C. § 816(a), allowing review by this Court of a final order of the Federal Mine Safety and Health Review Commission (the "Commission").  This appeal is from a final order that disposes of all claims.

On March 10, 2014, an Administrative Law Judge ("ALJ") of the Commission rendered his decision, ruling that Power Fuels is an operator of a mine and is subject to jurisdiction under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801-964 (2012) (the "Mine Act").  (Joint Appendix ("JA") 311.)  The ALJ affirmed the penalties for each of the citations.  (JA 311.)  On March 25, 2014, Power Fuels filed a petition for discretionary review with the Commission.  (JA 338.)  On April 18, 2014, the Commission issued a notice that the petition for discretionary review by Power Fuels had not been granted.  (JA 359.)  As a result, the decision of the Administrative Law Judge became the final order of the Commission 40 days after its issuance, 30 U.S.C. § 823(d)(1), making the decision final on April 19, 2014.  On May 6, 2014, Power Fuels filed with this Court a petition for review of the decision pursuant to Fed. R. App. P. 15.  (JA

1

361.)  Pursuant to 30 U.S.C. § 816(a), the petition for review was timely filed

within 30 days of the date the decision became a final order of the Commission.

## II.    STATEMENT OF ISSUES

1.    Whether Power Fuels is the operator of a "coal or other mine"

and engaged in the "work of preparing the coal" so as to be subject to the Mine

Act?

2.    Whether the ALJ's decision that Power Fuels is subject to the

Mine Act employs the correct legal standard?

3.    Whether the ALJ's decision that Power Fuels is subject to the

Mine Act is supported by substantial evidence?

## III.    STATEMENT OF CASE

### A.    *Procedural History*

This case involves three citations that were issued to Power Fuels on

April 9, 2013, by the Secretary of Labor, Mine Safety and Health Administration

("MSHA").  MSHA assessed a civil penalty of $100 for each of these citations.

(JA 5-8.)  Power Fuels contested the citations and penalties on the ground that it is

not the operator of a mine under the Mine Act and is not subject to jurisdiction

under the Mine Act.  (JA 9, 15, 48.)

The proceedings were assigned to Administrative Law Judge George

A. Koutras who held an evidentiary hearing on November 19, 2013.  Following the

2

hearing, the Administrative Law Judge took the case under advisement and permitted the parties to file post-hearing memoranda on the jurisdictional issue. (JA 280.)  On March 10, 2014, the Administrative Law Judge rendered his decision, ruling that Power Fuels is an operator of a mine and is subject to jurisdiction under the Mine Act.  (JA 311.)  He affirmed the penalties for each of the citations.  (JA 311.)

On March 25, 2014, Power Fuels filed a petition for discretionary review with the Commission.  (JA 338.)  On April 18, 2014, the Commission issued a notice that the petition for discretionary review by Power Fuels had not been granted.  (JA 359.)  On May 6, 2014, the petition for review was filed with this Court pursuant to 30 U.S.C. § 816(a) and Fed. R. App. P. 15.  (JA 361.)

### B.    *Statement of Facts*

Power Fuels owns and operates a blending terminal for Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion").  The terminal is located next to Dominion's Virginia City Hybrid Energy Center (the "plant") in Wise County, Virginia.  The plant is a 600 megawatt power plant that produces electricity from low BTU coal and biomass.  (JA 130, 142.)  The plant began operations in 2011, and it employs state-of-the-art systems that reduce emissions.  (JA 130, 142-43.)  The plant is billed as one of the cleanest coal-fired plants in the world.  (JA 142.)

The plant burns approximately 10,000 tons of fuel a day. Approximately 20% of the coal is delivered directly to the plant by producers. (JA 138.) The rest of the fuel is delivered by the producers to Power Fuels. (*Id.*) The fuel consists of coal and coal refuse ("gob"). (JA 142.) Power Fuels receives, blends, stores, and delivers the fuel to the plant. (JA 151-53.)

Dominion purchases, directly from the producers, all of the coal and gob that is delivered to Power Fuels. (JA 149-51.) The fuel is supplied by approximately 15 to 16 different producers. (JA 146.) Power Fuels does not own any of the coal or gob that comes onto its property; Dominion owns it all. (JA 149-51.) Power Fuels works exclusively for Dominion. (JA 146.)

Approximately 30-40% of the fuel consumed by the plant is gob. (JA 145.) The producers of the gob are recovering the material from old refuse sites, and, in the process, they are eliminating environmental hazards at these locations. (JA 144-45.)

The producers hire the truckers that transport the coal and gob to Power Fuels. (JA 150.) Power Fuels hires the truckers that transport the material from its site to the plant across the road. (JA 153.)

Dominion contracts directly with the producers for the general specifications of the coal and gob that it wants delivered to Power Fuels. (JA 150-51, 162-63.) The producers perform any necessary processing to meet Dominion's

4

needs.  (JA 162.)  Power Fuels does not do any crushing, sizing, screening,

washing, or other processing of the coal or gob.  (JA 163.)  As Walter Crickmer,

the manager of Power Fuels, explained,

> Power Fuels has never done anything to improve any
> quality of any fuel product. We've never screened it.
> We've never washed it. We've never sized it. We've
> never done anything to it other than take exactly what's
> been brought in there by Dominion and put it into a blend
> to fuel their furnace.

(JA 172.)

Dominion's plant is designed to burn low BTU coal and gob.  (JA

130-31, 143-44.)  The blend has to meet precise specifications to react properly in

the furnace burn chamber.  (*Id*.)  Dominion determines the desired blend on a daily

basis.  (JA 130-31, 151-53, 173, 177.)

At its site, Power Fuels has four loaders, a dozer, and a stacking

conveyer.  (JA 141.)  When the material arrives at Power Fuels it is weighed,

sampled, and dumped into separate piles.  (JA 151-53.)  On instructions from

Dominion, Power Fuels then uses its equipment to blend the material to

Dominion's daily specifications.  (*Id.*)  Power Fuels has no discretion on whether

or how to blend the material.  Power Fuels blends only and precisely as directed by

Dominion.  As Mr. Crickmer testified,

> Dominion directs us daily to take this quality coal, so
> much of this material and so much of that material and so

> much of this material and blend it together by one bucket
> of this, two buckets of that. Literally it says that.

(JA 152.)

At the hearing, Power Fuels introduced as Exhibit R-3 an example of the blending instructions that Power Fuels receives from Dominion. (JA 156, 268.) The specifications change daily to meet the desired heat rate for the plant's furnace. (JA 173, 177.) Consistent with Mr. Crickmer's testimony, the instructions from Dominion provide specific directions as to how the material should be blended. As Mr. Crickmer explained, Power Fuels is required to do "100% what they [Dominion] tell us." (JA 157.)

Power Fuels performs its work for Dominion under a Terminalling Agreement. (JA 147, 229.) Under the Terminalling Agreement, Power Fuels is required to blend the coal and gob in accordance with the requirements of Dominion. (JA 235 at § 3.05.) Power Fuels may make recommendations as to how to modify the blend to meet Dominion's specifications, but Power Fuels cannot change the blend on its own. (*Id.*)

Dominion pays Power Fuels on a cost plus basis. (JA 149.) Dominion reimburses Power Fuels for its expenses, and it pays Power Fuels a fixed fee for each ton of material delivered to the site. (*Id.*)

In addition to coal and gob, Power Fuels is also able to provide Dominion with biomass (wood products) for the plant. (JA 142.) Power Fuels is

currently storing some biomass on its property for later sale to Dominion. The biomass is not part of the Terminalling Agreement. (JA 178.)

In contrast to the work performed by Power Fuels, coal preparation generally involves the washing, screening, and sizing of the coal. (JA 171-72.) Power Fuels does not do any work of that type. (JA 163, 172.) Power Fuels simply "take[s] different fuels purchased by Dominion, which they own, and we blend it to whatever specifications they want." (JA 163.)

Dominion's facility is unique in that it only has a nine to ten day supply of fuel at the plant. (JA 163-64.) Typical coal-fired plants have a 60 to 90 day inventory. (JA 164.) Power Fuels provides a service to Dominion by storing an additional eight days of Dominion's fuel. (*Id.*)

The blending performed by Power Fuels according to the daily requirements of the plant's furnace is not the type of work performed by producers of coal. (JA 173.) This type of precision blending is usually performed by the consumer of the coal. (JA 171-74.) If Power Fuels did not perform this work for Dominion, Dominion would have to do the work itself. (JA 174.)

MSHA began its investigation of the Power Fuels site in May 2012 when a MSHA employee saw trucks delivering coal to the Power Fuels site instead of directly to the plant. (JA 108-09, 116.) After visiting the site, the agency decided to assert jurisdiction. (JA 122-123.) The investigator for MSHA was not

7

aware of any instances where the agency has asserted jurisdiction over power plants.  (JA 121.)

The citations in question were issued for defects on inbound trucks. (JA 95.)  These trucks were hired by the producers of the coal, not by Power Fuels. (JA 150.)

## IV.  SUMMARY OF ARGUMENT

This case presents important issues about the extent of MSHA's jurisdiction under the Mine Act.  Power Fuels is a contractor for a utility.  It receives, stores, and blends coal for the utility.  The utility purchases and owns all of the coal that is delivered to Power Fuels.  Power Fuels blends the coal to the daily specifications of the utility.  All of the coal is then delivered to and consumed by the utility at its plant, which is adjacent to Power Fuels.  Power Fuels does not buy any coal, it does not sell any coal, and it does not process any coal.  It simply stores and blends coal as directed by the utility.  This is work the utility would otherwise do itself.

The ALJ determined that Power Fuels is the operator of a "coal or other mine" because it stores and blends the coal.  In reaching this conclusion, the ALJ extended the Mine Act beyond its statutory limits.  A "coal or other mine" includes lands used in the "work of preparing coal."  30 U.S.C. § 802(h)(1). "Work of preparing the coal" is defined to include "mixing, storing, and loading"

8

of coal.  30 U.S.C. § 802(i).  But the activities are limited to the work of preparing

the coal "as is usually done by the operator of the coal mine."  *Id.*  This limitation

is critical.  It excludes mixing, storing, and loading of the type usually performed

by utilities or other consumers of coal.  In particular, mine operators do not

typically mix, store, or load coal produced by other operators.  Without this

limitation, anyone who mixes, stores, or loads coal would be subject to the Mine

Act, which is not what Congress intended.

## V.   ARGUMENT

### A.   *Standard of Review*

When, as in this case, the facts are not in dispute, the Court employs a

plenary standard of review for determining jurisdiction under the Mine Act.

*United Energy Servs., Inc. v. Fed. Mine Safety & Health Admin.*, 35 F.3d 971, 974

(4th Cir. 1994).  The Court reviews an ALJ's application of the law *de novo*.

*Thorn v. Itmann Coal Co.*, 3 F.3d 713, 718 (4th Cir. 1993).  When the facts are in

dispute, any findings of fact of the ALJ will be upheld if supported by substantial

evidence.  30 U.S.C. § 816(a)(1).

### B.   *Under the Mine Act, "Work of Preparing the Coal" Includes Only Those Coal Preparation Activities that Are Usually Done by Mine Operators*

Under 30 U.S.C. § 803, each "coal or other mine" and each "operator

of such mine" are subject to the jurisdiction of the Mine Act.

9

Under 30 U.S.C. § 802(h)(1), "coal or other mine" means:

(A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

Under § 802(h)(1), land and equipment used for "the work of preparing coal or other minerals" is a "coal or other mine." Under 30 U.S.C. § 802(i), the term "work of preparing the coal" means:

the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal *as is usually done by the operator of the coal mine*.

(Emphasis added.)

Mixing, storing, and loading coal are themselves insufficient to support jurisdiction. Otherwise, anyone who handles coal would be covered by the Mine Act. Under § 802(i), the enumerated activities, including mixing, storing, and loading, must be the type performed by the mine operator.

10

In *United Energy Servs.*, 35 F.3d at 973, employees of the operator of a power plant went onto neighboring mine property and loaded coal refuse from a pile and transported it to a location for processing. After processing, the material was transferred to a power plant. The Court was required to decide whether this work constituted "work of preparing the coal" under 30 U.S.C. § 802(i). For guidance, the Court looked to *Norfolk & W. Ry. Co. v. Roberson*, 918 F.2d 1144, 1148 (4th Cir. 1990), in which the Court held that coal preparation ended when the coal "'was processed and graded so as to be in a condition for delivery to distributors and consumers'" (quoting *Roberts v. Weinberger*, 527 F.2d 600, 602 (4th Cir. 1975)). Employing a "functional analysis," the Court found that the plant operator was engaged in the work of preparing the coal. *United Energy Servs.*, 35 F.3d at 975. The Court found it "irrelevant" whether the plant operator was the ultimate consumer of the coal or whether it was preparing the coal for another consumer. *Id*. Instead, the Court's decision turned on whether the plant operator was performing the functions of a mine operator. *Id*. The Court found that the work was the type of work performed by a mine operator. *Id*.

In *Eplion v. Dir., OWCP*, 794 F.2d 935, 937 (4th Cir. 1986), the Court held that an employee handling coal at a separate facility, after it had been shipped from the coal preparation facility, was not involved in "work of preparing the coal" under 30 U.S.C. § 802(i). The Court found that the "coal left the [first] facility

11

processed and ready for use," and the fact that the coal was washed again at the second facility did not mean that second facility was involved in coal preparation. *Id*. The Court declined to extend the definition of a coal mine to include washing that "was not necessary for the processing of the coal into its marketable form." *Id*. The Court distinguished *Roberts*, 527 F.2d at 602, in which jurisdiction was upheld, on the ground that "Roberts' job was an integral part of the process of preparing the coal for market, in contrast to Eplion's job which had nothing to do with the coal until after it had been prepared for market and shipped many miles." *Eplion*, 794 F.2d at 937. *See also Collins v. Dir., OWCP*, 795 F.2d 368, 372 (4th Cir. 1986) ("Traditionally the tipple marks the demarcation point between the mining and the marketing of coal. It is at that structure that the screening of the coal occurs and the final product is loaded for transport. When coal leaves the tipple, extraction and preparation are complete and it is entering the stream of commerce.").

The Eighth Circuit follows the same jurisdictional analysis. In *Herman v. Associated Elec. Coop., Inc.*, 172 F.3d 1078 (8th Cir. 1999), the Eighth Circuit held that "not all businesses that perform tasks listed under 'the work of preparing coal' in § 802(i) can be considered mines." *Id.* at 1082. While utilities may be subject to the Mine Act if they maintain a presence at the mine and assist in mining or loading the coal or if they engage in coal preparation of the type

12

performed by mine operators, "a utility that receives processed coal from a mine does not itself become a 'mine' by further processing the coal for combustion." *Id.* at 1083. Thus, once a producer delivers marketable coal to a utility, the jurisdiction of MSHA ends, even though the utility may do further blending of the product. *Id.*

In finding jurisdiction, the ALJ relied upon *RNS Servs., Inc. v. Sec'y of Labor*, 115 F.3d 182, 184-85 (3d Cir. 1997). That case involved a company that loaded material from a coal refuse site and transported the material to a utility for processing and consumption. In a 2-1 decision, the Third Circuit held that the loading of the coal constituted the "work of preparing" the coal because it occurred "at a place regularly used for that purpose" and "in preparation for further processing." *Id.* at 184. The majority read the phrase "such other work of preparing such coal as is usually done by the operator of the coal mine" to mean simply "work that is usually done in that particular place." *Id.* at 185.

The dissent argued that the Commission had applied an erroneous *per se* ruling making any loading of coal subject to the Act. *See id.* at 189-92 (Alito, J., dissenting). Then Circuit Judge Alito concluded that such an interpretation "extends MSHA jurisdiction to an unreasonable degree that Congress cannot have intended." *Id.* at 191. Judge Alito also disagreed with the majority's interpretation of "such other work of preparing such coal as is usually done by the operator of the

13

coal mine." He found that the phrase means such work "as is done by the typical coal mine operator." *Id*. The activity must not only be one of the enumerated activities in § 802(i), it must also be the type of work usually performed by a coal mine operator. *Id*. at 192.

The ALJ also relied upon *Kinder Morgan Operating, L.P. "C" v. Chao*, 78 Fed. Appx. 462, 463 (6th Cir. 2003) (unpublished), wherein the Sixth Circuit held that a facility that received and blended processed coal from various producers was subject to the Mine Act. The Commission had split 2-2 on whether the Act applied to the operation. *Id*. at 464. As an unpublished decision, this opinion has "no precedential weight." *Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir. 1996).

Under the functional analysis employed by this Court, the agency lacks jurisdiction unless the work of preparing the coal is the type of work usually performed by the mine operator, as opposed to the utility or other consumer. It is not enough that the work simply be the type of work that is regularly performed at the site. Otherwise, any mixing, storing, or loading of coal that is usually performed at a site would constitute the "work of preparing the coal," and the phrase "and such other work of preparing such coal as is usually done by the operator of the coal mine" would have no significant meaning.

14

C.    *The Activities of Power Fuels Are Not "Work of Preparing the Coal" Because They Are Not the Type Usually Done By the Mine Operator*

The key facts in this case are undisputed:

- Dominion purchases coal from various producers.  (JA 149-51.)

- The coal is delivered to the Power Fuels site by truckers hired by the producers.  (JA 150.)

- Dominion owns all of the coal that is delivered to the site.  (JA 149-51, 163.)

- Power Fuels is a contractor for Dominion under a Terminalling Agreement.  (JA 147, 229.)

- Power Fuels works only for Dominion.  (JA 97.)

- Dominion is the sole consumer of the coal at the Power Fuels site. (JA 146, 149-50.)

- Power Fuels weighs, samples, and stores the coal for Dominion. (JA 151-53.)

- Dominion instructs Power Fuels how to precision blend and deliver the coal.  (JA 151-53, 156-57.)

- Dominion's specifications for the fuel going into its plant change on a daily basis to achieve the desired heat rate in the plant's furnace.  (JA 130-31, 143, 173.)

15

- Power Fuels performs precision blending, sampling, and analysis work to meet the furnace's daily requirements.  (JA 172-74.)

- Power Fuels does not do the type of work done by coal producers, such as washing, screening, or sizing coal.  (JA 162-63, 171-73.)

- The producers perform all necessary processing to meet Dominion's general specifications before it is delivered to Power Fuels.  (JA 162-63.)

- The producers deliver some coal directly to Dominion's plant rather than to Power Fuels.  (JA 138, 172-73.)

- Typical coal-fired plants have a 60 to 90 day inventory of fuel, but Dominion has only a nine to ten day supply.  Power Fuels provides a service to Dominion by storing an additional eight days of Dominion's coal on site.  (JA 163-64.)

- If Power Fuels did not store and blend the coal for Dominion, Dominion would have to do the work itself or find another contractor to do it.  (JA 174.)

- The work of Power Fuels is not the type of work performed by producers of coal.  (JA 171-174.)

As discussed above, MSHA has jurisdiction under the Act only if the activities listed in 30 U.S.C. § 802(i) are usually done by coal mine operators.  If

16

the mixing, storing, and loading is the type of work usually performed by mine operators, the work is subject to the Act. On the other hand, if the work is not of that type, but is work of the type usually performed by utilities or other consumers of coal, the work is not subject to the Act. Based on the undisputed evidence, the work of Power Fuels is not of the type usually performed by mine operators.

Mine operators do not perform the type of precision blending that Power Fuels does for Dominion. (JA 163-64, 171-74.) In particular, mine operators do not blend coal from a variety of producers. On the other hand, utilities and other consumers generally sample and blend coal products to meet their particular needs. (*Id.*) In this case, Power Fuels works for Dominion, and only for Dominion. (JA 146.) The fuel it handles is purchased by Dominion and owned by Dominion. (JA 149-51, 163.) The specialized work of Power Fuels to meet the day-to-day specifications of Dominion is not performed by mine operators. (JA 172-74.) By the same token, Power Fuels does not do the mining and processing work typically performed by coal producers. (JA 162-63, 171-72.)

In ignoring the distinction between work usually performed by mine operators and work usually done by consumers of coal, the ALJ failed to perform the "functional analysis" required in this case. *United Energy Servs.*, 35 F.3d at 975. The ALJ found that "Power Fuels is a stand-alone coal blending facility" engaged in "receipt, testing, weighing, blending, mixing, storage, and

17

transportation of coal from that site in order to meet the coal specifications that are communicated to the respondent by Dominion Power on a daily continual basis." (JA 332). According to the ALJ, Dominion is Power Fuels' "customer." (JA 331, 333). The ALJ held that MSHA has jurisdiction over any person that engages in any of the activities enumerated in the statute as long as the person handles coal for another party who is the ultimate consumer. The ALJ thus avoided any analysis of whether the person's activities are functionally similar to those of a mine operator or those of a utility or other consumer. Because Power Fuels was not the consumer, but a contractor for the consumer, the ALJ found that Power Fuels was subject to the Mine Act.

The Court has plainly ruled, however, that "[t]he statute sets forth a functional analysis, not one turning on the identity of the consumer." *United Energy Servs.*, 35 F.3d at 975. Under this standard, it is "irrelevant" that Power Fuels is a contractor for the ultimate consumer and not the consumer itself. *Id*. In *United Energy Servs.*, the utility's activities at neighboring mine property were subject to the Mine Act, even though the utility was the ultimate consumer of the coal, because it was performing activities similar to those of the mine operator. *Id*. Here we have the converse. Power Fuels is not subject to the Mine Act, even though it is not the ultimate consumer of the coal, because it is performing activities of the type performed by a utility or other consumer, not a mine operator.

18

Otherwise, any person who handles coal who is not the ultimate consumer of the coal would be subject to MSHA jurisdiction. Labeling Dominion a "customer" of Power Fuels does not make Power Fuels a mine operator. As in *Eplion*, the blending and storage activities performed by Power Fuels were "not necessary for the processing of the coal into its marketable form," and the definition of a coal mine does not extend to such activities. *Eplion*, 794 F.2d at 937.

       The ALJ also improperly focused on the fact that the coal is handled and stored by Power Fuels at a place "regularly used for that purpose." (JA 331.) This is another categorical rule that avoids any functional analysis of Power Fuels' operations. All utilities and other consumers of coal who handle coal on a regular basis handle coal at places "regularly used for that purpose." This finding does not help determine whether the work is of the type typically performed by a mine operator or coal producer, as opposed to a consumer.

       The ALJ failed to apply the required functional analysis to Power Fuels' operations. Doing so leads directly to the conclusion that Power Fuels is not engaged in "work of preparing the coal." Unlike a mine operator, "Power Fuels has never done anything to improve any quality of any fuel product." (JA 172.) Power Fuels does not screen, wash, or size the coal. (JA 163, 172.) Dominion, and not Power Fuels, purchases the fuel in marketable form, directly from the producers. (JA 149-51, 163.) Mine operators do not typically handle coal

19

produced by other operators.  Power Fuels simply takes the material "brought in there by Dominion and put[s] it into a blend to fuel their furnace."  (JA 172.)  This is work that a utility would generally do itself.  (JA 174.)  The unique work that Power Fuels does to meet the day-to-day burn for Dominion's furnace is not the work of mine operators.  (JA 162-63, 171-74.)

> D.    To the Extent that the ALJ Made Contrary
>        Findings of Fact, Such Findings Are Not
>        Supported by Substantial Evidence

In his decision, the ALJ made certain statements that appear to be conclusions of law but that respondents may contend are findings of fact.  For instance, the ALJ said he was "not persuaded by [Power Fuels'] arguments that the work it performs for Dominion Power is work that is usually performed by utilities or other coal consumers, and is not the type of work performed by coal producers or brokers."  (JA 332.)   The ALJ also stated, "I am not further persuaded by [Power Fuels'] argument that if it did not store and blend the coal for Dominion, Dominion would have done the work itself or find another contractor to do it."  (JA 332.)  Finally, the ALJ stated that "I find the credible evidence with respect to the testing, blending, and re-blending as necessary, are directly accomplished in order to insure and maintain the consistent quality of the coal pursuant to Dominion's quality specifications."  (JA 333.)  If these statements were intended to be findings of fact, they are not supported by substantial evidence.

20

The undisputed facts are discussed at length above.  First, there was no evidence that Power Fuels does the type of work performed by coal producers. As discussed above, the unique work that Power Fuels does to meet the day-to-day burn for Dominion's furnace is not work usually performed by coal producers.  (JA 172-74.)  Power Fuels does not do the mining and processing work typically performed by coal producers.  (JA 162-63, 171-72.)  Second, there was no evidence to contradict the fact that if Power Fuels did not store and blend the coal for Dominion, Dominion would have to do the work itself.  (JA 174.)  Third, unlike mine operators and producers of coal, "Power Fuels has never done anything to improve any quality of any fuel product."  (JA 172.)  Power Fuels does not screen, wash, or size the coal.  (JA 163, 172.)  Power Fuels simply takes coal "brought in there by Dominion and put[s] it into a blend to fuel their furnace."  (JA 172.)  There is no evidence to support any findings to the contrary.

VI.  CONCLUSION

For the reasons stated, the Court should grant the petition for review, reverse the decision of the agency, and vacate the citations.

STATEMENT REGARDING ORAL ARGUMENT

This appeal presents important issues about the extent of MSHA's jurisdiction under the Mine Act.  As a result, oral argument is warranted.


Respectfully submitted,

POWER FUELS, LLC

By Counsel


Wade W. Massie
Seth M. Land
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia  24212
Telephone:  276/628-5151
Facsimile:  276/628-5621
wmassie@pennstuart.com

By _/s/ Wade W. Massie_____
    Wade W. Massie

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. <u>14-1450</u>        **Caption:** <u>Power Fuels, LLC v. Federal Mine Safety and Health</u>

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✔] this brief contains _____4991_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✔] this brief has been prepared in a proportionally spaced typeface using
   Word _____ [*identify word processing program*] in
   14-point Times New Romas _____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) <u>Wade W. Massie</u>

Attorney for <u>Power Fuels, LLC</u>

Dated: <u>June 10, 2014</u>

CERTIFICATE OF SERVICE

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this 10th day of June, 2014, filed the required copies of the foregoing Petitioner's Opening Brief in the Office of the Clerk of the United States Court of Appeals for the Fourth Circuit, via hand delivery and have electronically filed the Opening Brief using the Court's CM/ECF system which will send notification of such filing to the following counsel:

> John T. Sullivan, Esq.
> FMSHRC Office of General Counsel
> 1331 Pennsylvania Avenue, NW, Suite 520N
> Washington, D.C. 20004-1710
> Phone:  202/434-9929
> jsullivan@fmshrc.gov
>
> Sara L. Johnson, Esq.
> U.S. Department of Labor
> 1100 Wilson Blvd., 22nd Floor
> Arlington, VA  22209
> Phone:  202/693-9332
> johnson.sara.l@dol.gov

> */s/ Wade W. Massie*
> Wade W. Massie

24

ADDENDUM:  STATUTES INVOLVED

Pursuant to Fed. R. App. P. 28(f), Power Fuels submits this addendum containing the relevant parts of statutes necessary to the resolution of the issues presented by this petition.

UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

\*\*\* Current through PL 113-107, approved 5/24/14 \*\*\*

TITLE 30. MINERAL LANDS AND MINING
CHAPTER 22. MINE SAFETY AND HEALTH

**Go to the United States Code Service Archive Directory**

*30 USCS § 802*

§ 802.  Definitions

For the purpose of this Act, the term--

(a) "Secretary" means the Secretary of Labor or his delegate;

(b) "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between a place in a State and any place outside thereof, or within the District of Columbia or a possession of the United States, or between points in the same State but through a point outside thereof;

(c) "State" includes a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands;

(d) "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine;

(e) "agent" means any person charged with responsibility for the operation of all or a part of a coal or other mine or the supervision of the miners in a coal or other mine;

30 USCS § 802

(f) "person" means any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization;

(g) "miner" means any individual working in a coal or other mine;

(h) (1) "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this Act, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment;

(2) For purposes of titles II, III, and IV [*30 USCS §§ 841 et seq., 861 et seq., and 901 et seq.*], "coal mine" means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities;

(i) "work of preparing the coal" means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine;

(j) "imminent danger" means the existence of any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated;

(k) "accident" includes a mine explosion, mine ignition, mine fire, or mine inundation, or injury to, or death of, any person;

(l) "mandatory health or safety standard" means the interim mandatory health or safety standards established by titles II and III of this Act [*30 USCS §§ 841* et seq. and *861* et seq.], and the standards promulgated pursuant to title I of this Act [*30 USCS §§ 811* et seq.];

(m) "Panel" means the Interim Compliance Panel established by this Act; and

(n) "Administration" means the Mine Safety and Health Administration in the Department of Labor.

(o) "Commission" means the Federal Mine Safety and Health Review Commission.

UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-107, approved 5/24/14 ***

TITLE 30. MINERAL LANDS AND MINING
CHAPTER 22. MINE SAFETY AND HEALTH

**Go to the United States Code Service Archive Directory**

*30 USCS § 803*

§ 803.   Mines subject to coverage

Each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to the provisions of this Act.