RECORD NO. 14-1450

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

POWER FUELS, LLC,

*Petitioner,*

v.

FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION;
SECRETARY OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION,

*Respondents.*

APPEAL FROM AN ORDER OF
THE FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION

**JOINT APPENDIX**

Wade W. Massie
Seth M. Land
Penn, Stuart & Eskridge
208 East Main Street
Post Office Box 2288
Abingdon, Virginia 2421-2288
(276) 623-4422

John T. Sullivan
Federal Mine Safety &
Health Review Commission
Suite 520N
1331 Pennsylvania Ave., NW
Washington, DC 20004-1710
(202) 434-9929

Sara L. Johnson
U. S. Department of Labor
Office of the Solicitor
Room 2208
1100 Wilson Boulevard
Arlington, VA 22209-2296
(202) 693-9332

*Counsel for Petitioner*
Power Fuels, LLC

*Counsel for Respondent*
*Federal Mine Safety & Health*
*Review Commission*

*Counsel for Respondent*
*Secretary of Labor, Mine*
*Safety & Health Administration*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# TABLE OF CONTENTS

Certified Index to Materials Comprising the Administrative Record Filed
Pursuant to Rule 17(b) of the Federal Rules of Appellate Procedure .................... 1

Citation No. 8204724 (Docket No. 2013-312-R) ...................................................... 5

Citation No. 8204725 (Docket No. 2013-313-R) ...................................................... 7

Citation No. 8204726 (Docket No. 2013-353-R) ...................................................... 8

Notice of Contest of 8204724 and 8204725 (Docket Nos. 2013-312-R and
2013-313-R) ............................................................................................................. 9

Notice of Contest of 8204726 (Docket Nos. 2013-353-R) ..................................... 15

Proposed Assessment and Statement of Account ................................................... 19

Petition for Assessment of Civil Penalty (Docket No. 2013-403) ........................ 23

Answer to Petition for Assessment of Civil Penalty (Docket No. 2013-403) ....... 47

Transcript of Content Proceedings
Before Administrative Law Judge George A. Koutras
On November 19, 2013 ........................................................................................... 50
    Preliminary Proceedings .................................................................................. 54
    Opening Statement by Mr. Jones (for Petitioner) ........................................... 58
    Opening Statement by Mr. Massie (for Respondent) ...................................... 59
    Rebuttal Statement by Mr. Jones (for Petitioner) ........................................... 66

    Testimony of Thomas R. Bower
        Direct Examination by Mr. Jones ........................................................ 69
        Cross Examination by Mr. Massie ....................................................... 93
        Redirect Examination by Mr. Jones ..................................................... 102

    Testimony of Robert D. Clay
        Direct Examination by Mr. Jones ........................................................ 105

    Cross Examination by Mr. Massie................................................................ 116

    Redirect Examination by Mr. Jones .......................................................... 125

Testimony of Walter B. Crickmer

    Direct Examination by Mr. Massie.............................................................. 128

    Cross Examination by Mr. Jones ................................................................ 175

    Redirect Examination by Mr. Massie ........................................................ 178

Proceedings ....................................................................................................... 179

Exhibits to Contest Proceedings:

ALJ Exhibit 1:   Joint Stipulations.................................................................. 220

Government Exhibit 1:  Citation No. 8204724............................................... 222

Government Exhibit 2:  Citation No. 8204725............................................... 225

Government Exhibit 3:  Citation No. 8204726............................................... 227

Government Exhibit 4:  Terminalling Agreement.......................................... 229

Government Exhibit 5:  Photograph ................................................................ 263

Government Exhibit 6:  Photograph ................................................................ 264

Government Exhibit 7:  Photograph ................................................................ 265

Respondent Exhibit 1:  Aerial Photograph .................................................. 266

Respondent Exhibit 2:  Survey Map .............................................................. 267

Respondent Exhibit 3:  Blending Instruction Sheet ..................................... 268

Respondent Exhibit 4:  Photograph ............................................................... 277

Respondent Exhibit 5:  Photograph ............................................................... 278

Respondent Exhibit 6:  Photograph ............................................................... 279

Briefing Order

Dated December 16, 2013 ................................................................ 280

Respondent's Post-Hearing Memorandum
Dated January 13, 2014 ................................................................ 281

Secretary's Post-Hearing Brief
Dated January 16, 2014................................................................ 295

Decision of Federal Mine Safety and Health Review Commission
Dated March 10, 2014........................................................... 311

Petition for Discretionary Review by Power Fuels, LLC
Dated March 25, 2014................................................................ 338

Notice Denying Petition for Discretionary Review
Dated April 18, 2014................................................................ 359

Power Fuels, LLC's Petition for Review to the United States Court of Appeals
For the Fourth Circuit with attachments
Filed May 6, 2014 ................................................................ 361

## IN THE U.S. COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

POWER FUELS, LLC,                                    :
                                                    :
                        v.                          :    No. 14-1450
                                                    :
SECRETARY OF LABOR, MSHA, AND                       :
  the FEDERAL MINE SAFETY AND HEALTH                :
  REVIEW COMMISSION,                                :
             Respondents                            :

## CERTIFIED INDEX TO MATERIALS COMPRISING THE ADMINISTRATIVE
## RECORD FILED PURSUANT TO RULE 17(b) OF THE FEDERAL RULES
## OF APPELLATE PROCEDURE

CONTENTS                                                              PAGE

Notice of Contest of Citations 8204724 and 8204725 filed by Power Fuels, LLC
with the Federal Mine Safety and Health Review Commission
(FMSHRC) on April 26, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-6

Notice of Docketing cases as VA 2013-312-R and VA 2013-313-R, issued by
the FMSHRC on April 29, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Notice of Contest of Citation 8204726 filed by Power Fuels, LLC with the Federal
Mine Safety and Health Review Commission May 15, 2013. . . . . . . . . . . . . . . . . . . . . 8-11

Notice of Docketing case as VA 2013-353-R, issued by FMSHRC on May 15, 2013. . . . . . 12

Order of Assignment of cases to Administrative Law Judge Michael Zielinski
on July 23, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

Petition for the Assessment of Civil Penalty filed by the Secretary of Labor against Power
Fuels, LLC, docket No. VA2013-403, with FMSHRC on July 16, 2013 . . . . . . . . . . . . . . 15-41

Answer to VA 2013-403 filed by Power Fuels on July 19, 2013 . . . . . . . . . . . . . . . . . . 42-45

Notice of Designation for Simplified Proceedings and Order of Assignment for
VA 2013-403 issued by Chief Judge Robert Lesnick on July 23, 2013. . . . . . . . . . . . . . 46-51

1

Entry of Appearance of Wade Massie for Power Fuels in all cases, filed July 31, 2013... 52-56

Notice of Hearing issued by Judge Koutras on August 27, 2013. . . . . . . . . . . . . . . 56A–56C

Entry of Appearance of Anthony Jones for the Secretary of Labor, filed September 3, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-60

Secretary's Motion to Discontinue Simplified Proceedings in VA 2013-403, filed September 26, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-65

Joint Motion to Consolidate Proceedings and Schedule Proceedings for Trial filed for all cases on September 26, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66-76

Order of Reassignment to Judge George Koutras issued by Chief Judge Lesnick on October 17, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77-78

Consolidation Order and Order Continuing Hearing issued by Judge Koutras on September 30, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79–81

Supplemental Notice of Hearing issued by Judge Koutras on October 29, 2013. . . . . . . . . 82

Supplemental Disclosure filed by Power Fuels on November 14, 2013. . . . . . . . . . . . . . 83-86

Prehearing Statement filed by Secretary of Labor on November 15, 2013. . . . . . . . . . . . 87-93

Transcript of Hearing held November 19, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . 94-234
    ALJ Exhibit 1 - Joint Stipulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235-236
    Government Exhibit 1-3- Citations 8204724, 8204725, 8204726. . . . . . . . . . . 237-243
    Government Exhibit 4 - Terminalling Agreement w/Exhibits. . . . . . . . . . . . . 244-277
    Government Exhibit 5, 6,7 - photos. . . . . . . . . . . . . . . . . . . . . . . . . . . . 278-280
    Respondent's Exhibit 1 - Photo of Fuel Handling Facility. . . . . . . . . . . . . . . . 281
    Respondent's Exhibit 2 - Drawing of Fuel Handling Facility. . . . . . . . . . . . . . . 282
    Respondent's Exhibit 3 - E-mail from Christina Rodi re: Blends. . . . . . . . . . . . 283-291
    Respondent's Exhibits 4, 5, 6 - photos. . . . . . . . . . . . . . . . . . . . . . . . . . 292-294

Briefing Order issued by Judge Koutras on December 16, 2013 . . . . . . . . . . . . . . . . . . 295

Power Fuels Post-Hearing Brief filed January 13, 2014 . . . . . . . . . . . . . . . . . . . . . . 296-310

Secretary's Post-Hearing Brief filed January 16, 2014 . . . . . . . . . . . . . . . . . . . . . . . 311-327

Decision issued by Judge Koutras on March 10, 2014 affirming citations. . . . . . . . . . . 328-354

2

Petition For Discretionary Review filed by Power Fuels, LLC on March 26, 2014. . . . 355-375

Notice issued by the Federal Mine Safety & Health Review Commission that there are
no votes to grant the Petition for Review, issued April 18, 2014. . . . . . . . . . . . . . . . . . 376-377

3

## CERTIFICATE

I, JEAN H. ELLEN, Chief Docket Clerk, Federal Mine Safety and Health Review Commission, hereby certify that the foregoing is a true and correct Index to Materials Comprising the Administrative Record in the captioned proceeding.

/s/_____
JEAN H. ELLEN

4

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

**Section I—Violation Data**

| 1. Date    Mo Da  Yr<br>04/09/2013 | 2. Time (24 Hr. Clock)<br>1110 | 3. Citation/<br>Order Number    8204724 |
|---|---|---|

| 4. Served To<br>Mike Hendrickson, Foreman | 5. Operator<br>POWER FUELS, LLC |
|---|---|

| 6. Mine<br>POWER FUEL BLENDING TERMINAL | 7. Mine ID    44-07303    (Contractor) |
|---|---|

| 8. Condition or Practice | 8a. Written Notice (103g) |
|---|---|

Braking defects are present on the Hills Trucking 9900 International Tractor/Trailer Coal Truck (company # 114, serial # 2HSCHAPT35C015532}. The right side steering axle brake on the tractor is out of adjustment. This is a type 20 canister with a maximum pushrod stroke of 1 and 3/4 inches. When the driver engaged the service brakes, the pushrod traveled 2.5 inches. Measurement taken with a standard rule. Both rear axle brakes on the Benson Dump Trailer (tag # 287-977) being pulled by tractor # 114 are inoperative. When the driver engaged the service brakes, neither brake on the rear axle of the trailer would function. The brake pushrods would not move. There is no braking force at all being applied to the rear trailer axle brakes. This unit hauls coal into this Surface Facility under the direction of the mine operator. The Tractor/Trailer travels the same

See Continuation Form (MSHA Form 7000-3a) ☑

| 9. Violation | A. Health ☑<br>Safety<br>Other ☐ | B. Section<br>of Act | C. Part/Section of<br>Title 30 CFR    77.1605(b) |
|---|---|---|---|

**Section II—Inspector's Evaluation**

10. Gravity:

| A. Injury or illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☑ | Highly Likely ☐ | Occurred ☐ |
|---|---|---|---|---|---|

| B. Injury or illness could rea-<br>sonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | Permanently Disabling ☑ | Fatal ☐ |
|---|---|---|---|---|

| C. Significant and Substantial: | Yes ☑ | No ☐ | D. Number of Persons Affected:    002 |
|---|---|---|---|

| 11. Negligence (check one) | A. None ☐ | B. Low ☑ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action    104(a) | 13. Type of Issuance (check one)    Citation ☑    Order ☐    Safeguard ☐    Written Notice ☐ |
|---|---|

| 14. Initial Action<br>A. Citation ☐    B. Order ☐    C. Safeguard ☐    D. Written Notice ☐ | E. Citation/<br>Order Number | F. Dated    Mo Da  Yr |
|---|---|---|

15. Area or Equipment

| 16. Termination Due | A. Date    Mo Da  Yr<br>04/09/2013 | B. Time (24 Hr. Clock)    1200 |
|---|---|---|

**Section III—Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date    Mo Da  Yr | B. Time (24 Hr. Clock |
|---|---|---|

**Section IV—Automated System Data**

| 19. Type of Inspection<br>(activity code)    E01 | 20. Event Number    4409106 | 21. Primary or Mill |
|---|---|---|

| 22. Signature    Thomas R. Bower | 23. AR Number    24508 |
|---|---|

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small business about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

**5**

Mine Citation/Order
Continuation

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I—Subsequent Action/Continuation Data

| 1. Subsequent Action | 1a. Continuation ☑ | 2. Dated (Original Issue) | Mo Da Yr 04/09/2013 | 3. Citation/Order Number 8204724 |
|---|---|---|---|---|

| 4. Served To | 5. Operator |
|---|---|
| Mike Hendrickson, Foreman | POWER FUELS, LLC |

| 6. Mine | 7. Mine ID | (Contractor) |
|---|---|---|
| POWER FUEL BLENDING TERMINAL | 44-07303 | |

Section II—Justification for Action

Continuation of 8. Condition or Practice

```
roadways and in the same areas that mine personnel use.  The driver removed
the tractor and trailer from service until repairs are completed.
```

See Continuation Form ☐

Section III—Subsequent Action Taken

| 8. Extended To | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | C. Vacated ☐ | D. Terminated ☐ | E. Modified ☐ |
|---|---|---|---|---|---|---|

Section IV—Inspection Data

| 9. Type of Inspection | E01 | 10. Event Number | 4409106 | | |
|---|---|---|---|---|---|

| 11. Signature | AR Number | 12. Date | Mo Da Yr | 13. Time (24 Hr. Clock) |
|---|---|---|---|---|
| Thomas R. Bower | 24508 | | 04/09/2013 | 1110 |

MSHA Form 7000-3a, Mar 85 (revised)

6

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

**Section I–Violation Data**

| 1. Date  Mo Da Yr  04/09/2013 | 2. Time (24 Hr. Clock)  0900 | | 3. Citation/ Order Number  8204725 |
|---|---|---|---|
| 4. Served To  Mike Hendrickson, Foreman | | 5. Operator  POWER FUELS, LLC | |
| 6. Mine  POWER FUEL BLENDING TERMINAL | | 7. Mine ID  44-07303 | (Contractor) |

**8. Condition or Practice** — **8a. Written Notice (103g)** ☐

The back up alarm provided on the Presley Trucking 379 Peterbilt Tractor/Trailer (company # 132, serial # 1XP-5D40X-6N897015) is not being maintained in functional condition. When the driver placed the transmission into reverse, the back-up alarm failed to function. There is a broken wire on the back up alarm. This Tractor/Trailer is used to haul coal into this Surface Facility under the direction of the mine operator and backs up in congested areas at times while dumping. This Tractor/Trailer frequently operates in areas where mine personnel work and travel.

See Continuation Form (MSHA Form 7000-3a) ☐

| 9. Violation | A. Health ☐  Safety ☑  Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR  77.410(c) |
|---|---|---|---|

**Section II–Inspector's Evaluation**

10. Gravity:

A. Injury or illness (has) (is): No Likelihood ☐  Unlikely ☐  Reasonably Likely ☑  Highly Likely ☐  Occurred ☐

B. Injury or illness could reasonably be expected to be: No Lost Workdays ☐  Lost Workdays Or Restricted Duty ☐  Permanently Disabling ☑  Fatal ☐

C. Significant and Substantial: Yes ☑  No ☐ — D. Number of Persons Affected: 001

11. Negligence (check one): A. None ☐  B. Low ☑  C. Moderate ☐  D. High ☐  E. Reckless Disregard ☐

12. Type of Action  104(a) — 13. Type of Issuance (check one) Citation ☑  Order ☐  Safeguard ☐  Written Notice ☐

14. Initial Action  A. Citation ☐  B. Order ☐  C. Safeguard ☐  D. Written Notice ☐  E. Citation/ Order Number — F. Dated  Mo Da Yr

15. Area or Equipment

| 16. Termination Due | A. Date  Mo Da Yr  04/09/2013 | B. Time (24 Hr. Clock)  1200 | |
|---|---|---|---|

**Section III–Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date  Mo Da Yr | B. Time (24 Hr. Clock | |
|---|---|---|---|

**Section IV–Automated System Data**

| 19. Type of Inspection (activity code)  E01 | 20. Event Number  4409106 | 21. Primary or Mill | |
|---|---|---|---|
| 22. Signature  Thomas R. Bower | | 23. AR Number  24508 | |

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. This Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

**Section I–Violation Data**

| 1. Date Mo Da Yr 04/09/2013 | 2. Time (24 Hr. Clock) 0850 | | 3. Citation/ Order Number 8204726 |
|---|---|---|---|

| 4. Served To Mike Hendrickson, Foreman | 5. Operator POWER FUELS, LLC |
|---|---|

| 6. Mine POWER FUEL BLENDING TERMINAL | 7. Mine ID 44-07303 | (Contractor) |
|---|---|---|

| 8. Condition or Practice | 8a. Written Notice (103g) |
|---|---|

Braking defects are present on the Presley Trucking 379 Peterbilt Tractor/Trailer Coal Truck (company # 132, serial # 1XP-5D40X-6N897015). The left front steering axle brake is out of adjustment. This is a type 20 brake canister and maximum pushrod stroke is 1 and 3/4 inches. When the driver engages the service brakes, this brake pushrod is stroking 2 and 1/4 inches. Measurement taken with a standard rule. There is also a brake air leak present on the Mac Dump Trailer (tag # 401-482) being pulled by this Tractor. When the driver engages the service brakes, air is leaking continuously through a defective air brake valve located above the center axle on the trailer. This Tractor and Trailer is being used to haul coal into this Surface Facility under the direction of the mine operator and travels the same roadways and in the same areas that mine personnel use.

See Continuation Form (MSHA Form 7000-3a)

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR 77.1605(b) |
|---|---|---|---|

**Section II–Inspector's Evaluation**

| 10. Gravity: | | | | | | |
|---|---|---|---|---|---|---|
| A. Injury or illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☑ | Highly Likely ☐ | Occurred ☐ | |
| B. Injury or illness could reasonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | Permanently Disabling ☑ | Fatal ☐ | | |
| C. Significant and Substantial: | Yes ☑ | No ☐ | D. Number of Persons Affected: | 002 | | |

| 11. Negligence (check one) | A. None ☐ | B. Low ☑ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action 104(a) | 13. Type of Issuance (check one) Citation ☑ Order ☐ Safeguard ☐ Written Notice ☐ |
|---|---|

| 14. Initial Action A. Citation ☐ B. Order ☐ C. Safeguard ☐ D. Written Notice ☐ | E. Citation/ Order Number | F. Dated Mo Da Yr |
|---|---|---|

15. Area or Equipment

| 16. Termination Due | A. Date Mo Da Yr 04/09/2013 | B. Time (24 Hr. Clock) 1200 |
|---|---|---|

**Section III–Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date Mo Da Yr | B. Time (24 Hr. Clock) | |
|---|---|---|---|

**Section IV–Automated System Data**

| 19. Type of Inspection (activity code) E01 | 20. Event Number 4409106 | 21. Primary or Mill |
|---|---|---|

| 22. Signature Thomas R. Bower | 23. AR Number 24508 |
|---|---|

MSHA Form 7000-3, Apr 08 (revised) In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| POWER FUELS, LLC | ) | CONTEST PROCEEDING |
| | ) | |
| | ) | Docket No. VA |
| Contestant, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Citations Nos. 8204724 |
| | ) | 8204725 |
| SECRETARY OF LABOR, UNITED | ) | |
| STATES DEPARTMENT OF LABOR, | ) | |
| MINE SAFETY AND HEALTH | ) | Power Fuels Blending Terminal |
| ADMINISTRATION, | ) | Mine ID: 44-07303 |
| | ) | |
| Respondent. | ) | |

<u>NOTICE OF CONTEST</u>

Contestant, Power Fuels, LLC ("Power Fuels"), by counsel, for its notice of

contest of a citations issued by the Secretary of Labor, Mine Safety and Health

Administration ("MSHA"), states as follows:

      1.    In this proceeding, Power Fuels contests a citation issued by MSHA

for an alleged violation of the Federal Mine Safety and Health Act of 1977, 30 U.S.C.

§ 801 et seq. ("Mine Act"). Power Fuels is not an "operator" under the Mine Act, and its

facility is not a "mine" under the Mine Act. As a result, MSHA did not have jurisdiction

to issue the citation, and the citation should be vacated.

      2.    On April 9, 2013, MSHA issued Citation No. 8204724 to Power

Fuels under § 104(a) of the Mine Act for an alleged violation of 30 C.F.R. § 77.1605(b).

Abingdon: 848398-1

---

-2-

A copy of the citation is attached as Exhibit 1. The citation alleges braking defects on the Hills Trucking 9900 International Tractor/Trailer Coal Truck.

3.     On April 9, 2013, MSHA issued Citation No. 8204725 to Power Fuels under § 104(a) of the Mine Act for an alleged violation of 30 C.F.R. § 77.410(c). A copy of the citation is attached as Exhibit 2. The citation alleges failure of the back up alarm provided on the Presley Trucking 379 Peterbilt Tractor/Trailer.

4.     Power Fuels is not an "operator" under the Mine Act.

5.     The location of the alleged violations is not a "mine" under the Mine Act.

6.     Power Fuels did not own or operate the vehicles in question.

7.     MSHA lacks jurisdiction over Power Fuels and its activities.

8.     Power Fuels did not violate the Mine Act.

9.     The citations were improperly issued and lack a factual and legal basis.

WHEREFORE, Power Fuels contests the issuance of the citations and requests that the citations be vacated and that Power Fuels be awarded its costs, expenses, and attorney's fees.

POWER FUELS, LLC

By Counsel

Abingdon: 848398-1

-3-

Wade W. Massie
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
Telephone: 276/628-5151
Facsimile: 276/628-5621
wmassie@pennstuart.com

By _____
    Wade W. Massie

## CERTIFICATE

I hereby certify that a true copy of the foregoing has been sent by overnight delivery to Douglas N. White, Esq., U.S. Department of Labor, Office of the Regional Solicitor, 1100 Wilson Boulevard, 22nd Floor West, Arlington, Virginia 22209-2247, and to Lisa M. Boyd, Executive Director, Federal Mine Safety and Health Review Commission, 1331 Pennsylvania Ave., NW, Suite 520N, Washington, DC 20004-1710, this 25th day of April, 2013.

_____
        Wade W. Massie

Abingdon: 848398-1

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

**Section I—Violation Data**

| 1. Date    Mo Da Yr    04/09/2013 | 2. Time (24 Hr. Clock)    1110 | 3. Citation/Order Number    8204724 |
|---|---|---|

| 4. Served To    Mike Hendrickson, Foreman | 5. Operator    POWER FUELS, LLC |
|---|---|

| 6. Mine    POWER FUEL BLENDING TERMINAL | 7. Mine ID    44-07303    (Contractor) |
|---|---|

| 8. Condition or Practice | 8a. Written Notice (103g) |
|---|---|

Braking defects are present on the Hills Trucking 9900 International Tractor/Trailer Coal Truck (company # 114, serial # 2HSCHAPT35C015532). The right side steering axle brake on the tractor is out of adjustment. This is a type 20 canister with a maximum pushrod stroke of 1 and 3/4 inches. When the driver engaged the service brakes, the pushrod traveled 2.5 inches. Measurement taken with a standard rule. Both rear axle brakes on the Benson Dump Trailer (tag # 287-977) being pulled by tractor # 114 are inoperative. When the driver engaged the service brakes, neither brake on the rear axle of the trailer would function. The brake pushrods would not move. There is no braking force at all being applied to the rear trailer axle brakes. This unit hauls coal into this Surface Facility under the direction of the mine operator. The Tractor/Trailer travels the same

See Continuation Form (MSHA Form 7000-3a) ☑

| 9. Violation | A. Health ☑    Safety ☑    Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR    77.1605(b) |
|---|---|---|---|

**Section II—Inspector's Evaluation**

**10. Gravity:**

A. Injury or illness (has) (is):   No Likelihood ☐   Unlikely ☐   Reasonably Likely ☑   Highly Likely ☐   Occurred ☐

B. Injury or illness could reasonably be expected to be:   No Lost Workdays ☐   Lost Workdays Or Restricted Duty ☐   Permanently Disabling ☑   Fatal ☐

C. Significant and Substantial:   Yes ☑   No ☐        D. Number of Persons Affected:   002

| 11. Negligence (check one)   A. None ☐   B. Low ☑   C. Moderate ☐   D. High ☐   E. Reckless Disregard ☐ |
|---|

| 12. Type of Action    104(a) | 13. Type of Issuance (check one)   Citation ☑   Order ☐   Safeguard ☐   Written Notice ☐ |
|---|---|

**14. Initial Action**

| A. Citation ☐   B. Order ☐   C. Safeguard ☐   D. Written Notice ☐ | E. Citation/Order Number | F. Dated    Mo Da Yr |
|---|---|---|

15. Area or Equipment

| 16. Termination Due | A. Date   Mo Da Yr   04/09/2013 | B. Time (24 Hr. Clock)   1200 |
|---|---|---|

**Section III—Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date   Mo Da Yr | B. Time (24 Hr. Clock |
|---|---|---|

**Section IV—Automated System Data**

| 19. Type of Inspection (activity code)   E01 | 20. Event Number    4409106 | 21. Primary or Mill |
|---|---|---|

| 22. Signature    Thomas R. Bower | 23. AR Number    24508 |
|---|---|

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Exhibit 1

**12**

| Mine Citation/Order<br>Continuation | U.S. Department of Labor<br>Mine Safety and Health Administration | ◇ |
|---|---|---|

**Section I–Subsequent Action/Continuation Data**

| 1. Subsequent Action 1a. Continuation ☑ | 2. Dated (Original Issue) | Mo Da Yr<br>04/09/2013 | 3. Citation/Order Number 8204724 |
|---|---|---|---|

| 4. Served To<br>Mike Hendrickson, Foreman | 5. Operator<br>POWER FUELS, LLC |
|---|---|

| 6. Mine<br>POWER FUEL BLENDING TERMINAL | 7. Mine ID<br>44-07303 | (Contractor) |
|---|---|---|

**Section II–Justification for Action**

Continuation of 8. Condition or Practice

roadways and in the same areas that mine personnel use.  The driver removed
the tractor and trailer from service until repairs are completed.

See Continuation Form ☐

**Section III–Subsequent Action Taken**

| 8. Extended To | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☐ D. Terminated | ☐ E. Modified |
|---|---|---|---|---|---|---|

**Section IV–Inspection Data**

| 9. Type of Inspection E01 | 10. Event Number 4409106 |
|---|---|

| 11. Signature<br>Thomas R. Bower | AR Number<br>24508 | 12. Date | Mo Da Yr<br>04/09/2013 | 13. Time (24 Hr. Clock)<br>1110 |
|---|---|---|---|---|

MSHA Form 7000-3a, Mar 85 (revised)

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

### Section I—Violation Data

| 1. Date Mo Da Yr 04/09/2013 | 2. Time (24 Hr. Clock) 0900 | | 3. Citation/ Order Number 8204725 |
|---|---|---|---|
| 4. Served To Mike Hendrickson, Foreman | | 5. Operator POWER FUELS, LLC | |
| 6. Mine POWER FUEL BLENDING TERMINAL | | 7. Mine ID 44-07303 | (Contractor) |

8. Condition or Practice / 8a. Written Notice (103g)

The back up alarm provided on the Presley Trucking 379 Peterbilt Tractor/Trailer (company # 132, serial # 1XP-5D40X-6N897015) is not being maintained in functional condition.  When the driver placed the transmission into reverse, the back-up alarm failed to function.  There is a broken wire on the back up alarm.  This Tractor/Trailer is used to haul coal into this Surface Facility under the direction of the mine operator and backs up in congested areas at times while dumping.  This Tractor/Trailer frequently operates in areas where mine personnel work and travel.

See Continuation Form (MSHA Form 7000-3a) ☐

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR | 77.410(c) |
|---|---|---|---|---|

### Section II—Inspector's Evaluation

**10. Gravity:**

A. Injury or Illness (has) (is): No Likelihood ☐  Unlikely ☐  Reasonably Likely ☑  Highly Likely ☐  Occurred ☐

B. Injury or illness could reasonably be expected to be: No Lost Workdays ☐  Lost Workdays Or Restricted Duty ☐  Permanently Disabling ☑  Fatal ☐

C. Significant and Substantial: Yes ☑  No ☐    D. Number of Persons Affected: 001

11. Negligence (check one)  A. None ☐  B. Low ☑  C. Moderate ☐  D. High ☐  E. Reckless Disregard ☐

12. Type of Action 104(a)    13. Type of Issuance (check one)  Citation ☑  Order ☐  Safeguard ☐  Written Notice ☐

14. Initial Action  A. Citation ☐  B. Order ☐  C. Safeguard ☐  D. Written Notice ☐    E. Citation/ Order Number    F. Dated Mo Da Yr

15. Area or Equipment

| 16. Termination Due | A. Date Mo Da Yr 04/09/2013 | B. Time (24 Hr. Clock) 1200 | |
|---|---|---|---|

### Section III—Termination Action

17. Action to Terminate

| 18. Terminated | A. Date Mo Da Yr | B. Time (24 Hr. Clock | |
|---|---|---|---|

### Section IV—Automated System Data

| 19. Type of Inspection (activity code) E01 | 20. Event Number 4409106 | 21. Primary or Mill | |
|---|---|---|---|
| 22. Signature Thomas R. Bower | | 23. AR Number 24508 | |

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions.  The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business.  If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416.  Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Exhibit 2

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| POWER FUELS, LLC | ) | CONTEST PROCEEDING |
| | ) | |
| | ) | Docket No. VA |
| Contestant, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Citation No. 8204726 |
| | ) | |
| SECRETARY OF LABOR, UNITED | ) | |
| STATES DEPARTMENT OF LABOR, | ) | |
| MINE SAFETY AND HEALTH | ) | Power Fuels Blending Terminal |
| ADMINISTRATION, | ) | Mine ID:  44-07303 |
| | ) | |
| Respondent. | ) | |

## NOTICE OF CONTEST

Contestant, Power Fuels, LLC ("Power Fuels"), by counsel, for its notice of

contest of a citation issued by the Secretary of Labor, Mine Safety and Health

Administration ("MSHA"), states as follows:

1.      In this proceeding, Power Fuels contests a citation issued by MSHA

for an alleged violation of the Federal Mine Safety and Health Act of 1977, 30 U.S.C.

§ 801 et seq. ("Mine Act"). Power Fuels is not an "operator" under the Mine Act, and its

facility is not a "mine" under the Mine Act. As a result, MSHA did not have jurisdiction

to issue the citation, and the citation should be vacated.

2.      On April 9, 2013, MSHA issued Citation No. 8204726 to Power

Fuels under § 104(a) of the Mine Act for an alleged violation of 30 C.F.R. § 77.1605(b).

Abingdon: 849888-1

**15**

-2-

A copy of the citation is attached as Exhibit 1. The citation alleges braking defects on the Presley Trucking 379 Peterbilt Tractor/Trailer Coal Truck.

3.    Power Fuels is not an "operator" under the Mine Act.

4.    The location of the alleged violation is not a "mine" under the Mine Act.

5.    Power Fuels did not own or operate the vehicle in question.

6.    MSHA lacks jurisdiction over Power Fuels and its activities.

7.    Power Fuels did not violate the Mine Act.

8.    The citation was improperly issued and lacks a factual and legal basis.

WHEREFORE, Power Fuels contests the issuance of the citation and requests that the citation be vacated and that Power Fuels be awarded its costs, expenses, and attorney's fees.

POWER FUELS, LLC

By Counsel

Wade W. Massie
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
Telephone: 276/628-5151
Facsimile: 276/628-5621
wmassie@pennstuart.com

By _____
Wade W. Massie

Abingdon: 849888-1

**16**

-3-

## CERTIFICATE

I hereby certify that a true copy of the foregoing has been sent by overnight delivery to Douglas N. White, Esq., U.S. Department of Labor, Office of the Regional Solicitor, 1100 Wilson Boulevard, 22nd Floor West, Arlington, Virginia 22209-2247, and to Lisa M. Boyd, Executive Director, Federal Mine Safety and Health Review Commission, 1331 Pennsylvania Ave., NW, Suite 520N, Washington, DC 20004-1710, this _14th_ day of May, 2013.

_____
Wade W. Massie

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

### Section I—Violation Data

| 1. Date Mo Da Yr 04/09/2013 | 2. Time (24 Hr. Clock) 0850 | | 3. Citation/ Order Number 8204726 |
|---|---|---|---|
| 4. Served To Mike Hendrickson, Foreman | | 5. Operator POWER FUELS, LLC | |
| 6. Mine POWER FUEL BLENDING TERMINAL | | 7. Mine ID 44-07303 | (Contractor) |
| 8. Condition or Practice | | | 8a. Written Notice (103g) |

Braking defects are present on the Presley Trucking 379 Peterbilt Tractor/Trailer Coal Truck (company # 132, serial # 1XP-5D40X-6N897015). The left front steering axle brake is out of adjustment. This is a type 20 brake canister and maximum pushrod stroke is 1 and 3/4 inches. When the driver engages the service brakes, this brake pushrod is stroking 2 and 1/4 inches. Measurement taken with a standard rule. There is also a brake air leak present on the Mac Dump Trailer (tag # 401-482) being pulled by this Tractor. When the driver engages the service brakes, air is leaking continuously through a defective air brake valve located above the center axle on the trailer. This Tractor and Trailer is being used to haul coal into this Surface Facility under the direction of the mine operator and travels the same roadways and in the same areas that mine personnel use.

See Continuation Form (MSHA Form 7000-3a)

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR 77.1605(b) |
|---|---|---|---|

### Section II—Inspector's Evaluation

**10. Gravity:**

| A. Injury or illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☑ | Highly Likely ☐ | Occurred ☐ |
|---|---|---|---|---|---|

| B. Injury or illness could reasonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | Permanently Disabling ☑ | Fatal ☐ |
|---|---|---|---|---|

| C. Significant and Substantial: | Yes ☑ | No ☐ | D. Number of Persons Affected: 002 |
|---|---|---|---|

| 11. Negligence (check one) | A. None ☐ | B. Low ☑ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action 104(a) | 13. Type of Issuance (check one) Citation ☑ Order ☐ Safeguard ☐ Written Notice ☐ |
|---|---|

| 14. Initial Action A. Citation ☐ B. Order ☐ C. Safeguard ☐ D. Written Notice ☐ | E. Citation/ Order Number | F. Dated Mo Da Yr |
|---|---|---|

**15. Area or Equipment**

| 16. Termination Due | A. Date Mo Da Yr 04/09/2013 | B. Time (24 Hr. Clock) 1200 | |
|---|---|---|---|

### Section III—Termination Action

**17. Action to Terminate**

| 18. Terminated | A. Date Mo Da Yr | B. Time (24 Hr. Clock | |
|---|---|---|---|

### Section IV—Automated System Data

| 19. Type of Inspection (activity code) E01 | 20. Event Number 4409106 | 21. Primary or Mill |
|---|---|---|

| 22. Signature Thomas R. Bower | 23. AR Number 24508 |
|---|---|

MSHA Form 7000-3, Apr 06 (revised)     In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Exhibit 1



## US Department of Labor
### Mine Safety and Health Administration
### Office Of Assessments
## PROPOSED ASSESSMENT
## AND
## STATEMENT OF ACCOUNT



Statement Date: 05/30/2013

| | |
|---|---|
| Statement Number: 000323400 | |
| Mine Name: Power Fuel Blending Terminal | Mine ID: 4407303 |
| Served To: Power Fuels, LLC | Violator ID: (Operator - 0126254) |
| Attn.: Walt B Crickmer - Manager Partner | Mine Location: Wise, VA 24283 |
| 3630 Russell Creek Road | |
| ST Paul, VA USA 24283 | |

Upon reviewing the violations cited in the citations and orders referenced below and the data supplied by the Secretary's Authorized Representative, and all other information supplied concerning these citations and orders, MSHA finds that the violations cited did in fact occur and applying that data to the assessment regulations described in 30 CFR 100, MSHA proposes the penalty specified.

Pursuant to 30 CFR 100.7, you have 30 days from receipt of this proposed assessment to either pay the penalty, or notify MSHA that you wish to contest the proposed assessment and that you request a hearing on the violations in question before the Federal Mine Safety and Health Review Commission. If you do not exercise the right herein described within 30 days of receipt of this proposed assessment, this proposed assessment will become a final order of the Commission and will be enforced under provisions of the Federal Mine Safety and Health Act of 1977.

For violations assessed under the formula described in 30 CFR 100.3, the points assigned for the size of the operator (Column A) are derived from applying Subsection 100.3(b) of 30 CFR 100 using the size of your company and the size of your mine. The points assigned for the history of previous violations (Column B) are derived from applying subsection 100.3 (c) of 30 CFR, that is, the number of violations assessed per inspection day. The points assigned for negligence (Column C) are derived from applying subsection 100.3(d) of 30 CFR, that is, finding either no negligence, low negligence, moderate negligence, high negligence or reckless disregard. The points assigned for gravity (Column D) are derived from applying Subsection 100.3(e) of 30 CFR, that is, the likelihood of occurrence of the event against which the standard is directed, the severity of the injury or illness if it occurred or were to occur, and the number of persons potentially affected if the event occurred or were to occur. The points or percentage reduction assigned for the demonstrated good faith of the operator charged in attempting to achieve rapid compliance or the effects thereof (Column E) are derived from applying subsection 100.3(f) of 30 CFR, that is, finding either good faith or a lack of good faith. Single Penalty Assessments are developed in accordance with former Subsection 100.4 (prior to the 2007 rule revision) and Special Assessments are developed in accordance with subsection 100.5 of 30 CFR.

If there is an outstanding balance included with this billing statement, MSHA records indicate that you have unpaid civil penalties. The Debt Collection Improvement Act of 1996 requires us to either: (1) refer your debt to the U.S. Department of Treasury's Cross-Servicing Program with an additional 18% referral fee; (2) refer your debt to a private collection agency with an additional 23% referral fee; (3) refer you to the United States Department of Justice for collection with an additional 13% referral fee; (4) bar you from receiving Federal loans, guarantees, and other Federal benefits; or (5) report you to the credit bureaus, if your debt remains unpaid. For questions concerning your billing statement, please contact the Civil Penalty Compliance Office at (202) 693-9720. If you have entered bankruptcy protection, do not consider this a demand. Please provide the Civil Penalty Compliance Office with court, case number, and designated trustee and attorney contact information.

### Contest Information
Please see the 'NOTICE OF CONTEST RIGHTS AND INSTRUCTIONS' for instructions and options for contesting assessments, if any, included in this case.

### Payment Information
To ensure that your payment is properly applied, please include the attached Remittance Coupon with all payments submitted. Please send all payments to the address shown on the Remittance Coupon.

### Special MSHA Health and Safety Message or Notification
*Please notice the changes to the Proposed Assessment document: 1) There is new verbiage on the cover page explaining the consequences for failure to remit payment for outstanding debt within the allocated time frames. 2) A remittance coupon is now included with summary payment information. Please mail this coupon with the payment. 3) As requested by the Federal Mine Safety & Health Review Commission, the Notice of Contest Rights and Instructions has been revised and includes a section for signatures and dates for the contesting official and alternate contact. Please mail a signed copy with your contest request.*

1

## Remittance Coupon

**MSHA**
United States Department of Labor
Mine Safety and Health Administration

| | |
|---|---|
| Statement Number | 000323400 |
| Statement Date | 05/30/2013 |
| Date of Last Statement | |
| Mine ID | 4407303 |
| Violator ID | (Operator - 0126254) |

### Quick Account Summary

| | |
|---|---|
| Outstanding Balance | $0.00 |
| New Penalties | $300.00 |

Violator Name:
**Power Fuels, LLC**

Mine Name
**Power Fuel Blending Term**

Location
**Wise, VA 24283**

**Total Outstanding Balance          $300.00**

Make check payable to US Department of Treasury
Please return this remittance coupon with payment

Return to:
**Mine Safety and Health Administration**
P.O. Box 790390
St. Louis, MO 63179-0390

Amount Enclosed:

$ _____

☐   Check here if you are contesting any assessments in this statement

All payments will be applied in accordance with the Debt Collection Improvement Act of 1996.  Please include the statement number on any document returned.
To contest a citation, please see the NOTICE OF CONTEST RIGHTS AND INSTRUCTIONS page.

**If you wish to make a payment on a previously contested case, place a check next to the docket number(s) to be paid.**
**FMSHRC Decisions Pending**

V A 2 0 1 3 - 2 2 8 ☐        V A 2 0 1 3 - 2 5 7 ☐

2

**20**



Violator ID: 0126254
Mine ID: 4407303
Statement Number: 000323400

## NOTICE OF CONTEST RIGHTS AND INSTRUCTIONS

Pursuant to 30 CFR 100.7, you have 30 days from receipt of this proposed assessment to either (1) pay the penalty or penalties listed on the following page(s) or (2) notify MSHA that you wish to contest some or all of the proposed assessments and that you request a hearing on some or all of the violations in question before the Federal Mine Safety and Health Review Commission. The Commission is an independent federal agency, separate from MSHA and the Department of Labor, that adjudicates cases arising under the Federal Mine Safety and Health Act of 1977.

**If you wish to contest a violation:**
In order to contest violations and proposed penalties and have a formal hearing before the Commission on some or all of the violations listed in the Proposed Penalty Assessment, check the boxes on the attached form corresponding to the violations and proposed penalties you wish to contest and mail a copy of that form to:

**Mine Safety and Health Administration**
**Civil Penalty Compliance Office**
**1100 Wilson Blvd., Room 2526**
**Arlington, VA 22209-03939**
**Telephone: (202) 693-9720**

If you do not exercise the right to contest the proposed assessment within 30 days of receiving it, the proposed assessment will become a final order of the Commission not subject to further review and you will be required to pay the proposed penalty.

The fact that you may be negotiating a settlement with MSHA regarding these penalties or have filed a prior notice of contest of some of these citations, does not relieve you of the obligation to fill out and submit this form to notify MSHA that you wish to contest, and have a hearing on, some or all of the violations and penalties listed in the proposed assessment, or to comply with the Commission's rules, orders, and deadlines.

If you notify MSHA within 30 days that you wish to contest the proposed assessment, MSHA will subsequently file with the Commission a Petition for Penalty Assessment addressing all the violations that you are contesting and serve you with a copy of the petition. You must file an answer to the petition with the Commission within 30 days after receiving the petition regardless of whether you have already contested the citation, order, or proposed assessment involved.

For further information on penalty contest procedures and requirements, see **www.msha.gov.**
To access Commission rules, see **www.fmshrc.gov.**

| <u>Contesting Official:</u> | <u>Alternate Contact:</u> |
|---|---|
| The person responsible for contesting any of the assessments in this case must sign and date below. | To designate an alternate person, including an attorney, to contact regarding your contest request, please provide the information below. |

| Signature _____ Date _____ | Alternate Contact Name _____ |
|---|---|
| Print Name _____ | Alternate Contact Phone Number _____ |
| Title _____ | Alternate Contact Title _____ |
| Phone Number _____ | |
| Address _____ | City, State, Zip _____ |

3

Proposed Assessment Case Number: 000323400

Date: 05/30/2013

| Check For Contest | Citation/ Order Number | S&S | Issue Date | Type of Action | Health or Safety Standard Violated | (A) Size of Operator | | Number of Violations | (B) History of Previous Violations | | | | (C) Negligence Points | (D) Gravity | | | (E) Lack of Good Faith Penalty Points | Total Points | Penalty Amount Based On Total Points | Reduction for Good Faith | Proposed Penalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Mine Points | Controller Points | | Number of Inspection Days | History Points | Number of Repeat Violations | Repeat Violation Points | | Likelihood of Occurrence Points | Severity of Injury Expected Points | Number of Persons Affected Points | | | | | |
| ☐ | 8204724 | Y | 04/09/2013 | 104(a) C | 77.1605(b) | 1 | 1 | 0 | 11 | 0 | 0 | 0 | 10 | 30 | 10 | 2 | | 54 | $112.00 | 10% | $100.00 |
| ☐ | 8204725 | Y | 04/09/2013 | 104(a) C | 77.410(c) | 1 | 1 | 0 | 11 | 0 | 0 | 0 | 10 | 30 | 10 | 1 | | 53 | $112.00 | 10% | $100.00 |
| ☐ | 8204726 | Y | 04/09/2013 | 104(a) C | 77.1605(b) | 1 | 1 | 0 | 11 | 0 | 0 | 0 | 10 | 30 | 10 | 2 | | 54 | $112.00 | 10% | $100.00 |
| ☐ | I wish to contest and have a formal hearing on all violations listed in the Proposed Assessment(s) | | | | | | | | | | | | | | | | | | | | |

| | |
|---|---|
| Total Proposed Penalties for this Assessment Case | $300.00 |

| Outstanding Balances | Outstanding Penalty |
|---|---|
| Total Outstanding Balances | $0.00 |
| Total | $300.00 |

22

BEFORE THE
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

| | | |
|---|---|---|
| SECRETARY OF LABOR, | ) | CIVIL PENALTY PROCEEDING |
| UNITED STATES DEPARTMENT | ) | |
| OF LABOR, MINE SAFETY AND | ) | DOCKET NO. VA 2013-403 |
| HEALTH ADMINISTRATION (MSHA) | ) | |
|     Petitioner | ) | Assessment Control |
| | ) | No. 000323400 |
|     v. | ) | |
| | ) | Mine ID: 4407303 |
| Power Fuels, LLC | ) | Mine: Power Fuel Blending Terminal |
|     Respondent | ) | |

SECRETARY OF LABOR'S PETITION
FOR THE ASSESSMENT OF CIVIL PENALTY

Pursuant to the Federal Mine Safety and Health Act of 1977

("Mine Act"), 30 U.S.C. § 801 et seq., the Secretary of

Labor petitions for the assessment of a civil penalty against

Respondent for each violation set forth in Exhibit A, attached

hereto.  A copy of each citation and/or order for which a civil

penalty is sought and the amount of each proposed civil penalty

are included in Exhibit A.

The Secretary alleges the following:

1.  During all times relevant to this matter, the Respondent

was the operator of the mine identified above.

2.  The subject mine is a "mine" as that term is defined in

Section 3(h) of the Mine Act, 30 U.S.C. § 802(h).

3.  At all material times involved in this case, the products

of the subject mine entered commerce, or the operations or

https://salt.msha.dir.labor.gov/msis/generateLetters.do                    7/16/2013

products thereof affected commerce, within the meaning and
scope of Section 4 of the Mine Act, 30 U.S.C. § 803.

4.  The citation(s)/order(s) at issue in this proceeding are
listed in Exhibit A and were issued on the dates set forth
therein.

5.  The proposed penalty assessment(s) in this matter is/are
based on the Secretary's application of the six statutory
criteria according to the terms of Section 110(i) of the Mine
Act, 30 U.S.C. § 820(i), and the factors contained in 30 C.F.R.
Part 100.  For citations/orders which received a proposed
regular assessment pursuant to 30 C.F.R. § 100.3, point
values were assigned for each of the criteria as determined
by Tables I through XIII in Section 100.3.  See Exhibit A for
a detailed summary of point computations.  The inspector's(s')
findings of gravity and negligence are noted on the face of each
citation/order.  Additional points were assigned using records
of past inspections and violations which became final within the
15-month period defined in Section 100.3 to arrive at a ratio
of violations per inspection day, and additional points were
assigned using reported mine and controller tonnage or worker
hours.  See MSHA's Data Retrieval System at
http://www.msha.gov/drs/drshome.htm for a summary of
information pertaining to violation history and size of the
operator.  Good faith abatement, or lack thereof, was taken
into account as reflected in Exhibit A.  For
citations/orders designated as "unwarrantable failure" pursuant

to Section 104(d) of the Mine Act, 30 U.S.C. § 814(d), the

minimum penalty is set by Section 110(a)(3), 30 U.S.C.

§ 820(a)(3), as amended by Section 8 of the Mine Improvement

and New Emergency Response Act of 2006 ("MINER Act") and

codified at 30 C.F.R. § 100.4.  For citations/orders

assessed pursuant to 30 C.F.R. § 100.5, which are indicated

as "Special Assessment" in Exhibit A, a proposed penalty was

assessed in accordance with the special assessment guidelines

set forth in Section 100.5.  See the reasons identified in

the Narrative Findings for a Special Assessment in Exhibit A.

6.  Pursuant to Section 110(i) of the Mine Act, 30 U.S.C.

§ 820(i), the Secretary has assessed a total civil penalty

in the amount of $300 against Respondent.

7.  The proposed penalty assessment(s) is/are in accord with

the provisions of the Mine Act and is/are suitable given the

nature of the violation(s) and factors to be considered under

30 C.F.R. Part 100 for the proposed assessment of civil

penalties.

8.  The citation(s)/order(s) at issue in this proceeding have

not been contested pursuant to Commission Procedural Rule 20,

29 C.F.R. § 2700.20.

The Respondent is advised that, pursuant to Commission

Procedural Rule 29, 29 C.F.R. § 2700.29, an answer to

this petition must be filed with the Federal Mine Safety and

Health Review Commission and a copy of the answer must be served to the Secretary within 30 days.  The answer must be filed regardless of whether the Respondent has already filed a notice of contest for the citation, order, or proposed penalty assessment involved.

WHEREFORE, in accordance with Commission Procedural Rule 28, 29 C.F.R. § 2700.28, the Secretary submits this petition and requests that an order be issued by the Commission, pursuant to Section 110(i), assessing the proposed civil penalty in the amount stated herein against the Respondent for the violation(s).

Mailing Address:

Hagel Campbell
U.S. Department of Labor
Mine Safety and Health
Administration

PO Box 560
Norton, VA 24273-0000
Office: (276) 679-0230
Fax: (276) 679-1663
campbell.Hagel@dol.gov

Respectfully submitted,

Hagel Campbell
Conference Litigation
Representative


UNITED STATES DEPARTMENT
 OF LABOR
Mine Safety and Health
Administration

BEFORE THE
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

SECRETARY OF LABOR,                  ) CIVIL PENALTY PROCEEDING
UNITED STATES DEPARTMENT             )
OF LABOR, MINE SAFETY AND            ) DOCKET NO. VA 2013-403
HEALTH ADMINISTRATION (MSHA)         )
      Petitioner               ) Assessment Control
                                     ) No. 000323400
      v.                       )
                                     ) Mine ID: 4407303
Power Fuels, LLC                     ) Mine: Power Fuel Blending Terminal
      Respondent               )

NOTICE OF LIMITED APPEARANCE OF SECRETARY'S REPRESENTATIVE

The Secretary of Labor will be represented in this proceeding

by the following Conference and Litigation Representative:

      Hagel Campbell
      PO Box 560
      Norton, VA 24273-0000
      (276)679-0230

All communication with the Department of Labor regarding this

case should be directed to the undersigned at the above address

and telephone number.

The undersigned is authorized to represent the Secretary in all

pre-hearing matters in this case.  The undersigned may appear

at a hearing on behalf of the Secretary if an attorney from the

Office of the Solicitor is also present.  In the event that the

undersigned becomes authorized to appear at a hearing on behalf

of the Secretary without an attorney from the Office of the

Solicitor present, an Unlimited Notice of Appearance of

Secretary's Representative will be filed prior to the hearing.

Mailing Address:

Hagel Campbell
U.S. Department of Labor
Mine Safety and Health
Administration


PO Box 560
Norton, VA 24273-0000
(276)679-0230

Respectfully submitted,

*Hagel Campbell*

Hagel Campbell
Conference Litigation
Representative
campbell.Hagel@dol.gov
Fax Number:(276)679-1663


UNITED STATES DEPARTMENT
    OF LABOR
Mine Safety and Health
Administration

CERTIFICATE OF SERVICE

I hereby certify that on 07/16/2013, a
copy of the Secretary of Labor's Petition for the
Assessment of Civil Penalty, together with copies of
the attachments thereto, including Exhibit A, and
the Notice of Appearance of Secretary's Representative,
were mailed postage prepaid, certified mail, return
receipt requested, to the following:

PENNSTUART
Attn: Wade Massie
PO Box 2288
Abingdon, VA 24212

On the same date, a copy of the Petition, together
with copies of the attachments thereto, and
the Notice of Appearance of Secretary's Representative,
were sent by regular mail, postage prepaid,
to the following:

Executive Director
Docket Office
Federal Mine Safety and Health
Review Commission
1331 Pennsylvania Avenue, NW
Suite 520N
Washington, D.C. 20004-1710

Mailing Address:                    Respectfully submitted,

Hagel Campbell                      _Hagel Campbell_
U.S. Department of Labor
Mine Safety and Health              Hagel Campbell
Administration                      Conference Litigation
                                    Representative
PO Box 560
Norton, VA 24273-0000
Office: (276) 679-0230
Fax: (276) 679-1663                 UNITED STATES DEPARTMENT
campbell.Hagel@dol.gov               OF LABOR
                                    Mine Safety and Health
                                    Administration

**EXHIBIT A - Docket Number: VA 2013-403**

Report Date:06/21/2013

Violator ID: 0126254
Violator Name: Power Fuels, LLC
MINE ID: 4407303
MINE NAME: Power Fuel Blending Terminal
District: C0500 - Norton, VA

Postmark Date: 06/07/2013
Contest Date: 06/10/2013
Petition Due Date: 07/25/2013
Extension Due Date: 10/23/2013

Recipient:CLR
Simplified Proceedings:Y
Statement Number:000323400
Statement Date:05/30/2013

| S A | Citation/ Order Number | S & S | Issue Date | Type of Action | 30 CFR/Mine Act. | Mine Tonnage | Controller Tonnage | # Viols | # Insp Days | # Repeat Viols | # Pers Aff | Mine Size Points | Controller Size Points | VPID Points | RPID Points | Negl Points | Lklhd Points | Sev Inj Points | # Pers Points | Total Points | Penalty Based on Points | % Good Faith | Proposed Penalty Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8204726 | Y | 04/09/2013 | 104(a) C | 77.1605(b) | 0 | | 0 | 0 | 11 | 0 | 2 | 1 | 1 | 0 | 0 | 10 | 30 | 10 | 2 | 54 | 112.00 | 10% | $100.00 |
| | 8204725 | Y | 04/09/2013 | 104(a) C | 77.410(c) | 0 | | 0 | 0 | 11 | 0 | 1 | 1 | 1 | 0 | 0 | 10 | 30 | 10 | 1 | 53 | 112.00 | 10% | $100.00 |
| | 8204724 | Y | 04/09/2013 | 104(a) C | 77.1605(b) | 0 | | 0 | 0 | 11 | 0 | 2 | 1 | 1 | 0 | 0 | 10 | 30 | 10 | 2 | 54 | 112.00 | 10% | $100.00 |

Total Number of Assessments:    3        Total Contested Penalities in this Docket:        $300.00

31

SA= Special Assessment Indicator; # Viols = the total Number of Cited Violations that became final orders in the preceding 15 months; #Insp Days = the Number of Inspection Days in the preceding 15 Month period;
# Repeat Viols = the Number of Cited Violations of this standard that became final orders in the preceding 15 months; # Pers Aff = the Number of Persons Potentially Affected

PENALTY PACKET PREPARED BY:

RAPHAEL A. POINT
202-693-9733
point.raphael@dol.gov



Violator ID: 0126254
Mine ID: 4407303
Statement Number: 000323400

## NOTICE OF CONTEST RIGHTS AND INSTRUCTIONS

Pursuant to 30 CFR 100.7, you have 30 days from receipt of this proposed assessment to either (1) pay the penalty or penalties listed on the following page(s) or (2) notify MSHA that you wish to contest some or all of the proposed assessments and that you request a hearing on some or all of the violations in question before the Federal Mine Safety and Health Review Commission. The Commission is an independent federal agency, separate from MSHA and the Department of Labor, that adjudicates cases arising under the Federal Mine Safety and Health Act of 1977.

**If you wish to contest a violation:**
In order to contest violations and proposed penalties and have a formal hearing before the Commission on some or all of the violations listed in the Proposed Penalty Assessment, check the boxes on the attached form corresponding to the violations and proposed penalties you wish to contest and mail a copy of that form to:

Mine Safety and Health Administration
Civil Penalty Compliance Office
1100 Wilson Blvd., Room 2526
Arlington, VA 22209-03939
Telephone: (202) 693-9720

If you do not exercise the right to contest the proposed assessment within 30 days of receiving it, the proposed assessment will become a final order of the Commission not subject to further review and you will be required to pay the proposed penalty.

The fact that you may be negotiating a settlement with MSHA regarding these penalties or have filed a prior notice of contest of some of these citations, does not relieve you of the obligation to fill out and submit this form to notify MSHA that you wish to contest, and have a hearing on, some or all of the violations and penalties listed in the proposed assessment, or to comply with the Commission's rules, orders, and deadlines.

If you notify MSHA within 30 days that you wish to contest the proposed assessment, MSHA will subsequently file with the Commission a Petition for Penalty Assessment addressing all the violations that you are contesting and serve you with a copy of the petition. You must file an answer to the petition with the Commission within 30 days after receiving the petition regardless of whether you have already contested the citation, order, or proposed assessment involved.

For further information on penalty contest procedures and requirements, see  www.msha.gov.
To access Commission rules, see  www.fmshrc.gov.

Contesting Official:

The person responsible for contesting any of the assessments in this case must sign and date below.

*Walter Crickmer*          6/7/2013
Signature                    Date

WALTER CRICKMER
Print Name

Managing PARTNER
Title

276  608  9258
Phone Number

P.O. Box 1884, A___
Address

Alternate Contact:

To designate an alternate person, including an attorney, to contact regarding your contest request, please provide the information below.

Wade W. Massie
Alternate Contact Name

276-623-4409
Alternate Contact Phone Number

Attorney
Alternate Contact Title

ABINGDON, VA  24212
City, State, Zip

3

33

Proposed Assessment Case Number: 000323400

Date: 05/30/2013

| Check For Contest | Citation/ Order Number | S&S | Issue Date | Type of Action | Health or Safety Standard Violated | (A) Size of Operator | | (B) History of Previous Violations | | | | | (C) | (D) Gravity | | | (E) | Total Points | Penalty Amount Based On Total Points | Reduction for Good Faith | Proposed Penalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Mine Points | Controller Points | Number of Violations | Number of Inspection Days | History Points | Number of Repeat Violations | Repeat Violation Points | Negligence Points | Likelihood of Occurrence Points | Severity of Injury Expected Points | Number of Persons Affected Points | Lack of Good Faith Penalty Points | | | | |
| ☑ | 8204724 | Y | 04/09/2013 | 104(a) C | 77.1605(b) | 1 | 1 | 0 | 11 | 0 | 0 | 0 | 10 | 30 | 10 | 2 | | 54 | $112.00 | 10% | $100.00 |
| ☑ | 8204725 | Y | 04/09/2013 | 104(a) C | 77.410(c) | 1 | 1 | 0 | 11 | 0 | 0 | 0 | 10 | 30 | 10 | 1 | | 53 | $112.00 | 10% | $100.00 |
| ☑ | 8204726 | Y | 04/09/2013 | 104(a) C | 77.1605(b) | 1 | 1 | 0 | 11 | 0 | 0 | 0 | 10 | 30 | 10 | 2 | | 54 | $112.00 | 10% | $100.00 |

| | | |
|---|---|---|
| ☑ I wish to contest and have a formal hearing on all violations listed in the Proposed Assessment(s) | | |
| | Total Proposed Penalties for this Assessment Case | $300.00 |
| Outstanding Balances | | Outstanding Penalty |
| | Total Outstanding Balances | $0.00 |
| | Total | $300.00 |

*POWER TREES LLC*
*by Walter Crickman Managing Partner*
*WALTER CRICKMER*

MSHA Form 1000-179, April 2007 (revised)                4

34

# Remittance Coupon

| | |
|---|---|
| Statement Number | 000323400 |
| Statement Date | 05/30/2013 |
| Date of Last Statement | |
| Mine ID | 4407303 |
| Violator ID | (Operator - 0126254) |

**MSHA**
United States Department of Labor
Mine Safety and Health Administration

## Quick Account Summary

| | |
|---|---|
| Outstanding Balance | $0.00 |
| New Penalties | $300.00 |

Violator Name:
Power Fuels, LLC

Mine Name
Power Fuel Blending Term

Location
Wise, VA 24283

**Total Outstanding Balance**     **$300.00**

Return to:
Mine Safety and Health Administration
P.O. Box 790390
St. Louis, MO 63179-0390

Make check payable to US Department of Treasury
Please return this remittance coupon with payment

Amount Enclosed:

$     *ZERO*

☐ Check here if you are contesting any assessments in this statement

All payments will be applied in accordance with the Debt Collection Improvement Act of 1996. Please include the statement number on any document returned.
To contest a citation, please see the NOTICE OF CONTEST RIGHTS AND INSTRUCTIONS page.

If you wish to make a payment on a previously contested case, place a check next to the docket number(s) to be paid.
FMSHRC Decisions Pending

| V | A | 2 | 0 | 1 | 3 | - | 2 | 2 | 8 | | | ☐ |

| V | A | 2 | 0 | 1 | 3 | - | 2 | 5 | 7 | | | ☐ |

2

36

PENNSTUART
POST OFFICE BOX 2288
ABINGDON, VIRGINIA 24212-2288



OF THE RETURN ADDRESS
CERTIFIED MAIL

7012 1640 0002 4227 3197



U.S. POSTAGE ≫ PITNEY BOWES

ZIP 24210    $ 006.31⁰
02 1W
0001384637 JUN 07 2013

Mine Safety and Health Administration
Civil Penalty Compliance Office
1100 Wilson Boulevard, Room 2526
Arlington, VA 22209-03939

22209$2258 C008

| Mine Information Form |
|---|

| Mine Location Type 1-14 | |
|---|---|
| Change/New | Change |
| 1. MSHA Mine ID Number: | 2. Operating Company Name: |
| 4407303 | Power Fuels, LLC |

| 3. Mine or Mill Name: |
|---|
| Power Fuel Blending Terminal |

| 3a. Mine Emergency Phone Number: | 4. Type Of Operation | 5. Portable Operation | 6.Primary Mine Type |
|---|---|---|---|
| (276)- 762- 5218 | Coal | Y | Facility |

| 7. MSHA Office Code | 8a. Work Group | 8b. Travel Area | 9. Nearest Town, Landmark, or Post Office |
|---|---|---|---|
| C0501 - Norton VA Field Office | 01 | | St. Paul |

| 10. County Name Where Mine is Located | 11. State Abbreviation | 12. Cong. Dist. (Coal Only) | 13. Mileage from Field Office |
|---|---|---|---|
| Wise | VA | 09 | 23 |

| 14. Directions to Operation from Field Inspection Office |
|---|
| Travel US 23 South to Norton, Exit onto Route 58 towards Coeburn. Travel Route 58 through Coeburn towards St. Paul. After passing the Dominion Power Plant, take left onto Russell Creek Road. Facility is 1/4 mile on right. |

| Mine Description 15-20 | |
|---|---|
| 15. Total Employees: | 16. Schedule Of Operation: |
| 13 | a. Hours Per Production Shift  9    b.Production Shifts Per Day  2<br>c. Maint. Shifts Per Day  0    d. Work Days Per Week  5 |

| 17. Longitude and Latitude (Coal Only) | | | |
|---|---|---|---|
| a.Longitude: | Degrees  82 | Minutes  20 | Seconds  06 |
| b.Latitude: | Degrees  36 | Minutes  55 | Seconds  09 |

| 18. Mine Status : Active |
|---|

| 19. Status Date (mm/dd/yyyy) 01/16/2013 |
|---|

20. Types Of Mineral being Extracted or Processed:

a. Primary Commodity    Coal (Bituminous)

b. Secondary Commodity

c. Other Commodities

### Mine Characteristics

21. Mine Characteristics:

Mill/Prep Plant/Loading Dock

### Other Mine Information

22.Other Mine Information:    a.Applicable to all Mines

103(I) Status: Never                    Date Entered 103(I) Status
Methane Liberation cubic ft./24 hrs.

b. Applicable to Coal Mines Only

No.Of Producing Pits              No. Of Non Producing Pits      0
No Of Drift Openings              No. Of Slope Openings
No. Of Shaft Openings             Avg. Daily Coal Prod. Tons
Primary Coal Bed Name
Avg. Mine Height

c. Applicable to Metal and Nonmetal Mines Only

Mine Gas Category                    No. Of Impoundments
No.Of Escapeways to Surface          No. Of Hoists
No. Of Refuge Chambers

### Mailing Address

23.Quarterly Report Mailing Address

First Name    Mike              Middle Initial          Last Name      Hendrickson

Street Address                                   OR      P.O. Box
3630 Russell Creek Road

City                    State          Zip Code      Zip Ext
St. Paul                VA             24283

Country        Foreign State                      Foreign Zip Code
USA

Phone Number                         Fax Number
( 276 )- 762 5218                    (276)- 762 7597

24. Mailing Address for Respirable Dust Materials (Coal Only)

First Name    Mike              Middle Initial          Last Name      Hendrickson

Title

Street Address                                   OR      P.O. Box
3630 Russell Creek Road

City                    State          Zip Code      Zip Ext
St. Paul                VA             24283

| Phone Number | Fax Number |
|---|---|
| ( 276 )- 762- 5218 | ( 276)- 762- 7597 |

| Miner's Rep and Union Info |
|---|

**25.Miner's Representative Information (for transmittal of documents)**

| Name | Address |
|---|---|
|  |  |

**26. Union Information**

| Union Name | Union Dist | Union Local Nbr | Address |
|---|---|---|---|
|  |  |  |  |

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I—Violation Data

| 1. Date | Mo Da Yr 04/09/2013 | 2. Time (24 Hr. Clock) 1110 | | 3. Citation/ Order Number | 8204724 |

| 4. Served To | 5. Operator |
| Mike Hendrickson, Foreman | POWER FUELS, LLC |

| 6. Mine | 7. Mine ID |
| POWER FUEL BLENDING TERMINAL | 44-07303 |

(Contractor)

8. Condition or Practice — 8a. Written Notice (103g)

Braking defects are present on the Hills Trucking 9900 International Tractor/Trailer Coal Truck (company # 114, serial # 2HSCHAPT35C015532). The right side steering axle brake on the tractor is out of adjustment. This is a type 20 canister with a maximum pushrod stroke of 1 and 3/4 inches. When the driver engaged the service brakes, the pushrod traveled 2.5 inches. Measurement taken with a standard rule. Both rear axle brakes on the Benson Dump Trailer (tag # 287-977) being pulled by tractor # 114 are inoperative. When the driver engaged the service brakes, neither brake on the rear axle of the trailer would function. The brake pushrods would not move. There is no braking force at all being applied to the rear trailer axle brakes. This unit hauls coal into this Surface Facility under the direction of the mine operator. The Tractor/Trailer travels the same

See Continuation Form (MSHA Form 7000-3a) ☑

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR | 77.1605(b) |

Section II—Inspector's Evaluation

10. Gravity:
A. Injury or Illness (has) (is): No Likelihood ☐  Unlikely ☐  Reasonably Likely ☑  Highly Likely ☐  Occurred ☐

B. Injury or illness could reasonably be expected to be: No Lost Workdays ☐  Lost Workdays Or Restricted Duty ☐  Permanently Disabling ☑  Fatal ☐

C. Significant and Substantial: Yes ☑  No ☐    D. Number of Persons Affected: 002

11. Negligence (check one): A. None ☐  B. Low ☑  C. Moderate ☐  D. High ☐  E. Reckless Disregard ☐

12. Type of Action  104(a)

13. Type of Issuance (check one): Citation ☑  Order ☐  Safeguard ☐  Written Notice ☐

14. Initial Action: A. Citation ☐  B. Order ☐  C. Safeguard ☐  D. Written Notice ☐  E. Citation/Order Number    F. Dated  Mo Da Yr

15. Area or Equipment

| 16. Termination Due | A. Date Mo Da Yr 04/09/2013 | B. Time (24 Hr. Clock) 1200 |

Section III—Termination Action

17. Action to Terminate

| 18. Terminated | A. Date Mo Da Yr | B. Time (24 Hr. Clock) |

Section IV—Automated System Data

| 19. Type of Inspection (activity code) E01 | 20. Event Number 4409106 | 21. Primary or Mill |

| 22. Signature Thomas R. Bower | 23. AR Number 24508 |

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Enforcement Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Terminal Entry
Date 4-15-13
Initials KW

40

Mine Citation/Order
Continuation

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I—Subsequent Action/Continuation Data

| 1. Subsequent Action | 1a. Continuation | 2. Dated (Original Issue) | Mo | Da | Yr | 3. Citation/ Order Number |
|---|---|---|---|---|---|---|
| ☐ | ☑ | | 04/09/2013 | | | 8204724 |

| 4. Served To | 5. Operator |
|---|---|
| Mike Hendrickson, Foreman | POWER FUELS, LLC |

| 6. Mine | 7. Mine ID | (Contractor) |
|---|---|---|
| POWER FUEL BLENDING TERMINAL | 44-07303 | |

Section II—Justification for Action

Continuation of 8. Condition or Practice

roadways and in the same areas that mine personnel use.  The driver removed
the tractor and trailer from service until repairs are completed.

See Continuation Form ☐

Section III—Subsequent Action Taken

| 8. Extended To | A. Date | Mo | Da | Yr | B. Time (24 Hr. Clock) | C. Vacated | D. Terminated | E. Modified |
|---|---|---|---|---|---|---|---|---|
| | | | | | | ☐ | ☐ | ☐ |

Section IV—Inspection Data

| 9. Type of Inspection | E01 | 10. Event Number | 4409106 |
|---|---|---|---|

| 11. Signature | AR Number | 12. Date | Mo | Da | Yr | 13. Time (24 Hr. Clock) |
|---|---|---|---|---|---|---|
| Thomas R. Bower | 24508 | | 04/09/2013 | | | 1110 |

MSHA Form 7000-3a (revised)

Terminal Entry
Date 4|15|13
Initials TCB

| Mine Citation/Order<br>Continuation | U.S. Department of Labor<br>Mine Safety and Health Administration | |

*mc no 30*
*4/11/13*

**Section I—Subsequent Action/Continuation Data**

| 1. Subsequent Action 1a. Continuation | 2. Dated (Original Issue) | Mo Da Yr 04/09/2013 | 3. Citation/Order Number 8204724 - 01 |
| ☑ ☐ | | | |

| 4. Served To | 5. Operator |
| Mike Hendrickson, Foreman | POWER FUELS, LLC |

| 6. Mine | 7. Mine ID | (Contractor) |
| POWER FUEL BLENDING TERMINAL | 44-07303 | |

**Section II—Justification for Action**

The right side steering axle brake on the Hills Trucking 9900 International Tractor has been properly adjusted. The rear axle brakes on the Benson Dump Trailer (tag # 287-977) have been repaired. A new rear air valve has been installed onto the trailer. All braking defects have been repaired.

See Continuation Form ☐

**Section III—Subsequent Action Taken**

| 8. Extended To | A. Date Mo Da Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated ☑ D. Terminated ☐ E. Modified |

**Section IV—Inspection Data**

| 9. Type of Inspection E01 | 10. Event Number 4409106 |

| 11. Signature | AR Number | 12. Date Mo Da Yr | 13. Time (24 Hr. Clock) |
| Thomas R. Bower | 24508 | 04/11/2013 | 1217 |

MSHA Form 7000-3a, Mar 85 (revised)

Terminal Entry
Date 4/15/13
Initials *KB*

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I--Violation Data

| 1. Date Mo Da Yr<br>04/09/2013 | 2. Time (24 Hr. Clock)<br>0900 | | 3. Citation/<br>Order Number 8204725 |
|---|---|---|---|
| 4. Served To<br>Mike Hendrickson, Foreman | 5. Operator<br>POWER FUELS, LLC | | |
| 6. Mine<br>POWER FUEL BLENDING TERMINAL | 7. Mine ID 44-07303 | | (Contractor) |

8. Condition or Practice                                                     8a. Written Notice (103g) ☐

The back up alarm provided on the Presley Trucking 379 Peterbilt
Tractor/Trailer (company # 132, serial # 1XP-5D40X-6N897015) is not being
maintained in functional condition. When the driver placed the transmission
into reverse, the back-up alarm failed to function. There is a broken wire on
the back up alarm. This Tractor/Trailer is used to haul coal into this
Surface Facility under the direction of the mine operator and backs up in
congested areas at times while dumping. This Tractor/Trailer frequently
operates in areas where mine personnel work and travel.

See Continuation Form (MSHA Form 7000-3a) ☐

| 9. Violation | A. Health ☐<br>Safety ☑<br>Other ☐ | B. Section<br>of Act | C. Part/Section of<br>Title 30 CFR | 77.410(c) |
|---|---|---|---|---|

Section II--Inspector's Evaluation

10. Gravity:

A. Injury or illness (has) (is): No Likelihood ☐   Unlikely ☐   Reasonably Likely ☑   Highly Likely ☐   Occurred ☐

B. Injury or illness could rea-
sonably be expected to be:   No Lost Workdays ☐   Lost Workdays Or Restricted Duty ☐   Permanently Disabling ☑   Fatal ☐

C. Significant and Substantial:   Yes ☑   No ☐       D. Number of Persons Affected:   001

| 11. Negligence (check one) | A. None ☐ | B. Low ☑ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

12. Type of Action 104(a)   |   13. Type of Issuance (check one)   Citation ☑   Order ☐   Safeguard ☐   Written Notice ☐

14. Initial Action
A. Citation ☐   B. Order ☐   C. Safeguard ☐   D. Written Notice ☐   | E. Citation/<br>Order Number   | F. Dated   Mo Da Yr

15. Area or Equipment

| 16. Termination Due | A. Date Mo Da Yr<br>04/09/2013 | B. Time (24 Hr. Clock)   1200 | |
|---|---|---|---|

Section III--Termination Action

17. Action to Terminate

| 18. Terminated | A. Date Mo Da Yr | B. Time (24 Hr. Clock | |
|---|---|---|---|

Section IV--Automated System Data

| 19. Type of Inspection<br>(activity code)   E01 | 20. Event Number<br>4409106 | 21. Primary or Mill |
|---|---|---|

| 22. Signature   Thomas R. Bower | 23. AR Number   24508 |
|---|---|

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Terminal Entry
Date 4/13/13
Initials K88

| Mine Citation/Order Continuation | U.S. Department of Labor Mine Safety and Health Administration |
|---|---|

**Section I—Subsequent Action/Continuation Data**

| 1. Subsequent Action ☑ | 1a. Continuation ☐ | 2. Dated (Original Issue) | Mo Da Yr 04/09/2013 | 3. Citation/ Order Number 8204725 - 01 |
|---|---|---|---|---|

| 4. Served To Mike Hendrickson, Foreman | 5. Operator POWER FUELS, LLC |
|---|---|

| 6. Mine POWER FUEL BLENDING TERMINAL | 7. Mine ID 44-07303 | (Contractor) |
|---|---|---|

**Section II—Justification for Action**

The back up alarm provided on the Presley Trucking 379 Peterbilt Tractor/Trailer (company # 132, serial # 1XP-5D40X-6N897015) has been repaired and is working properly.  The back-up alarm has been re-wired.

See Continuation Form ☐

**Section III—Subsequent Action Taken**

| 8. Extended To | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☑ D. Terminated | ☐ E. Modified |
|---|---|---|---|---|---|---|

**Section IV—Inspection Data**

| 9. Type of Inspection E01 | 10. Event Number 4409106 |
|---|---|

| 11. Signature Thomas R. Bower | AR Number 24508 | 12. Date Mo Da Yr 04/11/2013 | 13. Time (24 Hr. Clock) 1045 |
|---|---|---|---|

MSHA Form 7000-3a, Mar 85 (revised)

Terminal Entry
Date 4/15/13
Initials

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

*4/2/12*

**Section I—Violation Data**

| 1. Date  Mo Da Yr<br>04/09/2013 | 2. Time (24 Hr. Clock)<br>0850 | | 3. Citation/<br>Order Number  8204726 |
|---|---|---|---|

| 4. Served To<br>Mike Hendrickson, Foreman | 5. Operator<br>POWER FUELS, LLC |
|---|---|

| 6. Mine<br>POWER FUEL BLENDING TERMINAL | 7. Mine ID  44-07303 | (Contractor) |
|---|---|---|

| 8. Condition or Practice | 8a. Written Notice (103g) ☐ |
|---|---|

Braking defects are present on the Presley Trucking 379 Peterbilt Tractor/Trailer Coal Truck (company # 132, serial # 1XP-5D40X-6N897015). The left front steering axle brake is out of adjustment. This is a type 20 brake canister and maximum pushrod stroke is 1 and 3/4 inches. When the driver engages the service brakes, this brake pushrod is stroking 2 and 1/4 inches. Measurement taken with a standard rule. There is also a brake air leak present on the Mac Dump Trailer (tag # 401-482) being pulled by this Tractor. When the driver engages the service brakes, air is leaking continuously through a defective air brake valve located above the center axle on the trailer. This Tractor and Trailer is being used to haul coal into this Surface Facility under the direction of the mine operator and travels the same roadways and in the same areas that mine personnel use.

See Continuation Form (MSHA Form 7000-3a) ☐

| 9. Violation | A. Health ☑<br>Safety ☑<br>Other ☐ | B. Section<br>of Act | C. Part/Section of<br>Title 30 CFR     77.1605(b) |
|---|---|---|---|

**Section II—Inspector's Evaluation**

10. Gravity:

| A. Injury or Illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☑ | Highly Likely ☐ | Occurred ☐ |
|---|---|---|---|---|---|

| B. Injury or illness could rea-<br>sonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | Permanently Disabling ☑ | Fatal ☐ |
|---|---|---|---|---|

| C. Significant and Substantial: | Yes ☑ | No ☐ | D. Number of Persons Affected:     002 |
|---|---|---|---|

| 11. Negligence (check one) | A. None ☐ | B. Low ☑ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action  104(a) | 13. Type of Issuance (check one)  Citation ☑  Order ☐  Safeguard ☐  Written Notice ☐ |
|---|---|

| 14. Initial Action<br>A. Citation ☐  B. Order ☐  C. Safeguard ☐  D. Written Notice ☐ | E. Citation/<br>Order Number | F. Dated  Mo Da Yr |
|---|---|---|

15. Area or Equipment

| 16. Termination Due | A. Date  Mo Da Yr<br>04/09/2013 | B. Time (24 Hr. Clock)     1200 |
|---|---|---|

**Section III—Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date  Mo Da Yr | B. Time (24 Hr. Clock) |
|---|---|---|

**Section IV—Automated System Data**

| 19. Type of Inspection<br>(activity code)  E01 | 20. Event Number  4409106 | 21. Primary or Mill |
|---|---|---|

| 22. Signature  Thomas R. Bower | 23. AR Number  24508 |
|---|---|

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 400 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Terminal Entry
Date 4/5/13
Initials *TCB*

45

| Mine Citation/Order Continuation | U.S. Department of Labor Mine Safety and Health Administration *mcforse* 4/12/13 |
|---|---|

Section I—Subsequent Action/Continuation Data

| 1. Subsequent Action ☑ | 1a. Continuation ☐ | 2. Dated (Original Issue) Mo Da Yr 04/09/2013 | 3. Citation/ Order Number 8204726 - 01 |
|---|---|---|---|

| 4. Served To Mike Hendrickson, Foreman | 5. Operator POWER FUELS, LLC |
|---|---|

| 6. Mine POWER FUEL BLENDING TERMINAL | 7. Mine ID 44-07303 (Contractor) |
|---|---|

Section II—Justification for Action

The left front steering axle brake on the Presley Trucking 379 Peterbilt Tractor (company # 132, serial # 1XP-5D40X-6N897015) has been properly adjusted.  The air leak on the Mac Dump Trailer ( Tag # 401-482) has been repaired.  A new air brake valve and a new brake canister (maxi-can) has been installed onto the trailer.

See Continuation Form ☐

Section III—Subsequent Action Taken

| 8. Extended To | A. Date Mo Da Yr | B. Time (24 Hr. Clock) | C. Vacated ☐ | D. Terminated ☑ | E. Modified ☐ |
|---|---|---|---|---|---|

Section IV—Inspection Data

| 9. Type of Inspection E01 | 10. Event Number 4409106 |
|---|---|

| 11. Signature Thomas R. Bower | AR Number 24508 | 12. Date Mo Da Yr 04/11/2013 | 13. Time (24 Hr. Clock) 1040 |
|---|---|---|---|

MSHA Form 7000-3a, Mar 85 (revised)

Terminal Entry
Date 4|15|13
Initials K8A

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION (MSHA), | ) ) ) ) | CIVIL PENALTY PROCEEDING |
| Petitioner, | ) ) ) | Docket No. VA 2013-403 |
| v. | ) ) ) | Assessment Control No. 000323400 |
| POWER FUELS, LLC, | ) ) | Mine ID Assigned: 4407303 |
| Respondent. | ) | |

## ANSWER

Respondent, Power Fuels, LLC ("Power Fuels"), for its answer to the petition for assessment of civil penalty filed by the Secretary of Labor, United States Department of Labor, Mine Safety and Health Administration ("Secretary"), states as follows:

1. The allegations in paragraph 1 are denied.

2. The allegations in paragraph 2 are denied.

3. The allegations in paragraph 3 are denied.

4. The allegations in paragraph 4 are admitted.

5. The allegations in paragraph 5 are denied.

6. The allegations in paragraph 6 are denied.

7. The allegations in paragraph 7 are denied.

2

8.    The allegations in paragraph 8 are denied.

9.    All allegations not expressly admitted are denied.

10.    The Secretary lacks jurisdiction over Power Fuels and its facilities.

11.    Power Fuels is not an "operator" under the Federal Mine Safety and

Health Act of 1997, 30 U.S.C. § 801 et seq. ("Mine Act").

12.    The facility in question is not a "mine" under the Mine Act.

13.    Power Fuels did not violate the Mine Act.

14.    The citations were improperly issued and lack a factual and legal

basis.

15.    Power Fuels is not liable for any civil penalties.

WHEREFORE, the citations should be vacated and this proceeding

dismissed with prejudice and Power Fuels awarded its costs, expenses, and attorney's

fees.

POWER FUELS, LLC

By Counsel

Wade W. Massie
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
Telephone: 276/628-5151
Facsimile: 276/628-5621
wmassie@pennstuart.com

By _Wade W. Massie_____
        Wade W. Massie

Abingdon: 854674-1

**48**

3

## CERTIFICATE

I hereby certify that a true copy of the foregoing has been mailed to Hagel Campbell, Conference Litigation Representative, U.S. Department of Labor, Mine Safety and Health Administration, P.O. Box 560, Norton, Virginia 24273, and to Anthony D. Jones, Esq., U.S. Department of Labor, Office of the Solicitor, Division of Mine Safety and Health, 1100 Wilson Boulevard, 22nd Floor, Arlington, Virginia 22209-2296, this _19ᵗʰ_ day of July, 2013.

_Wade W. Massie_
Wade W. Massie

Abingdon: 854674-1

1

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES


-------------------------:
SECRETARY OF LABOR,       : CIVIL PENALTY PROCEEDING
MINE SAFETY AND HEALTH    :
ADMINISTRATION(MSHA),     : DOCKET NO.VA 2013-403
                          : A.C. NO. 44-07303-323400
          Petitioner      :
                          :
v                         :
                          :
POWER FUELS, LLC,         : Power Fuels Blending
                          : Terminal
          Respondent      :
                          :
POWER FUELS, LLC,         : CONTEST PROCEEDINGS
                          :
          Contestant      : DOCKET NO.VA 2013-312-R
                          : CITATION NO.8204724;4/9/13
v                         :
                          : DOCKET NO.VA 2013-313-R
SECRETARY OF LABOR,       : CITATION NO.8204725;4/9/13
MINE SAFETY AND HEALTH    :
ADMINISTRATION(MSHA),     : DOCKET NO.VA 2013-353-R
                          : CITATION NO.8274726;4/9/13
          Respondent      :
-------------------------:

                          Bristol, Virginia

                          Thursday, November 19, 2013

          The following pages constitute the

proceedings held in the above-captioned matter before

ADMINISTRATIVE LAW JUDGE GEORGE A. KOUTRAS, held at

Holiday Inn Hotel, 305 Linden Drive, Bristol,

Virginia, before Charlene M. Shade, LCR, of Capital

Reporting Company, a Notary Public in and for the

State of Tennessee, beginning at 8:56 a.m.

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 55 of 400

**Capital Reporting Company**
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013

2

```
1              A P P E A R A N C E S
2    On behalf of Petitioner:
3      ANTHONY D. JONES, ESQUIRE
4      U.S. Department of Labor
5      Office of the Solicitor
6      1100 Wilson Boulevard, 22nd Floor
7      Arlington, Virginia 22209-2296
8      (202)693-9333
9
10   On behalf of Respondent:
11     WADE W. MASSIE, ESQUIRE
12     PennStuart
13     208 East Main Street
14     Abingdon, Virginia 24212-2288
15     (276)628-5151
16
17
18
19
20
21
22
23
24
25
```

3

1                    C O N T E N T S

2
                                              PAGE
3

4    OPENING STATEMENT

5    By Counsel For Petitioner              9

6    By Counsel For Respondent             10

7    By Counsel For Petitioner             17

8

9    WITNESS              DIRECT   CROSS    REDIRECT

10   THOMAS R. BOWER      20       44       53

11   ROBERT D. CLAY       56       67       76

12   WALTER B. CRICKMER   79       126      129

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    E X H I B I T S

| ALJ EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| Joint Stipulations | 8 | 8 |

GOVERNMENT EXHIBITS:

| | MARKED | RECEIVED |
|---|---|---|
| 1 - Citation #8204724 | 25 | 26 |
| 2 - Citation #8204725 | 32 | 35 |
| 3 - Citation #8204726 | 38 | 38 |
| 4 - Terminalling Agreement | 99 | 99 |
| 5 - Photograph | 61 | 62 |
| 6 - Photograph | 63 | 63 |
| 7 - Photograph | 64 | 67 |

RESPONDENT EXHIBITS:

| | MARKED | RECEIVED |
|---|---|---|
| 1 - Aerial Photograph | 81 | 89 |
| 2 - Survey Map | 105 | 107 |
| 3 - Blending Instruction Sheet | 107 | 115 |
| 4 - Photograph | 116 | 117 |
| 5 - Photograph | 116 | 117 |
| 6 - Photograph | 116 | 117 |

* Original exhibits retained by Judge George Koutras

5

```
1              P R O C E E D I N G S :
2              THE COURT:  Okay.  Good morning, Gentlemen
3    and Lady.
4              MR. JONES:  Good morning.
5              MR. MASSIE:  Good morning.
6              THE COURT:  This hearing this morning before
7    the Federal Mine Safety and Health Review Commission
8    has been convened pursuant to Section 105(d) of the
9    Federal Mine Safety and Health Act of 1977 and the
10   Commission's hearing rules found at subpart (g)
11   entitled 29 Code of Federal Regulations.
12             We have a civil penalty docket this morning,
13   docket number VA 2013-403.  This docket concerns three
14   alleged violations of several mandatory safety
15   standards.  And we have the companion contest, docket
16   VA 2013-312 and VA 2013-313.
17             I'd like to note for the record that these
18   are simplified proceeding cases pursuant to this
19   Commission's simplified proceeding rules, and although
20   pre-trial discovery is normally not permitted pursuant
21   to the rules, if my recollection is correct, I had a
22   telephone conference with the parties and I have
23   exercised my discretion and permitted the case to be
24   considered as a conventional case with limited
25   discovery.  And I appreciate the cooperation of the
```

6

1    parties for that.

2              I also note that there were several

3    additional dockets and cases pertaining to Power Fuels

4    that were continued pending the outcome of this

5    particular case here on the question of jurisdiction.

6              So what we are going to do today, Gentlemen,

7    is the principle issue here is one of jurisdiction.

8    The Respondent takes the position that it's not a mine

9    operator pursuant to the Mine Act, that the facility

10   in question is not a mine, that the Respondent did not

11   violate the Act, and that the violations have no

12   factual or legal basis, and it is not liable for any

13   penalties.

14             The reason we are here is the Secretary

15   takes the opposite view and takes issue with all of

16   the arguments advanced by the Respondent with respect

17   to jurisdiction.

18             While I'm on the subject, I'd like to

19   acknowledge the receipt of a pre-hearing statement by

20   the Secretary, Mr. Jones.

21             Did you get a copy of that, Mr. Massie?

22             MR. MASSIE:  I did, Judge.  Thank you.

23             THE COURT:  Okay.  Fine.  Setting forth the

24   Secretary's position in this matter.

25             So with that, I'll ask the parties to enter

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013

7

1    their appearances.  Mr. Jones.

2           MR. JONES:  Anthony D. Jones on behalf of

3    the Secretary of Labor.

4           MR. MASSIE:  Do you prefer that we stand?

5           THE COURT:  No.  The witnesses can sit and

6    be comfortable.

7           MR. MASSIE:  Yes, sir.  Wade Massie for the

8    Respondent, Power Fuels, LLC.

9           THE COURT:  Okay.  Do you gentlemen have any

10   -- have you reached any stipulations or agreements?

11          MR. JONES:  Yes, we have, your Honor.

12          THE COURT:  Okay.  Thank you.  I'm not going

13   to read this into the record.  I will just make a few

14   comments.  It deals with the fact that the three

15   citations were issued and it sets out penalty

16   citations will not affect the ability to continue in

17   business.

18          What about the size of this operation?

19   Small?  Medium?  Large?  I have to consider all of the

20   six criteria, history of prior violations, size and

21   stuff like that.

22          MR. MASSIE:  I probably need to consult with

23   Mr. Jones on that.

24          THE COURT:  Okay.  Sometime during the

25   course of this proceeding I'd like to get some

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013

8

1   information in the record about that, so I don't wake

2   up in the morning and say, hey, what did I forget when

3   I was in Bristol.

4        Okay.  I'll accept the joint stipulations,

5   and I'll mark it as ALJ Exhibit 1.

6        (ALJ Exhibit 1 - Joint Stipulations -

7        received)

8        THE COURT:  Okay.  Now, the testimony in

9   this case is taken under oath or affirmation.  Do any

10  of the witnesses have any objection to taking the

11  sworn oath or simply have you affirm the testimony?

12       And I'll give the parties an opportunity for

13  opening statements, if you care to make an opening

14  statement.  I'll also give you an opportunity to make

15  a closing statement if you want to make a closing

16  statement.

17       Although I find nothing in the simplified

18  procedures rules with regard to briefs, if the parties

19  want to file post-hearing briefs, I'll give them an

20  opportunity to do that also.  And my usual time frame

21  for that is once the parties and I receive the

22  transcript, I'll give the parties 30 days within which

23  to file a brief.  And if you need additional time, you

24  can request it from me and I'm usually pretty liberal

25  on that.  Okay?

9

```
 1            MR. JONES:  Yes.
 2            THE COURT:  Are there any questions on all
 3    of that?
 4            MR. MASSIE:  No, sir.
 5            THE COURT:  Well, with it being said, we're
 6    ready to go.  Mr. Jones, do you want to make an
 7    opening statement?
 8            MR. JONES:  Just a very brief opening
 9    statement.
10            THE COURT:  Go ahead.
11            MR. JONES:  Your Honor, the Secretary of
12    Labor will show that the facts of this case clearly
13    establish Mine Act jurisdiction.  The work performed
14    at Power Fuels, in particular the blending work, the
15    storage work, and the transportation work, that meets
16    the Mine Act definition of the work of preparing the
17    coal.
18            And under the very terms of the Mine Act, we
19    believe that there is jurisdiction in this case.  And
20    under the case law from the Commission and the Federal
21    Courts of Appeals, the Secretary of Labor's
22    interpretation about jurisdiction is entitled to
23    deference from the courts.  And we show through
24    evidence and through Respondent's own documents that
25    the activities performed at this site qualify for Mine
```

10

1    Act enforcement jurisdiction.

2         THE COURT:  Let me just note for a minute.

3    I note on page 3 that you cited two of my prior

4    decisions back in 1988.  I'd like to advise counsel,

5    please keep my age secret.  Mr. Massie.

6         MR. MASSIE:  Yes, sir.  Your Honor, Wade

7    Massie for the Respondent.

8         I think that your Honor is familiar with the

9    basic construct of how these issues are determined.

10   And you've had these cases for a number of years, but

11   as I see it, you start with the definition that's in

12   the statute and you look at it and then you try to

13   decide whether the facts of this case fit within that

14   definition.

15        And, of course, the definitions are in the

16   statute itself.  And coal mine is defined by Congress

17   to mean and include the work of preparing the coal so

18   extracted, including custom coal preparation

19   facilities.  So that's what we have.

20        And then we have a definition of what work

21   of preparing the coal means.  And that's where a lot

22   of the case law fits under, is what does that term

23   work of preparing the coal mean.

24        There's a statutory definition, which

25   includes various actions, breaking, crushing, sizing,

11

1    cleaning, washing, drying, mixing, storing, loading of

2    bituminous coal.  And then there's a phrase at the end

3    that I think is important.  "And such other work of

4    preparing coal as is usually done by the operator of

5    the coal mine."

6            Now, your Honor will hear the facts here.  I

7    don't really think there are going to be disputes

8    about the facts.  There may be differences -- there

9    will be differences about what the facts mean.

10            But I made a list of ten facts that I think

11    are important here.  One is that Virginia Electric and

12    Power Company -- also known as or doing business as

13    Dominion Virginia Power.  And most people say just

14    Dominion for short.  Dominion purchases this solid

15    fuel from various producers.  And I call it solid fuel

16    because that's the definition in the agreement itself.

17    It says solid fuel includes coal, gob, bits, et

18    cetera.  But it's all purchased by Dominion.

19            And the solid fuel is delivered to the site

20    in question by contract truckers for the producers of

21    the coal who have sold to Dominion.  So it's not Power

22    Fuels delivering to this site.  Dominion owns all of

23    the solid fuel that is delivered to the site.  Power

24    Fuels is a contractor for Dominion under these

25    agreements that we've stipulated here, terminally

12

1    agreements.

2              When the material gets to Power Fuels' site,

3    which is right next to the Dominion plant, Power Fuels

4    grades, samples, stores the solid fuel there for

5    Dominion.

6              Dominion on a daily basis, if not more

7    frequently, instructs Power Fuels how to blend and

8    deliver this material across the street.  So we get

9    orders from the owner of the coal how to handle the

10   coal and how to deliver the material.

11             Dominion does this for its own internal

12   reasons to achieve the desired specs for the right

13   burn that they want that day for their plant.  And

14   it's not always the same.  It varies on conditions

15   from season to season and maybe even more frequently

16   than that.

17             Dominion is the sole consumer and owner of

18   this solid fuel.  There's no other person that has an

19   interest in it or gets it.  It all goes to Dominion.

20             If Power Fuels did not store and blend this

21   fuel for Dominion, it's the type of work that Dominion

22   would do for itself.

23             And, lastly, the work that Power Fuels does

24   here is the type of work that's done by the end user

25   of the coal, or solid fuel, as opposed to the type of

13

1   work that's done by a plant or mine operator.  And I

2   think that probably is one of the crucial distinctions

3   here for your Honor to consider.

4          So those are the facts.  And there have been

5   several cases cited to your Honor.  One was the

6   Mineral Coal Sales case, which I'm sure is familiar to

7   you.

8          THE COURT:  Not necessarily.

9          MR. MASSIE:  Well, I won't try to go through

10  all the facts because, you know, we could get deep

11  into a lot of different cases instead of our own.

12         But the facts in that Mineral Coal Sales

13  case was that a middle man, in essence, a broker-type

14  person, purchased coal and processed the coal and

15  loaded the coal for resale to others at some site.

16  And that was held a mine.

17         It's different from our case on a number of

18  reasons.  Number one, Mineral, the entity there,

19  Mineral was not the end user of the coal.  Mineral

20  processed the coal actually at a tipple type facility.

21  And it was found to be the kind of work normally

22  performed by an operator of the mine.

23         The Marion Docks case involved a coal

24  loading tipple facility which loads and ships coal by

25  river barges to several utility customers who purchase

14

1    the coal from brokers.  That was held to be a mine.

2           We think that case was distinguishable,

3    again, because Marion Docks was not the end user.

4    Marion Docks operated a tipple -- actually, they

5    called it a tipple -- that processed the coal.  And,

6    again, it was the kind of work usually performed by a

7    coal mine or a coal preparation plant.

8           There is a case also cited by Mr. Jones, the

9    RNS Services case.

10          THE COURT:  What's that?

11          MR. MASSIE:  It's called RNS Services.  It's

12   a 3rd Circuit case.  It involved a company that went

13   out to a coal refuse pile and actually extracted and

14   loaded the material itself.  And that was held to be a

15   mine and mine operator.  We think, obviously, that's

16   distinguishable.  This company does not go out to the

17   sites and extract material and bring it in.

18          I think that case is also interesting for a

19   second reason.  There was a dissent that said even

20   that's not a mine.  One of the judges, who was Samuel

21   Alito, offered a dissent on that issue, even

22   questioning under those facts whether that was a mine

23   or not.

24          There is the Kinder Morgan case, which

25   involved a company that operated a coal loading and

15

1    storage facility for TVA, handling coal for TVA and

2    possibly some other folks.  And the unique part about

3    that case that we see is that this coal came in from

4    different mines and it went out to different plants.

5    In other words, it wasn't just the end-user facility

6    that got this that we have here.

7            This was in essence a middle-ground or a

8    middle-person operation where coal was brought in and

9    then it was really constructed to go to different

10   plants of TVA.  That was held a mine.

11           The Commission actually split 2/2 on that

12   question.  But the Court of Appeals held it was a

13   mine.  It sided with one of the two groups.

14           We think that case is distinguishable

15   because TVA was buying and blending the coal into

16   different products for different plants -- this is

17   kind of a middle-man function -- and it functioned

18   more like a coal broker or a middle man.

19           This site handles coal for one end user,

20   this one plant that comes in and it's all bought for

21   that plant.

22           THE COURT:  Which is Dominion?

23           MR. MASSIE:  Correct.  This is Dominion's

24   coal.  The Virginia Hybrid --

25           MR. CRICKMER:  Energy Center.

16

1              MR. MASSIE: -- Energy Center.  I'm leaving

2    one word out I think, or VCHEC.

3              MR. CRICKMER:  Virginia Electric and Power

4    Energy Center.

5              MR. MASSIE:  Okay.  But it's all for that

6    plant.

7              There is one case not cited by Mr. Jones

8    that I think is important here.  It's the Herman vs

9    Associated Electric Cooperative, 172 F.3d 1078, 8th

10   Circuit 1999.  We can give cites to the Court for all

11   these cases in our briefing.  But that involved a

12   company that operated a coal-fired electric power

13   generating facility.  So this was the plan.  This was

14   the coal burning plan.  And the evidence showed that

15   the plant received coal from different mines and it

16   sifted, crushed and sized that coal for use at the

17   plant.  So some of those same verbs that we saw

18   earlier in that definition are going on here at this

19   plant.

20             And even though that work was being done

21   there, the court held it was not the work of preparing

22   coal and this was not a mine.

23             So I think that is an important case.  And

24   there are others.  But we think we fall into a special

25   category here given the sole customer that we have and

17

1  the fact that we're working totally under their

2  direction and supervision, which is also the end user.

3         Thank you, Judge.

4         THE COURT:  All right.  Thank you.  Do you

5  have anything else?

6         MR. JONES:  Yes.  I would like to add just a

7  quick rebuttal to that.  I would just say that all of

8  the cases that I cited in the pre-hearing report,

9  including the cases that you ruled on in, you know,

10 Mineral Coal Sales and Marion Docks and the 3rd

11 Circuit case, RNS Services, and the 6th Circuit case,

12 Kinder Morgan Operating LP, all of those cases stand

13 for the proposition that when determining Mine Act

14 jurisdiction courts are to apply functional analysis

15 based on the work that is performed at the particular

16 facility.

17        And as Mr. Massie said, the facts really

18 aren't in dispute.  They acknowledge that at the Power

19 Fuels facility they mix the coal together, they store

20 the coal there and they load it and ship it across the

21 street to the Dominion power plant.  Those facts as a

22 matter of law establish Mine Act jurisdiction under a

23 whole host of cases.

24        And, you know, the Secretary's

25 interpretation of jurisdiction is entitled to

**Capital Reporting Company**
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013

18

1    deference under a whole line of, you know, Supreme

2    Court cases, Court of Appeals cases, and cases from

3    the Commission itself.

4              So I just think that, you know, the evidence

5    will show that their own contracts -- the testimony

6    will show that the work that they do here constitutes

7    the work of preparing the coal under

8    Section 802(h)(1)(C) of the Mine Act.

9              THE COURT:  As far as deference goes, as

10   long as it's reasonable under the facts.

11             MR. JONES:  As long as it's reasonable.

12             THE COURT:  Shall we end it now or do we

13   need any re-rebuttal and back-and-forth?

14             MR. MASSIE:  I assume we'll have plenty of

15   time.

16             THE COURT:  I assume you gentlemen want to

17   file some post-hearing briefs on the jurisdictional

18   question.

19             MR. MASSIE:  We're not going to agree on

20   this.

21             THE COURT:  But I would expect you to go

22   along with this case.  And there's one other case.  I

23   think in Consolidation Coal Company, the loading

24   facility on the Ohio River --

25             MR. MASSIE:  Yes, sir.

19

```
1              THE COURT:  -- that may have some interest
2    to you gentlemen.
3              MR. MASSIE:  Yes, sir.  That's one of yours
4    as well.
5              THE COURT:  Unfortunately, I'm the target of
6    all these jurisdictional questions.
7              All right.  With all that being said, do you
8    want to call your first witness?
9              MR. JONES:  The Secretary calls Thomas
10   Bower.
11             THE COURT:  Let me get something on --
12   excuse me a minute.  Your pre-hearing statement kind
13   of led me to believe that we may not need to address
14   the facts with regard to the three citations.  Those
15   are at issue too, so I expect to hear testimony to
16   support the three violations as well as the
17   jurisdiction question.  Right?
18             MR. MASSIE:  We think the citations are
19   relevant on the jurisdictional issue.
20             THE COURT:  They are?
21             MR. MASSIE:  Yes, sir.
22             THE COURT:  Even if they weren't relevant,
23   we still want to hear them?
24             MR. MASSIE:  Yes, I think we do.
25             THE COURT:  Because, obviously, I'm not
```

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 73 of 400

20

1   coming back to try these three, because, you know, we

2   have the other dockets that are pending on this case.

3          MR. MASSIE:  I understand.

4          THE COURT:  Depending on how it comes out on

5   jurisdiction.

6          MR. JONES:  Okay.  I'd like to start off

7   just, you know, talking about, you know, the work that

8   is done to establish jurisdiction first and then go

9   into each citation if that's okay.

10         THE COURT:  I don't have a problem with

11  that.

12         MR. JONES:  Okay.  The Secretary calls

13  Thomas Bower.

14             THOMAS R. BOWER,

15  called as a witness, and having been first duly sworn,

16  was examined and testified as follows:

17  DIRECT EXAMINATION BY COUNSEL FOR PETITIONER

18  BY MR. JONES:

19     Q.   Mr. Bower, could you please spell your name

20  for the court reporter?

21     A.   Thomas, T-h-o-m-a-s, middle name Robert,

22  R-o-b-e-r-t, Bower, B-o-w-e-r, II.

23     Q.   For whom do you work?

24     A.   I'm a surface coal mine inspector for the

25  Mine Safety and Health Administration in Norton,

21

1    Virginia.

2         Q.    And how long have you worked as a coal mine

3    surface inspector?

4         A.    Since January 7th, 2007.

5         Q.    What is your education past high school?

6         A.    I hold two associates degrees, one from

7    Southwest Community College, one from Marshall

8    Technical College, and I have a bachelor's degree from

9    the University of Virginia's College at Wise.

10        Q.    Now, before you went to work for MSHA, did

11   you have any experience in the mining industry?

12        A.    Yes.

13        Q.    Could you please describe your experience?

14        A.    2001 to 2002 I worked for Nicewonder Coal

15   Group in Renick, West Virginia as a heavy equipment

16   operator/coal shipping and receiving coordinator.

17   2002 through 2006 I worked for Nicewonder Coal Group

18   at Twin Star Mining in Hurley, Virginia as a heavy

19   equipment operator/coal shipping and receiving

20   coordinator.  Also a fill-in surface foreman.

21   Certified as a surface foreman in the State of

22   Virginia and West Virginia.  2005 I worked for Alpha

23   Natural Resources, due to a buyout of the Nicewonder

24   Coal Group, through 2006.

25        Q.    Okay.  So how long has MSHA inspected the

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013

22

1    Power Fuels facility?

2        A.    I first got there on December 12th, 2012.

3        Q.    And how many times have you inspected the

4    Power Fuels facility?

5        A.    Through two regular health and safety

6    inspections I've been there on 12 different days.

7        Q.    So you've been there a total of 12 days

8    inspecting this particular facility?

9        A.    Yes, sir.

10       Q.    And so in that 12-days' time have you become

11   familiar with the operations and the work that is done

12   there?

13       A.    Yes.

14       Q.    So basically in your inspections, what type

15   of work is performed at the Power Fuels facility?

16       A.    During our inspections we have to observe

17   work cycles and work practices as part of our regular

18   EO1s.

19            THE COURT:  What was that?

20            THE WITNESS:  During our regular

21   inspections, as part of our regular inspections, to

22   observe work cycles and work practices at the mine.

23            During observing the work cycle I saw

24   contract coal trucks, tractor and trailers, hauling

25   coal, refuse material, gob coal, and midds from the

23

1   preparation plant into this facility, being weighed,

2   and then being sampled, traveling to a designated

3   stockpile area.  The truck drivers were told where to

4   dump by the loader operators and the foreman on site.

5        The coal was then stored, blended, and

6   loaded as needed back to the power plant, taken back

7   out, weighed again, sampled again and then shipped

8   over to the power plant.  That's what I observed of

9   the work cycle.

10  BY MR. JONES:

11     Q.    You mentioned blending work.  What type of

12  blending work had you seen performed at this site?

13     A.    They basically used front-end loaders to

14  blend the coal from one stockpile to another.  They

15  had their stockpiles marked for -- for each type of

16  analysis, so they'll know how to blend it.

17     Q.    And so the material that you have seen

18  blended, what is it again?  Is it just coal or is it

19  other materials?

20     A.    Mainly coal, gob, refuse material, midds.

21        THE COURT:  What was that last term?

22        THE WITNESS:  Midds.  That's a term that

23  they use.  It's a byproduct.  It comes from the coal

24  preparation plant.

25        THE COURT:  How do you spell it?

24

```
1              THE WITNESS:  M-i-d-d-s.

2              THE COURT:  M-i-d-d-s?

3              THE WITNESS:  It's probably a slang term for

4    these preparation plants.

5              THE COURT:  Known by only people in these

6    parts, right?

7              THE WITNESS:  Yeah.

8    BY MR. JONES:

9        Q.    Could you repeat that?  It's coal and what

10   did you say?

11       A.    Coal, refuse material, gob and midds.

12       Q.    So all of the material they handle is coal

13   and coal byproducts?

14       A.    Yes, sir.

15       Q.    Okay.  And from the time the coal is brought

16   into the facility, by the time it's shipped in, do you

17   know what they do from that point until it's shipped

18   out?

19       A.    They basically store it.

20       Q.    Do they store it and do blending work as

21   well?

22       A.    Yes, store it and they also blend it in

23   preparation for shipment to the power plant.

24       Q.    Okay.  And you've seen them -- so your first

25   inspection was in December of 2012?
```

25

1      A.    Yes.

2      Q.    And your second regular inspection was?

3      A.    It started on April 1st, 2013.

4      Q.    So you have observed the operations over a

5  period of what?  That's five months that you've seen

6  them do this process?

7      A.    I'd like to clarify that I wasn't there five

8  months in total.  Our inspections only last on and off

9  approximately two to three weeks at a time.  These

10  inspections were performed during two six-months

11  intervals.

12      Q.    Okay.  But you've been there, you know, over

13  a period of several months several times?

14      A.    Yes, sir.

15      Q.    Okay.  So now that we've talked about the

16  actual work that is done there, let's go into the

17  actual citations.  So I want to draw your attention

18  to, you know, what has been marked as Government

19  Exhibit 1.  Do you recognize this citation?

20          (Government Exhibit 1 - Citation #8204724)

21      A.    Yes, sir.

22      Q.    Did you write this citation?

23      A.    Yes, I did.

24          MR. JONES:  Your Honor, I move that this be

25  admitted into evidence as Government Exhibit 1.

26

1           MR. MASSIE:  No objection except as to

2    jurisdictional issues.

3           THE COURT:  All right.  That will be your

4    standing objection throughout the proceeding?

5           MR. MASSIE:  Yes.  Thank you.

6           THE COURT:  And it will be noted throughout

7    the proceeding.  All right.  I'll receive Government

8    Exhibit 1.

9           (Government Exhibit 1 - received)

10   BY MR. JONES:

11       Q.   Could you please read the condition or

12   practice that you wrote?

13          THE COURT:  That's not necessary.

14          MR. JONES:  That's not necessary?

15          THE COURT:  In the interest of time.  Do you

16   want him to read it all?

17          MR. MASSIE:  No.

18          THE COURT:  He can paraphrase it.

19          MR. JONES:  Okay.

20   BY MR. JONES:

21       Q.   So why did you write this citation?

22       A.   Upon inspecting this contractor, contractor

23   trailer owned by Hills Trucking, it was determined

24   that there were numerous braking defects both on the

25   tractor and trailer together as one unit.

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 80 of 400

27

1      Q.   So it was essentially just for faulty

2   brakes?

3      A.   Yes, sir.

4      Q.   Okay.  Did anyone accompany you while you

5   were performing your inspection?

6      A.   No, sir, nobody stayed with me the whole

7   time, but the foreman on site, Mr. Hendrickson, he

8   would check on me from time to time to see how the

9   coal truck inspections were going.

10     Q.   Did you point out to Mr. Hendrickson why you

11  were writing the citation?

12     A.   Yes, I did.

13     Q.   Okay.  What did you say to him when you

14  informed him of this violation?

15     A.   I advised Mr. Hendrickson of the cited issue

16  due to the fact that this tractor trailer had numerous

17  braking defects and it was traveling the same roadways

18  that mine personnel used, exposing them to the hazards

19  of this truck being operated on the property.

20     Q.   Why did you mark this citation as

21  significant and substantial?

22     A.   Because the tractor trailer together as a

23  unit had a 25 percent loss of braking force.  Our

24  Commercial Vehicle Safety Alliance criteria regards

25  that over 20 percent braking loss reaches

28

```
1   out-of-service criteria.

2        Q.   How many employees were exposed to the

3   condition that you cited?

4        A.   Approximately four.

5        Q.   Okay.  For this citation why did you --

6             THE COURT:  What was that last question?

7   Excuse me.

8             MR. JONES:  I said how many miners were

9   exposed to the condition he cited.

10            THE COURT:  And he said four?

11            THE WITNESS:  Approximately four.

12            THE COURT:  The citation says two.

13            THE WITNESS:  That's the number of people

14  affected.  Could you repeat the question?

15  BY MR. JONES:

16       Q.   How many employees were exposed to the

17  hazard of the faulty brakes?

18       A.   I was trying to differentiate between

19  exposed and affected.

20            THE COURT:  Go ahead and explain that now.

21            THE WITNESS:  Exposed would be the people

22  that travel with this contract truck.  The number

23  affected would be what would likely happen if this

24  truck had an accident.  That would be the truck driver

25  and another miner.
```

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013

29

1  BY MR. JONES:

2      Q.   So the persons affected are those that are

3  likely to be injured if the hazard were allowed to

4  remain?

5      A.   Yes, sir.

6          THE COURT:  The other two people, how do

7  they travel with the truck other than the driver and

8  the --

9          THE WITNESS:  We have water trucks, your

10  Honor, sweeper trucks that clean the roads, and

11  front-end loader operators along with the foreman that

12  travel the roadways at the facility with these trucks

13  regularly.

14          THE COURT:  So on any given day all these

15  may be present or may not be present; is that right?

16          THE WITNESS:  Yes, your Honor.

17          THE COURT:  So you're looking at the

18  ultimate result?

19          THE WITNESS:  Yes, your Honor.

20          THE COURT:  Something that could conceivably

21  happen?

22          THE WITNESS:  Right.

23          THE COURT:  And this 25 percent loss of

24  braking is you said surface criteria?

25          THE WITNESS:  Commercial Vehicle Safety

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013

30

1    Alliance out-of-service criteria.

2              THE COURT:  And who sets that standard?

3              THE WITNESS:  CVSA, the Commercial Vehicle

4    Safety Alliance.

5              THE COURT:  It's not a MSHA standard?

6              THE WITNESS:  No, sir.  No, your Honor.

7              THE COURT:  Do you use it as a guideline?

8              THE WITNESS:  Use it as a guideline.

9              THE COURT:  Okay.

10   BY MR. JONES:

11       Q.   Sir, this citation, citation 8204724, you

12   marked it as injury would be reasonably likely.  Why

13   did you classify the injury as reasonably likely?

14       A.   Due to the fact that the unit, the tractor

15   trailer, had a 25 percent loss of braking force and it

16   hauls heavy loads.

17       Q.   And so because of the heavy loads and the

18   potential danger you marked it reasonably likely?

19       A.   Yes, sir.

20       Q.   Okay.  You also marked the injury was likely

21   to be permanently disabling?

22       A.   Yes, sir.

23       Q.   Why did you classify it as permanently

24   disabling?

25       A.   In my experience as an accident investigator

31

1    investigating coal truck wrecks with problems of this

2    nature, it has resulted in permanently disabling

3    injuries such as back injuries, traumatic injuries.

4    Broken bones as an example.

5              THE COURT:  So am I off the track here if I

6    were to consider that to be worse case scenario?

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  Conceivably it could be less

9    than that, though, couldn't it?

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  Okay.

12   BY MR. JONES:

13      Q.   What did Mr. Hendrickson say to you when you

14   pointed out this condition to him?

15      A.   I don't recall exactly what Mr. Hendrickson

16   said, if he took -- he was upset as I recall.  I think

17   he called the trucking company and told them they were

18   going to have to do better with their equipment.

19      Q.   Okay.

20             THE COURT:  He was upset at the fact that

21   you issued this citation or the fact that the brakes

22   on the truck were --

23             THE WITNESS:  He was upset at the brakes on

24   the truck.

25             THE COURT:  Which was a contract truck,

32

1 right?

2          THE WITNESS:  Yes, your Honor.

3          THE COURT:  Hills Trucking, right?

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  All right.

6          MR. JONES:  Okay.  Those are all of the

7 questions I have for citation #8204724.  That's the

8 first of the three citations.

9          THE COURT:  Do you want him to go through

10 all three of these and then you cross examine on the

11 whole thing?

12          MR. MASSIE:  Yes, your Honor.

13          MR. JONES:  Okay.

14          (Government Exhibit 2 - Citation #8204725)

15 BY MR. JONES:

16     Q.   Mr. Bower, I'd like to draw your attention

17 to what has been marked as Government Exhibit

18 Number 2.

19          THE COURT:  Oh, I have one question.

20          MR. JONES:  Yes.

21          THE COURT:  I noticed you marked low

22 negligence.  Why did you consider it low negligence?

23          THE WITNESS:  Your Honor, this was issued to

24 Mr. Hendrickson.  He's the foreman at the Power Fuel

25 blending terminal.  The truck was a contractor on the

33

1    Hills Trucking, contractor ID JG4.

2              Mr. Hendrickson travels the areas with this

3    truck at times during his shift, but he did not

4    directly oversee the maintenance of this truck.

5              THE COURT:  And one other question.  Did you

6    also cite Hills Trucking?

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  All right.  Let's go to the next

9    one.

10             MR. JONES:  Okay.

11   BY MR. JONES:

12       Q.   So Government Exhibit Number 2 is for

13   citation 8204725.  Did you write this citation?

14       A.   Yes, sir.

15       Q.   And it was written on April the 9th, 2013?

16       A.   Yes, sir.

17       Q.   So, just briefly, why did you write this

18   citation?

19       A.   Upon inspection of this contract tractor

20   trailer it was determined that the backup alarm failed

21   to function when the tractor was placed -- when the

22   transmission was placed in reverse.

23       Q.   So it was the backup alarm did not sound

24   when the track was placed in reverse?

25       A.   Yes, sir.

34

1      Q.   Okay.  Why did you evaluate the injury as

2  reasonably likely?

3      A.   Reasonably likely because the truck travels

4  in congested areas.  The truck has an obstructed

5  rearview.  The tractor pulls a 34-feet long trailer.

6  He backs up in congested areas with numerous other

7  people and numerous other pieces of equipment.

8      Q.   And for this citation you marked that the

9  injury or illness could be expected to be permanently

10  disabling?

11      A.   Yes, sir.

12      Q.   Why did you evaluate it as permanently

13  disabling?

14      A.   Being backed over by a 140 to 150,000 pound

15  unit would result in crushing injuries.

16      Q.   You also categorized this citation as

17  significant and substantial.  Could you explain the

18  reasons for the S&S designation?

19      A.   Due to the fact that the tractor trailer did

20  travel in congested areas and was observed backing up

21  in congested areas.

22      Q.   Okay.  So you marked that one person was

23  affected by this condition.  Who was that person and

24  how were they affected?

25      A.   The person could have been a number of

35

1    people from a sample person on the ground, a front-end

2    loader operator or one of the foremen at the facility

3    overseeing the stockpiling of the coal.

4        Q.   Okay.  And you marked this as low

5    negligence?

6        A.   Yes, sir.

7        Q.   Why the low designation?

8        A.   Basically the same as the other exhibit.

9    Because Mr. Hendrickson does not directly oversee the

10   maintenance of these trucks, but he does travel in the

11   areas with the trucks at various times during his

12   shift.

13       Q.   And so for all of these you marked them as

14   low negligence because they were given to the operator

15   and not to the independent contractor?

16       A.   Yes, sir.  There was another citation wrote

17   to Presley Trucking of this condition.

18           MR. JONES:  Okay.  No further questions on

19   citation #8204725, your Honor.

20           THE COURT:  Any objection?

21           MR. MASSIE:  None except as noted.

22           (Goverment Exhibit 2 - received)

23           THE COURT:  Okay.  Let me revisit G-1 first.

24           MR. JONES:  Sure.

25           THE COURT:  I notice in that citation you

36

1    also included a dump trailer being pulled by that

2    tractor.

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  And you say that that dump

5    trailer also had inoperative brakes; is that correct?

6    Is that the way I read this condition or practice

7    here?

8              THE WITNESS:  The next exhibit is probably

9    going to show the faulty brakes.  There's two

10   different standards.

11             THE COURT:  Well, wait a minute.

12             MR. JONES:  Would looking at the citation,

13   the second page, help refresh your recollection?

14             THE WITNESS:  There's nothing on this

15   citation that indicates that the truck had a braking

16   defect.

17             THE COURT:  What are you looking at?  I'm

18   look at your citation, Government Exhibit 1.

19             THE WITNESS:  That's a different truck, your

20   Honor.

21             THE COURT:  No, no.  I'm looking halfway

22   down in the condition.  You talk about the Benson Dump

23   Trailer being pulled by the tractor.

24             THE WITNESS:  Yes, your Honor.

25             THE COURT:  So, in other words, this tractor

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013

37

1   trailer was pulling another trailer; is that right?

2              THE WITNESS:  The tractor was pulling the

3   trailer, your Honor.

4              THE COURT:  And did the trailer have

5   defective brakes also?

6              THE WITNESS:  Yes, your Honor.  On the truck

7   with the faulty backup alarm, it did have defective

8   brakes.  I think that's what we'll see in the next

9   exhibit.

10             THE COURT:  I'm a little confused here.  Is

11  he citing -- he's not citing a separate citation for

12  defective brakes on the dump trailer being pulled by

13  the tractor, is he?

14             MR. JONES:  No.  He is citing, you know, on

15  the same trailer, you know, on the Hills truck,

16  International 9900, that tractor trailer, the brakes

17  on that were faulty and the trailer it was pulling

18  also had faulty rear axle brakes.

19             THE COURT:  But theoretically he could have

20  cited two individual citations, couldn't he, the dump

21  trailer being pulled as well as the truck?

22             MR. JONES:  Theoretically he could have.

23             THE COURT:  But he didn't.  He lumped it all

24  in one.

25             MR. JONES:  Yes, because it was all in the

38

1    same truck.

2              THE COURT:  All right.  Continue.

3              (Government Exhibit 3 - Citation #8204726)

4              MR. JONES:  So those are all of the

5    questions on Government Exhibit 2, and we'll now move

6    on to what's been marked as Government Exhibit 3.  And

7    this is for citation 8204726.

8    BY MR. JONES:

9         Q.   Mr. Bower, do you recognize this citation?

10        A.   Yes, sir.

11        Q.   Did you write this citation?

12        A.   Yes, sir.

13             MR. JONES:  Your Honor, I move that this be

14   admitted into evidence.

15             THE COURT:  The same objection?

16             MR. MASSIE:  Yes, your Honor.

17             THE COURT:  Okay.  I'll receive it.

18             (Government Exhibit 3 - received)

19   BY MR. JONES:

20        Q.   So why did you write citation #8204726 on

21   April 9th?

22        A.   Can I make this statement, that this is the

23   same unit that the backup alarm was not working on?

24        Q.   Okay.

25        A.   Okay.  This violation was wrote because the

39

1    tractor had a brake out of adjustment and it also had

2    a continuous air leak on the trailer that was being

3    pulled by the tracker together as a unit; a brake air

4    leak, a defective air valve on the trailer.

5        Q.    So what does having, you know, not enough

6    air pressure do for a braking system?

7        A.    You'll lose braking force, lose enough

8    pressure that you lose brakes all together.

9        Q.    So if there's a pressure leak, the brakes

10   won't stop properly?  They won't work like they are

11   designed to work?

12       A.    Correct.

13       Q.    Okay.  So for this particular citation you

14   marked the injury or illness as reasonably likely.

15   Why did you classify the injury as reasonably likely?

16       A.    A combination of a brake out of adjustment

17   and a continuous air leak makes it reasonably likely

18   to have brake failure to cause a wreck.

19       Q.    You also stated that an injury on this would

20   be expected to be permanently disabling.  Why did you

21   mark it that way?

22       A.    The truck hauls heavy loads.  It travels

23   somewhat inclined roadways.  It travels with other

24   vehicles.  Loss of brakes could result in truck

25   runaway, run over the top of another vehicle.  It also

40

1    would be crushing injuries.

2        Q.    And typically how many tons are these trucks

3    carrying?

4        A.    I would say estimated between 40 and 50.

5        Q.    Okay.  Now, you marked this citation as

6    significant and substantial?

7        A.    Yes, sir.

8        Q.    Why did you classify it as S&S?

9        A.    Due to the fact that the trailer had a

10   significant air leak and it was being pulled by a

11   tractor that had a brake out of adjustment together as

12   a unit.  These combined braking issues resulted in the

13   issuance of it being reasonably likely.

14       Q.    Okay.  So you noted that there were two

15   persons affected by this?

16       A.    Yes, sir.

17       Q.    Why did you use the number of two persons?

18       A.    Because it was reasonably likely that if the

19   truck ran away it would strike another vehicle on mine

20   property.  The truck driver and the person in the

21   other vehicle would be affected.

22       Q.    And, again, you classified this one as well

23   as low negligence?

24       A.    Yes, sir.

25       Q.    And why the low negligence classification?

41

1     A.    Due to the fact that Mr. Hendrickson does

2  not directly oversee the maintenance on this truck,

3  but he does travel in the areas of this truck

4  sometimes during his shift.

5     Q.    Okay.  So for all of these where you cited

6  the operator for the trucks that were owned by the

7  contractor, you marked them all as low negligence for

8  the operator?

9     A.    Yes, sir.

10         MR. JONES:  Okay.  Your Honor, no further

11 questions on citation #8204726.

12         THE COURT:  Okay.  I'll receive this with

13 the same objection noted by counsel for the

14 Respondent.

15         Let me ask you.  What is the function of the

16 dump trailer that is being pulled by these two trucks.

17         THE WITNESS:  The trailer actually

18 transports the coal, your Honor.  That's what the

19 front-end loader is loading the coal into and the

20 tractor pulls the trailer to the site.  They're

21 hauling -- that way they can haul bigger loads.

22         THE COURT:  So the tractor is actually the

23 contraption where the operator before he hooks up is

24 just running down the road just in the cab of the

25 trailer, right?

42

1              THE WITNESS: Yes, your Honor.

2              THE COURT: And does that have an

3    independent backup alarm on it?

4              THE WITNESS: The tractor and the trailer?

5              THE COURT: Yes.

6              THE WITNESS: Yes, your Honor.

7              THE COURT: Each has a backup alarm?

8              THE WITNESS: Yes, your Honor, but the

9    one -- may I clarify? The one cited in Exhibit 2, the

10   backup alarm failed to function on both units.

11             THE COURT: You said there are backup alarms

12   on both of those units?

13             THE WITNESS: Yes, your Honor.

14             MR. JONES: What do you mean by both units?

15             THE WITNESS: Some truckers place backup

16   alarms on their tractor and their trailer. Some just

17   place them on their trailer. The law states that it

18   has to be on all going above the surrounding noise

19   levels, so most of the time they do.

20             THE COURT: But isn't it true that under the

21   backup law standard if there's no obstructed view to

22   the rear there's no backup alarm required?

23             THE WITNESS: Yes, your Honor.

24             THE COURT: So there is that exception?

25             THE WITNESS: Yes, your Honor.

43

1          THE COURT:  So if the operator chooses not

2   to put a backup alarm on it because there is a clear

3   unobstructed view to the rear, it's not required?

4          THE WITNESS:  Yes.

5          THE COURT:  And if he does the outfit a

6   favor and puts one on there he's liable to get cited,

7   right, if it's not functioning?

8          THE WITNESS:  Yes, your Honor.  May I say

9   this?  The truck and trailer did have an obstructed

10  rearview.

11         THE COURT:  Oh, it did?

12         THE WITNESS:  Due to it being a 34-foot long

13  trailer being pulled behind the tractor, there was an

14  obstructed view.

15         THE COURT:  So the trailer is the

16  obstruction to the driver?

17         THE WITNESS:  Yes, your Honor.

18         THE COURT:  So he's pulling an obstructed

19  view and it's right there built in?

20         THE WITNESS:  Yes, your Honor.

21         THE COURT:  Okay.

22         MR. JONES:  No further questions for

23  Mr. Bower.

24         THE COURT:  Okay.  Folks, we'll take just a

25  little short five or ten-minute break before we cross.

44

1          (Thereupon a break was taken.)

2          THE COURT:  Okay.  If we're ready, let's

3  continue with the -- I mean, we'll go with the cross

4  examination.  Mr. Massie, the inspector is your

5  witness.

6          MR. MASSIE:  And I thank you, Judge.

7    CROSS EXAMINATION BY COUNSEL FOR RESPONDENT

8  BY MR. MASSIE:

9      Q.   Mr. Bower, your current title is what?

10     A.   I'm a surface coal mine inspector/accident

11  investigator.

12     Q.   So for the purposes of this case you were

13  not investigating any accidents.  You were doing an

14  inspection, correct?

15     A.   All in performing a regular inspection, yes,

16  sir.

17     Q.   And one of the purposes of that is to look

18  for any violations?

19     A.   Yes, sir, any violations.

20     Q.   You did not make the decision whether this

21  site is a mine within the meaning of the Act, did you?

22     A.   No, sir.  This was not my decision.

23     Q.   And you were just told to inspect this site

24  and to write, of course, any violations that you saw?

25     A.   Yes, sir.

45

1     Q.   And those have been your instructions for

2  each one of the inspections that you've made?

3     A.   Yes, sir.

4     Q.   And you said that there had been a total of

5  12 of those; is that right?

6     A.   I have been on site for 12 days during the

7  two inspections.

8     Q.   Okay.  And when you wrote these citations

9  had you seen the agreement between Power Fuels and

10 Dominion?

11    A.   No, sir.

12    Q.   Did you interview anyone at Dominion as to

13 what the job of Power Fuels was in their operations?

14    A.   I did not interview, but they told me what

15 their job was.

16    Q.   And "they" being who?

17    A.   Mr. Crickmer and Mr. Hendrickson.

18    Q.   Mr. Hendrickson is at the site on a daily

19 basis?

20    A.   Yes, sir.

21    Q.   Mr. Crickmer is there as well, right?

22    A.   Yes, sir.

23         THE COURT:  How do you spell that

24 gentleman's last name?

25         MR. CRICKMER:  C-r-i-c-k-m-e-r.

46

1            THE COURT:  Okay.  Thank you, sir.

2    BY MR. MASSIE:

3        Q.    And those folks are with Power Fuels,

4    correct?

5        A.    Yes, sir.

6        Q.    Now, you wrote these citations and they are

7    for inbound trucks, correct?

8        A.    Yes, sir.

9        Q.    So these are trucks that are bringing solid

10   fuel in from whatever producing facility it came from

11   to the Power Fuels site?

12       A.    Yes.

13       Q.    And if a truck is defective and it comes on

14   the site, is that a violation as far as you're

15   concerned for Power Fuels?

16       A.    We as an inspector have to make that

17   determination, if the production operator's personnel

18   are exposed to the hazard.  That is MSHA's policy.

19       Q.    Right, but my point is that as soon as that

20   truck enters the site of Power Fuels, that's a

21   violation?

22       A.    Not necessarily.

23       Q.    All right.  What would the circumstances be

24   when it was not a violation?

25       A.    It is a violation to the contractor which

47

1    does not involve Power Fuels employees.  It would only

2    directly involve the contractor.

3        Q.    So if it's on the site where Power Fuels

4    employees are working, then that is logically a

5    violation, correct?

6        A.    There are some instances where the violation

7    would only be issued to the contractor.  An example

8    would be a 77.1104, combustible material

9    accumulations.  Most likely the only person involved

10   with that type of accident would be the contractor

11   itself and not the employees of Power Fuels.

12       Q.    Okay.  Well, what we've got here, a truck

13   whose brakes are not in proper adjustment or a backup

14   alarm isn't working properly, that would potentially

15   involve Power Fuels people?

16       A.    Yes, sir.

17       Q.    So that's why you wrote the violation?

18       A.    Yes, sir.

19       Q.    And do you know if these trucks are

20   contractors for Power Fuels or are they contractors

21   for the producing entity mine?

22       A.    I do not know that.

23       Q.    If they are contractors for the producing

24   entity mine, then Power Fuels would not have the right

25   to hire those truckers, correct?

48

1       A.    Could you repeat that question?

2       Q.    Sure.  If they are working for the producing

3    mine, then Power Fuels doesn't determine who they are,

4    right?

5       A.    I'm not aware.  I don't really know enough

6    of the contract to answer that question, to be honest

7    with you.

8            MR. JONES:  Objection, your Honor; calls for

9    speculation.

10           THE COURT:  Well, wait a minute.  Let me

11   understand something, Mr. Massie, now.  You have these

12   trucks coming in there.  And your question is are

13   these contractors contracted by Dominion or are they

14   contracted by Power Fuels; is that correct?

15           MR. MASSIE:  No.  There's one other option.

16   BY MR. MASSIE:

17      Q.    Are these truckers delivering material for

18   the producing mine as contractors for the producing

19   mine to Power Fuels?  If you don't know, that's all

20   right.  We'll fill in the blanks later.

21      A.    I'm not aware who contracted the trucks.  I

22   mean, all I know is if I encounter them on site at

23   Power Fuels, I'm obligated to inspect the trucks on

24   the site of the facility that I'm inspecting.

25      Q.    So that wasn't relevant to you who

49

```
1    contracted them?

2         A.    Not when I'm on their property at that time.

3              THE COURT:  Mr. Massie, is there a third

4    option that they are independent contractors, sole

5    operators of a truck, that are not necessarily

6    contracted by the coal company or Dominion, just

7    independent contractors?

8              MR. MASSIE:  I think they are independent

9    contractors, but somebody hired them.

10              THE COURT:  They hired them.  Do they have a

11    contractual relationship between the two or is it the

12    state of the business that they need so many trucks on

13    a given day and these guys are walking around with a

14    tractor trailer having a coffee break at McDonald's

15    and get wound up and go up there and get a job?  How

16    does that work?  Is it a formal contract?

17              MR. MASSIE:  I think it's a little more

18    organized than that.

19              THE COURT:  Is it?

20              MR. MASSIE:  Yes, sir.

21              THE COURT:  Okay.  I've had cases where it's

22    not that organized.

23              MR. MASSIE:  We'll address that when we come

24    to it.

25              THE COURT:  Okay.  Continue.
```

50

1          MR. MASSIE:  Yes, sir.

2    BY MR. MASSIE:

3       Q.   And so the material that's being hauled into

4    the site on these trucks, do you know who the owner of

5    that material is?

6       A.   No, sir.

7       Q.   Was that relevant to you, whether it was

8    owned by Dominion or whether it was owned by Power

9    Fuels or not?

10      A.   No, sir.

11      Q.   And on a daily basis, how many trucks come

12   through this facility in your observation?

13      A.   I'd be reluctant to answer that question,

14   there's so many.

15      Q.   Well, would it be in the hundreds of trucks?

16      A.   Not in one day.  I'd say approximately 30 to

17   40 maybe.

18          THE COURT:  Do you recall how many you may

19   have viewed on any particular day during the 12 days

20   you were there just ballpark?

21          THE WITNESS:  During one day I've probably

22   inspected 10 to 12.  That's not all the trucks.

23   That's just randomly selecting the trucks.

24   BY MR. MASSIE:

25      Q.   So that was one of my questions.  You're not

51

1    inspecting every truck that comes into this site?

2        A.   No, sir.

3        Q.   But you found in the inspections on this day

4    that there were these trucks that had these violations

5    that you found?

6        A.   Yes, sir.

7        Q.   I assume you've inspected trucks and didn't

8    find any violations, haven't you?

9        A.   Absolutely, yes, sir.

10       Q.   And is that true on other days as well?

11       A.   Yes, sir.

12       Q.   Now, as far as these particular trucks are

13   concerned, are you aware of any difficulties they had

14   getting to this site?

15       A.   No, sir.

16       Q.   So even though you noticed some brake

17   issues, the trucks, for all you know, safely arrived

18   inbound at this site?

19       A.   For all I know, yes, sir.

20       Q.   Now, you make the statement in the citations

21   that the trucks are "under the direction of the mine

22   operator."  What mine operator are you referring to

23   there?

24       A.   Referring to Power Fuels, Mr. Hendrickson as

25   the foreman.

52

1        Q.    Because the trucks are on his site?

2        A.    Yes, sir.

3        Q.    But you're not making the statement that he

4   contracted for the trucks to be there?

5        A.    No, sir.

6        Q.    You mentioned that the facility handles

7   various kinds of solid fuels, and you named some of

8   those and you mentioned coal, coal refuse, midds,

9   correct?

10        A.    Yes, sir.

11        Q.    Does it handle other materials as well?

12        A.    I have seen some wood chips stored there.

13        Q.    So they have some biomass product at that

14   site as well, correct?

15        A.    Yes.

16        Q.    And this is the same site where the solid

17   fuel is, correct?

18        A.    Yes, sir.

19        Q.    And the biomass is handled by the same

20   people that handle the solid fuel, correct?

21        A.    Yes, sir.

22        Q.    And they handle it with the same equipment

23   that they use to handle the solid fuel, correct?

24        A.    Yes, sir.

25        Q.    So it's not all coal at this site or coal

53

1    byproducts as you said, there is some biomass there?

2         A.   Yes, sir.

3              MR. MASSIE:  All right.  Those are all the

4    questions I have.  Thank you, Judge.

5              THE COURT:  Okay.  Do you have anything else

6    for this witness?

7              MR. JONES:  Yes, just a couple of questions

8    on redirect.

9              THE COURT:  Okay.

10   REDIRECT EXAMINATION BY COUNSEL FOR PETITIONER

11   BY MR. JONES:

12        Q.   So I just want to just be clear about the

13   three citations that were written.  They were all

14   written for problems on trucks that came into the

15   facility?

16        A.   Yes, sir.

17        Q.   And you talked some about how -- okay.  So

18   there's a tractor, and that's the motor, that's the

19   engine of the truck that brings things where the

20   driver is?

21        A.   Yes, sir.

22        Q.   And the trailer is what the truck carries?

23        A.   It's coupled to the tractor, a fifth wheel

24   and a fifth wheel pin.

25        Q.   Okay.  And you mentioned an obstructed view

54

1  because of the trailer?

2      A.   Yes, sir.

3      Q.   Why does the trailer cause an obstructed

4  view?

5      A.   Because it is as wide as the tractor and

6  it's 34-feet long.  That's the typical dimensions of a

7  trailer.  And the driver sitting in the driver's seat

8  can't see directly behind the unit when backing up.

9      Q.   Okay.  So I have a question now about the

10  blending work that you've seen performed at the site.

11  What material is blended?

12      A.   From what I have witnessed being blended is

13  coal and -- just like I said, coal, midds, gob, the

14  refuse material blended together.

15      Q.   But you mentioned wood chips?

16      A.   Yes.

17      Q.   But you've never seen the wood chips being

18  blended with coal?

19      A.   I was never there to see it.  I never

20  witnessed it being blended.  I witnessed it stored

21  there.

22      Q.   But the only material that you've seen being

23  handled is coal and coal byproducts?

24      A.   Yes, sir.

25          MR. JONES:  All right.  No further

55

1    questions, your Honor.

2              MR. MASSIE:  Nothing further, Judge.

3              THE COURT:  Just as a matter of curiosity,

4    why would one blend wood chips with coal?  That

5    wouldn't make Dominion too happy, would it?

6              THE WITNESS:  I think that would be a better

7    question for these guys.

8              THE COURT:  You discussed the blending

9    system that you observed?

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  Were there any conveyors used or

12   plants or was it just loaders moving stuff from one

13   pile to another?

14             THE WITNESS:  Yes, your Honor.  It's

15   front-end loaders.  And they actually have a bulldozer

16   there on the property to help stockpile it.  The

17   front-end loader is moving the material from one

18   stockpile to another one.

19             THE COURT:  Are you gentlemen familiar with

20   the Department of Interior Dictionary of Mining,

21   Mineral and Related Terms of 1968?

22             MR. JONES:  Yes, your Honor.

23             THE COURT:  You know, never in my career

24   have I seen anybody quote it except me.  I've done a

25   little research trying to find out what a blending

56

```
 1   system, a blending conveyor and blending means under
 2   the dictionary definition.  I just throw that out to
 3   you gentlemen for maturity's sake.
 4           Ckay.  Thank you.  I have no further
 5   questions.
 6           THE WITNESS:  Thank you.
 7           (Witness excused)
 8           MR. JONES:  The Secretary calls Robert Clay.
 9     DIRECT EXAMINATION BY COUNSEL FOR PETITIONER
10   BY MR. JONES:
11       Q.   Mr. Clay, please identify yourself for the
12   Court.
13       A.   My name is Robert D. Clay.
14           COURT REPORTER:  Has he been sworn?
15           MR. JONES:  Oh, he hasn't been sworn.
16           THE COURT:  Oh, I'm sorry.
17               ROBERT D. CLAY,
18   called as a witness, and having been first duly sworn,
19   was examined and testified as follows:
20   BY MR. JONES:
21       Q.   Could you spell your last name, or your
22   whole name for the record?
23       A.   My name is Robert D. Clay; Robert,
24   R-o-b-e-r-t, D as in Duane, D-u-a-n-e, Clay, C-l-a-y.
25       Q.   For whom do you work, Mr. Clay?
```

57

1     A.    For the United States Department of Labor

2  Mine Safety and Health Administration.

3     Q.    How long have you worked for MSHA?

4     A.    A little over 22 years.

5     Q.    And what is your title with the agency?

6     A.    I'm the supervisory special investigator for

7  District 5 in Norton, Virginia.

8     Q.    So what are the responsibilities of a

9  supervisory special investigator?

10    A.    Basically violations of Section 110 of the

11 Mine Act or any possible other duties that the

12 district manager or assistant district manager may ask

13 me to look into that may violate the Mine Act.

14    Q.    Just for clarity, what are typical 110

15 violations?

16    A.    Unwarrantable failure type violations,

17 flagrant violations issued to the operator, violations

18 where operators or agents of the operator have

19 knowingly and willfully violated Section 110 of the

20 Mine Act.

21    Q.    Prior to you joining the Mine Safety and

22 Health Administration, did you have any mining

23 experience?

24    A.    Yes.  I worked for United States Steel in

25 Archer, Kentucky for 16 years.

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 111 of 400

58

1    Q.    And what did you do when you worked for the

2  private mining company?

3    A.    I was a certified first class surface

4  foreman in the State of the Kentucky.  I was a first

5  class underground mine foreman in the State of

6  Kentucky.  I operated a roof bolt machine, scoop

7  operator, continuous mining operator.  I operated

8  various types of haulage equipment, various types of

9  surface haulage equipment, front-end loaders, trucks;

10  things of that nature in the mines.

11    Q.    So you have both surface and underground

12  mining experience?

13    A.    Yes.  I'm also an authorized represent ive

14  for the Secretary of Labor underground and surface

15  inspector.

16    Q.    Okay.  So before you became a supervisory

17  special investigator, did you have any other jobs for

18  MSHA?

19    A.    Yes.  I was a coal mine inspector

20  underground and surface for ten years.  Three years I

21  was an electrical specialist for the Harlan, Kentucky

22  field office in District 7.  And I was a field office

23  supervisor for the 02 work group in District 5,

24  northern Virginia, where we had 20 underground mines

25  and 32 surface facilities and preparation plants.

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013

59

1      Q.    Okay.  So are you familiar with the

2    operations at the Power Fuels facility?

3      A.    Yes, I am.

4      Q.    And how did you become familiar with Power

5    Fuels?

6      A.    One of the inspectors observed a lot of coal

7    trucks coming off the state highway and they weren't

8    going directly to the power plant.  They were actually

9    turning off somewhere else.  And one of the inspectors

10   had mentioned that to the assistant district manager,

11   Jim Kizer, in the enforcement division of District 5.

12   And he had asked me to look into it and find out where

13   these trucks were going, because we didn't have a

14   preparation plant in that part of southwest Virginia,

15   directly off that four-lane road.

16     Q.    So the assistant district manager asked you

17   to investigate the operation at Power Fuels?

18     A.    Yes, that's correct.

19     Q.    And that's why you first went out there?

20     A.    Yes, it is.

21     Q.    And when you went out to the Power Fuels

22   site, what did you observe?  What type of work was

23   being performed there?

24     A.    I was off the property.  I observed several

25   coal trucks going on the property.  There was looked

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013

60

1    like a small sampling unit that the trucks would be

2    sampled whenever they drove through the gate.  And

3    there looked like there was a set of scales.  And that

4    was about as far as I could see from the county road.

5    Later on Mr. --

6        Q.   Just to be clear.  When did you go out to

7    the inspect the site?

8        A.   I think it was the 22nd of May of 2012.  And

9    I was on the county road.  And then I was approached

10   by a foreman for Power Fuels and he invited me on the

11   property and then he basically showed me the property.

12       Q.   Who was the foreman?

13       A.   I think it was Bobby Ketron; K-e-t-r-o-n I

14   believe.

15       Q.   And when he showed you the property, what

16   did you observe?

17       A.   He took me over to the mine office.  He

18   showed me their bulletin board.  The mine office

19   consisted of like a trailer, a small building.  He

20   took me over to an area that was called a yard, a

21   blending yard he called it, and there was a couple of

22   signs up there indicating that there was a yard there,

23   a blending facility, signs coming onto the property.

24            I observed a couple of end loaders.  I saw

25   several trucks coming onto the property.  I saw the

61

1    coal sampling unit.  I saw the scales.

2              He took me on an elevated roadway where

3    there was a water tank I believe.  And that was pretty

4    much it.

5         Q.   So the foreman's name was -- what was his

6    name again?

7         A.   I think it was Bobby Ketron.

8         Q.   Okay.  And what did he tell you about the

9    work that was done out there?

10        A.   Basically that coal trucks would deliver the

11   coal to the yard there.  They would dump the coal on

12   the yard and then the end loaders would blend the coal

13   together for a certain specification and it would be

14   stored there and then transported eventually to the

15   Virginia Power plant directly across the two-lane

16   small county road.

17        Q.   Did you take any photographs while you were

18   at the Power Fuels facility?

19        A.   Yes.  I asked Mr. Ketron and he didn't have

20   a problem with it.

21              (Government Exhibit 5 - Photograph Taken By

22              Mr. Clay)

23        Q.   So I want to talk about some of the

24   photographs that you took when you were inspecting the

25   facility.  And I'd like to draw your attention to what

62

1    has been marked as Government Exhibit G-5.

2              Did you take this picture?

3    A.    Yes, I did.

4    Q.    Do you know what date you took this picture?

5    A.    May 22nd, 2012.

6              MR. JONES:  Okay.  Your Honor, I move that

7    this be admitted into evidence.

8              MR. MASSIE:  No objection.

9              THE COURT:  Okay.  I'll receive it.

10             (Government Exhibit 5 - received)

11   BY MR. JONES:

12   Q.    What does this picture depict?

13   A.    An end loader on Power Fuels's property

14   mixing coal together in a pile on the yard.

15   Q.    And so could you explain to me just in

16   general, you know, what the layout is?  Are there

17   several piles of coal?

18   A.    On this date, this was the only pile of coal

19   that I observed.  This was I guess several months

20   before Mr. Bower inspected it.  So this was the only

21   pile of coal I saw.

22   Q.    But the mine foreman told you that they

23   typically take a scoop from one pile and mix it

24   together?

25   A.    Yes.

63

```
 1              (Government Exhibit 6 - Photograph Taken By

 2              Mr. Clay)

 3      Q.    So now I'll draw your attention to what's

 4   been marked as Government Exhibit G-6.  Now, did you

 5   take this picture?

 6      A.    Yes, I did.

 7      Q.    And, again, what date was this picture taken

 8   on?

 9      A.    It should be May 22nd, 2012.

10              MR. JONES:  Your Honor, I move that this be

11   admitted into evidence as Government Exhibit G-6.

12              MR. MASSIE: No objection.

13              THE COURT:  All right.  I'll receive it.

14              (Government Exhibit 6 - received)

15   BY MR. JONES:

16      Q.    So what does this picture depict?

17      A.    When you turn off the four-lane state

18   maintained highway across from the Virginia Power

19   plant, this is a sign indicating the location of the

20   Virginia City Fuel Blending Terminal for Power Fuels.

21   And it's located, according to the arrow on the sign,

22   one quarter mile on the right.

23      Q.    And so to your knowledge, this sign was

24   created by Power Fuels?

25      A.    I assume that.
```

64

1      Q.   Okay.  And it says the Virginia City Fuel

2   Blending Terminal?

3      A.   Yes, sir, that's correct.

4      Q.   So they call their own facility the fuel

5   blending terminal?

6      A.   Yes, sir.  That's their sign.

7           THE COURT:  Well, the sign does.

8      Q.   The sign does, but it is the sign of Power

9   Fuels.  They refer to their own facility as a blending

10  terminal?

11     A.   That's my understanding, yes, sir.

12     Q.   Okay.  And from your observations, blending

13  means mixing different types of coal together to meet

14  Dominion's specifications?

15     A.   That's my understanding, yes, sir.

16          (Government Exhibit 7 - Photograph Taken By

17          Mr. Clay)

18     Q.   Mr. Clay, I'd like to draw your attention to

19  what has been marked as Government Exhibit G-7.  Did

20  you take this picture?

21     A.   Yes, I did.

22     Q.   What date was that picture taken?

23     A.   It would have been the 22nd of May 2012.

24     Q.   And what does Exhibit G-7 depict?

25     A.   A sign on the property indicating blend

65

1    yard, storage area A with an arrow pointing towards

2    the left.

3        Q.    And so to your knowledge what was stored in

4    storage area A?

5        A.    Appeared to be a pile of coal.

6        Q.    So they are storing coal at the facility?

7        A.    Yes.  That's what I observed.

8        Q.    And their own sign points to a storage area?

9        A.    Yes, blend yard storage area A.

10        Q.    And just to recap your testimony, you

11    observed the operations there at the Power Fuels

12    facility?

13        A.    Yes, I did.

14        Q.    And you're familiar with the work that's

15    done?

16        A.    Yes, I am.

17        Q.    And just briefly, once again, could you

18    describe the work that is performed at this facility?

19        A.    The date that I was there, May the 22nd,

20    2012, I observed several coal trucks coming onto the

21    property.  I observed coal trucks stopping at a

22    sampling area, a sample being removed from the trailer

23    of the coal trucks.  They drive across a set of

24    scales.

25            They take their tractor and trailer to this

66

1  blending yard storage area A.  They dump their

2  trailers of coal.  A couple of end loaders push the

3  coal together, blended it together.  And then they

4  loaded the coal back up in the same end loaders,

5  placed them back in the truck and then the truck left

6  that area.  And I believe they may have drove across a

7  set of scales again and then they drove off the

8  property and I assume went across the county highway

9  to the Virginia Power plant.

10        MR. JONES:  Thank you, Mr. Clay.  No further

11  questions.

12        THE COURT:  Let me ask him one question.

13  The pile of coal that you saw stored, is that the same

14  pile as shown in the exhibit being loaded or is that a

15  different pile?

16        THE WITNESS:  That was the same pile.

17        THE COURT:  All right.  Mr. Massie, your

18  witness.

19        MR. JONES:  Your Honor, it's been pointed

20  out to me that I did not properly offer Exhibit Number

21  7 into evidence.  That was the picture of the

22  front-end loader and the pile of coal.

23        THE COURT:  Who caught you?

24        MR. JONES:  The court reporter pointed it

25  out for me.

67

```
1              THE COURT:  Then she's doing her job.
2              MR. JONES:  So I would like to move to admit
3    Exhibit Number 7.
4              THE COURT:  That's fine.  Mr. Massie?
5              MR. MASSIE:  No objection.
6              THE COURT:  I'll receive it on the same
7    caveat.  Okay.  Thank you.
8              (Government Exhibit 7 - received)
9       CROSS EXAMINATION BY COUNSEL FOR RESPONDENT
10   BY MR. MASSIE:
11        Q.   Mr. Clay, you said that one of your
12   inspectors observed some coal trucks that were
13   traveling near the plant but did not go directly into
14   the plant.
15        A.   That's what I was told, yes.
16        Q.   So you or someone investigated that?  Is
17   that what happened?
18        A.   I did.
19        Q.   You were the investigator in that?
20        A.   Yes, sir, I was.
21        Q.   So you went out to the site and parked and
22   looked and observed a few things and somebody at the
23   site actually invited you on to come and check
24   further?
25        A.   Yes, sir.  Bobby Ketron.
```

**Capital Reporting Company**
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013

68

1      Q.    And all of this can be seen from the

2    highway, correct?

3      A.    Portions of it could.

4      Q.    Portions of it.  And you got to see more up

5    on the site itself?

6      A.    Yes, sir.

7      Q.    And the Power Fuels site, we've got some

8    maps we'll introduce later, but it's on one side of

9    the road there.  What is that called?  Russell Creek

10   Road; is that right?

11     A.    I believe it is.

12     Q.    And then on the other side is the plant

13   itself, correct?

14     A.    Of the small two-lane road, yes.

15     Q.    And the plant is an electric generating

16   plant, right?

17     A.    That's my understanding, yes.

18     Q.    So when you said you saw the trucks not

19   going directly to the plant, you're saying they were

20   not going into the Dominion plant?

21     A.    No, they were not.

22     Q.    Now, if the trucks had been going directly

23   into the blending plant, there wouldn't have been any

24   issue, would there?

25     A.    I'm not sure.  Issue as far as what?

69

1      Q.    Well, what you said prompted your

2  investigation was that the trucks were not going

3  directly into the plant.

4      A.    What prompted my investigation was I was

5  requested to do so by a superior, one of the assistant

6  district managers on the enforcement division, James

7  Kizer.

8      Q.    Correct.

9      A.    That's what prompted mine.

10      Q.    I understand.

11      A.    Mr. Kizer had indicated that an inspector

12  had pointed out that they had seen several coal trucks

13  going in the direction, turning off the main state

14  highway, the four-lane road, and they weren't going

15  into the power plant.  That's what was told to me;

16  hearsay or however.

17      Q.    But my point is, if they had been going

18  directly into the power plant, there wouldn't have

19  been any investigation?

20      A.    I have no jurisdiction on power plant

21  property unless it's MSHA's jurisdiction and it's been

22  determined.

23      Q.    So that's the point I'm trying to make here.

24  These trucks were going onto a site which is adjacent

25  to the power plant?

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013

70

1      A.    Yes, sir.  That's what I observed.

2      Q.    And these activities that you described are

3   occurring on the Power Fuels site?

4      A.    The date that I was there, yes.

5      Q.    And on the basis of that, MSHA has asserted

6   jurisdiction over the site?

7      A.    That's my understanding.

8      Q.    But if these trucks had been going directly

9   into the power plant site, into the Dominion site, and

10  these activities were occurring across the street at

11  that site, that's not something MSHA would claim any

12  jurisdiction over?

13         MR. JONES:  Objection, your Honor.  That

14  calls for speculation.

15         THE COURT:  Okay.  Let me understand

16  something.  If these trucks were going directly into

17  Dominion, do you suspect that Dominion would be cited

18  as a mine operator and Power Fuels wouldn't be here

19  today but Dominion would be before me to make that

20  determination?

21         MR. MASSIE:  That's my question.

22         THE COURT:  Well, I'm asking that

23  hypothetically.

24         THE WITNESS:  I have no idea.  I don't

25  inspect on power company property.  Where I go and the

71

1    inspections and investigations that I've done

2    throughout my career have been on mine property and

3    determined by the agency to be MSHA's jurisdiction.

4              THE COURT:  Hypothetically, if these trucks

5    turned into Dominion's property and you happened to

6    follow one of them in there, just for the heck of it,

7    to see what was going on, and you saw all this

8    activity going on, would you then conduct an

9    inspection or would you say "Wait a minute.  I'm just

10   wondering, is this something that we have to check and

11   see whether they have a mine ID number"?

12             And let's assume you did and let's assume

13   you found out that what was going on on that day was

14   the same thing that you observed going on and then,

15   therefore, you would have issued a citation.

16             THE WITNESS:  Without a superior requesting

17   me to do that, if I saw something that I thought was

18   hazardous, yes, I probably would.

19             THE COURT:  Well, let me ask you this

20   question.  A 110(c) now, is that -- when you mentioned

21   all 110(c) investigations have to do with

22   unwarrantables, actually, unwarrantables and flagrant

23   violations usually send up the red flag, they're

24   potential 110(c) investigations, right?

25             THE WITNESS:  That's correct.

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013

72

1          THE COURT:  So you weren't actually when you

2    were observing conducting a 110(c) investigation?

3          THE WITNESS:  Oh, no.

4          THE COURT:  You were just testing the waters

5    to see what was going on?

6          THE WITNESS:  Yes, sir, that's correct.

7          THE COURT:  Because in this case there are

8    no unwarrantables here.  These are all 104(a)s.

9          THE WITNESS:  To the best of my knowledge,

10   no.

11         THE COURT:  All right.  Mr. Massie.

12     CROSS EXAMINATION BY COUNSEL FOR RESPONDENT

13   BY MR. MASSIE:

14     Q.   Just to follow up on this one point.  I

15   think you made the statement that you do not assert

16   any jurisdiction over power plant property.

17     A.   No, not in District 5.  To the best of my

18   knowledge, no.

19     Q.   Now, there are several power plants in this

20   district, correct?

21     A.   I only know the one.

22     Q.   Are you aware of one at Carbo?

23     A.   I don't know where Carbo is at.

24     Q.   Over next to Moss 3 plant?

25     A.   I know where Moss 3 plant's at.

73

1    Q.   Do you know the power plant run by American

2   Electric Power right next to the Moss 3 plant?

3    A.   I didn't know that was American Electric

4   Power.

5    Q.   But you were aware of this Virginia City

6   plant of Dominion, correct?

7    A.   Yes.

8    Q.   Is there a plant up at Glen Lyn as well?  Do

9   you know where the Glen Lyn plant is?

10    A.   No, I'm sorry, I don't.

11    Q.   But wherever these plants are in District 5,

12   MSHA doesn't assert any jurisdiction over those?

13    A.   The only one I was asked to look at as far

14   as power plants was that power plant and nobody

15   indicated to us that we had jurisdiction there.

16    Q.   Right.  And if the trucks had been going

17   into that plant, we wouldn't be here today?

18    A.   I probably would, because my assistant

19   district manager, my superior, asked me to look into

20   it and I reported to him what I found.

21    Q.   Right.  I understand that.  But the whole

22   thing that led to this was that these trucks were

23   going to some site next to the plant as opposed to

24   into the plant itself?

25    A.   The report that I got from the assistant

74

1    district manager, that's what prompted it, yes, sir.

2         Q.    Now, was there some debate about whether to

3    call this a mine or not?

4         A.    Not in my mind.

5         Q.    Well, I'm not talking about your mind alone.

6    I'm talking about at the MSHA office.  Was there some

7    debate about whether we really should be asserting

8    jurisdiction over this site?

9         A.    Not between Mr. Kizer and myself, no.

10        Q.    So you're not aware of any debate that took

11   place on this issue?

12        A.    I was looking into a problem for Mr. Kizer.

13   Mr. Kizer is my superior.  He's a GS14 and I'm a 13.

14   There was no debate between myself and Mr. Kizer.

15             THE COURT:  That's not the question, though.

16   Are you aware of any coffee-class discussions in

17   District 5 should we or shouldn't we?  You didn't have

18   one when Mr. Kizer sent you.

19             THE WITNESS:  No.  I wasn't privy to those.

20             THE COURT:  Now, you weren't privy to them.

21   Were you aware of them?

22             THE WITNESS:  No, I wasn't.

23             THE COURT:  Were there any rumors floating

24   around?

25             THE WITNESS:  I don't deal with rumors.  I'm

75

```
 1   sorry.
 2           THE COURT:  Well, rumors usually start
 3   something.  All right.  Let me ask you this next
 4   question.  You said MSHA does not assert jurisdiction
 5   not in District 5.  Are you aware of any other
 6   districts where they do?
 7           THE WITNESS:  I don't know.  I'm not sure.
 8           THE COURT:  So the term "not in District 5"
 9   kind of raises an inference in my mind that you could
10   be aware of other districts that do.  That's not the
11   case, is it?
12           THE WITNESS:  No, sir.
13           THE COURT:  You're not aware of any other
14   districts that do that?
15           THE WITNESS:  I'm not aware.
16           THE COURT:  All right.
17   BY MR. MASSIE:
18       Q.   Now, as part of your investigation did you
19   interview anybody at Dominion?
20       A.   No, I did not.
21       Q.   Did you interview any of the producers that
22   were bringing material into the Power Fuels site?
23       A.   I did not know who those people were.
24       Q.   Did you observe the biomass being handled at
25   the site?
```

76

```
1       A.    I'm not sure what that is.

2             MR. MASSIE:  Okay.  That's all I have.

3             THE COURT:  Do you have anything further?

4             MR. JONES:  I do.

5     REDIRECT EXAMINATION BY COUNSEL FOR PETITIONER

6     BY MR. JONES:

7       Q.    Mr. Clay, does MSHA have a uniform policy

8     for citing surface facilities?

9       A.    Yes, they do.

10      Q.    And so there was a question about, you know,

11    what is done in District 5.

12      A.    Yes, sir.

13      Q.    Were you just saying that to your knowledge

14    of District 5 where you work, there's one policy for

15    this?

16      A.    Yes, sir, that's correct.

17      Q.    All right.  And there were a lot of

18    questions about if there was debate in MSHA about the

19    jurisdiction.  Do you know who decides in the

20    Department of Labor -- what Department of Labor agency

21    decides jurisdiction?

22      A.    I believe it's the Solicitor's.

23      Q.    Yes.  And so nobody in MSHA made the

24    jurisdiction determination, but the lawyers from SOL

25    made the determination?
```

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 130 of 400

77

1       A.    That's my understanding, yes, sir.

2             MR. JONES:  Okay.  No further questions,

3   your Honor.

4             THE COURT:  With a military background, when

5   they do, then this Respondent is SOL, right?

6             MR. JONES:  Yes.  That's the abbreviation

7   for it.

8             THE COURT:  You can leave that in the

9   transcript if you like, because I have a collection of

10  them.

11            Doesn't the district manager, Counsel, have

12  a lot of input as to what initiates these kind of

13  debates?  Do you agree or disagree that there may be

14  different districts that have different perceptions at

15  that level what may be or may not be something that

16  should be looked into?  What is the service facility?

17  You mentioned MSHA's policy with regard to service

18  facilities.

19            MR. JONES:  I meant surface mining

20  facilities.

21            THE COURT:  Okay.  I'm sorry.  I

22  misunderstood you.  I thought you said service.

23            MR. JONES:  I'm sorry I wasn't more clear.

24            THE COURT:  No, that's fine.

25            MR. JONES:  It's surface mining facilities.

78

```
 1              THE COURT:  You did tell me you were from

 2    Kentucky, didn't you?  All right.  That's fine.  I

 3    have no further questions at this time.  Anything

 4    further?

 5              MR. MASSIE:  No, your Honor.

 6              THE COURT:  All right.  Sir, you can step

 7    down.  Thank you.

 8              THE WITNESS:  Yes, sir.  Thank you.

 9              (Witness excused)

10              THE COURT:  Now, does the Secretary have

11    anything else further?

12              MR. JONES:  No further witnesses for the

13    Secretary.

14              THE COURT:  I commend you, Counsel.  You

15    told me in your pre-trial submission that it might

16    take you a day to present your case.  Of course, I

17    haven't heard the operator's rebuttal yet.  Maybe that

18    will take us into the second day.  No, seriously, we

19    have all the time in the world, Gentlemen, to get the

20    record straight in this case.

21              MR. MASSIE:  We are ready to proceed if you

22    are.

23              THE COURT:  I'm ready.

24              MR. MASSIE:  Call Mr. Walt Crickmer.

25                   WALTER B. CRICKMER,
```

79

```
 1   called as a witness, and having been first duly sworn,

 2   was examined and testified as follows:

 3    DIRECT EXAMINATION BY COUNSEL FOR RESPONDENT

 4   BY MR. MASSIE:

 5        Q.   Would you state your name, please?

 6        A.   Walter B, as in boy, Crickmer.

 7        Q.   And are you the manager of Power Fuels, LLC?

 8        A.   Yes.

 9        Q.   Where is your facility located?

10        A.   3630 Russell Creek Road, Virginia City.

11        Q.   And Virginia City, is that in Wise County,

12   Virginia?

13        A.   Yes, it is.

14        Q.   And I guess the physical address is St.

15   Paul?

16        A.   St. Paul is the physical address.

17        Q.   Is that near the Virginia City Hybrid Energy

18   Center?

19        A.   Yes; short VCHEC.

20             COURT REPORTER:  I'm sorry.

21             MR. MASSIE:  VCHEC is --

22             THE WITNESS:  VCHEC is the short for

23   Virginia City Hybrid Energy Center.

24   BY MR. MASSIE:

25        Q.   So if we refer to it as VCHEC, that means
```

80

1    the power plant, correct?

2         A.    Correct.

3         Q.    And is it owned and operated by Virginia

4    Electric and Power Company?

5         A.    Yes.

6         Q.    And I think we talked earlier that Virginia

7    Electric and Power Company goes by Dominion Virginia

8    Power.

9         A.    Correct.

10        Q.    Or for short Dominion?

11        A.    Yes.

12        Q.    So if we refer to Dominion, we're talking

13   about the owner of the plant, correct?

14        A.    Correct.

15        Q.    Now, what property does Power Fuels own next

16   to or nearby the plant?

17        A.    We own 106 acres that adjoins on two sides

18   Virginia Electric and Power Company property.

19        Q.    And does your property front on Russell

20   Creek Road?

21        A.    Yes, it does.

22        Q.    And on what side of the road is it?

23        A.    On the east side of the road.

24        Q.    So if you're coming from St. Paul towards

25   the plant you're on what, Route 58?

81

1       A.    Route 58.

2       Q.    You make a right turn off of 58, go up

3    Russell Creek Road --

4       A.    Approximately a quarter of a mile and on

5    your right is Power Fuels.

6       Q.    Now, all along Russell Creek Road on the

7    left side, or the west side, of Russell Creek Road is

8    what?

9       A.    The power plant.

10      Q.    And what is the power plant?

11      A.    Well, it's basically a 600-megawatt power

12   plant.  I think it's classified 580.  I think it does

13   runs 600, a little over that at times.  It is a new

14   plant.  It went into operation basically two years

15   ago.  When it went into operation, Power Fuels went

16   into operation.

17          And the power plant is a different kind of

18   designed power plant.  Most coal-fired power plants

19   run on what we call a crushed high BTU coal content

20   which is blown into -- this powdered coal is blown

21   into a furnace, flash burned and makes the heat to

22   drive the generating station, whereas VCHEC is what

23   they call a fluidized plant where it does not take

24   high BTU coal.  It takes a very, very critical BTU,

25   low, medium BTU, 7500 BTU product.  The range could be

82

1    as low as 6500 maybe up to 8000.  But that changes

2    daily for the input into the furnace, the size of the

3    coal product going into the furnace on a belt.  It

4    also takes crushed limestone in with that product and

5    wood in with that product, all fueling the furnace

6    together.

7            And it's very critical that the BTU input to

8    that furnace -- there's two furnaces.  Both bear the

9    same product -- is kept right in that range of BTU for

10   quality.

11           MR. MASSIE:  Would you mark that?  How would

12   you like this marked, Judge?

13           THE COURT:  R-1.

14           MR. MASSIE:  R-1, please.

15           (Respondent Exhibit 1 - Aerial Photograph Of

16           Power Fuels Site)

17           MR. MASSIE:  With your Honor's permission,

18   this might be a little unwieldy unless we bring it up

19   to your table.  Is that all right?

20           THE COURT:  Yes.  Do you just have the one

21   copy?

22           MR. MASSIE:  Yes, sir.

23           THE COURT:  These pictures that you have

24   here, does this have anything to do with this?

25           MR. MASSIE:  Those are just some other

83

```
 1   photographs.  We may introduce those as well.

 2              THE COURT:  Mr. Jones, do you want to come

 3   up as well?

 4              MR. JONES:  Sure.

 5              MR. MASSIE:  This is a little better

 6   photograph here.

 7              THE COURT:  Let the record show that I've

 8   spread on the Judge's dais here this expanded

 9   photograph of what's going to be explained.  Go ahead.

10              MR. MASSIE:  Thank you.

11   BY MR. MASSIE:

12      Q.   Mr. Crickmer, is this an aerial photograph

13   of your site and the plant?

14      A.   Yes.

15              MR. MASSIE:  We'd offer R-1.

16              MR. JONES:  No objection.

17              THE COURT:  Okay.

18   BY MR. MASSIE:

19      Q.   Now, just orient the Judge if you will.

20   First let's take the highways, okay, and we'll talk

21   about some of those.  Show us the main highways here.

22      A.   Route 58, four-lane, travels between St.

23   Paul --

24              THE COURT:  I'm marking this.

25              THE WITNESS:  All right.
```

84

```
 1              THE COURT:  Route 58.  Okay.

 2              THE WITNESS:  This way is going west towards

 3   Norton-Coeburn.

 4              THE COURT:  Okay.

 5   BY MR. MASSIE:

 6       Q.   That's a what, four-lane highway?

 7       A.   Four-lane, that's correct.  This is Russell

 8   Creek Road.

 9       Q.   You're marking the place that --

10       A.   Right here is where that sign is located

11   that said one quarter mile.

12              THE COURT:  Is that Russell?

13              THE WITNESS:  Russell Creek Road.

14              THE COURT:  Russell Creek Road.  Okay.

15              THE WITNESS:  Correct.  And right up here is

16   our entrance right here.

17              THE COURT:  Okay.  I see that at the top of

18   the photograph.

19              THE WITNESS:  Virginia Electric Power --

20              MR. MASSIE:  Now, hold on.

21   BY MR. MASSIE:

22       Q.   So you turn off 58, up a quarter of a mile

23   as you said to your facility?

24       A.   Correct.

25       Q.   Now, what is the magenta?  Is that correct?
```

85

1    What is that line?

2        A.    That's our property line; pink.

3            THE COURT:  It's been years since I had

4    algebra, but that particular pink diagram there is the

5    metes and bounds of Power Fuels; is that correct?

6            THE WITNESS:  Correct.

7            THE COURT:  Okay.

8    BY MR. MASSIE:

9        Q.    That's the property you own, correct?

10       A.    Correct.

11       Q.    All right.  Now, so you've got -- where is

12   your entrance again?

13       A.    Right here.

14           THE COURT:  Okay.  I see that.  The entrance

15   is where it says "property line", right?

16           THE WITNESS:  Right.

17           THE COURT:  And I'll make a little circle.

18   Okay.

19   BY MR. MASSIE:

20       Q.    And what are the graded areas there?

21       A.    This is storage area B, storage area A, and,

22   actually, we have since enlarged our facility.

23           THE COURT:  As of the time that this

24   occurred, though, this --

25           THE WITNESS:  At the time that this

86

```
1    occurred, this photo was taken --

2            THE COURT:  Okay.  Fine.

3            THE WITNESS: -- it had not been enlarged.

4    At the time the inspections took place, it was

5    enlarged.

6            THE COURT:  Okay.  All right.

7    BY MR. MASSIE:

8        Q.   All right.  Now, where in reference to Power

9    Fuels property is Virginia Electric Power property

10   located?

11       A.   Well, we adjoin their property along this

12   property line here.  And Virginia Electric and Power

13   Company owns everything on this side of the road all

14   the way up through here on this side except for a tiny

15   little piece right where that garage sits.  They

16   actually bought this piece in here too, but that one

17   garage is not part of their property.

18       Q.   All right.  Now, what is the plant proper?

19   Where is that?  Show us the facility.

20       A.   This is the plant proper.  This is the raw

21   coal yard where the coal is stored.  This is the

22   biomass area right here where it's stored.  The

23   gravel, the calcium, is stored in this area.

24            These are the infeed twin belts feeding the

25   generating station.  The furnace lays in here and the
```

87

1    generator sits in there.  These are cooling towers

2    here.  This is a fly ash area right here where it's

3    bagged and the ash goes up this haul road to the Curry

4    Hollow landfill where the fly ash is disposed of.

5         THE COURT:  So when you identify these sort

6    of piles and stuff, that's everything that comes --

7    when it finishes here, it ends up here?

8         THE WITNESS:  That's correct.  It goes

9    through the main gate, around the loop road, up to

10   this piece right here.  Where you see the four belts

11   coming out of that, there's four truck feeders in here

12   and they have four belts that feed stacking conveyors

13   that move back and forth over this area here.  And

14   reclaimers, these big green things, are on this side

15   that reclaim material back onto this belt that goes up

16   to the crusher, the crusher down to this point where

17   the gravel is introduced, and the combination of

18   calcium and coal and wood flows into the plant to the

19   furnaces.

20   BY MR. MASSIE:

21        Q.   So this is taken approximately when?

22        A.   I would say this was probably taken in the

23   summer of 2011 prior to the plant firing up.  The

24   plant, there's no coal on the ground here.  We have no

25   coal in storage at our facility.  This is just an

88

1    aerial photograph that shows the relationship of our

2    property, the plant and the facility.

3             THE COURT:  And is that what this photograph

4    is intended --

5             MR. MASSIE:  Yes, sir.

6             THE COURT:  -- to come in as, correct?

7             MR. MASSIE:  Yes, sir.

8             THE COURT:  To show the metes and bounds as

9    of 2011.  Has anything changed since then?

10            MR. MASSIE:  And the relative location.

11   I'll ask the witness.  Have these locations changed at

12   all?

13            THE WITNESS:  No.

14            THE COURT:  Okay.  Let me ask you a

15   question.  You just described some things that occur

16   here.  Does any of this involve any coal preparation,

17   blending, et. cetera, things that the Secretary here

18   suggests might be jurisdictional, or does it come from

19   here to here and then end up here?

20            MR. MASSIE:  I understand your question.

21   BY MR. MASSIE:

22       Q.   This is the area, within this boundary,

23   where the citations occurred, correct?

24       A.   Correct.

25       Q.   Are you aware of any citations being written

89

1   on Dominion property?

2       A.   No, sir.

3            THE COURT:  Do you have any questions with

4   regard to the photograph?

5            MR. JONES:  No.

6            THE COURT:  All right.  I'll receive the

7   Exhibit R-1.

8            (Respondent Exhibit 1 - received)

9   BY MR. MASSIE:

10      Q.   Now, I just want -- while we've got it here,

11  may I ask you one more question, Mr. Crickmer?  Just

12  show the path that the trucks, the inbound trucks,

13  would take to your site for the Judge, please.

14      A.   Yes.  You have trucks coming from

15  everywhere; from West Virginia to Kentucky to

16  Virginia.  They come in 58 this way and this way, all

17  turning into the Power Fuels site.

18           Now, the power plant burns 10,000 tons a day

19  and only about 8,000 tons let's say as an average

20  comes from Power Fuels fueling the plant.  Two

21  thousand tons a day let's say goes directly into the

22  plant.  And so all the trucks to my place come in this

23  way.  And this is the main entrance to the plant right

24  here, and a portion of what fuel the plant burns goes

25  directly to the plant.

90

1      Q.    Okay.  So just to follow the path of the

2   trucks then, it's off 58 into your site?

3      A.    Correct.

4      Q.    Now, after the work is done at your site,

5   what is the path of the trucks to the plant?

6      A.    It goes back out Russell Creek Road onto 58,

7   down in the main entrance, up to the truck dump where

8   it's dumped.

9      Q.    Now, Mr. Crickmer, let's just talk for a

10   minute about the facilities and fixtures that are on

11   your property.  I'm not talking about equipment right

12   now.  I'm just talking about structures and fixtures.

13   What do you have on your property.

14      A.    Structure-wise we have the office, the

15   terminal office.  We have a set of scales.  We have an

16   auger sampler that is owned by a third party

17   contractor.  Power Fuels owns the scales and the

18   office.

19          We also own a small block building in A yard

20   where we store grease, lubricants, parts for our work

21   there.  We have a pump house where we have a deep well

22   that pumps water into a water tank that we own.  We

23   have various waterlines that we use for watering the

24   roads for dust suppression.  And we have the four

25   yards, A, B, C and D yards, along with the pond that

91

```
 1    we built for sediment runoff for DEQ related

 2    stormwater plan that we have.

 3        Q.    Do you have a bath house?

 4        A.    We now have a new bath house.

 5        Q.    Is that courtesy of an order from your

 6    friends?

 7        A.    Forty thousand dollars later.

 8        Q.    That was by an MSHA order?

 9        A.    Yes, it was.

10        Q.    Now, as far as --

11             THE COURT:  Excuse me.  Did you have one at

12    the time the citations were issued?

13             THE WITNESS:  No.  We were under notice to

14    start construction.  We built it and I guess they were

15    abated.  I assume that.  I don't know that.

16             MR. MASSIE:  But it's built now?

17             THE WITNESS:  It's built now.

18             THE COURT:  Does that bath house include

19    rest room facilities?

20             THE WITNESS:  Yes; multiple showers.

21             THE COURT:  Okay.

22    BY MR. MASSIE:

23        Q.    Now, let's talk for a minute about equipment

24    that's on the property and used on the property.  Tell

25    the Judge what equipment you have on the property.
```

92

```
 1        A.   We operate four rubber-tired end loaders,
 2   all equipped with computerized bucket scales.  So when
 3   you go in and get a bucket of fuel, it weighs the
 4   bucket.  They are calibrated.  It weighs each bucket,
 5   which is a critical thing that we do daily.  And, you
 6   know, those bucket weights are reported by producer
 7   every day to Dominion Power, every morning.  It's part
 8   of the process.
 9             We have a dozer.  We have a water truck.  We
10   have a vacuum sweeper, road maintenance truck.  We
11   have a street sweeper.  We have a mobile stacking
12   conveyor for stacking bigger piles and a pickup truck.
13   And that's basically everything.
14        Q.   All right.  Now, what different products are
15   handled at the site?
16        A.   Well, Power Fuels handles all different
17   kinds of fuels purchased by Dominion.  It could be
18   wash coal that come from preparation plants.  It could
19   be run-of-mine coal that's been properly sized and
20   brought to our property.
21             THE COURT:  Would you spell that term?
22             THE WITNESS:  Run-of-mine.
23             THE COURT:  Oh, run-of-mine.  Okay.
24             THE WITNESS:  Meaning that comes directly
25   from the mine itself.  We have highwall miner coal,
```

93

1  which I would consider run-of-mine coal, that's been

2  properly sized and brought to our property.  They have

3  strip coal.  Surface mine coal I think comes to our

4  property.  We have coal refuse, gob, that comes to our

5  property.  We have biomass, wood products, that comes

6  to our property.  I guess that's about it.

7  BY MR. MASSIE:

8      Q.    And when you say biomass, what is biomass?

9      A.    Well, you know, the power plant is designed

10  to burn a coal/wood and burn gravel or limestone.  But

11  it's part of the blend.  But that's what fuels the

12  furnaces.  So it takes -- biomass is nothing more than

13  trees or weed debris or brush that's been ground to a

14  certain spec, a certain size, that it's blended in

15  with the solid fuel at the furnace, in the burn shaft.

16  So it's just wood that's been ground up, which is

17  critical and it has to be sized properly to work in

18  the plant.

19      Q.    So is this plant especially designed for

20  these type materials?

21      A.    This plant is designed to burn coal, biomass

22  and plus they blend in limestone for emission.  It's

23  touted as the cleanest coal-fired power plant in the

24  world.  It's a smokeless plant -- there's nothing

25  comes out of the stacks -- and 99.9 something percent

94

```
 1    sulfur reduction.  And that's the reaction of the

 2    calcium.  You know, hundreds of thousands of tons of

 3    limestone is crushed and blended in with the coal and

 4    the wood in the burn chamber.  And it goes down a

 5    fluidized bed, a flowing bed of material.  It burns in

 6    the chamber and the calcium reacts in the burn chamber

 7    and sucks in the emissions, the sulfur and the

 8    mercury, and it goes back out as fly ash, or the fly

 9    ash, the calcium does.

10            So that's why this plant is very special.

11    It takes a very special spec fuel, because of all the

12    pieces in that burn chamber, the limestone, the wood

13    and the coal pieces, that has to be right on spec for

14    it to react properly in that burn chamber.

15        Q.    And was it one of the selling points for

16    this plant that it would take this range of

17    products --

18        A.    Yes.

19        Q.    -- that might not otherwise go to a power

20    plant?

21        A.    That's correct.

22        Q.    And that includes gob, correct?

23        A.    Coal refuse, gob, wood.

24        Q.    Explain for the record what refuse or gob

25    is.
```

95

1      A.    Since the beginning of the coal industry in

2  America, late 1800s, for the most part the coal

3  industry was supporting, you know, America through its

4  industrial growth and everything steam generated.

5  That's what coal was used for, for steam generation

6  for power or for making steel or whatever.

7           But there was never any use for coal fines.

8  Coal fines were a negative or deterrent for the sale

9  of your product if you were a coal producer, because

10  coal fines had a tenancy to smother the fire being a

11  steam -- you know, a lump coal type driven steam

12  furnace.  So all through the late 1800s, through the

13  early 1900s, it was about the late '50s, all coal

14  producers in the United States, even Europe, they all

15  screened off everything they considered to be coal

16  fine, which is anything less than two inches.  Two to

17  zero all went over the hill into a tailings pile and

18  those piles were called gob piles here in our area.

19  The term gob actually comes from an English term

20  meaning garbage of bituminous.

21           So these piles represent about a hundred

22  million tons.  According to the Department of Mines

23  here in Virginia they say we have approximately a

24  hundred million tons of tailings piles, old gob piles

25  in southwest Virginia, which can now be used as fuel

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 149 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013

96

1   for this new Dominion plant.  And there was basically

2   no market for that up until now.

3        Q.   So these piles are in, I guess the word,

4   pre-law locations?

5        A.   Most are pre-law.

6        Q.   And they are not environmentally stable in

7   all cases?

8        A.   There is a big issue with the state agencies

9   and Federal about the contamination of the watersheds

10   in southwest Virginia by these tailings piles.

11        Q.   And these piles are what are being reclaimed

12   or captured to go into the plant?

13        A.   A big piece of the fuel, probably I'll guess

14   30 or 40 percent of the fuel, the plant burns comes

15   from these types of piles.

16        Q.   All right.  Now, the producers of the fuel

17   for the plant are from what area?

18        A.   Well, Power Fuels now takes coal from

19   Kentucky, Virginia currently.  We have taken some from

20   West Virginia, but right now Virginia and Kentucky.

21        Q.   And how many different producers are there

22   of --

23        A.   Since, you know --

24        Q.   Let me stop you.  Just of the coal or gob

25   coming into the plant?

97

```
 1      A.   It varies, but since -- we fired up Power

 2   Fuels the same time the power plant started.  Since

 3   that time the most has probably been 16, 18 producers.

 4   We probably have 15 or 16 right now.

 5      Q.   At this time?

 6      A.   Yeah.  Around there probably.

 7      Q.   And who does Power Fuels work for?

 8      A.   Dominion Power.

 9      Q.   And is it under the terminal agreements?

10      A.   Yes.

11           MR. MASSIE:  And I believe, your Honor,

12   they're located at the stipulation.  If they need to

13   be separately offered, I will offer them, but,

14   otherwise, we'd just rely on the stipulation.

15           THE COURT:  You mean that big package that

16   you filed with me before?

17           MR. MASSIE:  Yes.

18           THE COURT:  Yes, I can incorporate them by

19   reference right now so we know what we're talking

20   about.  Are you familiar with what he's talking about?

21           MR. JONES:  Yes, your Honor.

22           THE COURT:  The agreement and all the maps

23   and all that?

24           MR. MASSIE:  Well, what we did today, we had

25   a stipulation which included the citations and then
```

98

1    they also had the agreement with it, so it's the

2    stipulation of the parties.  It's the first thing we

3    did this morning.  I have another copy if you need it.

4         THE COURT:  Let's see here.  The stipulation

5    says, item number 5, page 2 of the stipulations, the

6    agreement as amended is attached as Exhibit G-4.  Is

7    that what the stipulation says?

8         MR. JONES:  Yes.

9         MR. MASSIE:  Yes.

10        THE COURT:  Okay.

11        MR. MASSIE:  So we'd just like those to be,

12   the terminalling agreement as amended --

13        THE COURT:  I'm trying to see here where --

14   I don't see where it was offered as G-4.  Do you?  It

15   wasn't offered independent.  It's just mentioned in

16   the stipulation.

17        MR. JONES:  Correct.

18        THE COURT:  So this entire agreement now,

19   which consists of all these 24 pages with the

20   diagrams, correct?

21        MR. MASSIE:  Yes, sir.

22        THE COURT:  All right.  So I'll incorporate

23   that by reference.

24        MR. MASSIE:  All right.  That will remain

25   G-4 then?

99

```
1              THE COURT:  That will remain G-4.

2              MR. MASSIE:  And it will be admitted?

3              MR. JONES:  No objection.

4              THE COURT:  It will be admitted.

5              MR. MASSIE:  Thank you.

6              (Government Exhibit 4 - Terminalling

7              Agreement - received)

8              THE COURT:  Well, is this also, assuming

9     that you come out on the short end of the stick, if

10    you'll pardon the expression, any of these exhibits

11    will be available for the other cases that are waiting

12    in the wings for me to hear?  I don't want to confuse

13    two records here.  I'm trying to anticipate.

14             MR. MASSIE:  No, sir.  These would be the

15    exhibits for this case.  We may provide others as

16    well.

17             THE COURT:  For this case.  For the

18    jurisdictional issue?

19             MR. MASSIE:  Yes, sir.

20             THE COURT:  Okay.  So that will be a part of

21    this record.

22             MR. MASSIE:  Okay.  Thank you.

23    BY MR. MASSIE:

24        Q.   Now, the Judge has the agreement.  He can

25    see the terms for himself there.  But to short-circuit
```

100

1    that, how are you paid?

2        A.    Well, our agreement, since the beginning,

3    Power Fuels has never owned a single pound of

4    coal-related product, so we are paid to handle by

5    Dominion this fuel, be it coal, gob, midds, whatever,

6    so much at a time as it crosses our scale.  The actual

7    operating costs of our facility, be it wages,

8    equipment costs, fuel, everything associated with our

9    facility in its entirety is paid 100 percent by

10   Dominion Power covering our costs, except for one

11   employee, which is my manager, Mike Hendrickson.  All

12   my foremen, all my hourly people, all of their costs

13   are paid 100 percent to Power Fuels.  We pay the

14   costs.  We are reimbursed by Dominion Power.

15            So when a ton of fuel, be it coal, coal

16   related, it could be biomass, whenever it crosses our

17   scale we get paid so much a ton as a fee for that

18   process.

19       Q.    So you have your per-ton fee plus you have a

20   cost reimbursement agreement?

21       A.    That's correct.

22       Q.    And it's basically all costs are reimbursed

23   except for the manager?

24       A.    The manager, the one person.

25       Q.    And Dominion owns all of the solid fuel

101

1    that's delivered to the site?

2        A.    Solid fuel meaning coal-related product?

3        Q.    Yes.

4        A.    Yes.

5        Q.    Power Fuels has never owned any of that

6    solid fuel material?

7        A.    Never one pound.

8        Q.    All of the solid fuel comes in on trucks; is

9    that correct?

10       A.    Correct.

11       Q.    And who hires the inbound trucks to the

12   site?

13       A.    All fuel delivered to Power Fuels is being

14   delivered by whoever Dominion purchased that fuel

15   from, the producers.

16       Q.    So if I'm a producing entity, a mine for

17   Dominion --

18       A.    Furnishing fuel.

19       Q.    -- furnishing fuel --

20       A.    You furnish your own truck.  They may have

21   contract drivers.  It could be their own trucks.  I

22   really don't know.

23       Q.    But it's not you?

24       A.    No.  We do not do any incoming fuel trucks.

25       Q.    All right.  So this material comes into your

102

1    site, and just walk the Judge through what happens

2    with the material from the time it enters your

3    property until the time it leaves your property.

4        A.    You have a producer.  That's any name.  Say

5    Pepper Coal Company is one of those producers.

6    Dominion enters into a purchase agreement, I assume,

7    with Pepper to furnish so many tons to the Power Fuels

8    facility.  And it's certain spec fuel.  You know,

9    Pepper might make a 10 -- they do make a 10, 11,000

10   BTU product.

11          And so it comes in by truck from Kentucky

12   and across our scales where our computerized scales

13   weigh the truck, get the weights for Dominion, who

14   will be paying for that fuel to Pepper, goes around

15   our auger sampler, which is an auger that goes down

16   into the tractor trailer bed where the fuel is

17   located, takes a sample, it's a third-party sample, so

18   I think SGS contracted by Power Fuels.

19          We get that sample on that truck.  Then that

20   truck is taken to a storage area, A yard, B yard, C

21   yard, D yard.  We have four different storage areas.

22       Q.    On site?

23       A.    On site, where it is dumped and segregated.

24   All the fuel for that one day coming from that one

25   producer is stored in one particular pile in a

103

1    particular area.  So the next morning at 5:00 in the

2    morning, 5:30, Dominion Power and Power Fuels gets by

3    computer from SGS Lab Company the exact quality of the

4    fuel for that producer that day.

5            And you should have a sheet there that would

6    show you what it gives you; the BUT, the sulfur, the

7    ash, the moisture, for the fuel delivered that day.

8            So we keep that fuel segregated for that one

9    particular day because it has a certain quality.  And

10   we do this for all 16 producers, whoever we have

11   coming that day.

12           And then we get all the qualities the next

13   day.  And then Dominion directs us daily to take this

14   quality coal, so much of this material and so much of

15   that material and so much of this material and blend

16   it together by one bucket of this, two buckets of

17   that.  Literally it says that.  You have the sheets

18   there that comes from Dominion Power that says that

19   into a pile.

20           And then once it's blended in that pile, you

21   know -- this pile could have 2,000 to 5,000 tons in it

22   of blended fuel -- then that pile is sampled again.

23   We load one truck, take it to the auger sampler,

24   re-sample it.  Dominion gets that quality again.  They

25   look at it and they say "It's not quite what we want.

104

1    We want it a little bit hotter.  We want a little

2    lower ash."

3            So we will reblend the entire pile again

4    based upon their direction, add so much more of this

5    pile to it, be it a higher BTU or a lower BTU, because

6    that is so critical for the firing in the plant, this

7    blended fuel spec, that it has to be right on the

8    mark.

9            So Dominion makes that call.  And sometimes

10   we'll reblend a pile two or three times to get it

11   exactly what they want before they take it across the

12   street.

13       Q.   So all this is based on actual test results

14   from the pile?

15       A.   Exactly.  All through lab analysis.

16       Q.   And then once it's in the desired range,

17   what happens then?

18       A.   We have contract trucks that we provide.  We

19   have two or three different contract truckers that

20   work for Power Fuels.  They are allowed on Dominion

21   property.  And they haul Dominion's fuel by whatever

22   volume Dominion wants, 8,000, 10,000, haul as much as

23   15,000 tons in a day, across the street to the plant.

24   A normal operating day, Power Fuels will handle three

25   to five hundred tractor trailers a day.

105

1      Q.   How many did you say a day?

2      A.   Three to five hundred a day.

3      Q.   Is that inbound?

4      A.   In and out.

5      Q.   In and out?

6      A.   We'll do 150 out to the power plant a day.

7  Some days we get 200.

8           MR. MASSIE:  Mark that, please.

9           (Respondent Exhibit 2 - Survey Map Of Power

10          Fuels Site)

11          MR. MASSIE:  May I approach again, your

12  Honor?

13          THE COURT:  Sure.

14          MR. MASSIE:  All right.  Mr. Crickmer, will

15  you come up again, please?

16  BY MR. MASSIE:

17     Q.   What is the document marked R-2?

18     A.   That is a survey map of our property as

19  built.  This is exactly how it -- this is all the

20  contour lines showing a slight grade on this.  This is

21  what we call A yard, this is C yard, D yard and B

22  yard.

23          MR. MASSIE:  Could we mark it?

24          THE COURT:  Sure.

25          MR. MASSIE:  This is A.

106

1          THE WITNESS:  A.  Right here is D.  Here is

2     C and here is B.

3          THE COURT:  Let the record show that the

4     Judge has assigned A, B, C, D to the -- what did you

5     call it?

6          THE WITNESS:  All storage areas.

7          THE COURT:  Storage areas.  All right.

8          MR. MASSIE:  And does this accurately show

9     your site there?

10         THE WITNESS:  Yes.

11         MR. MASSIE:  We'd offer R-2.

12         MR. JONES:  No objection.

13         THE COURT:  All right.  I'll receive it.

14         (Respondent Exhibit 2 - received)

15         THE WITNESS:  And for your benefit, Judge,

16    entrance, this is a concrete entrance, comes around a

17    paved road, truck scales, goes around the circle here,

18    truck scales.

19         THE COURT:  Are these marked?

20         THE WITNESS:  Yes.  Truck scales.

21         THE COURT:  They are not marked on the

22    diagram, are they?

23         THE WITNESS:  It's really hard to read.  You

24    can mark it if you want to mark it.  Truck scales.

25         THE COURT:  Okay.

107

1          THE WITNESS:  Right there at that point,

2    right through that box right there, is the auger

3    sampler.

4          THE COURT:  Okay.  Auger sampler?

5          THE WITNESS:  Yeah.

6          THE COURT:  Okay.

7          THE WITNESS:  And then from that point it

8    goes to be stored on any one of the yards.

9          THE COURT:  Okay.  All right.  That's fine.

10   I'll receive R-2.  Are you finished with this?

11         MR. MASSIE:  Yes, sir, but while we're up I

12   may show one more document here if I may.

13         (Respondent Exhibit 3 - Blending Instruction

14         Sheet)

15   BY MR. MASSIE:

16      Q.   Now, you mentioned -- this is a little

17   easier to handle, but while we're up, you mentioned

18   that you get instructions every day.

19      A.   Every day.

20      Q.   Is R-3 a set or a typical example of the

21   instructions that you get?

22      A.   Yes, it is.

23      Q.   These come from Dominion to you?

24      A.   Every day.

25         MR. MASSIE:  All right.  We offer R-3.

108

1          THE WITNESS:  And it changes during the day.

2          MR. JONES:  No objection to R-3.

3          THE COURT:  Those are daily instructions?

4          MR. MASSIE:  How would you characterize

5    these?

6          THE WITNESS:  Daily directions; sometimes

7    bi-daily.  And what they say is, they tell us every

8    day, in A yard you mix this blend, and it tells you

9    exactly, and the moisture.  It tells you what they

10   want to do by step.

11         THE COURT:  Is this the loaded gun, if

12   you'll pardon the expression?

13         THE WITNESS:  Well, it's totally -- we do

14   100 percent what they tell us, so this is what we do.

15   This next piece of paper -- can I walk on that side?

16   It's hard for me to read upside down.

17         THE COURT:  I'm sorry.  I'll turn it around.

18         THE WITNESS:  No, that's okay.  This right

19   here says "Please blend 908A" -- which is our

20   product -- "5 buckets of Omega with 4 buckets of

21   Gobco/ETI for pile Aa."

22         THE COURT:  Okay.  I understand.

23         THE WITNESS:  BTU should be 7950, 39 percent

24   ash, 5.9 percent moisture.  "I have attached a

25   spreadsheet with calculations."  In yard B --

109

1          THE COURT:  Okay.  You don't need to go

2     through all of that.  I get the gist of it.

3          THE WITNESS:  All right.  The next one?

4          MR. MASSIE:  The next page?

5          THE WITNESS:  Here's our calculation.  These

6     are all producers that they bought fuel from.

7          THE COURT:  Okay.

8          THE WITNESS:  This is how many buckets.

9     There's 207.98 buckets in that pile.  This is the

10    percent.  And in the blended pile they want two

11    buckets of that.  They want three buckets of Pevler.

12    They want three buckets of IBCS and one bucket of

13    South East.  So it actually gives us a 6.5 moisture, a

14    39 ash, a .9 sulfur, and 7600 BTU.

15          Now, these are all critical things for that

16    power plant's furnace.  That BTU has to be right on

17    the money.  That sulfur has to be within the limits

18    required by the law.  And, of course, ash is, you

19    know, a byproduct of the BTU.

20          THE COURT:  Let me ask you a question,

21    Counsel.  You're going through some very critical

22    detailed steps and explanations about how great this

23    power plant is in terms of an emission end product,

24    which is great.  Are you trying to convince me or

25    argue that this plant is so unique it cannot be

110

1    treated as some ordinary run-of-the-mill plant that

2    does serial stuff, that it is so unique that this

3    really is not the type of blending that's within the

4    purview of the Mine Act definition?  Is that the track

5    you're going down?

6           MR. MASSIE:  I guess my point was to try to

7    get all of the facts in front of you and then we'll

8    all the draw the conclusions from those that we need

9    to draw.

10          THE COURT:  Because I'm the guy that has

11   draw those conclusions.

12          MR. MASSIE:  But this is -- the point is

13   well taken by you, that this is not your typical power

14   plant.  This is a unique facility.

15          Mr. Crickmer, can you explain that?

16          THE WITNESS:  Well, I just explained that.

17   It's not a standard coal-fired power plant that's

18   buying railroad, you know, coal coming in twelve five

19   or twelve thousand and it's getting pulverized and

20   blowed in the furnace.

21          This is a fluidized bed plant that in its

22   product going in that plant is other things such as

23   limestone.  And in that reaction chamber in the

24   furnace, it's very critical that it's not too hot or

25   not too low or the combustion won't take place or the

111

1    emissions won't get captured by that burn.

2              THE COURT:  What other Government agencies

3    cover the operation of Dominion?

4              THE WITNESS:  All the plant across the

5    street is the all OSHA.

6              THE COURT:  All OSHA?

7              THE WITNESS:  Yes.

8              THE COURT:  Is EPA involved at all?

9              THE WITNESS:  I'm sure they are; probably so

10   is DEQ.

11             THE COURT:  But OSHA is an arm of the

12   Secretary of Labor as it pertains to the mining

13   industry?

14             THE WITNESS:  That's correct.

15             THE COURT:  All right.  Is it your

16   contention that -- we're talking about Dominion.

17   Okay.  I'll back off on that.

18   BY MR. MASSIE:

19      Q.   And just to orient the Judge, what are the

20   succeeding pages here?

21      A.   Well, this is all the producers, the ash,

22   the sulfur.  This is all the different for different

23   qualities.  And we get this every day by producer, by

24   quality.

25             In these piles here, in product two, on

112

1    October 9th this came in, on the 10th it came in, the

2    11th it came in.  And we track in every pile the

3    quality as removed and what is left for our blending

4    purposes.  And it is tracked by Dominion's computers

5    so that all these products are properly blended

6    together.

7            THE COURT:  Now, let me ask you a question.

8    It may be obvious to you, but not to me.  All of these

9    products that come in that are highlighted here --

10           THE WITNESS:  Those are producers.

11           THE COURT:  These are coal producers, right?

12           THE WITNESS:  Yes.

13           THE COURT:  They come in by truck.  They

14   haven't been subjected to some level of mixing and

15   blending under these specifications on each of this?

16           THE WITNESS:  Before it gets to me?

17           THE COURT:  Before it gets to your facility.

18           THE WITNESS:  I can't answer that.  You

19   know, I would assume that.  Like, you know, being a

20   coal guy myself, you know, when we had a product we

21   sold to Dominion or ADP, it was a combination of strip

22   coal, deep mine coal, various things to get up to the

23   required spec for that fuel.

24           MR. MASSIE:  I think the Judge's question

25   may be a little different.  I think what he's asking

113

 1   you is, for these various products, and there may be

 2   different answers for different products, but on these

 3   various products what preparation has occurred before

 4   they come to you?

 5              THE WITNESS:  Oh, I'm sure that there's been

 6   a lot of preparation.  I mean, it has to be crushed

 7   and sized.  We don't do any crushing and we --

 8              THE COURT:  No.  My question is this.

 9   You're not getting raw coal out of the mine and loaded

10   on trucks and directed to your facility.  Something

11   happens to that coal before it's put on their trucks

12   and delivered to your facility.

13              THE WITNESS:  For sure it's being crushed

14   and sized.

15              THE COURT:  At least sized?

16              THE WITNESS:  Yes.

17              THE COURT:  So some process has taken place?

18              THE WITNESS:  Yes, that's right.

19              THE COURT:  All right.

20              MR. MASSIE:  And that's a good point.

21   BY MR. MASSIE:

22       Q.   As far as that producer is concerned, as far

23   as that mine producer is concerned, has that mine

24   producer done everything that that mine producer is

25   going to do to that product before the sale?

114

1       A.    Yes.  I assume that.

2       Q.    Okay.  So when it comes in, it meets the

3  purchase specs?

4       A.    That's right, for Dominion.  And if not,

5  Dominion has an issue with that.  And it's a problem

6  sometimes, because it comes in, it's oversized, you

7  know, and if it's oversized they get cut off.  They

8  say "You won't bring us any more until it's sized

9  properly."

10      Q.    But what you're talking about now is the

11  things that take place not at the mine site but take

12  place at your site?

13      A.    What we're talking about right here.  That's

14  what all we do.  We don't do any crushing, sizing,

15  washing, upticket coal.  All we do is take different

16  fuels purchased by Dominion, which they own, and we

17  blend to whatever specifications they want for the

18  next day burn at the power plant or two days.

19            The power plant only stores -- and I didn't

20  mention this earlier, your Honor.  The power plant in

21  this drawing over here only stores --

22      Q.    You're speaking of R-1?

23      A.    This power plant, which is very unique in

24  itself, it's 100 percent truck fed; no rail.  When the

25  inventory is full, it only has nine to ten days of

115

1    inventory.  That's it.  Most coal-fired power plants

2    have 60 to 90 days' inventory; the same size plant,

3    600 megawatt.  They have ten days on the ground when

4    it's full.

5              So we also provide a big service for

6    Dominion on back-stocking that fuel.  We can store

7    another eight days of burn, which they own the fuel,

8    here at our place.

9              THE COURT:  This is obviously a business

10   decision by Dominion so it doesn't have to get into

11   the coal business.

12             THE WITNESS:  That's right.  These are all

13   just --

14             MR. MASSIE:  Let me orient the Judge.

15   You're looking at R-3 now?

16             THE WITNESS:  Yes.

17             THE COURT:  I get the drift of what you're

18   talking about.  I don't have any further questions on

19   this.

20             MR. MASSIE:  Okay.  Thank you.

21             THE COURT:  Do you have any objection to

22   R-3, Counsel?

23             MR. JONES:  No objection.

24             THE COURT:  I will receive it.

25             (Respondent Exhibit 3 - received)

116

1          MR. MASSIE:  While we're up -- may I use

2    these copies?

3          THE COURT:  Absolutely.

4          MR. MASSIE:  So while we're up, let me just

5    have these marked and we'll introduce these as well.

6          MR. JONES:  I have no objection to any of

7    those.

8          (Respondent Exhibit 4 - photograph)

9          (Respondent Exhibit 5 - photograph)

10         (Respondent Exhibit 6 - photograph)

11   BY MR. MASSIE:

12       Q.  All right.  Mr. Crickmer, I'm going to show

13   you R-4 and ask you what that's a picture of.  What is

14   that?

15       A.  Well, this is the entrance to Power Fuels

16   right here.  This is Dominion's property.  That's the

17   fly ash road.  That's our office right here.

18         THE COURT:  Okay.  That's an expanded view

19   of what you had on this?

20         THE WITNESS:  That's correct.

21         THE COURT:  All right.  This is R-4.

22         THE WITNESS:  This is B yard.  The B yard

23   you saw there would be sitting right there.

24   BY MR. MASSIE:

25       Q.  All right.  R-5?

117

1      A.   The power plant.

2      Q.   And R-6?

3      A.   That is -- in 2012 we handled 1,000 tractor

4   trailer loads of biomass for Dominion.  This is

5   actually the only time in Power Fuels' history where

6   we actually ground or did something to a product.  All

7   the other products we've handled, all the coal

8   products, we've never ever done anything, size,

9   screen, never did anything to those products.  But the

10  biomass, at their direction, we ground and stored and

11  delivered to VCHEC basically 1,000 tractor trailer

12  loads of biomass for Dominion.

13     Q.   All right.  So this is wood product?

14     A.   That's all biomass.  That's all wood.

15     Q.   And this is occurring at your site?

16     A.   That's correct, 2012.

17          MR. MASSIE:  We offer 4, 5 and 6.

18          MR. JONES:  No objection.

19          THE COURT:  I will receive 4, 5 and 6.

20          (Respondent Exhibit 4 - received)

21          (Respondent Exhibit 5 - received)

22          (Respondent Exhibit 6 - received)

23          THE COURT:  Okay.  Let me ask you a

24  question.  Let's assume hypothetically again that all

25  that you produce here is biomass and all that you have

118

1   here is biomass.  And biomass includes trees, stumps

2   and all that business, right?

3           THE WITNESS:  Correct.

4           THE COURT:  Which also thrives on coal

5   piles?

6           THE WITNESS:  Excuse me?

7           THE COURT:  Also thrives on coal piles, on

8   highwalls?

9           THE WITNESS:  It does.

10          THE COURT:  When they strip highwalls, they

11  pull out all the trees and the branches.

12          THE WITNESS:  That's right.

13          THE COURT:  Let's assume a mine operator,

14  who is a customer of Dominion, pulls out all the

15  debris, the trees and the leaves that come out of the

16  highwall and sends it to you and you do your thing

17  with it and give it to Dominion.  Do you think MSHA

18  would hold you -- would assume jurisdiction because

19  the trees and the forest and all of the biomass is a

20  product of a coal mine?

21          THE WITNESS:  I wouldn't have thought so a

22  few years ago, but now I might think that.

23          THE COURT:  I didn't want to plant the seed

24  there, but I'm just curious about how this --

25          THE WITNESS:  Where it's going to.  That's

119

1    right.

2              THE COURT:  Where we're headed with it.

3              THE WITNESS:  One of our --

4              MR. MASSIE:  Well, let's finish this.

5              THE WITNESS:  All right.

6              THE COURT:  He doesn't want to go down that

7    road.

8              THE WITNESS:  I was thinking about examples

9    how somebody would figure out that, but I wasn't going

10   to bring it up.

11             THE COURT:  He's protecting his client.

12   He's doing his job.

13             MR. MASSIE:  We'll get to that at a break

14   maybe.

15   BY MR. MASSIE:

16        Q.   All right.  Now, you've described the use of

17   the loaders, moving the product around with the

18   loaders to achieve the desired blend, correct?

19        A.   Correct.

20        Q.   You also mentioned a piece of equipment

21   called a stacking conveyor?

22        A.   Correct.

23        Q.   Explain to the Judge what that was.

24        A.   Well, it's a Cat-mounted conveyor belt that

25   lets you still make it a 2,000 ton stockpile, blended

120

1  pile, or you could make a 4,000 ton pile.  It lets you

2  elevate your pile higher.  It's mobile, so you can

3  move it to whatever yard you need to to accomplish the

4  work.

5      Q.   Tell us just a little bit about your

6  personal background, Mr. Crickmer.

7      A.   Well, I'm not a youngster.

8      Q.   Where are you from?

9      A.   I came to southwest Virginia in the mid '70s

10  out of college.  I'm a geologist.  I went to work for

11  Clinchfield Coal Company in management as a trainee

12  foreman.  I worked my way underground as a -- I guess

13  before that I worked for Consol as an hourly employee

14  in West Virginia for a little while.

15          But then I came to work for Clinchfield here

16  in the mid '70s and worked my way from foreman, mine

17  foreman, to superintendent, division manager.  The

18  latter part of my career, in the late '80s, early

19  '90s, I was president of Clinchfield Coal Company.  I

20  was in charge of Clinchfield, Jewell Ridge Coal

21  Company at Richlands, Eastern Coal Company at Stone,

22  Kentucky.

23          After that I left coal, still stayed with

24  Pittston Coal, and I dealt in non-coal businesses,

25  which were mining mountain GAS.  We drilled gas wells.

121

```
 1   Started a new business called Mountain Forest

 2   Products, which was a chip mill and saw mill over in

 3   Clintwood, Virginia.  And started a company called

 4   Maxium Rebuild, which is a company that rebuilds

 5   surface mining equipment.

 6          Today I work -- I retired from Pittston when

 7   Pittston sold out ten years ago.  And myself, along

 8   with our partners, are in the wood business, we're in

 9   the oil and gas business, and we're in the power fuel

10   business, and we're in the coal business.

11          Q.   When you say you're in the coal business,

12   what are you talking about?

13          A.   We own a company called Gobco, we've had it

14   ten years, that reclaims abandoned gob piles.  We

15   worked the first eight years in that business

16   furnishing gob, basically 5000 BTU, 52, 55 ash

17   product, to companies like Alpha, Teco, United, I

18   think Warshco, and they sold it as twelve five coal or

19   whatever their product was.

20          We did that the first eight years, and

21   during those eight years I'm fortunate to say we won

22   many state reclamation awards.  We won the national

23   award from the Department of Interior for the best job

24   nationally for reclamation.  Established a habitat.

25   Every job you're planting tens of thousands of
```

122

1    hardwood and native trees.  We have a somewhat green

2    history as well.

3        Q.    But as far as Power Fuels is concerned, it's

4    not in the coal business?

5        A.    No; never has been.

6        Q.    It does the activities that you've described

7    here?

8        A.    Since day one Power Fuels was designed for

9    the purpose of what we do daily.

10       Q.    When you were with Clinchfield did you have

11   responsibility over coal preparation plants?

12       A.    Yes.

13       Q.    Moss 3, was that one of your plants?

14       A.    Yes.

15       Q.    Are you familiar with the work of coal

16   preparation plants?

17       A.    Yes.

18       Q.    Do you have a degree in geology?

19       A.    Yes.

20       Q.    Does Power Fuels do the work of a coal

21   preparation plant?

22       A.    You know, coal preparation plants take a

23   strip coal or whatever product that comes in there and

24   they wash the coal, they screen the coal, they size

25   the coal.  They make a product for a certain

123

1   specification for a customer that the preparation

2   plant services.  It's a certain spec fuel.  That's

3   what preparation plants do.

4           Power Fuels has never ever done anything to

5   improve any quality of any fuel product.  We've never

6   screened it.  We've never washed it.  We've never

7   sized it.  We've never done anything do it other than

8   take exactly what's been brought in there by Dominion

9   and put it into a blend to fuel their furnace.

10      Q.   Are you aware of any producers of coal that

11  do the type of work that you do on a daily basis at

12  their sites?

13      A.   Well, Dominion buys spec fuel.  You know,

14  Power Fuels only furnishes, and I'll guess here, I'll

15  say -- usually it'll be higher -- let's say basically

16  80 percent of the fuel the power plant burns.  Yes,

17  there's fuel out there, it could come from Kentucky or

18  wherever, that is the spec that they want.  It's 7500

19  BTU, it's .4 sulfur, the moisture is within range.

20  And they will buy that direct from the producer.

21          It could be coming from a wash plant.  It

22  could be coming from a highwall miner.  But it's been

23  sized properly, crushed and screened and is to spec.

24          And probably 20 percent of the fuel goes

25  directly in the main gate, does not come to Power

124

1    Fuels, and goes to the truck dump and is dumped.

2    Eighty percent of the fuel we probably furnish.

3         Q.   So as far as the fine-tuning of this product

4    that occurs at Power Fuels on a daily basis, does any

5    producer do that?

6         A.   No.  That spec fuel is a rare product.  You

7    know, it's a special fuel.  Power Fuels takes all

8    different kinds of blends that Dominion has.  They buy

9    12000 BTU that's a product that, you know, there's a

10   lot out there on the market.  They buy remined coal.

11   They buy gob.  You know, it all has to be blended

12   before it can go into the plant.

13            And it's done daily and it's changed daily.

14   Our specs, the sheets I gave your Honor there, we get

15   those sheets this morning and at 12:00 we could get

16   new specs that says we want to change the spec and

17   drop the ash 3 percent, reblend pile 3, 5, 7 and 9;

18   sample it.  Every pile once it's been blended has to

19   be sampled, an analysis done on it.

20            Dominion the next morning looks at that

21   analysis and says "No, we want it a little hotter.

22   Reblend that pile again, add more of this pile to it,"

23   give us that analysis and we'll see if we can ship it

24   the next day.  This goes on six days a week all year

25   long.

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 178 of 400

125

1       Q.    If Power Fuels didn't do this work for

2   Dominion, would Dominion have to do it for itself?

3       A.    They would have to do it themselves, that's

4   correct, because the plant has to have the desired

5   spec fuel.

6       Q.    When you put in this site did you consider

7   it a mine?

8       A.    When I put in this site, I met with DMME,

9   Department of Mines Minerals and Energy, Bush Lambert,

10  the director.  And I sat down with Bush and I said,

11  "I'm building this facility.  This is what we do.

12  We're not a coal -- you know, we're not going to do

13  any mining.  We're not going to do any washing.  All

14  we're going to do is work with Dominion Power, handle

15  the trucks, store their fuel, reblend it to spec and

16  haul it across the street.  Do we need anything from

17  DMME?"

18          He said, "Walt, you really don't.  You don't

19  need a mine license.  You're not a coal mine.  You're

20  not a wash plant.  DMME has no jurisdiction over your

21  facility.  You work with OSHA."

22          We set it up as OSHA.  We had all of our

23  safety brochures on OSHA.  All the signs there when

24  they came on the property were all OSHA.  Our daily

25  visitors that come on the property had to fill out

126

1    OSHA forms.  We operated that way up until MSHA showed

2    up, you know, late in the program.

3              MR. MASSIE:  Those are all the questions I

4    have, Judge.  Thank you.

5              THE COURT:  Do you have any?

6              MR. JONES:  Sure.

7      CROSS EXAMINATION BY COUNSEL FOR PETITIONER

8    BY MR. JONES:

9        Q.    So, Mr. Crickmer, you testified today that

10   Power Fuels blends coal on behalf of Dominion Power?

11       A.    Correct.

12       Q.    Power Fuels stores the fuel on site at the

13   Power Fuels facility?

14       A.    Correct.

15       Q.    And then Power Fuels loads the stored coal

16   and takes it across the street to Dominion Power?

17       A.    As directed.

18       Q.    Okay.  And I'm going to draw your attention

19   to what has been admitted as Government Exhibit 4.

20             THE COURT:  Is that the agreement?

21             MR. JONES:  Yes, it is.

22   BY MR. JONES:

23       Q.    And so is this the agreement that Power

24   Fuels has with Dominion that governs the

25   responsibilities that Power Fuels has on behalf of

127

1      Dominion?

2          A.    That's correct.

3          Q.    Okay.  So I'd like you to turn to page 3 of

4      the agreement.  And page 3 is Article III, Services By

5      Power Fuels, and Section 3.01 is the description of

6      the services provided -- that Power Fuels provides to

7      Dominion; is that correct?

8          A.    Correct.

9          Q.    And so could you please read -- turn to page

10     4 and read out loud to the Court Section 301(iv) and

11     (v)?

12         A.    (iv) and (v)?

13         Q.    Yes.

14         A.    "Blend Solid Fuel in accordance with the

15     reasonable requirements of the customer."

16              THE COURT:  Not so fast so that she can get

17     it.  Go ahead.

18         Q.    So that's Article III, Services By Power

19     Fuels, Section 3.01, Description of Services,

20     301(a)(iv) and 301(a)(v).

21         A.    Go ahead and read it?

22         Q.    Yes.

23         A.    "Blend Solid Fuel in accordance with the

24     reasonable requirements of the Customer as directed by

25     the Customers' representative, provided that such

128

1    requirements shall not exceed the Facility

2    Specifications as set forth in Article II."

3            (v) "Load and ship Solid Fuel to VCHEC."

4       Q.   So Power Fuels complies with the terms of

5    the agreement?

6       A.   Sure.

7       Q.   Is that correct?

8       A.   Yes.

9       Q.   So would you say that Power Fuels is a

10   custom blending facility for Dominion Power?

11      A.   Yes.

12      Q.   Custom in the sense that it makes a

13   particular blend just for Dominion ?

14      A.   It makes a buyer's spec fuel that really

15   changes daily or weekly.  And they change it based

16   upon the heat rate of the furnace.  It's a custom

17   fuel.  And we do that work for Dominion.  We make that

18   spec fuel for them with fuels that they own.  They buy

19   fuels from many people and we take those fuels and we

20   make that spec fuel.

21      Q.   So everything that is done at Power Fuels is

22   done to meet the requirements and specifications of

23   Dominion Power?

24      A.   That's correct.

25           MR. JONES:  Okay.  No further questions,

129

1    your Honor.

2              THE COURT:  Go ahead.

3              MR. MASSIE:  Yes.

4    REDIRECT EXAMINATION BY COUNSEL FOR RESPONDENT

5    BY MR. MASSIE:

6        Q.    Just to clarify, solid fuels is defined in

7    this agreement, if we can find that --

8              MR. JONES:  It's on page 2.

9              MR. MASSIE:  Page 2.  Thank you.

10             MR. JONES:  Section 1.9.

11   BY MR. MASSIE:

12       Q.    As meaning coal, coal refuse, coal midds or

13   gob, correct?

14       A.    Correct.

15       Q.    And you also said you handle biomass.  Is

16   that by separate agreement?

17       A.    Well, it is by separate agreement.  You

18   know, we did biomass for Dominion at our property.

19   The only product that Power Fuels has ever purchased

20   and is on site that we own is biomass.  We have never

21   owned any coal products, but we do own biomass.  And

22   we do provide services in the wood line with biomass

23   for Dominion.  We ground basically 1,000 truckloads

24   last year, sized and ground biomass wood material for

25   Dominion.

130

1      Q.    That's my question.  Do you handle that

2  outside of this particular contract?

3      A.    That is correct.

4            MR. MASSIE:  Okay.  That's all.

5            MR. JONES:  No further questions.

6            THE COURT:  At this point I'm going to make

7  an observation.  This is your first hearing with me?

8            MR. JONES:  Yes, it is.

9            THE COURT:  I've been known to make

10  observations from time to time --

11            MR. JONES:  Okay.

12            THE COURT: -- because I'm a resurrected ALJ

13  in the second life.  I'm reminded of --

14            THE WITNESS:  This?

15            THE COURT:  Whose exhibit is this?  This is

16  yours, isn't it?

17            MR. JONES:  Yes, it's the Government

18  exhibit.

19            THE COURT:  Did you just use that?

20            MR. JONES:  Yes, I did.

21            THE COURT:  Well, why don't you --

22            MR. JONES:  You have a copy.

23            THE COURT:  Well, wait a minute.  The one

24  that I marked was the one that he submitted as a

25  package and I marked it G-4.

131

1          MR. JONES:  Yes.  At the bottom that's also

2     marked G-4.

3          THE COURT:  I don't want two copies of the

4     exhibit.

5          MR. MASSIE:  I'll take it.

6          THE COURT:  I already have that, because it

7     was my understanding that I was going to use the one

8     that he submitted.

9          All right.  Back to my story.  I'm reminded

10    of this Afflac duck on a commercial.  Have you ever

11    seen it, that quacks?

12         MR. JONES:  Yes.

13         THE COURT:  And it lifts weights and it does

14    all this other stuff?

15         MR. JONES:  Yes.

16         THE COURT:  But in the final analysis, I'm

17    having difficulty right now when I see as a layman

18    blending terminal, blending yard, the contract, is

19    this still the duck.  Is this quacking like a duck?

20    And if the duck is subject -- what sets your operation

21    apart?

22         MR. MASSIE:  Whose duck is it?  Is it a coal

23    mine's duck or is this a power plant duck?

24         THE COURT:  Mr. Massie, when you said whose

25    operation is it, is it the coal mine, well, whose

132

```
 1    operation is it?  Who is the entity?  Why did you
 2    throw coal in there?
 3              MR. MASSIE:  Well, that's what the
 4    allegation is, that it's a coal mine.
 5              THE COURT:  No, it's a coal mine or a
 6    facility that does things --
 7              MR. MASSIE:  Right, but that's part of the
 8    definition.
 9              THE COURT:  That's right, part of the
10    definition.  You seem to be going down the trail that
11    we're separating the biomass from the other stuff
12    that's blended, which under the agreement is coal and
13    the coal product, and, therefore, it's very unique and
14    this is a green operation.  And you somehow want to
15    separate that from the run-of-the-mill stuff, right?
16              MR. MASSIE:  Not separate; just show that
17    all of this is taking place at the same site.  I don't
18    mean to separate it legally in any way, just to
19    show --
20              THE COURT:  In Consolidation Coal, which was
21    the loading barge case that I mentioned earlier --
22              MR. MASSIE:  Correct.
23              THE COURT: -- the coal barges were out on
24    the Ohio River, and they had a loading dock on
25    Consol's facility that was across the road from the
```

133

1    coal preparation plant, right?  The coal preparation

2    plant did some things to the coal.  They put it on

3    conveyors, it went to the site and then it was in

4    piles and they blend it.  The coal was coming from all

5    over the place, and it was, when it was loaded at the

6    loading dock, subjected to all this process.  And that

7    facility was held to be a coal mine subject to MSHA's

8    jurisdiction.

9             My ruling was the empty barges out here

10   weren't doing anything but just sitting there

11   anchored.  There was nothing happening there and they

12   were not subject to jurisdiction.  And as far as I

13   know the Secretary never appealed that decision.

14             MR. JONES:  That's correct.

15             THE COURT:  Are you aware of my Consol?

16             MR. JONES:  Yes.

17             MR. MASSIE:  Right.  And so how do you take

18   that definition, work of preparing the coal, right,

19   how do you take that definition?  Is it any blending?

20   Is it any storing of coal?  Is it any mixing of coal?

21   So that any consumer that has coal from two different

22   sources and uses that coal, is that a coal mine?  So

23   if you take your home that may have stoker coal from

24   one place and another stoker coal from some other

25   place and mix it together and put it in the furnace

134

```
 1   it's a coal mine because it blends that coal?
 2              THE COURT:  I notice the inspector is over
 3   here taking notes.
 4              MR. MASSIE:  Well, I mean, we can go only so
 5   far.
 6              THE COURT:  Absolutely.  Everything is
 7   possible.  The question is is it probable.
 8              MR. MASSIE:  Well, the question is where is
 9   the limitation.
10              THE COURT:  Where you draw the line.  Okay.
11              MR. MASSIE:  Where is the limitation.  And
12   the language goes on to say "as is usually done by the
13   operator of the coal mine."
14              So I would suggest -- and this was Judge
15   Alito's point in that dissent that he wrote -- that
16   there has to be a line somewhere to this, because not
17   every mixing, washing, sizing, touching of coal is a
18   coal mine.  And it has to be by that language the kind
19   of work that's usually done by the operator of a coal
20   mine.
21              THE COURT:  Usually done.  It doesn't
22   necessarily mean it's exclusively done.
23              MR. MASSIE:  Usually done.
24              THE COURT:  Usually.  Was he in the -- did
25   you say he was in the dissent on that?
```

135

1           MR. MASSIE:  He was in the dissent.

2           THE COURT:  He was?

3           MR. MASSIE:  Yes.

4           THE COURT:  That's why he's sitting on the

5    Supreme Court.

6           MR. MASSIE:  Well, I'm sure he would have an

7    interest in this issue.

8           MR. JONES:  Your Honor, but I would say, you

9    know, counsel asked, you know, where do you draw the

10   line, and the case law is clear where the line is

11   drawn.  When you mix, store and load to meet a

12   customer's specifications, the line is drawn when it's

13   done to meet a customer's specifications.

14          THE COURT:  I understand that you gentlemen

15   sitting at the table did not write this statute, nor

16   did you write the rules and regulations.

17   Unfortunately, the judges are responsible for

18   interpreting what all these words mean.  And sometimes

19   the ordinary person walking down the street wonders

20   what is going on here.

21          This poor guy is out there doing a little

22   sand and gravel operation and all of a sudden -- in a

23   recent case I had -- 100 acres of land and the

24   inspector comes by and finds it's all locked down.

25   And he lets him in.  He looks at all the equipment and

136

1    leaves.  And one of the citations was, as one of the

2    solicitors classified it, the potty citation.  This

3    operator did not have a facility for people to use if

4    they had to go to the bathroom.

5            Well, it turns out, in my decision I held

6    that there was a facility at McDonald's nearby that

7    was sufficient, particularly since the inspector said

8    that he had deference in that case.  He decided that

9    if the facility was at a local gas station or a home

10   office within a half a mile of this 100 acres in the

11   wilderness where a father, who was one of the

12   co-owners of the mining company, ran his little

13   operation there.  They operated one day in six or

14   seven years to produce some sand and gravel for the

15   local municipality that needed it to put on their

16   roads.  And he was faced with 20 citations.  And this

17   one, the inspector said "I would accept a half a

18   mile."  It turned out McDonald's was an eighth of a

19   mile.  So notwithstanding that there are no

20   exceptions, I vacated the citations.

21           But the point is, maybe I've overstated it,

22   is at first appearance -- you're probably wondering

23   what are we doing here because it's obvious to the

24   Secretary that this is a mine and subject to the Act

25   because we've got all this evidence and all this

137

1    indication of what happens at this location.  Is that

2    correct?

3              MR. JONES:  Yes.

4              THE COURT:  And I'm waiting for your

5    explanation in your brief to convince me that it ain't

6    that simple, Judge.

7              MR. MASSIE:  Well, the suggestion is made

8    that we're doing this for a customer, that we're some

9    kind of a middle man and we're custom blending this to

10   sell into a market.  We are the customer.  I mean,

11   we're the contractor for the customer.  The customer

12   is VCHEC.  It's the plant itself.  We work for them,

13   so this is the plant itself through us as the

14   contractor.

15             THE COURT:  You don't view Dominion as your

16   customer?

17             MR. MASSIE:  Note in that sense.  Not in a

18   sales sense.

19             THE WITNESS:  I am not responsible.  If it's

20   wrong, the blend is wrong, if there's a loss in a

21   stockpile, whatever, that is all 100 percent Dominion.

22   If they told me to blend it this way and it came out

23   something they didn't like, it's not my

24   responsibility.  I do only what I'm told to do.

25             And, you know, they even reblend across the

138

1    street.  Their reclaim systems senses sulfur, moisture

2    ash in both piles.  And they regulate those feeds onto

3    the infeed to the belt.  So they tweak it on their

4    side as well.

5            And they own the fuel.  I have no

6    responsibility other than to do as I'm told to do with

7    their fuel.

8            THE COURT:  All right.  Anything else?

9    Thank you, sir.

10           MR. MASSIE:  Thank you, Mr. Crickmer.  You

11   can step down.

12           THE COURT:  I appreciate your explanation.

13           (Witness excused)

14           MR. MASSIE:  We rest, your Honor.  Thank

15   you.

16           THE COURT:  You don't want to get into the

17   citations?

18           MR. MASSIE:  No, sir.

19           THE COURT:  Is this gentleman the foreman

20   who was --

21           MR. MASSIE:  No.  He's a lawyer.  He wants

22   to testify, but I'm not going to let him.

23           MR. KINDIG:  I was on the docket to

24   illuminate this, but Wade decided that that would be a

25   really bad idea.

139

```
1              THE COURT:  Who is this gentleman -- let me
2    find him.  Is Bobby Ketron still working for you?
3              MR. CRICKMER:  Yes.
4              THE COURT:  Okay.  I have a reason for
5    asking that, after hearing that he let the inspector
6    in, he took his pictures and all of that business.  I
7    had a case one time, but that particular Bobby was no
8    longer employed, in another kind of proceeding.
9              Let's see, how about some of the other
10   things -- what size of an operation?  I want to get
11   back to the six steps.  I have to have them in the
12   record.  Do you classify him, assuming I conclude that
13   it is subject, that he is a small, medium size
14   operation or what?
15             MR. JONES:  How many employees work at the
16   facility?
17             MR. CRICKMER:  Twelve.
18             THE COURT:  Twelve.
19             MR. JONES:  It would be classified as a
20   small mine under the regulations.
21             THE COURT:  Okay.  Anything that I've
22   missed, Gentlemen, with regard to the three citations?
23   We've covered quite a lot here over a relatively brief
24   period of time.
25             MR. JONES:  Not that I can think of, your
```

140

1    Honor.

2              THE COURT:  Okay.  Do you gentlemen want to

3    file briefs with me?

4              MR. MASSIE:  I think that would be helpful.

5              THE COURT:  Okay.

6              MR. JONES:  I have no objection to filing

7    briefs.

8              THE COURT:  Like I said, I'll issue an order

9    once I get the transcript to affix a specific time for

10   you to file briefs.

11             Okay.  Is there anything else, Gentlemen?

12   Thank you very much.  I appreciate your attention to

13   this case.

14             MR. JONES:  Thank you, your Honor.

15             MR. MASSIE:  Thank you, Judge.

16             (Proceedings concluded at 11:48 a.m.)

17

18

19

20

21

22

23

24

25

141

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2

 3        I, CHARLENE M. SHADE, do hereby certify that I

 4   reported in stenotype and thereafter reduced to

 5   typewriting the above-entitled hearing; that I am

 6   neither counsel for, related to, nor employed by any

 7   of the parties to the action in which this hearing was

 8   taken; and, further, that I am not a relative or

 9   employee of any counsel or attorney employed by the

10   parties hereto, nor financially or otherwise

11   interested in the outcome of this action.

12

13
                    _____
14                  CHARLENE M. SHADE, LCR
                    Notary Public in and for
15                  the State of Tennessee

16

17

18

19

20

21

22

23   My Commission Expires:

24   July 7, 2015

25   LCR #105
```

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 1

| 0 |
|---|

**02** 58:23

| 1 |
|---|

**1** 4:5,13 8:5,6
    25:19,20,25
    26:8,9 36:18
    82:15 89:8
**1,000** 117:3,11
    129:23
**1.9** 129:10
**10** 3:6 50:22 102:9
**10,000** 89:18
    104:22
**100** 100:9,13
    108:14 114:24
    135:23 136:10
    137:21
**104(a)s** 72:8
**105** 4:14 141:25
**105(d** 5:8
**106** 80:17
**107** 4:14,15
**1078** 16:9
**10th** 112:1
**11,000** 102:9
**11:48** 140:16
**110** 57:10,14,19
**110(c** 71:20,21,24
    72:2
**1100** 2:6
**115** 4:15
**116** 4:17,18,19
**117** 4:17,18,19
**11th** 112:2
**12** 22:6,7 45:5,6
    50:19,22
**12:00** 124:15
**12000** 124:9
**126** 3:12

**129** 3:12
**12-days** 22:10
**12th** 22:2
**13** 74:13
**140** 34:14
**15** 97:4
**15,000** 104:23
**150** 105:6
**150,000** 34:14
**16** 57:25 97:3,4
    103:10
**17** 3:7
**172** 16:9
**18** 97:3
**1800s** 95:2,12
**19** 1:18
**1900s** 95:13
**1968** 55:21
**1977** 5:9
**1988** 10:4
**1999** 16:10
**1st** 25:3

| 2 |
|---|

**2** 4:6,14 32:14,18
    33:12 35:22 38:5
    42:9 98:5 105:9
    106:14 129:8,9
**2,000** 103:21
    119:25
**2/2** 15:11
**20** 3:10 27:25
    58:24 123:24
    136:16
**200** 105:7
**2001** 21:14
**2002** 21:14,17
**2005** 21:22
**2006** 21:17,24

**2007** 21:4
**2011** 87:23 88:9
**2012** 22:2 24:25
    60:8 62:5 63:9
    64:23 65:20
    117:3,16
**2013** 1:18 25:3
    33:15
**2013-312** 5:16
**2013-312-R** 1:11
**2013-313** 5:16
**2013-313-R** 1:13
**2013-353-R** 1:14
**2013-403** 1:5 5:13
**2015** 141:24
**202)693-9333** 2:8
**207.98** 109:9
**208** 2:13
**22** 57:4
**22209-2296** 2:7
**22nd** 2:6 60:8 62:5
    63:9 64:23 65:19
**24** 98:19
**24212-2288** 2:14
**25** 4:5 27:23 29:23
    30:15
**26** 4:5
**276)628-5151** 2:15
**29** 5:11

| 3 |
|---|

**3** 4:7,15 10:3
    38:3,6,18
    72:24,25 73:2
    107:13 115:25
    122:13 124:17
    127:3,4
**3.01** 127:5,19
**30** 8:22 50:16
    96:14

**301(a)(iv** 127:20
**301(a)(v** 127:20
**301(iv** 127:10
**305** 1:22
**32** 4:6 58:25
**34-feet** 34:5 54:6
**34-foot** 43:12
**35** 4:6
**3630** 79:10
**38** 4:7
**39** 108:23 109:14
**3rd** 14:12 17:10

| 4 |
|---|

**4** 4:8,17 99:6
    108:20 116:8
    117:17,19,20
    123:19 126:19
    127:10
**4,000** 120:1
**40** 40:4 50:17
    96:14
**44** 3:10
**44-07303-323400**
    1:6

| 5 |
|---|

**5** 4:9,18 57:7 58:23
    59:11 61:21
    62:10 72:17
    73:11 74:17
    75:5,8 76:11,14
    98:5 108:20
    116:9
    117:17,19,21
    124:17
**5,000** 103:21
**5.9** 108:24
**5:00** 103:1
**5:30** 103:2
**50** 40:4

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 196 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 2

**5000** 121:16

**50s** 95:13

**52** 121:16

**53** 3:10

**55** 121:16

**56** 3:11

**58** 80:25 81:1,2
83:22 84:1,22
89:16 90:2,6

**580** 81:12

---

**6**

**6** 4:10,19 63:1,14
116:10
117:17,19,22

**6.5** 109:13

**60** 115:2

**600** 81:13 115:3

**600-megawatt**
81:11

**61** 4:9

**62** 4:9

**63** 4:10

**64** 4:11

**6500** 82:1

**67** 3:11 4:11

**6th** 17:11

---

**7**

**7** 4:11 58:22 64:16
66:21 67:3,8
124:17 141:24

**70s** 120:9,16

**7500** 81:25 123:18

**76** 3:11

**7600** 109:14

**77.1104** 47:8

**79** 3:12

**7950** 108:23

**7th** 21:4

---

**8**

**8** 4:3

**8,000** 89:19 104:22

**8:56** 1:25

**80** 123:16

**8000** 82:1

**802(h)(1)(C** 18:8

**80s** 120:18

**81** 4:13

**8204724** 4:5 25:20
30:11 32:7

**8204725** 4:6 32:14
33:13 35:19

**8204726** 4:7
38:3,7,20 41:11

**89** 4:13

**8th** 16:9

---

**9**

**9** 3:5 109:14
124:17

**90** 115:2

**908A** 108:19

**90s** 120:19

**99** 4:8

**99.9** 93:25

**9900** 37:16

**9th** 33:15 38:21
112:1

---

**A**

**A.C** 1:6

**a.m** 1:25 140:16

**Aa** 108:21

**abandoned** 121:14

**abated** 91:15

**abbreviation** 77:6

**ability** 7:16

**Abingdon** 2:14

---

**above-captioned**
1:20

**above-entitled**
141:5

**Absolutely** 51:9
116:3 134:6

**accept** 8:4 136:17

**accident** 28:24
30:25 47:10

**accidents** 44:13

**accompany** 27:4

**accomplish** 120:3

**accordance**
127:14,23

**according** 63:21
95:22

**accumulations**
47:9

**accurately** 106:8

**achieve** 12:12
119:18

**acknowledge** 6:19
17:18

**acres** 80:17 135:23
136:10

**across** 12:8 17:20
61:15 63:18
65:23 66:6,8
70:10 102:12
104:11,23 111:4
125:16 126:16
132:25 137:25

**Act** 5:9 6:9,11
9:13,16,18 10:1
17:13,22 18:8
44:21
57:11,13,20
110:4 136:24

**action** 141:7,11

**actions** 10:25

**activities** 9:25
70:2,10 122:6

---

**activity** 71:8

**actual** 25:16,17
100:6 104:13

**actually** 13:20
14:4,13 15:11
41:17,22 55:15
59:8 67:23 71:22
72:1 85:22 86:16
95:19 109:13
117:5,6

**add** 17:6 104:4
124:22

**additional** 6:3
8:23

**address** 19:13
49:23 79:14,16

**adjacent** 69:24

**adjoin** 86:11

**adjoins** 80:17

**adjustment**
39:1,16 40:11
47:13

**Administration**
20:25 57:2,22

**ADMINISTRATI
ON(MSHA**
1:5,14

**ADMINISTRATI
VE** 1:1,21

**admit** 67:2

**admitted** 25:25
38:14 62:7 63:11
99:2,4 126:19

**ADP** 112:21

**advanced** 6:16

**advise** 10:4

**advised** 27:15

**aerial** 4:13 82:15
83:12 88:1

**affect** 7:16

**affected**
28:14,19,23 29:2

---

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 3

34:23,24
40:15,21

affirm 8:11

affirmation 8:9

affix 140:9

Afflac 131:10

age 10:5

agencies 96:8
111:2

agency 57:5 71:3
76:20

agents 57:18

ago 81:15 118:22
121:7

agreement 4:8
11:16 45:9 97:22
98:1,6,12,18
99:7,24 100:2,20
102:6 126:20,23
127:4 128:5
129:7,16,17
132:12

agreements 7:10
11:25 12:1 97:9

ahead 9:10 28:20
83:9 127:17,21
129:2

ain't 137:5

air 39:2,3,4,6,17
40:10

alarm 33:20,23
37:7 38:23
42:3,7,10,22
43:2 47:14

alarms 42:11,16

algebra 85:4

Alito 14:21

Alito's 134:15

ALJ 4:2 8:5,6
130:12

allegation 132:4

alleged 5:14

Alliance 27:24
30:1,4

allowed 29:3
104:20

alone 74:5

Alpha 21:22
121:17

already 131:6

am 31:5 59:3
65:16 137:19
141:5,8

amended 98:6,12

America 95:2,3

American 73:1,3

analysis 17:14
23:16 104:15
124:19,21,23
131:16

anchored 133:11

answer 48:6 50:13
112:18

answers 113:2

Anthony 2:3 7:2

anticipate 99:13

anybody 55:24
75:19

anyone 27:4 45:12

anything 17:5 53:5
76:3 78:3,11
82:24 88:9 95:16
117:8,9 123:4,7
125:16 133:10
138:8 139:21
140:11

apart 131:21

appealed 133:13

Appeals 9:21
15:12 18:2

appearance
136:22

appearances 7:1

Appeared 65:5

apply 17:14

appreciate 5:25
138:12 140:12

approach 105:11

approached 60:9

approximately
25:9 28:4,11
50:16 81:4 87:21
95:23

April 25:3 33:15
38:21

Archer 57:25

area 23:3 60:20
65:1,4,8,9,22
66:1,6 85:21
86:22,23 87:2,13
88:22 95:18
96:17 102:20
103:1

areas 33:2
34:4,6,20,21
35:11 41:3 85:20
102:21 106:6,7

aren't 17:18

argue 109:25

arguments 6:16

Arlington 2:7

arm 111:11

arrived 51:17

arrow 63:21 65:1

Article 127:4,18
128:2

ash 87:2,3,4 94:8,9
103:7 104:2
108:24
109:14,18
111:21 116:17
121:16 124:17
138:2

assert 72:15 73:12
75:4

asserted 70:5

asserting 74:7

assigned 106:4

assistant 57:12
59:10,16 69:5
73:18,25

associated 16:9
100:8

associates 21:6

assume 18:14,16
51:7 63:25 66:8
71:12 91:15
102:6 112:19
114:1 117:24
118:13,18

assuming 99:8
139:12

attached 98:6
108:24

attention 25:17
32:16 61:25 63:3
64:18 126:18
140:12

attorney 141:9

auger 90:16
102:15 103:23
107:2,4

authorized 58:13

available 99:11

average 89:19

award 121:23

awards 121:22

aware 48:5,21
51:13 72:22 73:5
74:10,16,21
75:5,10,13,15
88:25 123:10
133:15

away 40:19

axle 37:18

---

B

bachelor's 21:8

back-and-forth 18:13

backed 34:14

background 77:4 120:6

backing 34:20 54:8

backs 34:6

back-stocking 115:6

backup 33:20,23 37:7 38:23 42:3,7,10,11,15, 21,22 43:2 47:13

bad 138:25

bagged 87:3

ballpark 50:20

barge 132:21

barges 13:25 132:23 133:9

based 17:15 104:4,13 128:15

basic 10:9

basically 22:14 23:13 24:19 35:8 57:10 60:11 61:10 81:11,14 92:13 96:1 100:22 117:11 121:16 123:15 129:23

basis 6:12 12:6 45:19 50:11 70:5 123:11 124:4

bath 91:3,4,18

bathroom 136:4

bear 82:8

became 58:16

become 22:10 59:4

bed 94:5 102:16 110:21

beginning 1:25 95:1 100:2

behalf 2:2,10 7:2 126:10,25

behind 43:13 54:8

believe 9:19 19:13 60:14 61:3 66:6 68:11 76:22 97:11

belt 82:3 87:15 119:24 138:3

belts 86:24 87:10,12

benefit 106:15

Benson 36:22

best 72:9,17 121:23

better 31:18 55:6 83:5

bi-daily 108:7

bigger 41:21 92:12

biomass 52:13,19 53:1 75:24 86:22 93:5,8,12,21 100:16 117:4,10,12,14,2 5 118:1,19 129:15,18,20,21, 22,24 132:11

bit 104:1 120:5

bits 11:17

bituminous 11:2 95:20

blanks 48:20

blend 12:7,20 23:14,16 24:22 55:4 61:12 64:25 65:9 93:11,22 103:15 108:8,19 114:17 119:18 123:9 127:14,23 128:13 133:4 137:20,22

blended 23:5,18 54:11,12,14,18,2 0 66:3 93:14 94:3 103:20,22 104:7 109:10 112:5 119:25 124:11,18 132:12

blending 1:8 4:15 9:14 15:15 23:11,12 24:20 32:25 54:10 55:8,25 56:1 60:21,23 63:20 64:2,5,9,12 66:1 68:23 88:17 107:13 110:3 112:3,15 128:10 131:18 133:19 137:9

blends 124:8 126:10 134:1

block 90:19

blowed 110:20

blown 81:20

board 60:18

Bobby 60:13 61:7 67:25 139:2,7

bolt 58:6

bones 31:4

bottom 131:1

bought 15:20 86:16 109:6

Boulevard 2:6

boundary 88:22

bounds 85:5 88:8

Bower 19:10 20:13,19,22 32:16 38:9 43:23 44:9 62:20

B-o-w-e-r 20:22

BOWER 3:10 20:14

box 107:2

boy 79:6

brake 39:1,3,16,18 40:11 51:16

brakes 27:2 28:17 31:21,23 36:5,9 37:5,8,12,16,18 39:8,9,24 47:13

braking 26:24 27:17,23,25 29:24 30:15 36:15 39:6,7 40:12

branches 118:11

break 43:25 44:1 49:14 119:13

breaking 10:25

brief 8:23 9:8 137:5 139:23

briefing 16:11

briefly 33:17 65:17

briefs 8:18,19 18:17 140:3,7,10

bring 14:17 82:18 114:8 119:10

bringing 46:9 75:22

brings 53:19

Bristol 1:17,22 8:3

brochures 125:23

Broken 31:4

broker 15:18

brokers 14:1

broker-type 13:13

brought 15:8 24:15 92:20 93:2 123:8

brush 93:13

BTU 81:19,24,25 82:7,9 102:10 104:5 108:23

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 5

109:14,16,19
121:16 123:19
124:9
**bucket** 92:2,3,4,6
103:16 109:12
**buckets** 103:16
108:20
109:8,9,11,12
**building** 60:19
90:19 125:11
**built** 43:19
91:1,14,16,17
105:19
**bulldozer** 55:15
**bulletin** 60:18
**burn** 12:13
93:10,15,21
94:4,6,12,14
111:1 114:18
115:7
**burned** 81:21
**burning** 16:14
**burns** 89:18,24
94:5 96:14
123:16
**Bush** 125:9,10
**business** 7:17
11:12 49:12
115:9,11 118:2
121:1,8,9,10,11,
15 122:4 139:6
**businesses** 120:24
**buy** 123:20
124:8,10,11
128:18
**buyer's** 128:14
**buying** 15:15
110:18
**buyout** 21:23
**buys** 123:13
**byproduct** 23:23
109:19
**byproducts** 24:13

53:1 54:23

---

**C**

**cab** 41:24
**calcium** 86:23
87:18 94:2,6,9
**calculation** 109:5
**calculations**
108:25
**calibrated** 92:4
**Capital** 1:23
**captured** 96:12
111:1
**Carbo** 72:22,23
**care** 8:13
**career** 55:23 71:2
120:18
**carries** 53:22
**carrying** 40:3
**case** 5:23,24 6:5
8:9 9:12,19,20
10:13,22
13:6,13,17,23
14:2,8,9,12,18,2
4 15:3,14
16:7,23 17:11
18:22 20:2 31:6
44:12 72:7 75:11
78:16,20
99:15,17 132:21
135:10,23 136:8
139:7 140:13
**cases** 5:18 6:3
10:10 13:5,11
16:11
17:8,9,12,23
18:2 49:21 96:7
99:11
**categorized** 34:16
**category** 16:25
**Cat-mounted**
119:24
**caught** 66:23

**cause** 39:18 54:3
**caveat** 67:7
**Center** 15:25
16:1,4 79:18,23
**certain** 61:13
93:14 102:8
103:9 122:25
123:2
**CERTIFICATE**
141:1
**certified** 21:21
58:3
**certify** 141:3
**cetera** 11:18 88:17
**chamber**
94:4,6,12,14
110:23
**change** 124:16
128:15
**changed** 88:9,11
124:13
**changes** 82:1
108:1 128:15
**characterize** 108:4
**charge** 120:20
**Charlene** 1:23
141:3,14
**check** 27:8 67:23
71:10
**chip** 121:2
**chips** 52:12
54:15,17 55:4
**chooses** 43:1
**circle** 85:17
106:17
**Circuit** 14:12
16:10 17:11
**circumstances**
46:23
**citation** 1:12,13,15
4:5,6,7 20:9
25:19,20,22

26:21 27:11,20
28:5,12 30:11
31:21 32:7,14
33:13,18 34:8,16
35:16,19,25
36:12,15,18
37:11
38:3,7,9,11,20
39:13 40:5 41:11
71:15 136:2
**citations** 7:15,16
19:14,18 25:17
32:8 37:20 45:8
46:6 51:20 53:13
88:23,25 91:12
97:25
136:1,16,20
138:17 139:22
**cite** 33:6
**cited** 10:3 13:5
14:8 16:7 17:8
27:15 28:3,9
37:20 41:5 42:9
43:6 70:17
**cites** 16:10
**citing** 37:11,14
76:8
**City** 63:20 64:1
73:5
79:10,11,17,23
**civil** 1:4 5:12
**claim** 70:11
**clarify** 25:7 42:9
129:6
**clarity** 57:14
**class** 58:3,5
**classification**
40:25
**classified** 40:22
81:12 136:2
139:19
**classify** 30:13,23
39:15 40:8
139:12
**Clay**

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 6

56:8,11,13,23,24
,25 61:22 63:2
64:17,18 66:10
67:11 76:7

C-l-a-y 56:24

CLAY 3:11 56:17

clean 29:10

cleanest 93:23

cleaning 11:1

clear 43:2 53:12
60:6 77:23
135:10

clearly 9:12

client 119:11

Clinchfield
120:11,15,19,20
122:10

Clintwood 121:3

closing 8:15

coal 9:17
10:16,17,18,21,2
3 11:2,4,5,17,21
12:9,10,25
13:6,12,14,15,19
,20,23,24
14:1,5,7,13,25
15:1,3,8,15,18,1
9,24
16:14,15,16,22
17:10,19,20
18:7,23 20:24
21:2,14,17,24
22:24,25
23:5,14,18,20,23
24:9,11,12,13,15
27:9 31:1 35:3
41:18,19 44:10
49:6 52:8,25
54:13,18,23 55:4
58:19 59:6,25
61:1,10,11,12
62:14,17,18,21
64:13
65:5,6,20,21,23
66:2,3,4,13,22
67:12 69:12

81:19,20,24 82:3
86:21
87:18,24,25
88:16
92:18,19,25
93:1,3,4,21
94:3,13,23
95:1,2,5,7,8,9,10
,11,13,15
96:18,24
100:5,15 102:5
103:14 110:18
112:11,20,22
113:9,11 114:15
115:11 117:7
118:4,7,20
120:11,19,20,21,
23,24
121:10,11,18
122:4,11,15,20,2
2,23,24,25
123:10 124:10
125:12,19
126:10,15
129:12,21
131:22,25
132:2,4,5,12,13,
20,23
133:1,2,4,7,18,2
0,21,22,23,24
134:1,13,17,18,1
9

coal/wood 93:10

coal-fired 16:12
81:18 93:23
110:17 115:1

coal-related 100:4
101:2

Code 5:11

coffee 49:14

coffee-class 74:16

collection 77:9

college 21:7,8,9
120:10

combination 39:16
87:17 112:21

combined 40:12

combustible 47:8

combustion
110:25

comes 15:20 20:4
23:23 46:13 51:1
87:6 89:20 92:24
93:3,4,5,25
95:19 96:14
101:8,25 102:11
103:18 106:16
114:2,6 122:23
135:24

comfortable 7:6

coming 20:1 48:12
59:7 60:23,25
65:20 80:24
87:11 89:14
96:25 102:24
103:11 110:18
123:21,22 133:4

commend 78:14

comments 7:14

commercial 27:24
29:25 30:3
131:10

Commission 1:1
5:7 9:20 15:11
18:3 141:23

Commission's
5:10,19

Community 21:7

companies 121:17

companion 5:15

company 1:24
11:12
14:12,16,25
16:12 18:23
31:17 49:6 58:2
70:25 80:4,7,18
86:13 102:5
103:3
120:11,19,21
121:3,4,13
136:12

complies 128:4

computer 103:3

computerized 92:2
102:12

computers 112:4

conceivably 29:20
31:8

concerned 46:15
51:13 113:22,23
122:3

concerns 5:13

conclude 139:12

concluded 140:16

conclusions
110:8,11

concrete 106:16

condition 26:11
28:3,9 31:14
34:23 35:17
36:6,22

conditions 12:14

conduct 71:8

conducting 72:2

conference 5:22

confuse 99:12

confused 37:10

congested
34:4,6,20,21

Congress 10:16

consider 7:19 13:3
31:6 32:22 93:1
125:6

considered 5:24
95:15

consisted 60:19

consists 98:19

Consol 120:13
133:15

Consolidation
18:23 132:20

Consol's 132:25

constitute 1:19

constitutes 18:6

construct 10:9

constructed 15:9

construction 91:14

consult 7:22

consumer 12:17
133:21

contamination
96:9

content 81:19

contention 111:16

contest 1:10 5:15

Contestant 1:11

continue 7:16 38:2
44:3 49:25

continued 6:4

continuous
39:2,17 58:7

contour 105:20

contract 11:20
22:24 28:22
31:25 33:19 48:6
49:16 101:21
104:18,19 130:2
131:18

contracted
48:13,14,21
49:1,6 52:4
102:18

contractor 11:24
26:22 32:25 33:1
35:15 41:7 46:25
47:2,7,10 90:17
137:11,14

contractors
47:20,23
48:13,18
49:4,7,9

contracts 18:5

contractual 49:11

contraption 41:23

convened 5:8

conventional 5:24

conveyor 56:1
92:12 119:21,24

conveyors 55:11
87:12 133:3

convince 109:24
137:5

cooling 87:1

cooperation 5:25

Cooperative 16:9

coordinator
21:16,20

co-owners 136:12

copies 116:2 131:3

copy 6:21 82:21
98:3 130:22

correct 5:21 15:23
36:5 39:12 44:14
46:4,7 47:5,25
48:14
52:9,14,17,20,23
59:18 64:3
68:2,13 69:8
71:25 72:6,20
73:6 76:16
80:1,2,9,13,14
84:7,15,24,25
85:5,6,9,10 87:8
88:6,23,24 90:3
94:21,22
98:17,20 100:21
101:9,10 111:14
116:20 117:16
118:3
119:18,19,22
125:4 126:11,14
127:2,7,8
128:7,24
129:13,14 130:3
132:22 133:14
137:2

cost 100:20

costs
100:7,8,10,12,14
,22

counsel 3:5,6,7
10:4 20:17 41:13
44:7 53:10 56:9
67:9 72:12 76:5
77:11 78:14 79:3
109:21 115:22
126:7 129:4
135:9 141:6,9

county 60:4,9
61:16 66:8 79:11

couple 53:7
60:21,24 66:2

coupled 53:23

course 7:25 10:15
44:24 78:16
109:18

court 5:2,6 6:23
7:5,9,12,24 8:8
9:2,5,10 10:2
13:8 14:10
15:12,22
16:10,21 17:4
18:2,9,12,16,21
19:1,5,11,20,22,
25 20:4,10,20
22:19 23:21,25
24:2,5
26:3,6,13,15,18
28:6,10,12,20
29:6,14,17,20,23
30:2,5,7,9
31:5,8,11,20,25
32:3,5,9,19,21
33:5,8
35:20,23,25
36:4,11,17,21,25
37:4,10,19,23
38:2,15,17
41:12,22
42:2,5,7,11,20,2
4
43:1,5,11,15,18,
21,24 44:2 45:23
46:1 48:10
49:3,10,19,21,25

50:18 53:5,9
55:3,8,11,19,23
56:12,14,16 62:9
63:13 64:7
66:12,17,23,24
67:1,4,6
70:15,22 71:4,19
72:1,4,7,11
74:15,20,23
75:2,8,13,16
76:3
77:4,8,21,24
78:1,6,10,14,23
79:20
82:13,20,23
83:2,7,17,24
84:1,4,12,14,17
85:3,7,14,17,23
86:2,6 87:5
88:3,6,8,14
89:3,6
91:11,18,21
92:21,23
97:15,18,22
98:4,10,13,18,22
99:1,4,8,17,20
105:13,24
106:3,7,13,19,21
,25 107:4,6,9
108:3,11,17,22
109:1,7,20
110:10
111:2,6,8,11,15
112:7,11,13,17
113:8,15,17,19
115:9,17,21,24
116:3,18,21
117:19,23
118:4,7,10,13,23
119:2,6,11
126:5,20
127:10,16 129:2
130:6,9,12,15,19
,21,23
131:3,6,13,16,24
132:5,9,20,23
133:15
134:2,6,10,21,24
135:2,4,5,14
137:4,15

138:8,12,16,19
139:1,4,18,21
140:2,5,8
**courtesy** 91:5
**courts** 9:21,23
17:14
**cover** 111:3
**covered** 139:23
**covering** 100:10
**created** 63:24
**Creek** 68:9 79:10
80:20 81:3,6,7
84:8,13,14 90:6
**Crickmer**
45:17,21 78:24
79:6 83:12 89:11
90:9 105:14
110:15 116:12
120:6 126:9
138:10
**C-r-i-c-k-m-e-r**
45:25
**CRICKMER** 3:12
15:25 16:3 45:25
78:25 139:3,17
**criteria** 7:20 27:24
28:1 29:24 30:1
**critical** 81:24 82:7
92:5 93:17 104:6
109:15,21
110:24
**cross** 3:9 32:10
43:25 44:3,7
67:9 72:12 126:7
**crosses** 100:6,16
**crucial** 13:2
**crushed** 16:16
81:19 82:4 94:3
113:6,13 123:23
**crusher** 87:16
**crushing** 10:25
34:15 40:1 113:7
114:14

**curiosity** 55:3
**curious** 118:24
**current** 44:9
**currently** 96:19
**Curry** 87:3
**custom** 10:18
128:10,12,16
137:9
**customer** 16:25
118:14 123:1
127:15,24
137:8,10,11,16
**customers** 13:25
**customer's**
135:12,13
**Customers** 127:25
**cut** 114:7
**CVSA** 30:3
**cycle** 22:23 23:9
**cycles** 22:17,22

---

### D

**daily** 12:6 45:18
50:11 82:2 92:5
103:13 108:3,6
122:9 123:11
124:4,13 125:24
128:15
**dais** 83:8
**danger** 30:18
**date** 62:4,18 63:7
64:22 65:19 70:4
**day** 12:13 29:14
49:13
50:16,19,21 51:3
71:13 78:16,18
89:18,21 92:7
102:24
103:4,7,9,11,13
104:23,24,25
105:1,2,6
107:18,19,24
108:1,8 111:23

114:18 122:8
124:24 136:13
**days** 8:22 22:6,7
45:6 50:19 51:10
105:7 114:18,25
115:2,3,7 124:24
**deal** 74:25
**deals** 7:14
**dealt** 120:24
**debate**
74:2,7,10,14
76:18
**debates** 77:13
**debris** 93:13
118:15
**December** 22:2
24:25
**decide** 10:13
**decided** 136:8
138:24
**decides** 76:19,21
**decision** 44:20,22
115:10 133:13
136:5
**decisions** 10:4
**deep** 13:10 90:21
112:22
**defect** 36:16
**defective** 37:5,7,12
39:4 46:13
**defects** 26:24
27:17
**deference** 9:23
18:1,9 136:8
**defined** 10:16
129:6
**definition** 9:16
10:11,14,20,24
11:16 16:18 56:2
110:4 132:8,10
133:18,19
**definitions** 10:15

**degree** 21:8
122:18
**degrees** 21:6
**deliver** 12:8,10
61:10
**delivered** 11:19,23
101:1,13,14
103:7 113:12
117:11
**delivering** 11:22
48:17
**Department** 2:4
55:20 57:1 76:20
95:22 121:23
125:9
**Depending** 20:4
**depict** 62:12 63:16
64:24
**DEQ** 91:1 111:10
**describe** 21:13
65:18
**described** 70:2
88:15 119:16
122:6
**description**
127:5,19
**designated** 23:2
**designation** 34:18
35:7
**designed** 39:11
81:18 93:9,19,21
122:8
**desired** 12:12
104:16 119:18
125:4
**detailed** 109:22
**determination**
46:17 70:20
76:24,25
**determine** 48:3
**determined** 10:9
26:23 33:20
69:22 71:3

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013
Page 9

determining 17:13

deterrent 95:8

diagram 85:4
106:22

diagrams 98:20

dictionary 55:20
56:2

differences 11:8,9

different 13:11,17
15:4,9,16 16:15
22:6 36:10,19
64:13 66:15
77:14 81:17
92:14,16 96:21
102:21 104:19
111:22 112:25
113:2 114:15
124:8 133:21

differentiate 28:18

difficulties 51:13

difficulty 131:17

dimensions 54:6

direct 3:9 20:17
56:9 79:3 123:20

directed 113:10
126:17 127:24

direction 17:2
51:21 69:13
104:4 117:10

directions 108:6

directly 33:4 35:9
41:2 47:2 54:8
59:8,15 61:15
67:13 68:19,22
69:3,18 70:8,16
89:21,25 92:24
123:25

director 125:10

directs 103:13

disabling 30:21,24
31:2 34:10,13
39:20

disagree 77:13

discovery 5:20,25

discretion 5:23

discussed 55:8

discussions 74:16

disposed 87:4

dispute 17:18

disputes 11:7

dissent 14:19,21
134:15,25 135:1

distinctions 13:2

distinguishable
14:2,16 15:14

district 57:7,12
58:22,23
59:10,11,16 69:6
72:17,20
73:11,19 74:1,17
75:5,8 76:11,14
77:11

districts
75:6,10,14 77:14

division 59:11
69:6 120:17

DMME
125:8,17,20

dock 132:24 133:6

docket
1:5,11,13,14
5:12,13,15
138:23

dockets 6:3 20:2

Docks 13:23
14:3,4 17:10

document 105:17
107:12

documents 9:24

dollars 91:7

Dominion
11:13,14,18,21,2
2,24
12:3,5,6,11,17,1
9,21 15:22 17:21

45:10,12 48:13
49:6 50:8 55:5
68:20 70:9,17,19
73:6 75:19
80:7,10,12 89:1
92:7,17 96:1
97:8
100:5,10,14,25
101:14,17
102:6,13
103:2,13,18,24
104:9,20,22
107:23 111:3,16
112:21
114:4,5,16
115:6,10
117:4,12
118:14,17
123:8,13
124:8,20
125:2,14
126:10,16,24
127:1,7
128:10,13,17,23
129:18,23,25
137:15,21

Dominion's 15:23
64:14 71:5
104:21 112:4
116:16

done 11:4 12:24
13:1 16:20 20:8
22:11 25:16
55:24 61:9 65:15
71:1 76:11 90:4
113:24 117:8
123:4,7
124:13,19
128:21,22
134:12,19,21,22,
23 135:13

dozer 92:9

draw 25:17 32:16
61:25 63:3 64:18
110:8,9,11
126:18 134:10
135:9

drawing 114:21

drawn 135:11,12

drift 115:17

drilled 120:25

drive 1:22 65:23
81:22

driven 95:11

driver 28:24 29:7
40:20 43:16
53:20 54:7

drivers 23:3
101:21

driver's 54:7

drop 124:17

drove 60:2 66:6,7

drying 11:1

Duane 56:24

D-u-a-n-e 56:24

duck
131:10,19,20,22,
23

due 21:23 27:16
30:14 34:19 40:9
41:1 43:12

duly 20:15 56:18
79:1

dump 23:4
36:1,4,22
37:12,20 41:16
61:11 66:1 90:7
124:1

dumped 90:8
102:23 124:1

during 7:24
22:16,20,23
25:10 33:3 35:11
41:4 45:6
50:19,21 108:1
121:21

dust 90:24

duties 57:11

_____
E

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 204 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 10

earlier 16:18 80:6
  114:20 132:21

early 95:13 120:18

easier 107:17

east 2:13 80:23
  109:13

Eastern 120:21

education 21:5

eight 115:7
  121:15,20,21

eighth 136:18

Eighty 124:2

electric 11:11
  16:3,9,12 68:15
  73:2,3 80:4,7,18
  84:19 86:9,12

electrical 58:21

elevate 120:2

elevated 61:2

else 17:5 53:5 59:9
  78:11 138:8
  140:11

emission 93:22
  109:23

emissions 94:7
  111:1

employed 139:8
  141:6,9

employee 100:11
  120:13 141:9

employees 28:2,16
  47:1,4,11 139:15

empty 133:9

encounter 48:22

end-user 15:5

Energy 15:25
  16:1,4 79:17,23
  125:9

enforcement 10:1
  59:11 69:6

engine 53:19

English 95:19

enlarged 85:22
  86:3,5

enter 6:25

enters 46:20
  102:2,6

entire 98:18 104:3

entirety 100:9

entitled 5:11 9:22
  17:25

entity 13:18
  47:21,24 101:16
  132:1

entrance 84:16
  85:12,14 89:23
  90:7 106:16
  116:15

environmentally
  96:6

EO1s 22:18

EPA 111:8

equipment
  21:15,19 31:18
  34:7 52:22
  58:8,9 90:11
  91:23,25 100:8
  119:20 121:5
  135:25

equipped 92:2

especially 93:19

ESQUIRE 2:3,11

essence 13:13 15:7

essentially 27:1

establish 9:13
  17:22 20:8

Established
  121:24

estimated 40:4

et 11:17 88:17

Europe 95:14

evaluate 34:1,12

eventually 61:14

everything 86:13
  87:6 92:13
  95:4,15 100:8
  113:24 128:21
  134:6

everywhere 89:15

evidence 9:24
  16:14 18:4 25:25
  38:14 62:7 63:11
  66:21 136:25

exact 103:3

exactly 31:15
  104:11,15
  105:19 108:9
  123:8

examination 20:17
  44:4,7 53:10
  56:9 67:9 72:12
  76:5 79:3 126:7
  129:4

examine 32:10

examined 20:16
  56:19 79:2

example 31:4 47:7
  107:20

examples 119:8

exceed 128:1

except 26:1 35:21
  55:24 86:14
  100:10,23

exception 42:24

exceptions 136:20

exclusively 134:22

excuse 19:12 28:7
  91:11 118:6

excused 56:7 78:9
  138:13

exercised 5:23

exhibit 8:5,6
  25:19,20,25
  26:8,9 32:14,17
  33:12 35:8,22

36:8,18 37:9
38:3,5,6,18 42:9
61:21 62:1,10
63:1,4,11,14
64:16,19,24
66:14,20 67:3,8
82:15 89:7,8
98:6 99:6 105:9
106:14 107:13
115:25
116:8,9,10
117:20,21,22
126:19
130:15,18 131:4

exhibits
  4:2,4,12,22
  99:10,15

expanded 83:8
  116:18

expect 18:21 19:15

expected 34:9
  39:20

experience
  21:11,13 30:25
  57:23 58:12

Expires 141:23

explain 28:20
  34:17 62:15
  94:24 110:15
  119:23

explained 83:9
  110:16

explanation 137:5
  138:12

explanations
  109:22

exposed
  28:2,9,16,19,21
  46:18

exposing 27:18

expression 99:10
  108:12

extract 14:17

extracted 10:18

Appeal: 14-1450   Doc: 14   Filed: 06/10/2014   Pg: 205 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 11

14:13

**F**

**F.3d** 16:9
**faced** 136:16
**facilities** 10:19
58:25 76:8
77:18,20,25
90:10 91:19
**facility** 6:9
13:20,24 15:1,5
16:13 17:16,19
18:24
22:1,4,8,15 23:1
24:16 29:12 35:2
46:10 48:24
50:12 52:6 53:15
59:2 60:23
61:18,25 64:4,9
65:6,12,18 77:16
79:9 84:23 85:22
86:19 87:25 88:2
100:7,9 102:8
110:14 112:17
113:10,12
125:11,21
126:13 128:1,10
132:6,25 133:7
136:3,6,9 139:16
**fact** 7:14 17:1
27:16 30:14
31:20,21 34:19
40:9 41:1
**facts** 9:12 10:13
11:6,8,9,10
13:4,10,12 14:22
17:17,21 18:10
19:14 110:7
**factual** 6:12
**failed** 33:20 42:10
**failure** 39:18
57:16
**fall** 16:24
**familiar** 10:8 13:6
22:11 55:19
59:1,4 65:14

**fast** 127:16
**father** 136:11
**faulty** 27:1 28:17
36:9 37:7,17,18
**favor** 43:6
**fed** 114:24
**Federal** 1:1
5:7,9,11 9:20
96:9
**fee** 100:17,19
**feed** 87:12
**feeders** 87:11
**feeding** 86:24
**feeds** 138:2
**field** 58:22
**fifth** 53:23,24
**figure** 119:9
**file** 8:19,23 18:17
140:3,10
**filed** 97:16
**filing** 140:6
**fill** 48:20 125:25
**fill-in** 21:20
**final** 131:16
**financially** 141:10
**finds** 135:24
**fine** 6:23 67:4
77:24 78:2 86:2
95:16 107:9
**fines** 95:7,8,10
**fine-tuning** 124:3
**finish** 119:4
**finished** 107:10
**finishes** 87:7
**fire** 95:10
**fired** 97:1
**firing** 87:23 104:6

97:20 122:15

**first** 19:8 20:8,15
22:2 24:24 32:8
35:23 56:18
58:3,4 59:19
79:1 83:20 98:2
121:15,20 130:7
136:22
**fit** 10:13
**fits** 10:22
**five** 25:5,7 43:25
104:25 105:2
110:18 121:18
**fixtures** 90:10,12
**flag** 71:23
**flagrant** 57:17
71:22
**flash** 81:21
**floating** 74:23
**Floor** 2:6
**flowing** 94:5
**flows** 87:18
**fluidized** 81:23
94:5 110:21
**fly** 87:2,4 94:8
116:17
**folks** 15:2 43:24
46:3
**force** 27:23 30:15
39:7
**foreman** 21:20,21
23:4 27:7 29:11
32:24 51:25
58:4,5 60:10,12
62:22
120:12,16,17
138:19
**foreman's** 61:5
**foremen** 35:2
100:12
**forest** 118:19
121:1
**forget** 8:2

**formal** 49:16
**forms** 126:1
**forth** 6:23 87:13
128:2
**fortunate** 121:21
**Forty** 91:7
**four-lane** 59:15
63:17 69:14
83:22 84:6,7
**frame** 8:20
**frequently** 12:7,15
**friends** 91:6
**front** 80:19 110:7
**front-end** 23:13
29:11 35:1 41:19
55:15,17 58:9
66:22
**fuel**
11:15,17,19,23
12:4,18,21,25
32:24 46:10
52:17,20,23
63:20 64:1,4
89:24 92:3 93:15
94:11 95:25
96:13,14,16
100:5,8,15,25
101:2,6,8,13,14,
18,19,24
102:8,14,16,24
103:4,7,8,22
104:7,21 109:6
112:23 115:6,7
121:9
123:2,5,9,13,16,
17,24 124:2,6,7
125:5,15 126:12
127:14,23
128:3,14,17,18,2
0 138:5,7
**fueling** 82:5 89:20
**fuels** 1:8,10 6:3 7:8
9:14 11:22,24
12:2,3,7,20,23
17:19 22:1,4,15

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 12

45:9,13
46:3,11,15,20
47:1,3,11,15,20,
24 48:3,14,19,23
50:9 51:24 52:7
59:2,5,17,21
60:10 61:18
63:20,24 64:9
65:11 68:7
70:3,18 75:22
79:7 80:15
81:5,15 82:16
85:5 86:9
89:17,20 90:17
92:16,17 93:11
96:18 97:2,7
100:3,13
101:5,13
102:7,18 103:2
104:20,24
105:10 114:16
116:15 117:5
122:3,8,20
123:4,14
124:1,4,7 125:1
126:10,12,13,15,
24,25 127:5,6,19
128:4,9,18,19,21
129:6,19

**Fuels's** 62:13

**full** 114:25 115:4

**function** 15:17
33:21 41:15
42:10

**functional** 17:14

**functioned** 15:17

**functioning** 43:7

**furnace** 81:21
82:2,3,5,8 86:25
93:15 95:12
109:16
110:20,24 123:9
128:16 133:25

**furnaces** 82:8
87:19 93:12

**furnish** 101:20

102:7 124:2

**furnishes** 123:14

**furnishing**
101:18,19
121:16

_____ G _____

**G-1** 35:23

**G-4** 98:6,14,25
99:1 130:25
131:2

**G-5** 62:1

**G-6** 63:4,11

**G-7** 64:19,24

**garage** 86:15,17

**garbage** 95:20

**gas** 120:25 121:9
136:9

**gate** 60:2 87:9
123:25

**general** 62:16

**generated** 95:4

**generating** 16:13
68:15 81:22
86:25

**generation** 95:5

**generator** 87:1

**gentleman** 138:19
139:1

**gentleman's** 45:24

**gentlemen** 5:2 6:6
7:9 18:16 19:2
55:19 56:3 78:19
135:14 139:22
140:2,11

**geologist** 120:10

**geology** 122:18

**George** 1:21 4:22

**gets** 12:2,19
103:2,24
112:16,17

**getting** 51:14
110:19 113:9

**gist** 109:2

**given** 16:25 29:14
35:14 49:13

**gives** 103:6 109:13

**Glen** 73:8,9

**gob** 11:17 22:25
23:20 24:11
54:13 93:4
94:22,23,24
95:18,19,24
96:24 100:5
121:14,16
124:11 129:13

**Gobco** 121:13

**Gobco/ETI** 108:21

**Goverment** 35:22

**Government** 4:4
25:18,20,25
26:7,9 32:14,17
33:12 36:18
38:3,5,6,18
61:21 62:1,10
63:1,4,11,14
64:16,19 67:8
99:6 111:2
126:19 130:17

**governs** 126:24

**grade** 105:20

**graded** 85:20

**grades** 12:4

**gravel** 86:23 87:17
93:10 135:22
136:14

**grease** 90:20

**great** 109:22,24

**green** 87:14 122:1
132:14

**ground** 35:1 87:24
93:13,16 115:3
117:6,10
129:23,24

**group** 21:15,17,24
58:23

**groups** 15:13

**growth** 95:4

**GS14** 74:13

**guess** 62:19 79:14
91:14 93:6
96:3,13 110:6
120:12 123:14

**guideline** 30:7,8

**gun** 108:11

**guy** 110:10 112:20
135:21

**guys** 49:13 55:7

_____ H _____

**habitat** 121:24

**half** 136:10,17

**halfway** 36:21

**handle** 12:9 24:12
52:11,20,22,23
100:4 104:24
107:17 125:14
129:15 130:1

**handled** 52:19
54:23 75:24
92:15 117:3,7

**handles** 15:19 52:6
92:16

**handling** 15:1

**happen** 28:23
29:21

**happened** 67:17
71:5

**happens** 102:1
104:17 113:11
137:1

**happy** 55:5

**hard** 106:23
108:16

**hardwood** 122:1

**Harlan** 58:21

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 13

**haul** 41:21 87:3
104:21,22
125:16

**haulage** 58:8,9

**hauled** 50:3

**hauling** 22:24
41:21

**hauls** 30:16 39:22

**haven't** 51:8 78:17
112:14

**having** 20:15 39:5
49:14 56:18 79:1
131:17

**hazard** 28:17 29:3
46:18

**hazardous** 71:18

**hazards** 27:18

**headed** 119:2

**health** 1:1,5,14
5:7,9 20:25 22:5
57:2,22

**hear** 11:6 19:15,23
99:12

**heard** 78:17

**hearing** 5:6,10
130:7 139:5
141:5,7

**hearsay** 69:16

**heat** 81:21 128:16

**heavy** 21:15,18
30:16,17 39:22

**heck** 71:6

**held** 1:20,21 13:16
14:1,14 15:10,12
16:21 133:7
136:5

**help** 36:13 55:16

**helpful** 140:4

**Hendrickson**
27:7,10,15
31:13,15 32:24
33:2 35:9 41:1

45:17,18 51:24
100:11

**hereby** 141:3

**Here's** 109:5

**hereto** 141:10

**Herman** 16:8

**he's** 32:24 37:11
43:6,18 74:13
97:20 112:25
119:11,12 135:4
138:21

**hey** 8:2

**high** 21:5 81:19,24

**higher** 104:5 120:2
123:15

**highlighted** 112:9

**highwall** 92:25
118:16 123:22

**highwalls** 118:8,10

**highway** 59:7
63:18 66:8 68:2
69:14 84:6

**highways** 83:20,21

**hill** 95:17

**Hills** 26:23 32:3
33:1,6 37:15

**hire** 47:25

**hired** 49:9,10

**hires** 101:11

**history** 7:20 117:5
122:2

**hold** 21:6 84:20
118:18

**Holiday** 1:22

**Hollow** 87:4

**home** 133:23
136:9

**honest** 48:6

**Honor** 7:11 9:11
10:6,8 11:6
13:3,5 25:24

29:10,16,19 30:6
31:7,10
32:2,4,12,23
33:7 35:19
36:3,20,24
37:3,6 38:13,16
41:10,18
42:1,6,8,13,23,2
5 43:8,17,20
48:8
55:1,10,14,22
62:6 63:10 66:19
70:13 77:3 78:5
97:11,21 105:12
114:20 124:14
129:1 135:8
138:14 140:1,14

**Honor's** 82:17

**hooks** 41:23

**host** 17:23

**hot** 110:24

**Hotel** 1:22

**hotter** 104:1
124:21

**hourly** 100:12
120:13

**house** 90:21
91:3,4,18

**hundred** 95:21,24
104:25 105:2

**hundreds** 50:15
94:2

**Hurley** 21:18

**Hybrid** 15:24
79:17,23

**hypothetically**
70:23 71:4
117:24

___

**I**

**IBCS** 109:12

**I'd** 5:17 6:18 7:25
10:4 20:6 25:7
32:16 50:13,16
61:25 64:18

127:3

**ID** 33:1 71:11

**idea** 70:24 138:25

**identify** 56:11 87:5

**II** 20:22 128:2

**III** 127:4,18

**I'll** 6:25
8:4,5,12,14,19,2
2 26:7 38:17
41:12 62:9
63:3,13 67:6
85:17 88:11 89:6
96:13 98:22
106:13 107:10
108:17 111:17
123:14 131:5
140:8

**illness** 34:9 39:14

**illuminate** 138:24

**I'm** 6:18 7:12 8:24
13:6 16:1
19:5,25 20:24
36:17,21 37:10
44:10
48:5,21,23,24
49:2 56:16 57:6
58:13 68:25
69:23 70:22 71:9
73:10
74:5,6,13,25
75:7,15 76:1
77:21,23 78:23
79:20 83:24
90:11,12 98:13
99:13 101:16
108:17 110:10
111:9 113:5
116:12 118:24
120:7,10 121:21
125:11 126:18
130:6,12,13
131:9,16 135:6
137:4,24
138:6,22

**important** 11:3,11
16:8,23

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 14

| | | | |
|---|---|---|---|
| improve 123:5 | 39:14,15,19 | 121:23 | 135:7 140:8 |
| inbound 46:7 51:18 89:12 101:11 105:3 | Inn 1:22 | internal 12:11 | issued 7:15 31:21 32:23 47:7 57:17 71:15 91:12 |
| inches 95:16 | inoperative 36:5 | International 37:16 | issues 10:9 26:2 40:12 51:17 |
| inclined 39:23 | input 77:12 82:2,7 | interpretation 9:22 17:25 | item 98:5 |
| include 10:17 91:18 | inspect 44:23 48:23 60:7 70:25 | interpreting 135:18 | it'll 123:15 |
| included 36:1 97:25 | inspected 21:25 22:3 50:22 51:7 62:20 | intervals 25:11 | it's 6:8 11:18,21 12:14,21 13:17 14:11 15:20 16:5,8 18:10,11 23:23 24:3,9,16,17 30:5 43:3,7,19 47:3 49:17,21 52:25 53:23 54:6 55:14 63:21 66:19 68:8 69:21 76:22 77:25 81:11,12 82:7 85:3 86:22 87:2 90:2,8 91:16,17 92:7 93:11,14,16,22,2 4 98:1,2,15 100:22 101:23 102:8,17 103:20,25 104:16 106:23 108:13,16 110:17,19,24 113:11,13 114:5,6,7,8,24 115:4 118:25 119:24 120:2 122:3 123:2,18,19,22 124:7,13,18 128:16 129:8 130:17 132:4,5,13 134:1,22 135:12,24 136:23 137:12,19,23 |
| includes 10:25 11:17 94:22 118:1 | inspecting 22:8 26:22 48:24 51:1 61:24 | interview 45:12,14 75:19,21 | |
| including 10:18 17:9 | inspection 24:25 25:2 27:5 33:19 44:14,15 71:9 | introduce 68:8 83:1 116:5 | |
| incoming 101:24 | inspections 22:6,14,16,21 25:8,10 27:9 45:2,7 51:3 71:1 86:4 | introduced 87:17 | |
| incorporate 97:18 98:22 | | inventory 114:25 115:1,2 | |
| independent 35:15 42:3 49:4,7,8 98:15 | inspector 20:24 21:3 44:4 46:16 58:15,19 69:11 134:2 135:24 136:7,17 139:5 | investigate 59:17 | |
| | | investigated 67:16 | |
| indicated 69:11 73:15 | | investigating 31:1 44:13 | |
| indicates 36:15 | inspector/accident 44:10 | investigation 69:2,4,19 72:2 75:18 | |
| indicating 60:22 63:19 64:25 | inspectors 59:6,9 67:12 | investigations 71:1,21,24 | |
| indication 137:1 | instances 47:6 | investigator 30:25 44:11 57:6,9 58:17 67:19 | |
| individual 37:20 | instead 13:11 | | |
| industrial 95:4 | Instruction 4:15 107:13 | invited 60:10 67:23 | |
| industry 21:11 95:1,3 111:13 | instructions 45:1 107:18,21 108:3 | involve 47:1,2,15 88:16 | |
| infeed 86:24 138:3 | instructs 12:7 | involved 13:23 14:12,25 16:11 47:9 111:8 | |
| inference 75:9 | intended 88:4 | | |
| information 8:1 | interest 12:19 19:1 26:15 135:7 | isn't 42:20 47:14 130:16 | |
| informed 27:14 | | issuance 40:13 | |
| initiates 77:12 | interested 141:11 | issue 6:7,15 14:21 19:15,19 27:15 68:24,25 74:11 96:8 99:18 114:5 | |
| injured 29:3 | interesting 14:18 | | |
| injuries 31:3 34:15 40:1 | Interior 55:20 | | iv 127:12 |
| injury 30:12,13,20 34:1,9 | | | |

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 15

ive 58:13

I've 22:6 49:21
50:21 55:24 71:1
83:7 130:9
136:21 139:21

**J**

James 69:6

January 21:4

Jewell 120:20

JG4 33:1

Jim 59:11

job 45:13,15 49:15
67:1 119:12
121:23,25

jobs 58:17

joining 57:21

joint 4:3 8:4,6

Jones 2:3 5:4 6:20
7:1,2,11,23
9:1,6,8,11 14:8
16:7 17:6 18:11
19:9 20:6,12,18
23:10 24:8 25:24
26:10,14,19,20
28:8,15 29:1
30:10 31:12
32:6,13,15,20
33:10,11
35:18,24 36:12
37:14,22,25
38:4,8,13,19
41:10 42:14
43:22 48:8
53:7,11 54:25
55:22
56:8,10,15,20
62:6,11 63:10,15
66:10,19,24 67:2
70:13 76:4,6
77:2,6,19,23,25
78:12 83:2,4,16
89:5 97:21
98:8,17 99:3
106:12 108:2
115:23 116:6

117:18
126:6,8,21,22
128:25 129:8,10
130:5,8,11,17,20
,22 131:1,12,15
133:14,16 135:8
137:3
139:15,19,25
140:6,14

Judge 1:21 4:22
6:22 17:3 44:6
53:4 55:2 82:12
83:19 89:13
91:25 99:24
102:1 106:4,15
111:19 115:14
119:23 126:4
134:14 137:6
140:15

judges 14:20
135:17

Judge's 83:8
112:24

JUDGES 1:1

July 141:24

jurisdiction
6:5,7,17
9:13,19,22 10:1
17:14,22,25
19:17 20:5,8
69:20,21 70:6,12
71:3 72:16
73:12,15 74:8
75:4 76:19,21,24
118:18 125:20
133:8,12

jurisdictional
18:17 19:6,19
26:2 88:18 99:18

**K**

Kentucky 57:25
58:4,6,21 78:2
89:15 96:19,20
102:11 120:22
123:17

Ketron 60:13

61:7,19 67:25
139:2

K-e-t-r-o-n 60:13

Kinder 14:24
17:12

KINDIG 138:23

kinds 52:7 92:17
124:8

Kizer 59:11
69:7,11
74:9,12,13,14,18

knowingly 57:19

knowledge 63:23
65:3 72:9,18
76:13

known 11:12 24:5
130:9

Koutras 1:21 4:22

**L**

lab 103:3 104:15

Labor 1:4,13 2:4
7:3 9:12 57:1
58:14 76:20
111:12

Labor's 9:21

Lady 5:3

Lambert 125:9

land 135:23

landfill 87:4

language
134:12,18

Large 7:19

last 23:21 25:8
28:6 45:24 56:21
129:24

lastly 12:23

late 95:2,12,13
120:18 126:2

later 48:20 60:5
68:8 91:7

latter 120:18

law 1:1,21 9:20
10:22 17:22
42:17,21 109:11
135:10

lawyer 138:21

lawyers 76:24

layman 131:17

layout 62:16

lays 86:25

LCR 1:23
141:14,25

leak 39:2,4,9,17
40:10

least 113:15

leave 77:8

leaves 102:3
118:15 136:1

leaving 16:1

led 19:13 73:22

legal 6:12

legally 132:18

less 31:8 95:16

lets 119:25 120:1
135:25

let's 25:16 33:8
44:2 71:12 83:20
89:19,21 90:9
91:23 98:4
117:24 118:13
119:4 123:15
139:9

level 77:15 112:14

levels 42:19

liable 6:12 43:6

liberal 8:24

license 125:19

life 130:13

lifts 131:13

likely 28:23 29:3
30:12,13,18,20

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 210 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 16

34:2,3
39:14,15,17
40:13,18 47:9

**limestone** 82:4
93:10,22 94:3,12
110:23

**limitation**
134:9,11

**limited** 5:24

**limits** 109:17

**Linden** 1:22

**line** 18:1 85:1,2,15
86:12 129:22
134:10,16
135:10,12

**lines** 105:20

**list** 11:10

**Literally** 103:17

**little** 37:10 43:25
49:17 55:25 57:4
81:13 82:18 83:5
85:17 86:15
104:1 107:16
112:25 120:5,14
124:21 135:21
136:12

**LLC** 1:8,10 7:8
79:7

**load** 17:20 103:23
128:3 135:11

**loaded** 13:15
14:14 23:6
66:4,14 108:11
113:9 133:5

**loader** 23:4 29:11
35:2 41:19 55:17
62:13 66:22

**loaders** 23:13
55:12,15 58:9
60:24 61:12
66:2,4 92:1
119:17,18

**loading** 11:1 13:24
14:25 18:23

41:19 132:21,24
133:6

**loads** 13:24
30:16,17 39:22
41:21 117:4,12
126:15

**local** 136:9,15

**located** 63:21 79:9
84:10 86:10
97:12 102:17

**location** 63:19
88:10 137:1

**locations** 88:11
96:4

**locked** 135:24

**logically** 47:4

**long** 18:10,11
21:2,25 34:5
43:12 54:6 57:3
124:25

**longer** 139:8

**loop** 87:9

**lose** 39:7,8

**loss** 27:23,25
29:23 30:15
39:24 137:20

**lot** 10:21 13:11
59:6 76:17 77:12
113:6 124:10
139:23

**loud** 127:10

**low** 32:21,22
35:4,7,14
40:23,25 41:7
81:25 82:1
110:25

**lower** 104:2,5

**LP** 17:12

**lubricants** 90:20

**lump** 95:11

**lumped** 37:23

**Lyn** 73:8,9

_____
**M**
_____

**machine** 58:6

**magenta** 84:25

**main** 2:13 69:13
83:21 87:9 89:23
90:7 123:25

**Mainly** 23:20

**maintained** 63:18

**maintenance** 33:4
35:10 41:2 92:10

**man** 13:13 15:18
137:9

**management**
120:11

**manager** 57:12
59:10,16 73:19
74:1 77:11 79:7
100:11,23,24
120:17

**managers** 69:6

**mandatory** 5:14

**map** 4:14 105:9,18

**maps** 68:8 97:22

**Marion** 13:23
14:3,4 17:10

**mark** 8:5 27:20
39:21 82:11
104:8 105:8,23
106:24

**marked** 4:2 23:15
25:18
30:12,18,20
32:17,21 34:8,22
35:4,13 38:6
39:14 40:5 41:7
62:1 63:4 64:19
82:12 105:17
106:19,21 116:5
130:24,25 131:2

**market** 96:2
124:10 137:10

**marking** 83:24

84:9

**Marshall** 21:7

**Massie** 2:11 5:5
6:21,22 7:4,7,22
9:4 10:5,6,7 13:9
14:11 15:23
16:1,5 17:17
18:14,19,25
19:3,18,21,24
20:3 26:1,5,17
32:12 35:21
38:16 44:4,6,8
46:2 48:11,15,16
49:3,8,17,20,23
50:1,2,24 53:3
55:2 62:8 63:12
66:17 67:4,5,10
70:21 72:11,13
75:17 76:2
78:5,21,24
79:4,21,24
82:11,14,17,22,2
5
83:5,10,11,15,18
84:5,20,21
85:8,19 86:7
87:20
88:5,7,10,20,21
89:9 91:16,22
93:7 97:11,17,24
98:9,11,21,24
99:2,5,14,19,22,
23
105:8,11,14,16,2
3,25 106:8,11
107:11,15,25
108:4 109:4
110:6,12 111:18
112:24
113:20,21
115:14,20
116:1,4,11,24
117:17
119:4,13,15
126:3
129:3,5,9,11
130:4
131:5,22,24
132:3,7,16,22

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 211 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 17

133:17
134:4,8,11,23
135:1,3,6
137:7,17
138:10,14,18,21
140:4,15

**material** 12:2,8,10
14:14,17 22:25
23:17,20
24:11,12 47:8
48:17 50:3,5
54:11,14,22
55:17 75:22
87:15 94:5
101:6,25 102:2
103:14,15
129:24

**materials** 23:19
52:11 93:20

**matter** 1:20 6:24
17:22 55:3

**maturity's** 56:3

**Maxium** 121:4

**may** 11:8 19:1,13
29:15 42:9 43:8
50:18 57:12,13
60:8 62:5 63:9
64:23 65:19 66:6
77:13,15 83:1
89:11 99:15
101:20 105:11
107:12 112:8,25
113:1 116:1
133:23

**maybe** 12:15
50:17 78:17 82:1
119:14 136:21

**McDonald's** 49:14
136:6,18

**mean** 10:17,23
11:9 42:14 44:3
48:22 97:15
113:6 132:18
134:4,22 135:18
137:10

**meaning** 44:21

92:24 95:20
101:2 129:12

**means** 10:21 56:1
64:13 79:25

**meant** 77:19

**medium** 7:19
81:25 139:13

**meet** 64:13 128:22
135:11,13

**meets** 9:15 114:2

**megawatt** 115:3

**mention** 114:20

**mentioned** 23:11
52:6,8 53:25
54:15 59:10
71:20 77:17
98:15 107:16,17
119:20 132:21

**mercury** 94:8

**met** 125:8

**metes** 85:5 88:8

**mid** 120:9,16

**middle** 13:13
15:18 20:21
137:9

**middle-ground**
15:7

**middle-man** 15:17

**middle-person**
15:8

**midds** 22:25
23:20,22 24:11
52:8 54:13 100:5
129:12

**M-i-d-d-s** 24:1,2

**Mike** 100:11

**mile** 63:22 81:4
84:11,22
136:10,18,19

**military** 77:4

**mill** 121:2

**million** 95:22,24

**mind** 74:4,5 75:9

**mine** 1:1,5,14
5:7,9 6:8,9,10
9:13,16,18,25
10:16 11:5
13:1,16,22
14:1,7,15,20,22
15:10,13 16:22
17:13,22 18:8
20:24,25 21:2
22:22 27:18
40:19 44:10,21
47:21,24
48:3,18,19
51:21,22
57:2,11,13,20,21
58:5,19 60:17,18
62:22 69:9 70:18
71:2,11 74:3
92:25 93:3
101:16 110:4
112:22
113:9,23,24
114:11
118:13,20
120:16 125:7,19
131:25 132:4,5
133:7,22
134:1,13,18,20
136:24 139:20

**miner** 28:25 92:25
123:22

**Mineral**
13:6,12,18,19
17:10 55:21

**Minerals** 125:9

**miners** 28:8

**mines** 15:4 16:15
58:10,24

**mine's** 131:23

**Mines** 95:22 125:9

**mining** 21:11,18
55:20 57:22
58:2,7,12
77:19,25 111:12

120:25 121:5
125:13 136:12

**minute** 10:2 19:12
36:11 48:10 71:9
90:10 91:23
130:23

**missed** 139:22

**misunderstood**
77:22

**mix** 17:19 62:23
108:8 133:25
135:11

**mixing** 11:1 62:14
64:13 112:14
133:20 134:17

**mobile** 92:11
120:2

**moisture** 103:7
108:9,24 109:13
123:19 138:1

**money** 109:17

**months** 25:5,8,13
62:19

**Morgan** 14:24
17:12

**morning**
5:2,4,5,6,12 8:2
92:7 98:3
103:1,2
124:15,20

**Moss** 72:24,25
73:2 122:13

**motor** 53:18

**mountain** 120:25
121:1

**move** 25:24
38:5,13 62:6
63:10 67:2 87:13
120:3

**moving** 55:12,17
119:17

**MSHA** 21:10,25
30:5 57:3 58:18
70:5,11 73:12

Appeal: 14-1450     Doc: 14     Filed: 06/10/2014     Pg: 212 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 18

74:6 75:4
76:7,18,23 91:8
118:17 126:1
**MSHA's** 46:18
69:21 71:3 77:17
133:7
**multiple** 91:20
**municipality**
136:15
**myself** 74:9,14
112:20 121:7

___

**N**
**national** 121:22
**nationally** 121:24
**native** 122:1
**Natural** 21:23
**nature** 31:2 58:10
**nearby** 80:16
136:6
**necessarily** 13:8
46:22 49:5
134:22
**necessary**
26:13,14
**negative** 95:8
**negligence** 32:22
35:5,14 40:23,25
41:7
**neither** 141:6
**Nicewonder**
21:14,17,23
**nine** 114:25
**NO.8204724;4/9/1
3** 1:12
**NO.8204725;4/9/1
3** 1:13
**NO.8274726;4/9/1
3** 1:15
**NO.VA**
1:5,11,13,14
**nobody** 27:6 73:14

76:23
**noise** 42:18
**non-coal** 120:24
**None** 35:21
**nor** 135:15
141:6,10
**normal** 104:24
**normally** 5:20
13:21
**northern** 58:24
**Norton** 20:25 57:7
136:15
**Norton-Coeburn**
84:3
**Notary** 1:24
141:1,14
**note** 5:17 6:2
10:2,3 137:17
**noted** 26:6 35:21
40:14 41:13
**notes** 134:3
**nothing** 8:17 36:14
55:2 93:12,24
133:11
**notice** 35:25 91:13
134:2
**noticed** 32:21
51:16
**notwithstanding**
136:19
**November** 1:18
**numerous** 26:24
27:16 34:6,7

___

**O**
**oath** 8:9,11
**objection** 8:10
26:1,4 35:20
38:15 41:13 48:8
62:8 63:12 67:5
70:13 83:16 99:3
106:12 108:2
115:21,23 116:6

117:18 140:6
**obligated** 48:23
**observation** 50:12
130:7
**observations**
64:12 130:10
**obstructed** 34:4
42:21 43:9,14,18
53:25 54:3
**obstruction** 43:16
**obvious** 112:8
136:23
**obviously** 14:15
19:25 115:9
**occur** 88:15
**occurred** 85:24
86:1 88:23 113:3
**occurring** 70:3,10
117:15
**occurs** 124:4
**October** 112:1
**offer** 66:20 83:15
97:13 106:11
107:25 117:17
**offered** 14:21
97:13 98:14,15
**office** 1:1 2:5
58:22 60:17,18
74:6 90:14,15,18
116:17 136:10
**Oh** 32:19 43:11
56:15,16 72:3
92:23 113:5
**Ohio** 18:24 132:24
**oil** 121:9
**okay** 5:2 6:23
7:9,12,24
8:4,8,25 16:5
20:6,9,12 21:25
24:15,24
25:12,15 26:19
27:4,13 28:5
30:9,20 31:11,19

32:6,13 33:10
34:1,22
35:4,18,23
38:17,24,25
39:13 40:5,14
41:5,10,12
43:21,24 44:2
45:8 46:1 47:12
49:21,25
53:5,9,17,25
54:9 56:4 58:16
59:1 61:8 62:6,9
64:1,12 67:7
70:15 76:2
77:2,21 83:17,20
84:1,4,14,17
85:7,14,18
86:2,6 88:14
90:1 91:21 92:23
98:10 99:20,22
106:25 107:4,6,9
108:18,22
109:1,7 111:17
114:2 115:20
116:18 117:23
126:18 127:3
128:25 130:4,11
134:10 139:4,21
140:2,5,11
**old** 95:24
**Omega** 108:20
**onto** 60:23,25
65:20 69:24
87:15 90:6 138:2
**opening** 3:4 8:13
9:7,8
**operate** 92:1
**operated** 14:4,25
16:12 27:19
58:6,7 80:3
126:1 136:13
**operating** 17:12
100:7 104:24
**operation** 7:18
15:8 59:17
81:14,15,16
111:3 131:20,25

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 213 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 19

132:1,14 135:22
136:13
139:10,14

**operations** 22:11
25:4 45:13 59:2
65:11

**operator** 6:9 11:4
13:1,22 14:15
35:2,14
41:6,8,23 43:1
51:22 57:17,18
58:7 70:18
118:13
134:13,19 136:3

**operator/coal**
21:16,19

**operators** 23:4
29:11 49:5 57:18

**operator's** 46:17
78:17

**opportunity**
8:12,14,20

**opposed** 12:25
73:23

**opposite** 6:15

**option** 48:15 49:4

**order** 91:5,8 140:8

**orders** 12:9

**ordinary** 110:1
135:19

**organized**
49:18,22

**orient** 83:19
111:19 115:14

**Original** 4:22

**OSHA** 111:5,6,11
125:21,22,23,24
126:1

**others** 13:15 16:24
99:15

**otherwise** 94:19
97:14 141:10

**outcome** 6:4

141:11

**outfit** 43:5

**out-of-service** 28:1
30:1

**outside** 130:2

**oversee** 33:4 35:9
41:2

**overseeing** 35:3

**oversized** 114:6,7

**overstated** 136:21

**owned** 26:23 41:6
50:8 80:3 90:16
100:3 101:5
129:21

**owner** 12:9,17
50:4 80:13

**owns** 11:22 86:13
90:17 100:25

**P**

**package** 97:15
130:25

**page** 3:2 10:3
36:13 98:5 109:4
127:3,4,9
129:8,9

**pages** 1:19 98:19
111:20

**paid**
100:1,4,9,13,17

**paper** 108:15

**paraphrase** 26:18

**pardon** 99:10
108:12

**parked** 67:21

**particular** 6:5
9:14 17:15 22:8
39:13 50:19
51:12 85:4
102:25 103:1,9
128:13 130:2
139:7

**particularly** 136:7

**parties** 5:22 6:1,25
8:12,18,21,22
98:2 141:7,10

**partners** 121:8

**party** 90:16

**past** 21:5

**path** 89:12 90:1,5

**Paul** 79:15,16
80:24 83:23

**paved** 106:17

**pay** 100:13

**paying** 102:14

**penalties** 6:13

**penalty** 1:4 5:12
7:15

**pending** 6:4 20:2

**PennStuart** 2:12

**people** 11:13 24:5
28:13,21 29:6
34:7 35:1 47:15
52:20 75:23
100:12 128:19
136:3

**Pepper**
102:5,7,9,14

**percent** 27:23,25
29:23 30:15
93:25 96:14
100:9,13
108:14,23,24
109:10 114:24
123:16,24
124:2,17 137:21

**perceptions** 77:14

**performed** 9:13,25
13:22 14:6 17:15
22:15 23:12
25:10 54:10
59:23 65:18

**performing** 27:5
44:15

**period** 25:5,13

139:24

**permanently**
30:21,23 31:2
34:9,12 39:20

**permission** 82:17

**permitted** 5:20,23

**person** 12:18
13:14
34:22,23,25 35:1
40:20 47:9
100:24 135:19

**personal** 120:6

**personnel** 27:18
46:17

**persons** 29:2
40:15,17

**pertaining** 6:3

**pertains** 111:12

**per-ton** 100:19

**Petitioner** 1:6 2:2
3:5,7 20:17
53:10 56:9 76:5
126:7

**Pevler** 109:11

**photo** 86:1

**photograph**
4:9,10,11,13,17,
18,19 61:21 63:1
64:16 82:15
83:6,9,12 84:18
88:1,3 89:4
116:8,9,10

**photographs**
61:17,24 83:1

**phrase** 11:2

**physical** 79:14,16

**pickup** 92:12

**picture** 62:2,4,12
63:5,7,16
64:20,22 66:21
116:13

**pictures** 82:23

139:6

**piece** 86:15,16
87:10 96:13
108:15 119:20

**pieces** 34:7
94:12,13

**pile** 14:13 55:13
62:14,18,21,23
65:5
66:13,14,15,16,2
2 95:17 102:25
103:19,20,21,22
104:3,5,10,14
108:21 109:9,10
112:2 120:1,2
124:17,18,22

**piles** 62:17 87:6
92:12
95:18,21,24
96:3,10,11,15
111:25 118:5,7
121:14 133:4
138:2

**pin** 53:24

**pink** 85:2,4

**Pittston** 120:24
121:6,7

**placed** 33:21,22,24
66:5

**plan** 16:13,14 91:2

**plant** 12:3,13 13:1
14:7 15:20,21
16:6,15,17,19
17:21
23:1,6,8,24
24:23 59:8,14
61:15 63:19 66:9
67:13,14
68:12,15,16,19,2
0,23
69:3,15,18,20,25
70:9 72:16,24
73:1,2,6,8,9,14,1
7,23,24
80:1,13,16,25
81:9,10,12,14,17

,18,23 83:13
86:18,20
87:18,23,24 88:2
89:18,20,22,23,2
4,25 90:5
93:9,18,19,21,23
,24 94:10,16,20
96:1,12,14,17,25
97:2 104:6,23
105:6 109:23,25
110:1,14,17,21,2
2 111:4
114:18,19,20,23
115:2 117:1
118:23 122:21
123:2,16,21
124:12 125:4,20
131:23 133:1,2
137:12,13

**planting** 121:25

**plants** 15:4,10,16
24:4 55:12 58:25
72:19 73:11,14
81:18 92:18
115:1
122:11,13,16,22
123:3

**plant's** 72:25
109:16

**please** 10:5 20:19
21:13 26:11
56:11 79:5 82:14
89:13 105:8,15
108:19 127:9

**plenty** 18:14

**plus** 93:22 100:19

**point** 24:17 27:10
46:19 69:17,23
72:14 87:16
107:1,7 110:6,12
113:20 130:6
134:15 136:21

**pointed** 31:14
66:19,24 69:12

**pointing** 65:1

**points** 65:8 94:15

**policy** 46:18
76:7,14 77:17

**pond** 90:25

**poor** 135:21

**portion** 89:24

**Portions** 68:3,4

**position** 6:8,24

**possible** 57:11
134:7

**possibly** 15:2

**post-hearing** 8:19
18:17

**potential** 30:18
71:24

**potentially** 47:14

**potty** 136:2

**pound** 34:14 100:3
101:7

**powdered** 81:20

**power** 1:8,10 6:3
7:8 9:14
11:12,13,21,23
12:2,3,7,20,23
16:3,12 17:18,21
22:1,4,15 23:6,8
24:23 32:24
45:9,13
46:3,11,15,20
47:1,3,11,15,20,
24 48:3,14,19,23
50:8 51:24
59:2,4,8,17,21
60:10 61:15,18
62:13
63:18,20,24 64:8
65:11 66:9 68:7
69:15,18,20,25
70:3,9,18,25
72:16,19
73:1,2,4,14
75:22 79:7
80:1,4,7,8,15,18
81:5,9,10,11,15,
17,18 82:16
84:19 85:5

86:8,9,12
89:17,18,20
90:17 92:7,16
93:9,23 94:19
95:6 96:18
97:1,2,7,8
100:3,10,13,14
101:5,13
102:7,18
103:2,18
104:20,24
105:6,9
109:16,23
110:13,17
114:18,19,20,23
115:1 116:15
117:1,5 121:9
122:3,8,20
123:3,4,14,16,25
124:4,7 125:1,14
126:10,12,13,15,
16,23,25
127:5,6,18
128:4,9,10,21,23
129:19 131:23

**practice** 26:12
36:6

**practices** 22:17,22

**prefer** 7:4

**pre-hearing** 6:19
17:8 19:12

**pre-law** 96:4,5

**preparation** 10:18
14:7 23:1,24
24:4,23 58:25
59:14 88:16
92:18 113:3,6
122:11,16,21,22
123:1,3 133:1

**preparing** 9:16
10:17,21,23 11:4
16:21 18:7
133:18

**present** 29:15
78:16

**president** 120:19

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 215 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 21

Presley 35:17

pressure 39:6,8,9

pre-trial 5:20
78:15

pretty 8:24 61:3

principle 6:7

prior 7:20 10:3
57:21 87:23

private 58:2

privy 74:19,20

probable 134:7

probably 7:22
13:2 24:3 36:8
50:21 71:18
73:18 87:22
96:13 97:3,4,6
111:9 123:24
124:2 136:22

problem 20:10
61:20 74:12
114:5

problems 31:1
53:14

procedures 8:18

proceed 78:21

proceeding 1:4
5:18,19 7:25
26:4,7 139:8

proceedings
1:10,20 140:16

process 25:6 92:8
100:18 113:17
133:6

processed
13:14,20 14:5

produce 117:25
136:14

producer 92:6
95:9 102:4,25
103:4 111:23
113:22,23,24
123:20 124:5

producers

11:15,20 75:21
95:14 96:16,21
97:3 101:15
102:5 103:10
109:6 111:21
112:10,11
123:10

producing 46:10
47:21,23 48:2,18
101:16

product 52:13
81:25 82:3,4,5,9
95:9 100:4 101:2
102:10 108:20
109:23 110:22
111:25 112:20
113:25 117:6,13
118:20 119:17
121:17,19
122:23,25 123:5
124:3,6,9 129:19
132:13

production 46:17

products 15:16
92:14 93:5 94:17
112:5,9
113:1,2,3
117:7,8,9 121:2
129:21

program 126:2

prompted 69:1,4,9
74:1

proper 47:13
86:18,20

properly 39:10
47:14 66:20
92:19 93:2,17
94:14 112:5
114:9 123:23

property 27:19
40:20 49:2 55:16
59:24,25
60:11,15,23,25
62:13 64:25
65:21 66:8 69:21
70:25 71:2,5
72:16

80:15,18,19
85:2,9,15
86:9,11,12,17
88:2 89:1
90:11,13
91:24,25 92:20
93:2,4,5,6 102:3
104:21 105:18
116:16
125:24,25
129:18

proposition 17:13

protecting 119:11

provide 99:15
104:18 115:5
129:22

provided 127:6,25

provides 127:6

Public 1:24
141:1,14

pull 118:11

pulled 36:1,23
37:12,21 39:3
40:10 41:16
43:13

pulling 37:1,2,17
43:18

pulls 34:5 41:20
118:14

pulverized 110:19

pump 90:21

pumps 90:22

purchase 13:25
102:6 114:3

purchased 11:18
13:14 92:17
101:14 114:16
129:19

purchases 11:14

purpose 122:9

purposes 44:12,17
112:4

pursuant

5:8,18,20 6:9

purview 110:4

push 66:2

puts 43:6

_____
Q

quacking 131:19

quacks 131:11

qualify 9:25

qualities 103:12
111:23

quality 82:10
103:3,9,14,24
111:24 112:3
123:5

quarter 63:22 81:4
84:11,22

question 6:5,10
11:20 15:12
18:18 19:17
28:6,14 32:19
33:5 48:1,6,12
50:13 54:9 55:7
66:12 70:21
71:20 74:15 75:4
76:10 88:15,20
89:11 109:20
112:7,24 113:8
117:24 130:1
134:7,8

questioning 14:22

questions 9:2 19:6
32:7 35:18 38:5
41:11 43:22
50:25 53:4,7
55:1 56:5 66:11
76:18 77:2 78:3
89:3 115:18
126:3 128:25
130:5

quick 17:7

quite 103:25
139:23

quote 55:24

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 22

| | | | |
|---|---|---|---|
| **R** | reasonable 18:10,11 127:15,24 | 38:9 | 88:1 |
| **R-1** 82:13,14 83:15 89:7 114:22 | reasonably 30:12,13,18 34:2,3 39:14,15,17 40:13,18 | recollection 5:21 36:13 | relative 88:10 141:8 |
| **R-2** 105:17 106:11 107:10 | | record 5:17 7:13 8:1 56:22 78:20 83:7 94:24 99:21 106:3 139:12 | relatively 139:23 |
| **R-3** 107:20,25 108:2 115:15,22 | reasons 12:12 13:18 34:18 | records 99:13 | relevant 19:19,22 48:25 50:7 |
| **R-4** 116:13,21 | reblend 104:3,10 124:17,22 125:15 137:25 | red 71:23 | reluctant 50:13 |
| **R-5** 116:25 | | redirect 3:9 53:8,10 76:5 129:4 | rely 97:14 |
| **R-6** 117:2 | Rebuild 121:4 | | remain 29:4 98:24 99:1 |
| rail 114:24 | rebuilds 121:4 | reduced 141:4 | reminded 130:13 131:9 |
| railroad 110:18 | rebuttal 17:7 78:17 | reduction 94:1 | remined 124:10 |
| raises 75:9 | recall 31:15,16 50:18 | refer 64:9 79:25 80:12 | removed 65:22 112:3 |
| ran 40:19 136:12 | | reference 86:8 97:19 98:23 | Renick 21:15 |
| randomly 50:23 | recap 65:10 | referring 51:22,24 | repeat 24:9 28:14 48:1 |
| range 81:25 82:9 94:16 104:16 123:19 | receipt 6:19 | refresh 36:13 | report 17:8 73:25 |
| | receive 8:21 26:7 38:17 41:12 62:9 63:13 67:6 89:6 106:13 107:10 115:24 117:19 | refuse 14:13 22:25 23:20 24:11 52:8 54:14 93:4 94:23,24 129:12 | reported 73:20 92:6 141:4 |
| rare 124:6 | | | reporter 20:20 56:14 66:24 79:20 |
| rate 128:16 | | regard 8:18 19:14 77:17 89:4 139:22 | |
| raw 86:20 113:9 | | | Reporting 1:24 |
| reached 7:10 | | regards 27:24 | represent 58:13 95:21 |
| reaches 27:25 | received 4:2 8:7 16:15 26:9 35:22 38:18 62:10 63:14 67:8 89:8 99:7 106:14 115:25 117:20,21,22 | regular 22:5,17,20,21 25:2 44:15 | representative 127:25 |
| react 94:14 | | | request 8:24 |
| reaction 94:1 110:23 | | regularly 29:13 | requested 69:5 |
| reacts 94:6 | | regulate 138:2 | requesting 71:16 |
| ready 9:6 44:2 78:21,23 | receiving 21:16,19 | regulations 5:11 135:16 139:20 | required 42:22 43:3 109:18 112:23 |
| | recent 135:23 | reimbursed 100:14,22 | |
| really 11:7 15:9 17:17 48:5 74:7 101:22 106:23 110:3 125:18 128:14 138:25 | reclaim 87:15 138:1 | | requirements 127:15,24 128:1,22 |
| | reclaimed 96:11 | reimbursement 100:20 | |
| | reclaimers 87:14 | | re-rebuttal 18:13 |
| rear 37:18 42:22 43:3 | reclaims 121:14 | related 55:21 91:1 100:16 141:6 | resale 13:15 |
| rearview 34:5 43:10 | reclamation 121:22,24 | relationship 49:11 | re-sample 103:24 |
| reason 6:14 14:19 139:4 | recognize 25:19 | | |

research 55:25

Resources 21:23

respect 6:16

Respondent 1:9,15
2:10 3:6 4:12
6:8,10,16 7:8
10:7 41:14 44:7
67:9 72:12 77:5
79:3 82:15 89:8
105:9 106:14
107:13 115:25
116:8,9,10
117:20,21,22
129:4

Respondent's 9:24

responsibilities
57:8 126:25

responsibility
122:11 137:24
138:6

responsible
135:17 137:19

rest 91:19 138:14

result 29:18 34:15
39:24

resulted 31:2
40:12

results 104:13

resurrected
130:12

retained 4:22

retired 121:6

reverse 33:22,24

Review 1:1 5:7

revisit 35:23

Richlands 120:21

Ridge 120:20

river 13:25 18:24
132:24

RNS 14:9,11 17:11

road 41:24 59:15
60:4,9 61:16

68:9,10,14 69:14
79:10
80:20,22,23
81:3,6,7
84:8,13,14 86:13
87:3,9 90:6
92:10 106:17
116:17 119:7
132:25

roads 29:10 90:24
136:16

roadway 61:2

roadways 27:17
29:12 39:23

Robert 20:21
56:8,13,23

R-o-b-e-r-t 20:22
56:24

ROBERT 3:11
56:17

roof 58:6

room 91:19

Route 80:25 81:1
83:22 84:1

rubber-tired 92:1

ruled 17:9

rules 5:10,19,21
8:18 135:16

ruling 133:9

rumors 74:23,25
75:2

run 39:25 73:1
81:19

runaway 39:25

running 41:24

runoff 91:1

run-of-mine
92:19,22,23 93:1

run-of-the-mill
110:1 132:15

runs 81:13

Russell 68:9 79:10

80:19 81:3,6,7
84:7,12,13,14
90:6

---

**S**

S&S 34:18 40:8

safely 51:17

safety 1:1,5,14
5:7,9,14 20:25
22:5 27:24 29:25
30:4 57:2,21
125:23

sake 56:3

sale 95:8 113:25

sales 13:6,12 17:10
137:18

sample 35:1 65:22
102:17,19
124:18

sampled 23:2,7
60:2 103:22
124:19

sampler 90:16
102:15 103:23
107:3,4

samples 12:4

sampling 60:1
61:1 65:22

Samuel 14:20

sand 135:22
136:14

sat 125:10

saw 16:17 22:23
44:24 60:24,25
61:1 62:21 66:13
68:18 71:7,17
116:23 121:2

scale 100:6,17

scales 60:3 61:1
65:24 66:7
90:15,17 92:2
102:12
106:17,18,20,24

scenario 31:6

school 21:5

scoop 58:6 62:23

screen 117:9
122:24

screened 95:15
123:6,23

season 12:15

seat 54:7

second 14:19 25:2
36:13 78:18
130:13

secret 10:5

Secretary 1:4,13
6:14,20 7:3
9:11,21 19:9
20:12 56:8 58:14
78:10,13 88:17
111:12 133:13
136:24

Secretary's 6:24
17:24

Section 5:8 18:8
57:10,19
127:5,10,19
129:10

sediment 91:1

seed 118:23

seem 132:10

seen 23:12,17
24:24 25:5 45:9
52:12
54:10,17,22
55:24 68:1 69:12
131:11

segregated 102:23
103:8

selecting 50:23

sell 137:10

selling 94:15

send 71:23

sends 118:16

sense 128:12
137:17,18

senses 138:1

sent 74:18

separate 37:11
129:16,17
132:15,16,18

separately 97:13

separating 132:11

serial 110:2

seriously 78:18

service
77:16,17,22
115:5

services 14:9,11
17:11 123:2
127:4,6,18,19
129:22

sets 7:15 30:2
131:20

Setting 6:23

seven 136:14

several 5:14 6:2
13:5,25 25:13
59:24 60:25
62:17,19 65:20
69:12 72:19

SGS 102:18 103:3

Shade 1:23
141:3,14

shaft 93:15

sheet 4:16 103:5
107:14

sheets 103:17
124:14,15

she's 67:1

shift 33:3 35:12
41:4

ship 17:20 124:23
128:3

shipment 24:23

shipped 23:7

24:16,17

shipping 21:16,19

ships 13:24

short 11:14 43:25
79:19,22 80:10
99:9

short-circuit 99:25

showed 16:14
60:11,15,18
126:1

showers 91:20

showing 105:20

shown 66:14

shows 88:1

sided 15:13

sides 80:17

sifted 16:16

sign 63:19,21,23
64:6,7,8,25 65:8
84:10

significant 27:21
34:17 40:6,10

signs 60:22,23
125:23

simple 137:6

simplified 5:18,19
8:17

simply 8:11

single 100:3

sir 7:7 9:4 10:6
18:25 19:3,21
22:9 24:14
25:14,21 27:3,6
29:5
30:6,11,19,22
33:14,16,25
34:11 35:6,16
38:10,12
40:7,16,24 41:9
44:16,19,22,25
45:3,11,20,22
46:1,5,8
47:16,18 49:20

50:1,6,10
51:2,6,9,11,15,1
9
52:2,5,10,18,21,
24 53:2,16,21
54:2,24
64:3,6,11,15
67:20,25 68:6
70:1 72:6 74:1
75:12 76:12,16
77:1 78:6,8
82:22 88:5,7
89:2 98:21
99:14,19 107:11
138:9,18

sit 7:5

site 9:25
11:19,22,23 12:2
13:15 15:19
23:4,12 27:7
41:20 44:21,23
45:6,18
46:11,14,20 47:3
48:22,24 50:4
51:1,14,18
52:1,14,16,25
54:10 59:22 60:7
67:21,23 68:5,7
69:24
70:3,6,9,11
73:23 74:8
75:22,25 82:16
83:13 89:13,17
90:2,4 92:15
101:1,12
102:1,22,23
105:10 106:9
114:11,12
117:15 125:6,8
126:12 129:20
132:17 133:3

sites 14:17 123:12

sits 86:15 87:1

sitting 54:7 116:23
133:10 135:4,15

six 7:20 124:24
136:13 139:11

six-months 25:10

size 7:18,20 82:2
93:14 115:2
117:8 122:24
139:10,13

sized 16:16 92:19
93:2,17
113:7,14,15
114:8 123:7,23
129:24

sizing 10:25
114:14 134:17

slang 24:3

slight 105:20

small 7:19 60:1,19
61:16 68:14
90:19 139:13,20

smokeless 93:24

smother 95:10

SOL 76:24 77:5

sold 11:21 112:21
121:7,18

sole 12:17 16:25
49:4

Solicitor 2:5

solicitors 136:2

Solicitor's 76:22

solid
11:14,15,17,19,2
3 12:4,18,25
46:9
52:7,16,20,23
93:15 100:25
101:2,6,8
127:14,23 128:3
129:6

somebody 49:9
67:22 119:9

somehow 132:14

someone 67:16

Sometime 7:24

somewhat 39:23

122:1

**somewhere** 59:9
134:16

**sorry** 56:16 73:10
75:1 77:21,23
79:20 108:17

**sort** 87:5

**sound** 33:23

**sources** 133:22

**South** 109:13

**southwest** 21:7
59:14 95:25
96:10 120:9

**speaking** 114:22

**spec** 93:14
94:11,13 102:8
104:7 112:23
123:2,13,18,23
124:6,16
125:5,15
128:14,18,20

**special** 16:24
57:6,9 58:17
94:10,11 124:7

**specialist** 58:21

**specific** 140:9

**specification**
61:13 123:1

**specifications**
64:14 112:16
114:17 128:2,22
135:12,13

**specs** 12:12 114:3
124:14,16

**speculation** 48:9
70:14

**spell** 20:19 23:25
45:23 56:21
92:21

**split** 15:11

**spread** 83:8

**spreadsheet**

108:25

**St** 79:14,16 80:24
83:22

**stable** 96:6

**stacking** 87:12
92:11,12 119:21

**stacks** 93:25

**stand** 7:4 17:12

**standard** 30:2,5
42:21 110:17

**standards** 5:15
36:10

**standing** 26:4

**Star** 21:18

**start** 10:11 20:6
75:2 91:14

**started** 25:3 97:2
121:1,3

**state** 1:25 21:21
49:12 58:4,5
59:7 63:17 69:13
79:5 96:8 121:22
141:15

**stated** 39:19

**statement** 3:4 6:19
8:14,15,16 9:7,9
19:12 38:22
51:20 52:3 72:15

**statements** 8:13

**states** 42:17
57:1,24 95:14

**station** 81:22
86:25 136:9

**statute** 10:12,16
135:15

**statutory** 10:24

**stayed** 27:6 120:23

**steam** 95:4,5,11

**steel** 57:24 95:6

**stenotype** 141:4

**step** 78:6 108:10

138:11

**steps** 109:22
139:11

**stick** 99:9

**stipulated** 11:25

**stipulation**
97:12,14,25
98:2,4,7,16

**stipulations** 4:3
7:10 8:4,6 98:5

**stockpile** 23:3,14
55:16,18 119:25
137:21

**stockpiles** 23:15

**stockpiling** 35:3

**stoker** 133:23,24

**Stone** 120:21

**stop** 39:10 96:24

**stopping** 65:21

**storage** 9:15 15:1
65:1,4,8,9 66:1
85:21 87:25
102:20,21
106:6,7

**store** 12:20 17:19
24:19,20,22
90:20 115:6
125:15 135:11

**stored** 23:5 52:12
54:20 61:14 65:3
66:13
86:21,22,23
102:25 107:8
117:10 126:15

**stores** 12:4
114:19,21
126:12

**storing** 11:1 65:6
133:20

**stormwater** 91:2

**story** 131:9

**straight** 78:20

**street** 2:13 12:8
17:21 70:10
92:11 104:12,23
111:5 125:16
126:16 135:19
138:1

**strike** 40:19

**strip** 93:3 112:21
118:10 122:23

**structures** 90:12

**Structure-wise**
90:14

**stuff** 7:21 55:12
87:6 110:2
131:14
132:11,15

**stumps** 118:1

**subject** 6:18
131:20 133:7,12
136:24 139:13

**subjected** 112:14
133:6

**submission** 78:15

**submitted** 130:24
131:8

**subpart** 5:10

**substantial** 27:21
34:17 40:6

**succeeding** 111:20

**sucks** 94:7

**sudden** 135:22

**sufficient** 136:7

**suggest** 134:14

**suggestion** 137:7

**suggests** 88:18

**sulfur** 94:1,7
103:6 109:14,17
111:22 123:19
138:1

**summer** 87:23

**superintendent**
120:17

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al.  11-19-2013
Page 26

| | | | |
|---|---|---|---|
| **superior** 69:5 71:16 73:19 74:13 | **talk** 36:22 61:23 83:20 90:9 91:23 | **thank** 6:22 7:12 17:3,4 26:5 44:6 46:1 53:4 56:4,6 66:10 67:7 78:7,8 83:10 99:5,22 115:20 126:4 129:9 138:9,10,14 140:12,14,15 | **theoretically** 37:19,22 |
| **supervision** 17:2 | **talked** 25:15 53:17 80:6 | | **thereafter** 141:4 |
| **supervisor** 58:23 | **talking** 20:7 74:5,6 80:12 90:11,12 97:19,20 111:16 114:10,13 115:18 121:12 | | **therefore** 71:15 132:13 |
| **supervisory** 57:6,9 58:16 | | | **there's** 10:24 11:2 12:18 18:22 36:9,14 39:9 42:21,22 48:15 50:14 53:18 76:14 82:8 87:11,24 93:24 109:9 113:5 123:17 124:9 137:20 |
| **support** 19:16 | | | |
| **supporting** 95:3 | **tank** 61:3 90:22 | **that's** 10:11,19,21 11:16 12:24 13:1 14:15,20 19:3 20:9 23:8,22 25:5 26:13,14 28:13 32:7 36:19 37:8 41:18 46:20 47:17 48:19 50:3,22,23 53:18 54:6 59:18,19 64:3,6,11,15 65:7,14 67:4,15 68:17 69:9,15,23 70:1,7,11,21 71:25 72:6 74:1,15 75:10 76:2,16 77:1,6,24 78:2 84:6,7 85:2,9 87:6,8 91:24 92:13,19 93:1,6,11,13,16 94:1,10,21 95:5 100:21 101:1 102:4 107:9 108:18 110:3,17 111:14 113:18,20 114:4,13 115:1,12 116:13,16,17,18, 20 117:14,16 118:12,25 123:2 124:9 125:3 127:2,18 128:24 130:1,4 131:1 132:3,7,9,12 133:14 134:19 135:4 | |
| **suppression** 90:24 | **target** 19:5 | | |
| **Supreme** 18:1 135:5 | **Technical** 21:8 | | |
| **sure** 13:6 35:24 48:2 68:25 75:7 76:1 83:4 105:13,24 111:9 113:5,13 126:6 128:6 135:6 | **Teco** 121:17 | | **Thereupon** 44:1 |
| | **telephone** 5:22 | | **they'll** 23:16 |
| | **ten** 11:10 58:20 114:25 115:3 121:7,14 | | **they're** 41:20 71:23 97:12 |
| | | | **third** 49:3 90:16 |
| **surface** 20:24 21:3,20,21 29:24 44:10 58:3,9,11,14,20, 25 76:8 77:19,25 93:3 121:5 | **tenancy** 95:10 | | **third-party** 102:17 |
| | **ten-minute** 43:25 | | **Thomas** 19:9 20:13,21 |
| | **Tennessee** 1:25 141:15 | | **T-h-o-m-a-s** 20:21 |
| **surrounding** 42:15 | **tens** 121:25 | | **THOMAS** 3:10 20:14 |
| **survey** 4:14 105:9,18 | **term** 10:22 23:21,22 24:3 75:8 92:21 95:19 | | **thousand** 89:21 91:7 110:19 |
| **suspect** 70:17 | **terminal** 1:9 32:25 63:20 64:2,5,10 90:15 97:9 131:18 | | **thousands** 94:2 121:25 |
| **sweeper** 29:10 92:10,11 | | | **thrives** 118:4,7 |
| **sworn** 8:11 20:15 56:14,15,18 79:1 | **terminalling** 4:8 98:12 99:6 | | **throughout** 26:4,6 71:2 |
| **system** 39:6 55:9 56:1 | **terminally** 11:25 | | **throw** 56:2 132:2 |
| **systems** 138:1 | **terms** 9:18 55:21 99:25 109:23 128:4 | | **Thursday** 1:18 |
| | **test** 104:13 | | **tiny** 86:14 |
| ——————— T ——————— | **testified** 20:16 56:19 79:2 126:9 | | **tipple** 13:20,24 14:4,5 |
| **table** 82:19 135:15 | **testify** 138:22 | | **title** 44:9 57:5 |
| **tailings** 95:17,24 96:10 | **testimony** 8:8,11 18:5 19:15 65:10 | | **today** 6:6 70:19 73:17 97:24 121:6 126:9 |
| **taking** 8:10 132:17 134:3 | **testing** 72:4 | **themselves** 125:3 | |

**216**

Appeal: 14-1450    Doc: 14    Filed: 06/10/2014    Pg: 221 of 400

Capital Reporting Company
Secretary of Labor vs. Power Fuels, LLC, et al. 11-19-2013
Page 27

**ton** 100:15,17 119:25 120:1

**tons** 40:2 89:18,19,21 94:2 95:22,24 102:7 103:21 104:23

**top** 39:25 84:17

**total** 22:7 25:8 45:4

**totally** 17:1 108:13

**touching** 134:17

**touted** 93:23

**towards** 65:1 80:24 84:2

**towers** 87:1

**track** 31:5 33:24 110:4 112:2

**tracked** 112:4

**tracker** 39:3

**tractor** 22:24 26:25 27:16,22 30:14 33:19,21 34:5,19 36:2,23,25 37:2,13,16 39:1 40:11 41:20,22 42:4,16 43:13 49:14 53:18,23 54:5 65:25 102:16 104:25 117:3,11

**trail** 132:10

**trailer** 26:23,25 27:16,22 30:15 33:20 34:5,19 36:1,5,23 37:1,3,4,12,15,1 6,17,21 39:2,4 40:9 41:16,17,20,25 42:4,16,17 43:9,13,15 49:14 53:22 54:1,3,7 60:19 65:22,25 102:16 117:4,11

**trailers** 22:24 66:2 104:25

**trainee** 120:11

**transcript** 8:22 77:9 140:9

**transmission** 33:22

**transportation** 9:15

**transported** 61:14

**transports** 41:18

**traumatic** 31:3

**travel** 28:22 29:7,12 34:20 35:10 41:3

**traveling** 23:2 27:17 67:13

**travels** 33:2 34:3 39:22,23 83:22

**treated** 110:1

**trees** 93:13 118:1,11,15,19 122:1

**truck** 23:3 27:9,19 28:22,24 29:7 31:1,22,24,25 32:25 33:3,4 34:3,4 36:15,19 37:6,15,21 38:1 39:22,24 40:19,20 41:2,3 43:9 46:13,20 47:12 49:5 51:1 53:19,22 66:5 87:11 90:7 92:9,10,12 101:20 102:11,13,19,20 103:23 106:17,18,20,24 112:13 114:24 124:1

**truckers** 11:20 42:15 47:25 48:17 104:19

**trucking** 26:23 31:17 32:3 33:1,6 35:17

**truckloads** 129:23

**trucks** 22:24 29:9,10,12 35:10,11 40:2 41:6,16 46:7,9 47:19 48:12,21,23 49:12 50:4,11,15,22,23 51:4,7,12,17,21 52:1,4 53:14 58:9 59:7,13,25 60:1,25 61:10 65:20,21,23 67:12 68:18,22 69:2,12,24 70:8,16 71:4 73:16,22 89:12,14,22 90:2,5 101:8,11,21,24 104:18 113:10,11 125:15

**true** 42:20 51:10

**try** 10:12 13:9 20:1 110:6

**trying** 28:18 55:25 69:23 98:13 99:13 109:24

**turn** 63:17 81:2 84:22 108:17 127:3,9

**turned** 71:5 136:18

**turning** 59:9 69:13 89:17

**turns** 136:5

**TVA** 15:1,10,15

**tweak** 138:3

**twelve** 110:18,19 121:18

139:17,18

**twin** 21:18 86:24

**two-lane** 61:15 68:14

**type** 12:21,24,25 13:20 22:14 23:11,15 47:10 57:16 59:22 93:20 95:11 110:3 123:11

**types** 58:8 64:13 96:15

**typewriting** 141:5

**typical** 54:6 57:14 107:20 110:13

**typically** 40:2 62:23

---

**U**

**U.S** 2:4

**ultimate** 29:18

**underground** 58:5,11,14,20,24 120:12

**understand** 20:3 48:11 69:10 70:15 73:21 88:20 108:22 135:14

**understanding** 64:11,15 68:17 70:7 77:1 131:7

**Unfortunately** 19:5 135:17

**uniform** 76:7

**unique** 15:2 109:25 110:2,14 114:23 132:13

**unit** 26:25 27:23 30:14 34:15 38:23 39:3 40:12 54:8 60:1 61:1

**United** 57:1,24

95:14 121:17

**units** 42:10,12,14

**University** 21:9

**unless** 69:21 82:18

**unobstructed** 43:3

**Unwarrantable** 57:16

**unwarrantables** 71:22 72:8

**unwieldy** 82:18

**upon** 26:22 33:19 104:4 128:16

**upset** 31:16,20,23

**upside** 108:16

**upticket** 114:15

**user** 12:24 13:19 14:3 15:19 17:2

**usual** 8:20

**usually** 8:24 11:4 14:6 71:23 75:2 123:15 134:12,19,21,23, 24

**utility** 13:25

**V**

**VA** 5:13,16

**vacated** 136:20

**vacuum** 92:10

**valve** 39:4

**varies** 12:14 97:1

**various** 10:25 11:15 35:11 52:7 58:8 90:23 112:22 113:1,3

**VCHEC** 16:2 79:19,21,22,25 81:22 117:11 128:3 137:12

**vehicle** 27:24 29:25 30:3 39:25

40:19,21

**vehicles** 39:24

**verbs** 16:17

**view** 6:15 42:21 43:3,14,19 53:25 54:4 116:18 137:15

**viewed** 50:19

**violate** 6:11 57:13

**violated** 57:19

**violation** 27:14 38:25 46:14,21,24,25 47:5,6,17

**violations** 5:14 6:11 7:20 19:16 44:18,19,24 51:4,8 57:10,15,16,17 71:23

**Virginia** 1:17,23 2:7,14 11:11,13 15:24 16:3 21:1,15,18,22 57:7 58:24 59:14 61:15 63:18,20 64:1 66:9 73:5 79:10,11,12,17,2 3 80:3,6,7,18 84:19 86:9,12 89:15,16 95:23,25 96:10,19,20 120:9,14 121:3

**Virginia's** 21:9

**visitors** 125:25

**volume** 104:22

**vs** 16:8

**W**

**Wade** 2:11 7:7 10:6 138:24

**wages** 100:7

**wait** 36:11 48:10

71:9 130:23

**waiting** 99:11 137:4

**wake** 8:1

**walk** 102:1 108:15

**walking** 49:13 135:19

**Walt** 78:24 125:18

**Walter** 3:12 78:25 79:6

**Warshco** 121:18

**wash** 92:18 122:24 123:21 125:20

**washed** 123:6

**washing** 11:1 114:15 125:13 134:17

**wasn't** 15:5 25:7 48:25 74:19,22 77:23 98:15 119:9

**water** 29:9 61:3 90:22 92:9

**watering** 90:23

**waterlines** 90:23

**waters** 72:4

**watersheds** 96:9

**we'd** 83:15 97:14 98:11 106:11

**weed** 93:13

**week** 124:24

**weekly** 128:15

**weeks** 25:9

**weigh** 102:13

**weighed** 23:1,7

**weighs** 92:3,4

**weights** 92:6 102:13 131:13

**we'll** 18:14 37:8 38:5 43:24 44:3 48:20 49:23 68:8

83:20 104:10 105:6 110:7 116:5 119:13 124:23

**wells** 120:25

**we're** 9:5 17:1 18:19 44:2 80:12 97:19 107:11,17 111:16 114:13 116:1,4 119:2 121:8,9,10 125:12,13,14 132:11 137:8,9,11

**west** 21:15,22 81:7 84:2 89:15 96:20 120:14

**we've** 11:25 25:15 47:12 68:7 89:10 117:7,8 121:13 123:5,6,7 136:25 139:23

**whatever** 46:10 95:6 100:5 104:21 114:17 120:3 121:19 122:23 137:21

**wheel** 53:23,24

**whenever** 60:2 100:16

**whereas** 81:22

**wherever** 73:11 123:18

**whether** 10:13 14:22 44:20 50:7,8 71:11 74:2,7

**whoever** 101:14 103:10

**whole** 17:23 18:1 27:6 32:11 56:22 73:21

**whom** 20:23 56:25

**whose** 47:13 130:15

131:22,24,25

**wide** 54:5

**wilderness** 136:11

**willfully** 57:19

**Wilson** 2:6

**wings** 99:12

**Wise** 21:9 79:11

**witness** 3:9 19:8
20:15 22:20
23:22 24:1,3,7
28:11,13,21
29:9,16,19,22,25
30:3,6,8
31:7,10,23
32:2,4,23 33:7
36:3,8,14,19,24
37:2,6 41:17
42:1,4,6,8,13,15,
23,25
43:4,8,12,17,20
44:5 50:21 53:6
55:6,10,14
56:6,7,18
66:16,18 70:24
71:16,25
72:3,6,9
74:19,22,25
75:7,12,15
78:8,9 79:1,22
83:25
84:2,13,15,19
85:6,16,25 86:3
87:8 88:11,13
91:13,17,20
92:22,24
106:1,6,10,15,20
,23 107:1,5,7
108:1,6,13,18,23
109:3,5,8 110:16
111:4,7,9,14
112:10,12,16,18
113:5,13,16,18
115:12,16
116:20,22
118:3,6,9,12,21,
25 119:3,5,8
130:14 137:19

**138:13

**witnessed**
54:12,20

**witnesses** 7:5 8:10
78:12

**won** 121:21,22

**wondering** 71:10
136:22

**wonders** 135:19

**wood** 52:12
54:15,17 55:4
82:5 87:18
93:5,16
94:4,12,23
117:13,14 121:8
129:22,24

**work**
9:13,14,15,16
10:17,20,23 11:3
12:21,23,24
13:1,21 14:6
16:20,21 17:15
18:6,7 20:7,23
21:10
22:11,15,17,22,2
3 23:9,11,12
24:20 25:16
39:10,11 49:16
54:10 56:25
58:23 59:22 61:9
65:14,18 76:14
90:4,20 93:17
97:7 104:20
120:4,10,15
121:6 122:15,20
123:11
125:1,14,21
128:17 133:18
134:19 137:12
139:15

**worked**
21:2,14,17,22
57:3,24 58:1
120:12,13,16
121:15

**working** 17:1
38:23 47:4,14

**48:2 139:2

**world** 78:19 93:24

**worse** 31:6

**wound** 49:15

**wreck** 39:18

**wrecks** 31:1

**write** 25:22 26:21
33:13,17
38:11,20 44:24
135:15,16

**writing** 27:11

**written** 33:15
53:13,14 88:25

**wrong** 137:20

**wrote** 26:12 35:16
38:25 45:8 46:6
47:17 134:15

—————————
**Y**
—————————

**yard** 60:20,21,22
61:11,12 62:14
65:1,9 66:1
86:21 90:19
102:20,21
105:21,22
108:8,25 116:22
120:3 131:18

**yards** 90:25 107:8

**yet** 78:17

**you'll** 39:7 99:10
108:12

**youngster** 120:7

**yours** 19:3 130:16

**yourself** 56:11

**you've** 10:10 22:7
24:24 25:5,12
45:2 51:7
54:10,17,22
85:11 119:16
122:6

—————————
**Z**
—————————
**zero** 95:17

Honorable George A. Koutras

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
## OFFICE OF ADMINISTRATIVE LAW JUDGES

| | | |
|---|---|---|
| | : | CIVIL PENALTY PROCEEDING |
| **SECRETARY OF LABOR,** | : | |
| **MINE SAFETY AND HEALTH** | : | Docket No. VA 2013-403 |
| **ADMINISTRATION (MSHA),** | : | A.C. No. 44-07303-323400 |
| | : | |
| Petitioner, | : | Power Fuels Blending Terminal |
| | : | |
| v. | : | |
| | : | |
| **POWER FUELS, LLC,** | : | |
| | : | |
| Respondent. | : | |
| | | |
| **POWER FUELS, LLC,** | : | CONTEST PROCEEDINGS |
| | : | |
| Contestant | : | Docket No. VA 2013-312-R |
| | : | Citation No. 8204724; 4/9/13 |
| v. | : | |
| | : | Docket No. VA 2013-313-R |
| **SECRETARY OF LABOR,** | : | Citation No. 8204725; 4/19/13 |
| **MINE SAFETY AND HEALTH** | : | |
| **ADMINISTRATION (MSHA)** | : | Docket No. VA 2013-313-R |
| | : | Citation No. 8274726; 4/9/13 |
| Respondent. | : | |
| | | Power Fuels Blending Terminal |

## JOINT STIPULATIONS

AND NOW, come the Secretary of Labor, by his undersigned counsel, and Power Fuels, LLC, ("Power Fuels"), by its undersigned counsel, and stipulate and agree as follows:

1.    Citation No. 8204724 was issued on April 9, 2013 and alleged a violation of 30 C.F.R. § 77.1605(b). A copy of the Citation is attached as Exhibit G-1 and may be admitted into evidence without objection, except as to jurisdiction.

ALJ-1

2.    Citation No. 8204725 was issued on April 9, 2013 and alleged a violation of 30 C.F.R. § 77.410(c).  A copy of the Citation is attached as Exhibit G-2 and may be admitted into evidence without objection, except as to jurisdiction.

3.    Citation No. 8204726 was issued on April 9, 2013 and alleged a violation of 30 C.F.R. § 77.1605(b).  A copy of the Citation is attached as Exhibit G-3 and may be admitted into evidence without objection, except as to jurisdiction.

4.    The total proposed penalty for the citations at issue in this proceeding will not affect Power Fuels' ability to continue in business.

5.    The Terminalling Agreement between Power Fuels, LLC and Virginia Electric Power Company, d/b/a Dominion Virginia Power, as amended, attached as Exhibit G-4, is a true and authentic copy of the Agreement in effect at the time of the citations and may be admitted into evidence as a business record of Power Fuels.

Respectfully Submitted,

SECRETARY OF LABOR

By: _____
Anthony D. Jones, Esq.
U.S. Department of Labor
Office of the Solicitor
1100 Wilson Blvd, 22nd Floor
Arlington, VA 22209
jones.anthony@dol.gov

Attorney for the Secretary of Labor

POWER FUELS, LLC

By: _____
Wade W. Massie, Esq.
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, VA 24212
wmassie@pennstuart.com

Attorney for Power Fuels, LLC

Abingdon: S71240-1

2

Mine Citation/Order

GOVERNMENT
EXHIBIT

**U.S. Department of Labor**
Mine Safety and Health Administration

ML
4/8/13
for Jw

**Section—Violation Data**

| 1. Date Mo Da Yr 04/09/2013 | 2. Time (24 Hr. Clock) 1110 | | 3. Citation/Order Number 8204724 |
|---|---|---|---|
| 4. Served To Mike Hendrickson, Foreman | | 5. Operator POWER FUELS, LLC | |
| 6. Mine POWER FUEL BLENDING TERMINAL | | 7. Mine ID 44-07303 | (Contractor) |

**8. Condition or Practice**                                          6a. Written Notice (103g)

Braking defects are present on the Hills Trucking 9900 International Tractor/Trailer Coal Truck (company # 114, serial # 2HSCHAPT35C015532). The right side steering axle brake on the tractor is out of adjustment. This is a type 20 canister with a maximum pushrod stroke of 1 and 3/4 inches. When the driver engaged the service brakes, the pushrod traveled 2.5 inches. Measurement taken with a standard rule. Both rear axle brakes on the Benson Dump Trailer (tag # 287-977) being pulled by tractor # 114 are inoperative. When the driver engaged the service brakes, neither brake on the rear axle of the trailer would function. The brake pushrods would not move. There is no braking force at all being applied to the rear trailer axle brakes. This unit hauls coal into this Surface Facility under the direction of the mine operator. The Tractor/Trailer travels the same

See Continuation Form (MSHA Form 7000-3a) ☑

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR | 77.1605(b) |
|---|---|---|---|---|

**Section II—Inspector's Evaluation**

**10. Gravity:**

A. Injury or Illness (has) (is): No Likelihood ☐   Unlikely ☐   Reasonably Likely ☑   Highly Likely ☐   Occurred ☐

B. Injury or Illness could reasonably be expected to be: No Lost Workdays ☐   Lost Workdays Or Restricted Duty ☐   Permanently Disabling ☑   Fatal ☐

| C. Significant and Substantial: | Yes ☑   No ☐ | D. Number of Persons Affected: 002 |
|---|---|---|

**11. Negligence (check one)**   A. None ☐   B. Low ☑   C. Moderate ☐   D. High ☐   E. Reckless Disregard ☐

| 12. Type of Action 104(a) | 13. Type of Issuance (check one) Citation ☑   Order ☐   Safeguard ☐   Written Notice ☐ | | |
|---|---|---|---|

| 14. Initial Action A. Citation ☐   B. Order ☐   C. Safeguard ☐   D. Written Notice ☐ | E. Citation/Order Number | | F. Dated Mo Da Yr |
|---|---|---|---|

**15. Area or Equipment**

| 16. Termination Due | A. Date Mo Da Yr 04/09/2013 | B. Time (24 Hr. Clock) 1200 | |
|---|---|---|---|

**Section III—Termination Action**

**17. Action to Terminate**

| 18. Terminated | A. Date Mo Da Yr | B. Time (24 Hr. Clock | |
|---|---|---|---|

**Section IV—Automated System Data**

| 19. Type of Inspection (activity code) E01 | 20. Event Number 4409106 | 21. Primary or Mill | |
|---|---|---|---|
| 22. Signature Thomas R. Bower | | | 23. AR Number 24508 |

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Terminal Entry
Date 4 15 13
Initial's

225

Mine Citation/Order
Continuation

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I—Subsequent Action/Continuation Data

| 1. Subsequent Action | 1a. Continuation | 2. Dated (Original Issue) | Mo Da Yr 04/09/2013 | 3. Citation/Order Number 8204724 |
|---|---|---|---|---|
| ☐ | ☑ | | | |

| 4. Served To Mike Hendrickson, Foreman | 5. Operator POWER FUELS, LLC |
|---|---|
| 6. Mine POWER FUEL BLENDING TERMINAL | 7. Mine ID 44-07303        (Contractor) |

Section II—Justification for Action

Continuation of 8. Condition or Practice

roadways and in the same areas that mine personnel use.  The driver removed
the tractor and trailer from service until repairs are completed.

See Continuation Form ☐

Section III—Subsequent Action Taken

| 8. Extended To | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☐ D. Terminated | ☐ E. Modified |
|---|---|---|---|---|---|---|

Section IV—Inspection Data

| 9. Type of Inspection E01 | 10. Event Number 4409106 |
|---|---|

| 11. Signature Thomas R. Bower | AR Number 24508 | 12. Date | Mo Da Yr 04/09/2013 | 13. Time (24 Hr. Clock) 1110 |
|---|---|---|---|---|

MSHA Form 7000-3a, Mar 85 (revised)

Terminal Entry
Date 4|15|13
Initial's 1CX

233

Mine Citation/Order
Continuation

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I—Subsequent Action/Continuation Data

| 1. Subsequent Action | 1a. Continuation | 2. Dated (Original Issue) | Mo | Da | Yr | 3. Citation/ Order Number | 8204724 - 01 |
|---|---|---|---|---|---|---|---|
| ☑ | ☐ | | | 04/09/2013 | | | |

| 4. Served To | 5. Operator |
|---|---|
| Mike Hendrickson, Foreman | POWER FUELS, LLC |

| 6. Mine | 7. Mine ID | (Contractor) |
|---|---|---|
| POWER FUEL BLENDING TERMINAL | 44-07303 | |

Section II—Justification for Action

The right side steering axle brake on the Hills Trucking 9900 International Tractor has been properly adjusted. The rear axle brakes on the Benson Dump Trailer (tag # 287-977) have been repaired. A new rear air valve has been installed onto the trailer. All braking defects have been repaired.

See Continuation Form ☐

Section III—Subsequent Action Taken

| 8. Extended To | A. Date | Mo | Da | Yr | B. Time (24 Hr. Clock) | | ☐ C. Vacated | ☑ D. Terminated | ☐ E. Modified |
|---|---|---|---|---|---|---|---|---|---|

Section IV—Inspection Data

| 9. Type of Inspection | E01 | 10. Event Number | 4409106 |
|---|---|---|---|

| 11. Signature | AR Number | 12. Date | Mo | Da | Yr | 13. Time (24 Hr. Clock) |
|---|---|---|---|---|---|---|
| Thomas R. Bower | 24508 | | | 04/11/2013 | | 1217 |

MSHA Form 7000-3a, Mar 85 (revised)

Terminal Entry
Date 4/15/13
Initials KBO

234

Mine Citation/Order

**GOVERNMENT EXHIBIT 2**

U.S. Department of Labor
Mine Safety and Health Administration

**Section I—Violation Data**

| 1. Date | Mo Da Yr 04/09/2013 | 2. Time (24 Hr. Clock) 0900 | | 3. Citation/ Order Number | 8204725 |
|---|---|---|---|---|---|

| 4. Served To | Mike Hendrickson, Foreman | 5. Operator POWER FUELS, LLC |
|---|---|---|

| 6. Mine POWER FUEL BLENDING TERMINAL | 7. Mine ID 44-07303 | (Contractor) |
|---|---|---|

8. Condition or Practice                                    8a. Written Notice (103g)

The back up alarm provided on the Presley Trucking 379 Peterbilt Tractor/Trailer (company # 132, serial # 1XP-5D40X-6N897015) is not being maintained in functional condition.  When the driver placed the transmission into reverse, the back-up alarm failed to function.  There is a broken wire on the back up alarm.  This Tractor/Trailer is used to haul coal into this Surface Facility under the direction of the mine operator and backs up in congested areas at times while dumping.  This Tractor/Trailer frequently operates in areas where mine personnel work and travel.

See Continuation Form (MSHA Form 7000-3a)

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR | 77.410(c) |
|---|---|---|---|---|

**Section II—Inspector's Evaluation**

**10. Gravity:**

| A. Injury or Illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☑ | Highly Likely ☐ | Occurred ☐ |
|---|---|---|---|---|---|

| B. Injury or Illness could reasonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | Permanently Disabling ☑ | Fatal ☐ |
|---|---|---|---|---|

| C. Significant and Substantial: | Yes ☑ | No ☐ | D. Number of Persons Affected: | 001 |
|---|---|---|---|---|

| 11. Negligence (check one) | A. None ☐ | B. Low ☑ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action 104(a) | 13. Type of Issuance (check one) Citation ☑ Order ☐ Safeguard ☐ Written Notice ☐ |
|---|---|

| 14. Initial Action A. Citation ☐ B. Order ☐ C. Safeguard ☐ D. Written Notice ☐ | E. Citation/ Order Number | F. Dated Mo Da Yr |
|---|---|---|

15. Area or Equipment

| 16. Termination Due | A. Date Mo Da Yr 04/09/2013 | B. Time (24 Hr Clock) 1200 | |
|---|---|---|---|

**Section III—Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date Mo Da Yr | B. Time (24 Hr. Clock) | |
|---|---|---|---|

**Section IV—Automated System Data**

| 19. Type of Inspection (activity code) E01 | 20. Event Number 4409106 | 21. Primary or Mill |
|---|---|---|

| 22. Signature Thomas R. Bower | 23. AR Number 24508 |
|---|---|

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Terminal Entry
Date 4/15/13
Initials KB

240

Mine Citation/Order
Continuation

U.S. Department of Labor
Mine Safety and Health Administration

Section I—Subsequent Action/Continuation Data

| 1. Subsequent Action | 1a. Continuation | 2. Dated (Original Issue) | Mo Da Yr 04/09/2013 | 3. Citation/ Order Number 8204725 - 01 |
|---|---|---|---|---|

| 4. Served To | 5. Operator |
|---|---|
| Mike Hendrickson, Foreman | POWER FUELS, LLC |

| 6. Mine | 7. Mine ID | (Contractor) |
|---|---|---|
| POWER FUEL BLENDING TERMINAL | 44-07303 | |

Section II—Justification for Action

The back up alarm provided on the Presley Trucking 379 Peterbilt
Tractor/Trailer (company # 132, serial # 1XP-5D40X-6N897015) has been
repaired and is working properly.  The back-up alarm has been re-wired.

See Continuation Form [ ]

Section III—Subsequent Action Taken

| 8. Extended To | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | [ ] C. Vacated | [✓] D. Terminated | [ ] E. Modified |
|---|---|---|---|---|---|---|

Section IV—Inspection Data

| 9. Type of Inspection E01 | 10. Event Number 4409106 | | |
|---|---|---|---|

| 11. Signature Thomas R. Bower | AR Number 24508 | 12. Date Mo Da Yr 04/11/2013 | 13. Time (24 Hr. Clock) 1045 |
|---|---|---|---|

MSHA Form 7000-3a, Mar 85 (revised)

Terminal Entry
Date 4/15/13
Initial's

241

*Mine Citation/Order*



GOVERNMENT
EXHIBIT
3

**U.S. Department of Labor**
Mine Safety and Health Administration

4/12/13 

**Section I—Violation Data**

| 1. Date Mo Da Yr 04/09/2013 | 2. Time (24 Hr. Clock) 0850 | | 3. Citation/Order Number 8204726 |
|---|---|---|---|
| 4. Served To Mike Hendrickson, Foreman | | 5. Operator POWER FUELS, LLC | |
| 6. Mine POWER FUEL BLENDING TERMINAL | | 7. Mine ID 44-07303 | (Contractor) |

6. Condition or Practice          8a. Written Notice (103g)

Braking defects are present on the Presley Trucking 379 Peterbilt
Tractor/Trailer Coal Truck (company # 132, serial # 1XP-5D40X-6N897015).  The
left front steering axle brake is out of adjustment.  This is a type 20 brake
canister and maximum pushrod stroke is 1 and 3/4 inches.  When the driver
engages the service brakes, this brake pushrod is stroking 2 and 1/4 inches.
Measurement taken with a standard rule.  There is also a brake air leak
present on the Mac Dump Trailer (tag # 401-482) being pulled by this Tractor.
When the driver engages the service brakes, air is leaking continuously
through a defective air brake valve located above the center axle on the
trailer.  This Tractor and Trailer is being used to haul coal into this
Surface Facility under the direction of the mine operator and travels the same
roadways and in the same areas that mine personnel use.

See Continuation Form (MSHA Form 7000-3a)

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR | 77.1605(b) |
|---|---|---|---|---|

**Section II—Inspector's Evaluation**

10. Gravity:

A. Injury or Illness (has) (is):  No Likelihood ☐  Unlikely ☐  Reasonably Likely ☑  Highly Likely ☐  Occurred ☐

B. Injury or illness could reasonably be expected to be:  No Lost Workdays ☐  Lost Workdays Or Restricted Duty ☐  Permanently Disabling ☑  Fatal ☐

C. Significant and Substantial:  Yes ☑  No ☐     D. Number of Persons Affected:  002

| 11. Negligence (check one) | A. None ☐ | B. Low ☑ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action 104(a) | 13. Type of Issuance (check one) | Citation ☑ | Order ☐ | Safeguard ☐ | Written Notice ☐ |
|---|---|---|---|---|---|

| 14. Initial Action A. Citation ☐ B. Order ☐ C. Safeguard ☐ D. Written Notice ☐ | E. Citation/Order Number | | F. Dated Mo Da Yr |
|---|---|---|---|

15. Area or Equipment

| 16. Termination Due | A. Date Mo Da Yr 04/09/2013 | B. Time (24 Hr. Clock) 1200 | |
|---|---|---|---|

**Section III—Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date Mo Da Yr | B. Time (24 Hr. Clock) | |
|---|---|---|---|

**Section IV—Automated System Data**

| 19. Type of Inspection (activity code) E01 | 20. Event Number 4409106 | 21. Primary or Mill | |
|---|---|---|---|
| 22. Signature Thomas R. Bower | | | 23. AR Number 24508 |

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW, MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

Terminal Entry
Date 4/15/13
Initials 781

242

| Mine Citation/Order Continuation | U.S. Department of Labor Mine Safety and Health Administration 4/12/13 | McForJW |
|---|---|---|

**Section I—Subsequent Action/Continuation Data**

| 1. Subsequent Action 1a. Continuation ✓ | 2. Dated (Original Issue) Mo Da Yr 04/09/2013 | 3. Citation/Order Number 8204726 - 01 |
|---|---|---|

| 4. Served To Mike Hendrickson, Foreman | 5. Operator POWER FUELS, LLC |
|---|---|

| 6. Mine POWER FUEL BLENDING TERMINAL | 7. Mine ID 44-07303 | (Contractor) |
|---|---|---|

**Section II—Justification for Action**

The left front steering axle brake on the Presley Trucking 379 Peterbilt Tractor (company # 132, serial # 1XP-5D40X-6N897015) has been properly adjusted. The air leak on the Mac Dump Trailer ( Tag # 401-482) has been repaired. A new air brake valve and a new brake canister (maxi-can) has been installed onto the trailer.

See Continuation Form ☐

**Section III—Subsequent Action Taken**

| 8. Extended To | A. Date Mo Da Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☑ D. Terminated | ☐ E. Modified |
|---|---|---|---|---|---|

**Section IV—Inspection Data**

| 9. Type of Inspection E01 | 10. Event Number 4409106 |
|---|---|

| 11. Signature Thomas R. Bower | AR Number 24508 | 12. Date Mo Da Yr 04/11/2013 | 13. Time (24 Hr. Clock) 1040 |
|---|---|---|---|

MSHA Form 7000-3a, Mar 85 (revised)

Terminal Entry
Date 4|15|13
Initials KM

243

## TERMINALLING AGREEMENT

**THIS TERMINALLING AGREEMENT** is made and entered into and is effective as of the ____ day of July, 2012, by and between **POWER FUELS, LLC**, a Virginia limited liability company (hereinafter "Power Fuels"), with offices at 171 East Main Street, Abingdon, Virginia, 24212 and **VIRGINIA ELECTRIC AND POWER COMPANY** (hereinafter "Customer" or "DVP"), a Virginia public service corporation, with offices at 120 Tredegar Street, Richmond, Virginia 23219.

Power Fuels and Customer are each hereinafter sometimes referred to individually as "Party" and collectively as "Parties."

NOW, WHEREFORE, in consideration of the mutual covenants set forth below, Power Fuels and Customer agree as follows:

### Article I. Definitions.

The following terms shall have the meaning as hereinafter set forth, unless the context shall otherwise require:

**Section 1.01. "Affiliate"** shall mean, with respect to a Party, another person or entity which controls, is controlled by, or is under common control with such Party. A person or entity shall be deemed to control another person or entity if such person or entity possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Section 1.02. "Agreement"** shall mean this Terminalling Agreement together with all Exhibits and amendments hereto.

**Section 1.03. "Assignment"** shall mean any sale, gift, license, contract, mortgage, pledge, setting over or other transfer or encumbrance, whether voluntary or by operation of law.

**Section 1.04. "Facility"** shall mean Power Fuels' Solid Fuel terminalling facility located in Virginia City, Virginia and more fully described in Article II hereof at the site

G-4
244

**229**

depicted on Exhibit A hereto.

Section 1.05. **"Force Majeure"** shall mean any of the events described in
Section 13.02.

*Redacted*

Section 1.06. **"Interest Rate"** means means, for any date,           percent over the
per annum rate of interest equal to the prime lending rate as may from time to time be published
in The Wall Street Journal under "Money Rates"; provided the Interest Rate shall never exceed
the maximum rate allowed by applicable law.

Section 1.07. **"Services"** shall mean the services to be provided by Power Fuels
pursuant to Article III.

Section 1.08. **"Shipment"** shall mean the aggregate of the truckloads of Solid
Fuel that are loaded and transported to VCHEC from the Facility pursuant to this Agreement on
any one day.

Section 1.9. **"Solid Fuel"** shall mean coal, coal refuse, coal mids, or gob.

Section 1.10. **"Specifications"** shall mean the quality specifications attached as
Exhibit B.

Section 1.11. **"Term"** shall be that period of time commencing on the date that
Customer has ownership of VCHEC and Customer has control of the unit for dispatch into the
PJM wholesale electricity market and ending on September 30, 2012. Customer shall have the
unilateral right to extend this agreement through December 31, 2012 by providing written notice
to Power Fuels by September 15, 2012.

Section 1.12 **"Ton"** shall mean a short ton of 2,000 pounds.

Section 1.13 **"VCHEC"** shall mean the Virginia City Hybrid Energy Center.

**Article II. Facility Specifications.**

(a)    Power Fuels is the owner of a Solid Fuel terminalling Facility located on its
        106 acre site at Virginia City, Wise County, Virginia comprised of the

Page 2

245

**230**

following:

    (i)    Approximately thirty (30) acres of graded and gravel paved area;

    (ii)   Two hundred (200) Ton automatic truck scales with computerized recording and card access;

    (iii)  dust suppression system;

    (iv)  480 volt, three-phase power;

    (v)   lighting for night operation;

    (vi)  office and scale house with power and potable water; and

    (vii)  such mobile equipment and automatic sampling equipment as required to perform the Services.

(b)    Power Fuels shall operate at the following performance standards:

    (i)    maintain throughput capacity for up to *Redacted* Tons of Solid Fuel for the Customer's account;

    (ii)   receive, sample, weigh and dump up to *Redacted* Tons of Solid Fuel per day for the Customer's account;

    (iii)  weigh, load and ship for Customer's account per day a volume of Solid Fuel approximately equivalent to that received for the Customer's account.

**Article III. Services by Power Fuels.**

**Section 3.01. Description of the Services.**

(a)    During the Term of this Agreement, Power Fuels shall perform the following Services:

**Page 3**

2⁴ᵇ

**231**

(i)    receive, weigh and sample shipments of Solid Fuel delivered by Customer, its suppliers or contractors;

(ii)   provide **Redacted** Tons of Solid Fuel throughput capacity at the Facility;

(iii)  sample, analyze, and weigh Solid Fuel in accordance with the reasonable requirements of the Customer as directed by the Customers' representative, provided that such requirements shall not exceed the Facility Specifications as set forth in Article II;

(iv)   blend Solid Fuel in accordance with the reasonable requirements of the Customer as directed by the Customers' representative, provided that such requirements shall not exceed the Facility Specifications as set forth in Article II;

(v)    load trucks and ship Solid Fuel to VCHEC; and

(vi)   provide security for the Facility twenty-four hours per day, seven days per week.

(b)  Power Fuels shall perform the Services in a workmanlike manner in accordance with customary industry standards and practices.

(c)  The Facility shall be operated for twenty-four (24) consecutive hours each day, Monday through Saturday. Unless otherwise agreed by the Parties, the Facility shall not operate on nationally recognized holidays. The specific times during which the Facility shall be operated shall be determined by mutual agreement of the Parties.

(d)  In the event that Customer requests Power Fuels operate the Facility at times other than as specified above, Power Fuels will use its best efforts to accommodate Customer's request in exchange for compensation at rates reasonably agreed by the Parties. Power Fuels shall not be required to operate the Facility pursuant to this Section 3.01(d) in the event such

Page 4

247

232

operation would materially interfere with regularly scheduled maintenance of the Facility.

(e)   Power Fuels shall maintain the Facility in good, safe, neat, clean, and proper operational order and shall promptly repair, at its expense, any damage to the Facility.

(f)   In the event of an unplanned shutdown, failure or outage at the Facility that could materially affect the Services to be provided hereunder, Power Fuels shall notify Customer by telephone as soon as possible and, in any event, not more than three hours after such shutdown, failure or outage is discovered by Power Fuels. Power Fuels shall provide to Customer, via facsimile or electronic mail, notice of each such shutdown, failure or outage not later than twenty-four (24) hours following the discovery thereof.

(g)   Customer shall provide a designated representative who shall be available for consultation during normal hours of operation.  Customer's representative shall have unrestricted access to the Facility during operation. In addition, without unreasonably interfering with Power Fuels' operation of the Facility, Customer, through its employees, agents or contractors, may enter the Facility during normal business hours in order to (i) inspect the Facility, (ii) take inventory of Solid Fuel, (iii) observe the operation of the Facility and (iv), upon twenty-four (24) hours advance notice, inspect and copy Power Fuels' records pertaining to delivery, throughput capacity availability and loading of Solid Fuel. While at the Facility, Customer's representative and its other employees, agents and contractors shall observe all Power Fuels' rules and regulations pertaining to safety. Entry upon the Facility hereunder shall be subject to the provisions of Section 9.01(c).

**Section 3.02. Compliance with Laws.**

Power Fuels shall operate and maintain the Facility and perform the Services in compliance with all federal, state and local laws, rules and regulations, including

**Page 5**

248

**233**

without limitation those regulating occupational health and safety and protection of the environment.

**Section 3.03. Reports and Certifications.**

(a)  Power Fuels shall provide to Customer, via facsimile or electronic mail, on each Monday through Saturday, a daily report setting forth (i) the amount of Solid Fuel received at the Facility for Customer's account, (ii) an estimate of the volume of Customer's Solid Fuel throughput capacity at the Facility and (iii) the amount of Solid Fuel shipped from the Facility for Customer's account.  Power Fuels shall use its best efforts to ensure that reports on quality of Solid Fuel received and shipped are reported by 8:00 a.m. the following morning directly by Solid Fuels contractor, Mineral Labs, Inc., or such other laboratory providing sampling and analysis services at the Facility.

(b)  The truck scales at the Facility have been calibrated by an independent inspector at Power Fuels' expense and shall be re-calibrated at Power Fuels' expense not less than once every six (6) months.  At its election and expense, Customer shall have the right at its expense to have the truck scale recalibrated by another independent inspector. Any differences between the calibrations performed by the two inspectors shall be resolved by mutual agreement of the Parties.  Power Fuels shall furnish to Customer a copy of any calibration reports.

(c)  Power Fuels shall comply with the VCHEC Special Terms and Conditions attached hereto as Exhibit C in the performance of sampling, analysis, transportation, and preparation of blended product ready piles.

(d)  Power Fuels shall provide the "Fuel Certification" attached hereto as Attachment 1 to Exhibit C with respect to each truckload of Solid Fuel delivered to VCHEC prior to unloading.  The Parties acknowledge that Customer has procured and owns the Solid Fuel to be certified, and

**Page 6**

249

Customer shall therefore indemnify Power Fuels as provided in Section 9.01(c)(v).

**Section 3.04.  Segregation of Solid Fuel.**  Power Fuels shall keep all Solid Fuel owned by Customer segregated and identifiable from materials at the Facility that are owned by Power Fuels or its other customers.  Power Fuels acknowledges that Customer, its suppliers and contractors will provide Solid Fuels of various qualities.  Power Fuels shall segregate and keep identifiable Customer's Solid Fuels according to quality as directed by Customer, including without limitation segregation of the blended product ready pile described in the VCHEC Special Terms and Conditions attached hereto as Exhibit C.

**Section 3.05.  Blending.**  Power Fuels shall blend the Solid Fuels in accordance with the reasonable requirements of the Customer as directed by the Customers' representative, provided that such requirements shall not exceed the Facility Specifications as set forth in Article II.  Power Fuels acknowledges that Customer requires blended Solid Fuel to meet the Specifications.  Power Fuels shall provide consulting services related to blending and inventory, including without limitation: (i) promptly advising Customer if the directions given by Customer's representative are not reasonably likely to produce a blended product that meets the Specifications, (ii) providing recommendations on how to modify the blending instructions if any blended product does not meet the Specifications, (iii) promptly advising Customer if any Solid Fuel delivered to the Facility will be detrimental to the blending process or is otherwise reasonably likely to prevent the blended product from meeting the Specifications, and (iv) regularly advising and consulting with Customer regarding the quality and quantity of the Solid Fuels that should be available at the Facility in order to meet the Specifications.

**Section 3.06.  Transportation.**  All transportation of Solid Fuel will be via trucks to the VCHEC coal unloading area, or other location as designated by Customer.  Power Fuels shall use its best efforts to furnish an adequate supply of trucks that are suitable for loading and delivery of the Solid Fuel. Such trucks shall be

Page 7



**235**

compatible with the loading and unloading facilities utilized at VCHEC and shall be clean, dry and suitable for the transportation of the Solid Fuel. VCHEC's coal yard designate will direct Power Fuels to the location(s) at VCHEC where Customer will receive deliveries. Customer shall have, upon reasonable notice to Power Fuels under the circumstances, the right to determine hours for Power Fuels to deliver Solid Fuel at VCHEC. While Power Fuels is on-site at VCHEC, all of its on-site activities shall be subject to the provisions of the "Supplemental Terms and Conditions for On-Site Services, Non-Nuclear" and Annex A thereto, collectively attached hereto as Exhibit D and incorporated herein by reference. As used in Annex A, "Work" and "Services" refer to any activities of Power Fuels, any of its subcontractors, employees or representatives while on-site at VCHEC; "Supplier" refers to Power Fuels, its Affiliates, and any of its subcontractors, employees or representatives; and "Purchaser" or "Company" refers to Customer. The Parties acknowledge and agree that the provisions of Exhibit D apply only to activities on-site at VCHEC and do not apply to activities at the Facility.

**Article IV. Fees and Expenses.**

Redacted

Redacted

Redacted

### Article V. Term-Termination.

Section 5.01. Term. The Term shall be as defined in Section 1.11, unless extended by mutual agreement of the Parties. During the Term, the Parties shall negotiate in good faith a new agreement for the potential provision of the Services after the Term.

Section 5.02. Termination. This Agreement shall not be terminated except as specifically set forth in this Agreement.

(a)    Either Party shall have the right (but not the obligation) to terminate this Agreement as provided in Section 12.02(b) hereof.

(b)    In the event that the Facility is substantially destroyed or rendered unusable

Page 10

253

(due to any cause, including without limitation, Force Majeure) to such an extent that the Facility cannot be repaired within thirty (30) days plus a reasonable period of time to order and receive equipment, parts and material necessary to repair or replace the Facility, then Customer shall have the right to terminate this Agreement upon the giving of ten (10) days written notice to Power Fuels unless such cause was due to the fault of Customer or its contractors.

**Section 5.03. Removal of Solid Fuel.**

(a)    Upon the termination of this Agreement for any reason, Customer shall have a period of twenty (20) days to remove any Solid Fuel owned by it from the Facility.

(b)    Power Fuels grants Customer and its agents, employees, and contractors an unconditional right to enter onto and access the Facility at any time upon one business day's notice to access and remove Customer's Solid Fuel from the Facility.  Such right of access and removal includes the right of Customer and its agents, employees, and contractors to utilize equipment and vehicles reasonably necessary to remove such Solid Fuel.  This right of access shall survive termination of this Agreement and the occurrence of any Event of Default (as defined below) or Force Majeure until such time as all Solid Fuel owned by Customer has been removed from the Facility.

Redacted

**Article VI. Title to the Facility and Solid Fuel.**

**Section 6.01. Title to Facility.**  Power Fuels holds and shall continue to hold sole and exclusive right, title and interest in and to the Facility throughout the term of this Agreement.

**Page 11**

254

Nothing in this Agreement shall impair in any way Power Fuels' right, title and interest in and to the Facility, and Customer shall have no interest therein and shall not be deemed to have any control over the Facility. Customer shall execute such documents as may be reasonably requested by Power Fuels to indicate that Power Fuels has title to the Facility.

**Section 6.02. Title to Solid Fuel.** Customer holds and shall continue to hold sole and exclusive right, title and interest in and to all of Customer's Solid Fuel at the Facility, including all Solid Fuel that is or may be available, tested, sampled, blended, or weighed at or delivered to the Facility pursuant to this Agreement. Nothing in this Agreement shall impair or authorize Power Fuels to impair in any way Customer's right, title and interest in and to Solid Fuel owned by Customer and delivered or handled at the Facility. Power Fuels shall not use, transport, pledge, sell or lend Customer's Solid Fuel for Power Fuels' account. Power Fuels waives, disclaims, and relinquishes any lien on Customer's Solid Fuel that it has now or may have in the future, whether arising by statute, common law, or any other source, to secure any payments to which Power Fuels may be entitled hereunder, including, without limitation, any landlord's lien or warehouseman's lien. Such waiver, disclaimer, and relinquishment is intended to be continuing in nature. Power Fuels shall not encumber or seek to encumber (or represent to any person that it has the right to encumber) in any way Customer's Solid Fuel or Customer's title thereto. Power Fuels shall execute such documents as may be reasonably requested by Customer to indicate that Customer has sole and exclusive title to its Solid Fuel.

**Article VII. Payments and Notices.** All payments required by this Agreement to be made to Power Fuels shall be made by electronic funds transfer to the order of Power Fuels to the following account: First Bank & Trust Co., Account No.: 20025680; ABA Routing No. 051404464, Account Name: Power Fuels, LLC . Any notice or other communication required or permitted to be given hereunder, shall be in writing addressed to the Parties as follows:

> Power Fuels:   Power Fuels, LLC
> 171 East Valley Street
> Abingdon, Virginia  24212
> Attention:     Walter B. Crickmer

> Customer:   Virginia Electric Power Company
> 120 Tredegar Street
> Richmond, Virginia 23219

**Page 12**

255

Attention:   Manager Fuels Contracts

as the case may be. Any notice to be given hereunder to either Power Fuels or Customer shall be (i) personally given, (ii) sent by a nationally-recognized overnight courier service, or (iii) sent by the United States mail, registered or certified, return receipt requested, with postage prepaid. Any Party may, from time to time, change its address for future notices hereunder by notice in accordance with this Article VII.  Notices and other communications hereunder to either Party, elections and other documents shall be effective when received by such Party.

**Article VIII. Confidentiality.**  No Party shall disclose, without the prior written consent of the other Party, the terms of this Agreement to a third party (other than a Party's and its Affiliates' employees, lenders, counsel, agents, accountants or prospective permitted purchasers, directly or indirectly, of a Party or all or substantially all of a Party's assets or of any rights under this Agreement, in each case who have agreed to keep such terms confidential) except in order to comply with any applicable law, order, regulation or exchange rule; provided, each Party shall notify the other Party of any proceeding of which it is aware which may result in disclosure and use commercially reasonable efforts to prevent or limit the disclosure.  The Parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with, this confidentiality obligation.  Also, Power Fuels shall retain in confidence all information regarding Customer's fuel purchases or consumption.  Notwithstanding the foregoing, the Parties recognize and agree that certain information related to this Agreement is routinely reported by Customer to state regulatory agencies and the Federal Energy Regulatory Commission and may be used by Customer's consultants to make economic forecasts.

### Article IX. Liability and Insurance.

### Section 9.01. Allocation of Risk

(a)   Power Fuels shall assume responsibility for performance of the services and operation of the Facility and shall indemnify and hold harmless Customer for and on account of claims, demands or liabilities arising from or in connection with (i) Power Fuels, its employees, contractors, or representatives activities and/or performance of Services and operation of

**Page 13**

256

the Facility, (ii) Power Fuels' breach of this Agreement, (iii) personal injury, death, or property damage resulting from the Services, or (iv) from the presence and activities of any third parties not associated with Customer who may be on or at the Facility; provided, however, Customer shall be solely responsible for any shortages in or loss of its Solid Fuel due to stock shrinkage, handling losses, contamination, wind, fire or other casualty unless such shortage or loss arises from breach of this Agreement by Power Fuels or from the negligence of Power Fuels or its contractors while Customer's Solid Fuel is located at the Facility. Nothing herein shall be construed as making Power Fuels liable for any injuries, deaths or damage to the extent caused by the negligence or willful misconduct of Customer.

(b)   Without limiting the foregoing, Power Fuels shall be responsible for compliance with any federal, state or local law relating to the receipt, delivery, and handling of Solid Fuel during the time it has custody thereof, provided, however, Power Fuels shall not be required to accept at the Facility Solid Fuel which contain additives or other chemical compounds not normally associated with Solid Fuel or which may result in environmental hazards not normally associated with Solid Fuel.

(c)   Customer shall indemnify and hold harmless Power Fuels for and on account of claims, demands or liabilities arising from or in connection with (i) the activities of Customer, its employees, contractors or representatives at the Facility, (ii) Customer's breach of this Agreement, (iii) personal injury, death, or property damage resulting from Customer's performance under this Agreement, (iv) from any environmental liability arising from or associated with any chemical or chemical compound transported to the Facility on behalf of Customer other than that normally associated with the Solid Fuels, and (v) third party claims against Power Fuels resulting from the Fuel Sulfur Certification described in Section 3.03(d). Nothing herein shall be construed as making Customer liable for any injuries, deaths or damage to the extent caused by the negligence or willful misconduct of

**Page 14**

257

Power Fuels.

**Section 9.02. Insurance.** Power Fuels shall maintain, at its sole cost at all times during the term of this Agreement, the insurance coverages set forth on Exhibit F with companies reasonably satisfactory to Customer with policy limits in amounts not less than those applicable for such coverages as set forth on Exhibit F. Power Fuels shall ensure that any subcontractors providing Services under this Agreement also maintain the insurance coverages set forth on Exhibit F. A certificate naming Customer as an additional insured and evidencing coverages shall be delivered to Customer prior to the execution hereof. Power Fuels agrees to provide Customer with at least 30 days' prior written notice of termination or cancellation.

**Article X. Assignment.**

Neither Party shall Assign its rights under this Agreement without the prior written approval of the other Party, which approval shall not be unreasonably withheld. Notwithstanding the foregoing, either Party may Assign its rights under this Agreement to an Affiliate of such Party, to a successor by merger or consolidation or the transferee of all or substantially all of such Party's assets or the assets of Customer's business.

**Article XI. Taxes.**

**Section 11.01. Taxes For Power Fuels' Account.** Power Fuels shall pay all taxes, levies and assessments imposed by the United States, any state, or any political subdivision upon the Facility or related to the Services during the term of this Agreement.

**Section 11.02. Taxes for Customer's Account.** Customer shall pay all taxes, levies and assessments imposed by the United States, any state or political subdivision upon its Solid Fuel or other property of Customer.

**Article XII. Default.**

**Section 12.01. Events of Default.** Any one or more of the following shall constitute an Event of Default under this Agreement:

Page 15

243

(a)  If Customer shall fail to pay any payment due to Power Fuels hereunder for a period of ten business (10) days following receipt of written notice that such payment is past due unless Customer disputes the amount of such invoice in writing and pays any undisputed portion;

(b)  If either Party shall file a voluntary petition for bankruptcy or have an order for relief entered against it in response to an involuntary petition for bankruptcy, shall be adjudicated bankrupt or insolvent, shall make a general assignment for the benefit of creditors or shall have (either voluntarily or involuntarily) appointed any trustee, receiver or liquidator to arrange its affairs, or shall be insolvent or otherwise unable to pay its debts when they become due in the ordinary course of business;

(c)  Failure to segregate Customer's Solid Fuel in accordance with Section 3.04;

(d)  The Assignment or attempted Assignment of this Agreement in violation of Article X; or

(e)  Failure of either Party to perform or observe any other covenant, provision, term, restriction or condition required to be performed or observed by such Party under the terms of this Agreement or imposed upon such Party by operation of law.

**Section 12.02. Remedies.**

(a)  In the event that the Customer shall be under Section 12.01(a) hereof, Power Fuels shall be entitled to pursue any remedy available at law or equity not otherwise limited hereunder.

(b)  If either Party commits an Event of Default and such Party fails to cure such Event of Default within thirty (30) days of receipt of written notice thereof, the other Party may, at its option, terminate this Agreement provided, however, that upon an Event of Default described in Section 12.01(b), the other Party shall have the right to terminate this Agreement immediately,

**Page 16**

**244**

and such termination shall be effective upon receipt of the notice of termination without any right to cure.

(c) Except as expressly set forth herein, exercise by either Party of any remedy provided herein shall not preclude it from exercising any other remedy provided herein or available at law or equity, it being the intention of the Parties that the remedies hereunder shall be cumulative and shall survive the termination of this Agreement; provided, however, neither Party shall be liable to the other Party for consequential, exemplary or punitive damages except with respect to the Parties' indemnification obligations under Section 9.01 and in cases of fraud or intentional misrepresentation.

(d) Notwithstanding anything herein to the contrary, neither Party shall be liable to the other Party for consequential, punitive, lost profit, business destruction, or exemplary damages except with respect to the Parties' indemnification obligations under Section 9.01 and in cases of fraud or intentional misrepresentation. In no event shall Power Fuels be liable for the failure of Customer to meet any of its contractual obligations to a third party.

**Section 12.03. Dispute Resolution.** If any dispute should arise between the Parties hereto as to the amount of any payment due or as to any other matter or determination arising under this Agreement, then members of each Party's senior management shall negotiate in good faith to reach a resolution. If senior management is unable to reach agreement within thirty (30) days, the Parties may pursue all remedies at law or in equity, subject to the limitations contained in this Agreement. Both Parties consent to the jurisdiction and venue of any local, state, or federal court located within the Commonwealth of Virginia upon service of process made in accordance with the statutes of the Commonwealth of Virginia and the United States, and further agrees that any and all causes of action, whether or not arising under this Agreement, by and between the Parties hereto shall only be brought in a local, state, or federal court situated within the Commonwealth of Virginia. EACH PARTY WAIVES ITS RESPECTIVE RIGHT TO ANY JURY TRIAL WITH RESPECT TO ANY LITIGATION ARISING UNDER OR IN

Page 17

CONNECTION WITH THIS AGREEMENT.

### Article XIII. General Provisions.

**Section 13.01. No Fiduciary Duty.** Neither of the Parties shall be under any fiduciary or other duty to the other Party.

**Section 13.02. Force Majeure.**

(a)    To the extent either Party is prevented by Force Majeure from carrying out, in whole or part, its obligations under this Agreement and that Party (the "Claiming Party") gives notice and details of the Force Majeure to the other Party as soon as practicable, but not later than forty-eight (48) hours after the inception of the Force Majeure, then the Claiming Party shall be excused during the event of Force Majeure from the performance of its obligations under this Agreement (other than the obligation to make payments then due or becoming due with respect to performance prior to the Force Majeure). Any oral notice shall be confirmed in writing within three (3) business days, thereafter.  The Party affected by the Force Majeure shall remedy the Force Majeure with all reasonable dispatch and will keep the other Party advised as to the continuance of the Force Majeure event.  The non-Claiming Party shall not be required to perform or resume performance of its obligations to the Claiming Party corresponding to the obligations of the Claiming Party excused by Force Majeure.

(b)    If an event of complete or partial Force Majeure persists for a continuous period of sixty (60) consecutive days, then the non-Claiming Party shall have the option, upon three (3) days prior written notice, to terminate this Agreement to the extent affected and the associated obligations of the Parties thereunder (other than payment obligations for prior performance thereunder).

(c)    It is understood and agreed that settlement of strikes and lockouts shall be entirely within the discretion of the Party having the difficulty, and that the

**Page 18**

**246**

above requirement that any Force Majeure shall be remedied with all reasonable dispatch shall not require settlement of strikes and lockouts by acceding to the demands of the opposing Party when such course is inadvisable in the discretion of the Party having said difficulty.

(d)    "Force Majeure" shall mean means an event or circumstance which prevents one Party from performing its obligations under this Agreement, which event or circumstance was not anticipated as of the date of this Agreement, which is not within the reasonable control of, or the result of the negligence of, the Claiming Party, and which, by the exercise of due diligence, the Claiming Party is unable to overcome or cause to be avoided.

**Section 13.03. No Partnership.** It is not the purpose or intention of this Agreement to create a partnership, commercial partnership, joint venture or any other partnership relation between the Parties hereto. Each of the Parties shall be responsible only for its obligations and liabilities as set forth in this Agreement, and neither Party shall have any authority to act for or to assume any obligations or responsibility on behalf of the other Party. Nothing contained in this Agreement shall be deemed to constitute any Party the partner of the other or agent or legal representative of the other.

**Section 13.04. Headings.** The sections, titles and other headings of this Agreement (other than the definitions) are inserted only for convenience and shall not control or affect the meaning, construction or interpretation of the Agreement or affect its terms and provisions. Unless otherwise indicated to the contrary, references to Articles and Sections shall be to Articles and Sections of this Agreement.

**Section 13.05. Choice of Law.** This Agreement shall be interpreted and governed by the laws of the Commonwealth of Virginia, without consideration of the law thereof regarding choice of law.

**Section 13.06. Conformance to Law.** This Agreement shall be subject to all applicable federal, state and local laws, rules and regulations or public bodies exercising jurisdiction over the Agreement, the Services, or the operation of the Facility.

**Page 19**

**247**

**Section 13.07. No Waiver.** No failure or delay on the part of either Party in exercising any of their respective rights hereunder upon any failure by the other Party to perform or observe any condition, covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any of such rights preclude any other or further exercise thereof or the exercise of any other right hereunder. Neither this Agreement nor any provision hereof may be supplemented, changed, waived, discharged or terminated orally, or by any course of dealing or trade usage, but only by an instrument in writing signed by the party against whom the enforcement of the supplement, change, waiver, discharge or termination is sought.

**Section 13.08. Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

**Section 13.09 Further Assurances.** Upon the written request of either Party, the other agrees to furnish such additional formal assurances or other written documents in proper form as may be reasonably necessary to carry out the intent, purposes and terms of this Agreement. Inasmuch as Customer is the ultimate recipient of all Solid Fuel delivered, received, blended, or shipped from the Facility, Customer will use its best efforts to treat all Solid Fuel shipped from the Facility in an equitable manner irrespective of the seller of such Sold Fuel.

**Section 13.10. Successors.** The terms, conditions and covenants contained in this Agreement shall extend to, be binding upon, and inure to the benefit of, the successors, legal representatives and assigns of the Parties hereto, subject to the restrictions on assignment set forth in Article X.

**Section 13.11. Entire Agreement.** This Agreement is the entire agreement between the Parties pertaining to the Facility, the Services and the subject matter hereof and supersedes all prior representations, negotiations, writings, memoranda and agreements with respect thereto. Any prior agreements, promises, negotiations or representations not expressly set forth herein are of no force and effect.

**Section 13.12. Equal Employment Opportunity.** Power Fuels agrees to comply with all applicable provisions and successor provisions thereto, of Executive Order

11246, as amended; §§ 503 of the Rehabilitation Act of 1973, as amended; §402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended; and implementing regulations set forth in 41 C.F.R. §§ 60 1, 60 250 and 60 741; and the applicable provisions relating to the utilization of small and minority business concerns as set forth in 15 U.S.C. § 637, as amended. Power Fuels agrees that the equal opportunity clause set forth in 41 C.F.R. § 60 1.4, the affirmative action clauses set forth in 41 C.F.R. §§ 60 250.4 and 60 741.4, and the clauses relating to the utilization of small and minority business concerns set forth in 15 U.S.C. § 637(d)(3) and 48 C.F.R. § 52 219.9 are hereby incorporated by reference and made part of this Agreement. If this Agreement has a total estimated value of $500,000 or more, Power Fuels shall adopt and comply with a small business and Small Disadvantaged Business Subcontracting Plan that shall conform to the requirements set forth in 15 U.S.C. § 637(d)(6). The provisions of this Section shall apply to Power Fuels only to the extent that (a) such provisions are required of Power Fuels under existing law, (b) Power Fuels is not otherwise exempt from said provisions, and (c) compliance with said provisions is consistent with and not violative of 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, et seq., or other acts of Congress. If this Agreement has a total estimated value of $500,000 or more, Power Fuels agrees to report the actual use of Small Disadvantaged and Women-owned small business subcontracts used in satisfying the requirements of this Agreement in accordance with the requirements set forth in 15 U.S.C. § 637(d)(6). This information will be reported quarterly on a form to be provided to Power Fuels by Customer or other acceptable formats.

      **Section 13.13. Recordings.** The Parties acknowledge that any telephone conversation wherein the Parties discuss the terms of this Agreement or performance hereunder may be recorded by either Party. Each Party hereby expressly consents to the recording of such conversations without any further notice and to the creation of a tape or other electronic recording of all telephone conversations between the Parties to this Agreement, and that any such recordings will be retained in confidence and secured from improper access. Each Party waives any further notice of such monitoring or recording, and agrees to notify its officers and employees of such monitoring or recording and to obtain any necessary consent of such officers and employees.

      **Section 13.14. Audit and Records.**

**Page 21**

(a) Each Party shall maintain accurate records relating to its performance under this Agreement. Such records shall be retained for a period of at least twenty-four (24) months after completion or termination of the Agreement. Each Party (and its representatives) has the right, at its sole expense during normal working hours and upon reasonable advance notice, to examine the records of the other Party, but only to the extent reasonably necessary to verify the accuracy of any statement, charge or computation made pursuant to this Agreement. If requested, a Party shall provide to the requesting Party statements evidencing the Services and the quantity and details of all Solid Fuels received or shipped. Examination of records hereunder shall be limited to one examination per year. If any such examination reveals any inaccuracy in any statement, the necessary adjustments in such statements and the payments thereof will be promptly made and shall bear interest calculated at the Interest Rate from the date the overpayment or underpayment was made until paid; provided, however, that no adjustment for any statement or payment will be made unless objection to the accuracy thereof was made in writing, in reference hereto, prior to the lapse of twenty-four (24) months from the rendition thereof; and provided further, that for the purpose of such statement and payment objections, this Section will survive any termination of this Agreement.

(b) In the event Customer determines that pursuant to FASB Accounting Standards Codification (810 Consolidation) it may be required to consolidate Power Fuels or any Power Fuels Affiliate for accounting purposes in its consolidated financial statements filed with the Securities and Exchange Commission, Power Fuels will, as requested by Customer, provide or cause to be provided all financial statements and other supporting information of Power Fuels and its Affiliate, including access to records and applicable personnel by Customer or its auditors, as determined to be necessary by Customer. Such information, if requested by Customer, should be provided on a quarterly basis within 30 days after the end of the calendar quarter.

**Page 22**

**250**

[signatures on following page]

Page 23

251

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement, effective as of the day and year above written.

VIRGINIA ELECTRIC AND POWER COMPANY          POWER FUELS, LLC

By _____          By _____

Title    Authorized Representative          Title    Secretary

Date    July 03, 2012          Date    July 5, 2012

Page 24

267

252



DOMINION POWER TERMINAL AGREEMENT
WORK AREA EXHIBIT

**EXHIBIT B**

**QUALITY SPECIFICATIONS**

Redacted

269

**EXHIBIT C**
**VCHEC SPECIAL TERMS AND CONDITIONS**

**VCHEC Truck Requirements and Sampling Requirements**

## I. VCHEC TRUCK REQUIREMENTS

Power Fuels shall provide the Fuel Certification (Attachment 1 to this Exhibit C) for each truck delivery to VCHEC prior to unloading.

Deliveries will be in accordance with daily truck schedules arranged between Power Fuels and DVP.

Each truck must not exceed the maximum gross weight limit set forth by the Commonwealth of Virginia.

Power Fuels shall use its best efforts to obtain sufficient number of trucks are available to deliver the quantities of Solid Fuel as set forth in the Agreement. Subject to the other terms of this Agreement, Power Fuels may subcontract the truck delivery of coal to independent third party trucking contractor(s), and/or operate its own fleet of trucks to meet the delivery requirements hereunder. DVP may, at any time and in its sole discretion, require Power Fuels to discontinue use of any truck, driver, or independent third party trucking contractor. All trucks must have full dump, or bottom dump, capability and Power Fuels will work with DVP, if requested, to establish an electronic scanning system to improve traffic flow.

These truck deliveries must conform to the following VCHEC policy:
1. Power Fuels may be scheduled to deliver truck coal any day of the week.
2. Power Fuels is to evenly distribute deliveries throughout the normally scheduled delivery times and shall not bunch trucks at the beginning or at the end of the normal delivery times.
3. Power Fuels will encourage truck drivers not to create back-ups on US-58.
4. It is the responsibility of the Power Fuels to immediately notify Conrad Francis (804-332-3365), or in their absence, _____ (276-___-____), if scheduled deliveries are delayed or cancelled or if Power Fuels expects to ship considerably less tonnage than scheduled.
5. DVP will provide a copy of transportation procedures to Power Fuels delivering Solid Fuel. It will be Power Fuels's obligation to review the transportation procedures with each truck driver, prior to the truck driver making his/her first delivery to VCHEC. Power Fuels will supply DVP with a sheet reflecting the date of training and the name and signature of the truck driver(s) so trained.
6. The driver will be issued a scale card to be used with that truck for the automated scale. Power Fuels will be responsible for communicating the proper purchase order code number to the driver. A driver should not enter VCHEC without a scale card.
7. If required certification information is not provided/available, truck driver should proceed to the designated recovery area and resolve this issue, or leave VCHEC.
8. All truck drivers must follow the written instructions displayed when approaching the scale house and the truck unloading areas.
9. All truck drivers must obey all posted VCHEC directions, and not interfere with the unloading of wood or limestone.
10. Truck drivers are to proceed to the designated unloading bay, either bays 1 and 2 or bays 3 and 4.
11. No driver should be out of his truck without a valid reason, such as removing the tarp, checking his vehicle, or signing in or signing out.
12. No passengers are allowed in trucks entering VCHEC property unless it is a new driver undergoing training.

270

13. No one shall stand within 50 feet of a dumping truck.
14. For safety reasons, no one is allowed to enter a truck bed or work from the outside for the purpose of freeing Solid Fuel from the truck bed. The driver will raise the truck bed and dump what comes out freely; any remaining frozen Solid Fuel will be retained in the bed and the driver will exit VCHEC property with any frozen Solid Fuel left in the bed.
15. After dumping coal into the truck hopper, drivers must lower their truck bed completely before moving the truck.
16. Truck will proceed to the outbound scale for weighing, after dumping Solid Fuel and prior to leaving VCHEC property. If required certification information is not provided/available, truck driver should proceed to the designated recovery area and resolve this issue prior to leaving VCHEC.

## II. SAMPLING REQUIREMENTS:

Power Fuels will perform the sampling and analysis of the Solid Fuel at the Facility as set forth below. Notwithstanding the above, DVP reserves the right for DVP, or its representative, to sample and analyze the Solid Fuel at either the Facility or at VCHEC. If Solid Fuel is also sampled and analyzed by DVP (or DVP's third party laboratory), then DVP's analysis will be used.

Unless otherwise agreed to by DVP, Power Fuels shall accumulate Solid Fuel to deliver to VCHEC in a segregated ready pile at the Facility. Once the ready pile has been sampled, Power Fuels warrants that it will only deliver Solid Fuel from the ready pile and that it will not place any additional material on the ready pile without re-sampling and performing a new analysis. Each sample, and subsequent analysis, of the ready pile shall be performed in accordance with the then current published ASTM standards.

(1)     Power Fuels, or a third party vendor, will perform sampling of the Solid Fuel as set forth above. The Solid Fuel supplied to DVP shall be from the ready pile (sampled by Power Fuels) and loaded into each truck at the Facility. The origin samples shall be deemed to be on an "as-loaded" basis, and analyzed on an "as-received" basis. All sampling, sample preparation, and analysis shall be performed in accordance with the then current published applicable ASTM standards.   In cases where the Power Fuels's mechanical sampling system is used to obtain a sample, DVP or its independent third-party laboratory may inspect the system for proper operation and maintenance. DVP or its independent third-party laboratory may be present during sampling of the ready pile and the loading of Shipments and when present will certify that the sampling was performed properly during the accumulation of the ready pile and the loading of Shipments from the ready pile. If a representative sample of the fuel cannot be taken in accordance with ASTM standards, DVP shall have the right to defer any Shipments.

(2)     Analysis shall be performed for Power Fuels by an independent third party lab. Power Fuels shall provide a proximate analysis which shall include (i) percentage moisture, percentage ash, percentage volatile matter, percentage fixed carbons, and percentage sulfur, by weight on an "as received" and "dry" basis, (ii) BTU per pound on an "as received", "dry" and "moisture and ash free" basis, and (iii) mercury, chlorine, fluoride (collectively, the "Proximate Analysis").   Except as otherwise set forth in the Agreement, Power Fuels shall report, and shall cause the independent third party lab to directly report the results of the Proximate Analysis to DVP, by fax, telephone (to be confirmed promptly by fax) or other electronic means as soon as available, but in no event shall it be later than twenty-four (24) hours from completion of loading or of analysis of the stockpile to be used for supplying Solid Fuel; with the exception of results for mercury, chlorine, and fluoride where the results of the analysis must be submitted within 24 hours of completion of the analysis.

2511

**256**

# EXHIBIT D

## Supplemental Terms and Conditions, On-Site Services, Fossil and Hydro
Rev- May 20, 2010

Redacted

272

**Exhibit E**
**Terminalling Agreement**
**Power Fuels, LLC – Virginia Electric and Power Company**

Redacted

273

**EXHIBIT F**
**VCHEC INSURANCE REQUIREMENTS**

Power Fuels will ensure that it and/or its transportation provider(s) have, at a minimum, the insurance requirements set forth below:

(a)    Coverage:  Power Fuels shall purchase and maintain, and shall require its subcontractors to purchase and maintain, during any period while Power Fuels or its employees or agents are present on property or facilities owned or operated by DVP or its Affiliates, the following policies of insurance with insurance carriers acceptable to DVP:  (i) workers compensation as required by the statutory benefit laws of the state where the Solid Fuel is mined and in each state in which the Solid Fuel is transported; (ii) employer's liability insurance with a total limit of at least $2,000,000 each accident for bodily injury by accident and $2,000,000 each employee for bodily injury by disease; (iii) commercial general liability insurance with a total limit of at least $2,000,000 per occurrence (occurrence form policy), which shall include, but not be limited to, specific coverage for (1) contractual liability encompassing any indemnification provisions of the Agreement, (2) personal injury and property damage liability, and (3) products/completed operations liability; and (iv) automobile liability insurance covering bodily injury and property damage with a total limit of at least $2,000,000 per accident.  Such insurance will cover liability arising from or attributable to any vehicle (whether owned, hired and non-owned) used by Power Fuels or Power Fuels's transporter or subcontractor to deliver Solid Fuel to DVP.

(b)    Umbrella Policy.  The amount of coverage required may be satisfied, at Power Fuels's option, through a separate excess umbrella liability policy together with lower limit primary underlying insurance.  The coverage required above will provide for claims by one insured against another such that, except for the limits of insurance, the insurance will apply separately to each insured against whom or which a claim is made or suit is brought.

(c)    Waiver.  Power Fuels waives and shall cause its insurers to waive all rights against DVP and its Affiliates, and their directors, officers and employees, whether in contract or tort (including negligence and strict liability) for recovery of damages to the extent these damages are covered by the insurance required by this Exhibit.  The insurance required by this Exhibit will be amended to waive any rights by the insurer to subrogate against DVP, its Affiliates, and their directors, officers, and employees.

(d)    Additional Insureds.  Power Fuels shall cause its insurers providing the coverage required in this Article to name DVP, DVP's affiliates and each of their officers, directors, employees, contractors and agents as additional insureds to the coverages required above as their interests attach with respect to liability arising out of Power Fuels's performance of its obligations pursuant to the Agreement.

(e)    Primary Coverage.  Power Fuels shall ensure that the coverage required by this Exhibit is primary with respect to any other similar insurance maintained by DVP.

(f)    Cancellation of Coverage.  The coverage required by this Exhibit may not be canceled, nonrenewed or materially changed without giving thirty (30) days prior written notice to DVP.

(g)    Certificates of Insurance.  Prior to providing Services hereunder, Power Fuels shall provide certificates of insurance to DVP from Power Fuels's insurers, certifying that the Power Fuels's insurance coverage is in the form and amount required by this Exhibit.  Power Fuels agrees to provide DVP with at least 30 days' prior written notice of termination or cancellation.  Failure of DVP to demand certificate of insurance or other evidence of full compliance with these insurance requirements or failure of DVP to identify a deficiency from evidence that is provided will not be construed as a waiver of Power Fuels's obligation to maintain such insurance and will in no way relieve or limit Power Fuels's obligations and liabilities under this Exhibit or any other provisions of the Agreement.

274

**259**

**AMENDMENT NO. 1 – TERMINALLING AGREEMENT**
**"Virginia Electric and Power Company and Power Fuels, LLC"**

This Amendment No. 1 is made and effective as of the 10th day of September, 2012 by and between Virginia Electric and Power ("DVP") and Power Fuels, LLC ("Power Fuels").

DVP and Power Fuels entered into a Terminialling Agreement effective July 5, 2012. DVP and Power Fuels wish to amend the Agreement as set forth herein.

a) The Parties agree to extend the Term of the Agreement from September 30, 2012 until December 31, 2012.

b) As amended herein, the Agreement will continue in full force an effect in accordance with its terms.

IN WITNESS WHEREOF, the Parties have caused this Amendment No. 1 to be executed by their duly authorized representatives.

**VIRGINIA ELECTRIC AND POWER COMPANY**

By: _____

Title: Authorized Representative

Date: September 12, 2012

**POWER FUELS, LLC**

By: _____

Title: Manager / Co-owner

Date: 9/13/2012

275

**260**

## AMENDMENT NO. 2 – TERMINALLING AGREEMENT
### "Virginia Electric and Power Company and Power Fuels, LLC"

This Amendment No. 2 is made and effective as of the 27th day of December, 2012 by and between Virginia Electric and Power ("DVP") and Power Fuels, LLC ("Power Fuels").

WHEREAS, DVP and **Power Fuels, LLC** entered into a **Terminalling Agreement** effective July 5, 2012, as amended by Amendment No.1 effective September 10, 2012. DVP and Power Fuels wish to amend the Agreement as set forth herein.

    a) The Parties agree to extend the Term of the Agreement through January 31, 2013.

    b) As amended herein, the Agreement will continue in full force an effect in accordance with its terms.

IN WITNESS WHEREOF, the Parties have caused this Amendment No. 2 to be executed by their duly authorized representatives.

**VIRGINIA ELECTRIC AND POWER COMPANY**

By: _____

Title: Authorized Representative

Date: _12-28-2012_____

**POWER FUELS, LLC**

By: _____

Title: _____

Date: _12-23-2012_____

**261**

## AMENDMENT NO. 3 – TERMINALLING AGREEMENT
### "Virginia Electric and Power Company and Power Fuels, LLC"

This Amendment No. 3 is made and effective as of the 29th day of January 2013 by and between Virginia Electric and Power ("DVP") and Power Fuels, LLC ("Power Fuels").

WHEREAS, DVP and **Power Fuels, LLC** entered into a **Terminalling Agreement** effective July 5, 2012, as amended by Amendment No.1 effective September 10, 2012 as amended by Amendment No. 2 effective December 27, 2012. DVP and Power Fuels wish to amend the Agreement as set forth herein.

a) The Parties agree to extend the Term of the Agreement through May 31, 2013.

b) As amended herein, the Agreement will continue in full force an effect in accordance with its terms.

IN WITNESS WHEREOF, the Parties have caused this Amendment No. 3 to be executed by their duly authorized representatives.

**VIRGINIA ELECTRIC AND POWER COMPANY**

By: _____

Title: Authorized Representative

Date: January 29, 2013

**POWER FUELS, LLC**

By: _____

Title: _____

Date: Jan. 30, 2013

262

Exhibit G5

278







**PRINTER'S NOTE**

**RESPONDENT'S EXHIBIT 1 (OVERSIZE EXHIBIT)**
**AERIAL PHOTOGRAPH**

**LOCATED IN PAPER COPIES ONLY OF JOINT APPENDIX**

**PRINTER'S NOTE**

**RESPONDENT'S EXHIBIT 2 (OVERSIZE EXHIBIT)
SURVEY MAP**

**LOCATED IN PAPER COPIES ONLY OF JOINT APPENDIX**

**From:** Christina M Rodi (Generation - 34) [mailto:christina.m.rodi@dom.com]
**Sent:** Tuesday, October 29, 2013 2:59 PM
**To:** 'mike@powerfuelsva.com'; 'eric@powerfuelsva.com'; Greg Wetzel (Generation - 34); Ben Baughan (Generation - 34); Timothy R Howerter (Generation - 34); Robert B McCadden (Generation - 34); Bill Eckroade (Generation - 34); Gary Hamilton (Generation - 3); Conrad Francis (Generation - 3); Henry Seaman (Generation - 34); 'johntrent13@gmail.com'; 'john.trent@mail.com'; Shane Young (Generation - 3); Rick D. Boyd (Generation - 34); Craig F Wilson (Generation - 3)
**Subject:** 906B, 906C, 908A & 908B - 10/29 Power Fuels Blends

Good afternoon, the blends are:

1. In yard A – Please blend 908A product: 5 buckets of Omega with 4 bucket of Gobco/ETI for pile Aa. BTU is ~7950 BTU Ash – 39.9% moisture 5.9%
   a. I have attached a spreadsheet with calculations
2. In yard B – Please blend 908B product: 6 buckets of Omega with 1 bucket of Gobco, for pile Ba BTU is ~8250 BTU Ash – 39.9% moisture 4.0%
   a. I have attached a spreadsheet with calculations
3. In yard C&D – Please blend 906C product: 3 buckets of Pevler with 2 bucket of Gobco, 3 buckets of IBCS and 1 bucket of South East for pile Ca BTU is ~7700 BTU Ash – 39.8%
   a. I have attached a spreadsheet with calculations
4. In yard C&D – Please blend 906D product: 4 buckets of Pevler with 3 bucket of Gobco, and 2 bucket of Bransen for pile Da BTU is ~7500 BTU Ash – 39.3%
   a. I have attached a spreadsheet with calculations


As discussed this morning, we are striving to keep ash below 40%. After these blends are created, please perform a ready pile sample analysis today in order for us to get an analysis back by tomorrow and ship for Thursday. Great job with yesterdays blends

Thanks for your continued support of VCHEC,

*Christina Hager*
**Fuel Planner**
**Dominion Clearinghouse**
**Fuel Supply, DC-3**
**Office Phone: 804-787-6533**
**Cell Phone: 804-516-9854**
**Fax: 804-787-5752**



1



EXHIBIT
R3

Pevler/SE/IBCS/Gobco (95000)
10/29/2013

| Buckets of: | BLEND BY | Bucket | Percent | Buckets |
|---|---|---|---|---|
| Gobco | | 207.98 bucket | 21.88% | 2 |
| Pevler | | 306.42 bucket | 32.24% | 3 |
| IBCS | | 307.98 | 32.40% | 3 |
| South East | | 128.06 | 13.47% | 1 |
| Next Day Expected Quality | | | | |
| Moisture | Ash | Sulfur | BTU | |
| 6.50 | 39.80 | 0.90 | 7,684.28 | |
| Dominion Spec | | | | |
| 8.00 | 45.50 | < 1% | 7,600.00 | |
| Moisture | Ash | Sulfur | BTU | |

| | Gobco | Pevler | IBCS | South East | total buckets |
|---|---|---|---|---|---|
| Buckets | 2 | 3 | 3 | 1 | 9.00 |
| Percent | 22.22% | 33.33% | 33.33% | 11% | |

| Pile |
|---|
| Ca |

| Tons per bucket | Gobco | 8.50 |
|---|---|---|
| Tons per bucket | Pevler | 7.50 |
| Tons per bucket | IBCS | 8.30 |
| Tons per bucket | South East | 7.80 |

269

**270**

**Product 1**
**Pevler**

| | Cs 10/8 | MA 10/8 | Cs 10/9 | MA 10/9 | Cs 10/10 | MA 10/10 | Cs 10/11 | MA 10/11 | Cs 10/14 | MA 10/14 | Cs 10/15 | MA 10/15 | Cs 10/16 | MA 10/16 | Cs 10/17 | MA 10/17 | Cs 10/21 | MA 10/21 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| mos | 7.91 | 7.63 | 7.72 | 4.88 | 7.58 | 6.11 | 7.6 | 5.78 | 6.02 | 5.9 | 6.92 | 6.06 | 5.46 | 6.09 | 7.43 | 7.06 | 5.91 | 6.1 | 6.82 |
| ash | 18.76 | 18.72 | 18.76 | 20.62 | 19.69 | 20.83 | 19.96 | 23.05 | 16.91 | 20.45 | 21.32 | 20.51 | 19.37 | 24.29 | 18.8 | 24.48 | 15.23 | 25.32 | 20.04 |
| sulf | 1.78 | 1.29 | 1.72 | 1.14 | 1.76 | 1.34 | 2.29 | 1.33 | 1.93 | 1.42 | 0.94 | 1.79 | 2.16 | 0.94 | 1.85 | 0.89 | 1.74 | 1.06 | 1.52 |
| btu | 10609 | 11026 | 10513 | 11144 | 10276 | 10880 | 10271 | 10633 | 11161 | 10663 | 10222 | 10699 | 10689 | 10139 | 10111 | 9518 | 11429 | 10029 | 10635.32 |
| tons | 848.52 | 823.1 | 327.28 | 374.02 | 327.46 | 331.04 | 326.23 | 317.42 | 247.06 | 249.11 | 245.93 | 204.82 | 165.42 | 169.58 | 204.82 | 252.1 | 250.12 | 247.79 | 5911.82 |
| % | 14% | 14% | 6% | 6% | 6% | 6% | 6% | 5% | 4% | 4% | 4% | 3% | 3% | 3% | 4% | 4% | 4% | 4% | 1.00 |

**Product 2**
**Gobco**

| | 8-Oct | 9-Oct | 10-Oct | 11-Oct | 14-Oct | 15-Oct | 16-Oct | 17-Oct | total | Product 3 IBCS 10-Oct | Product 4 South East 10-Oct | 22-Oct | Sum of product 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| mos | 8.79 | 8.4 | 7.91 | 8.48 | 7.42 | 6.96 | 6.01 | 7.67 | 7.4 | 5.41 | 6.38 | 7.14 | 6.90 |
| ash | 57.81 | 53.98 | 56.3 | 59.37 | 52.78 | 56.8 | 59.97 | 59.1 | 57.2 | 51.91 | 9.06 | 29.87 | 23.42 |
| sulf | 0.44 | 0.54 | 0.5 | 0.57 | 0.57 | 2.14 | 0.51 | 0.56 | 0.8 | 0.4 | 0.82 | 1.01 | 0.95 |
| btu | 4374 | 4938 | 4738 | 4234 | 5463 | 4833 | 4370 | 4393 | 4676.4 | 6037 | 12967 | 9297 | 10433.82 |
| tons | 1145 | 885 | 1174 | 1342 | 2101 | 2281 | 2516 | 2128 | 13573.0 | 723 | 87.51 | 195 | 282.51 |
| % | 8% | 7% | 9% | 10% | 15% | 17% | 19% | 16% | 1.0 | 31% | 69% | 0% | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Gobco | 500 | 23% | 7684.283 BTU | | 10.45827586 | | 9.12 |
| Pevler | 650 | 30% | | | 20.0018555 | | 19.47 |
| IBCS | 723 | 34% | | | 0.974895268 | | 1.53 |
| South East | 283 | 13% | | | 10452.3087 | | 10348 |
| NT | 2156 | | | | 702 | | 650 |
| leftover | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| left | Gobco | 13073 | | | |
| left | Pevler | 5261.82 | | 83.33333333 | |
| left | IBCS | 0 | | | |
| left | South East | 0.00 | | | |



**271**

Pevler/Bransen/Gobco (95000)
10/29/2013

| Buckets of: | BLEND BY | Bucket | Percent | Buckets |
|---|---|---|---|---|
| Bransen | | 343.41 bucket | 21.91% | 2 |
| Pevler BL | | 706.67 bucket | 45.08% | 4 |
| Gobco | | 517.65 | 33.02% | 3 |
| | | 0.00 | 0.00% | 0 |
| Next Day Expected Quality | | | | |
| Moisture | Ash | Sulfur | BTU | |
| 7.91 | 39.28 | 1.06 | 7,481.57 | |
| Dominion Spec | | | | |
| 8.00 | 45.50 | < 1% | 7,600.00 | |
| Moisture | Ash | Sulfur | BTU | |

Pile
Da

| | Bransen | Pevler BL | Gobco | | total buckets |
|---|---|---|---|---|---|
| Buckets | 2 | 4 | 3 | 0 | 9.00 |
| Percent | 22.22% | 44.44% | 33.33% | 0% | |

| Tons per bucket | Bransen | 8.20 |
|---|---|---|
| Tons per bucket | Pevler BL | 7.50 |
| Tons per bucket | Gobco | 8.50 |
| Tons per bucket | | 7.90 |

**272**



| | Product 1 | | | | | | | | new product | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pevler BL | | | | | | | | | | | |
| | from 906 | | | | | | | | | | | |
| mos | 4.39 | | | | | | | | 6.82 | | | |
| ash | 16.47 | | | | | | | | 20.04 | | | |
| sulf | 1.15 | | | | | | | | 1.52 | | | |
| btu | 11919 | | | | | | | | 10635.32 | | | |
| tons | 0.000001 | | | | | | | | 5911.82 | | | |
| % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | | | |

| | Product 2 | | | | | | Product 3 | Product 4 | | | Sum of product 4 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bransen | | | | | | Gobco | | | | | |
| | 19-Aug | 9-Oct | 16-Aug | total | | | from 906 | 6/12 and 6/13 | | | | |
| mos | 10.13 | 11.43 | 10.95 | 10.7 | | | 7.447280631 | 10.45827586 | 11.7 | 6.39 | 10.46 | |
| ash | 49.5 | 41.48 | 47.51 | 47.4 | | | 57.23820821 | 20.0218555 | 21.87 | 38.27 | 20.02 | |
| sulf | 0.66 | 0.6 | 0.58 | 0.6 | | | 0.802168275 | 0.974893268 | 0.68 | 0.72 | 0.97 | |
| btu | 5901 | 6594 | 5764 | 5929.0 | | | 4676.359979 | 10452.3087 | 9179 | 8070 | 10452.31 | |
| tons | 680 | 252 | 900 | 1832.0 | | | 13573 | 0.00001 | 0 | 0 | 0.00 | |
| | 37% | 14% | 49% | | | | | 100% | 0% | 0% | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 10.45827586 | | 9.12 |
| Bransen | 2816 | 22% | 7481.57 BTU | | | | 20.0218555 | | 19.47 |
| Pevler BL | 5300 | 42% | | | | | 0.974893268 | | 1.53 |
| Gobco | 4400 | 35% | | | | | 10452.3087 | | 10348 |
| | 0 | 0% | | | | | 702 | | 650 |
| NT | 12516 | | | | | | | | |
| leftover | | | | | | | | | |
| left Bransen | -984 | | | | | | | | |
| left Pevler BL | 611.82 | | | | | | 83.33333333 | | |
| left Gobco | 9173 | | | | | | | | |
| left | 0.00 | | | | | | | | |

Omega/Gobco (98000) A yard
    10/29/2013

| Buckets of: | BLEND BY | Bucket | Percent | Buckets |
|---|---|---|---|---|
| Gobco/ETI BL | | 418.82 bucket | 44.58% | 4 |
| Omega | | 520.64 bucket | 55.42% | 5 |
| | | 0.00 | 0.00% | 0 |
| | | 0.00 | 0.00% | 0 |
| Next Day Expected Quality | | | | |
| Moisture | Ash | Sulfur | BTU | |
| 5.89 | 39.99 | 0.52 | 7,950.23 | |
| Dominion Spec | | | | |
| 8.00 | 45.50 | < 1% | 7,600.00 | |
| Moisture | Ash | Sulfur | BTU | |

| Pile |
|---|
| Aa |

|  | Gobco/ETI BL | Omega | | | total buckets |
|---|---|---|---|---|---|
| Buckets | 4 | 5 | 0 | 0 | 9.00 |
| Percent | 44.44% | 56% | 0.00% | 0% | |

| Tons per bucket | Gobco/ETI BL | 8.50 |
|---|---|---|
| Tons per bucket | Omega | 7.80 |
| Tons per bucket | | 8.30 |
| Tons per bucket | | 8.50 |

**273**

**274**

**Product 1**
**Omega** 

| | HC 10/23 | HC 10/24 | | | | | | | new product | |
|---|---|---|---|---|---|---|---|---|---|---|
| mos | 3.32 | 3.43 | | | | | | | 3.38 | |
| ash | 27.76 | 26.14 | | | | | | | 26.91 | |
| sulf | 0.5 | 0.54 | | | | | | | 0.52 | |
| btu | 10529 | 10706 | | | | | | | 10621.92 | |
| tons | 1929 | 2132 | | | | | | | 4061.00 | |
| % | 48% | 52% | 0% | 0% | 0% | 0% | 0% | 0% | 100% | |

**Product 2**
**Gobco/ETI BL**

| | ETI BL 7/15 | ETI 7/15 | ETI 7/17 | ETI B7/18 | Gob 8/1 | Gob 8/2 | Gob 8/12 | Gob 10/4 | total | Product 3 27-Sep | Product 4 16-Aug | | | Sum of product 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| mos | 6.15 | 9.75 | 9.56 | 9.27 | 8.86 | 8.39 | 9.5 | 8.01 | 8.8 | 8.35 | 10.95 | 11.7 | 6.39 | 10.95 |
| ash | 45.88 | 63.06 | 65.88 | 44.02 | 55.27 | 56.88 | 55.85 | 56.37 | 54.9 | 53.03 | 47.51 | 21.87 | 38.27 | 47.51 |
| sulf | 0.71 | 0.67 | 0.59 | 0.78 | 0.46 | 0.37 | 0.44 | 0.46 | 0.5 | 0.55 | 0.58 | 0.68 | 0.72 | 0.58 |
| btu | 6917 | 3372 | 2952 | 6585 | 4760 | 4657 | 4674 | 4770 | 4902.6 | 5255 | 5764 | 9179 | 8070 | 5764.00 |
| tons | 783.5 | 58.52 | 1279 | 1264 | 1703 | 1460 | 1782 | 845 | 9175.0 | 500 | 0.00001 | 0 | 0 | 0.00 |
| | 9% | 1% | 14% | 14% | 19% | 16% | 19% | 9% | 100% | | 100% | 0% | 0% | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Gobco/ETI BL | 3560 | 47% | 7950.235 BTU | | 10.45828 | 9.12 |
| Omega | 4061 | 53% | | | 20.02186 | 19.47 |
| | 0 | 0% | | | 0.974893 | 1.53 |
| | 0 | 0% | | | 10452.31 | 10348 |
| NT | 7621 | | | | 702 | 650 |

leftover

| | | | | |
|---|---|---|---|---|
| left | Gobco/ETI BL | 5615 | | |
| left | Omega | 0 | 83.33333 | |
| left | | 500 | | |
| left | | 0.00 | | |

Omega/Gobco (98000) B yard
10/29/2013

| Buckets of: | BLEND BY | Bucket | Percent | Buckets |
|---|---|---|---|---|
| Gobco BL | | 249.65 bucket | 14.29% | 6 |
| Omega BL | | 1496.89 bucket | 85.71% | 1 |
| | | 0.00 | 0.00% | 0 |
| | | 0.00 | 0.00% | 0 |
| Next Day Expected Quality | | | | |
| Moisture | Ash | Sulfur | BTU | |
| 4.02 | 39.99 | 0.77 | 8,255.18 | |
| Dominion Spec | | | | |
| 8.00 | 45.50 | < 1% | 7,600.00 | |
| Moisture | Ash | Sulfur | BTU | |

| | Gobco BL | Omega BL | | | total buckets |
|---|---|---|---|---|---|
| Buckets | 6 | 1 | 0 | 0 | 7.00 |
| Percent | 85.71% | 14.29% | 0.00% | 0% | |

| Pile |
|---|
| Ba |

| Tons per bucket | Gobco BL | 8.50 |
|---|---|---|
| Tons per bucket | Omega BL | 7.40 |
| Tons per bucket | | 8.05 |
| Tons per bucket | | 7.90 |

275

**Product 1**
Omega BL

| | HC 10/7 | FR 10/8 | HC 10/8 | FR 10/9 | FR 10/10 | FR 10/11 | FR 10/14 | FR 10/15 | FR 10/16 | FR 10/17 | HC 10/17 | HC 10/21 | HC 10/22 (new product) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| mos | 3.31 | 3.55 | 6.31 | 3.36 | 3.1 | 2.95 | 3.29 | 3.07 | 2.88 | 2.99 | 2.96 | 3.39 | 3.12 | 3.17 |
| ash | 27.5 | 41.19 | 30.68 | 38.96 | 36.66 | 38.75 | 42.46 | 36.43 | 37.47 | 36.94 | 32.5 | 32.13 | 27.55 | 36.68 |
| sulf | 0.61 | 0.86 | 0.47 | 0.92 | 1.06 | 0.93 | 0.67 | 0.87 | 1.1 | 0.5 | 0.49 | 0.48 | 0.82 | |
| btu | 10636 | 8235 | 9629 | 8508 | 8872 | 8556 | 8062 | 8957 | 8892 | 9004 | 9666 | 9874 | 10560 | 8973.97 |
| tons | 455.71 | 2184.92 | 41.74 | 1959 | 2761 | 2735 | 2026 | 2007 | 2130 | 1148.86 | 591.59 | 1908 | 1931 | 21879.82 |
| % | 2% | 10% | 0% | 9% | 13% | 13% | 9% | 9% | 10% | 5% | 3% | 9% | 9% | 100% |

**Product 2**
Gobco BL

| | gob 10/8 | gob 10/9 | gob 10/10 | gob 10/11 | total |
|---|---|---|---|---|---|
| mos | 8.79 | 8.4 | 7.91 | 8.48 | 8.4 |
| ash | 57.81 | 53.98 | 56.3 | 59.37 | 57.3 |
| sulf | 0.44 | 0.54 | 0.5 | 0.57 | 0.5 |
| btu | 4374 | 4938 | 4738 | 4234 | 4503.0 |
| tons | 591 | 407 | 400 | 724 | 2122.0 |
| % | 28% | 19% | 19% | 34% | 100% |

**Product 3   Product 4**        Sum of product 4

| | Product 3 27-Sep | Product 4 6/12 and 6/13 | | | Sum of product 4 |
|---|---|---|---|---|---|
| mos | 8.35 | 10.45827586 | 11.7 | 6.39 | 10.46 |
| ash | 53.03 | 20.0218555 | 21.87 | 38.27 | 20.02 |
| sulf | 0.55 | 0.974893268 | 0.68 | 0.72 | 0.97 |
| btu | 5255 | 10452.3087 | 9179 | 8070 | 10452.31 |
| tons | 500 | 0.00001 | 0 | 0 | 0.00 |
| | | 100% | 0% | 0% | |

| | | | | | |
|---|---|---|---|---|---|
| Gobco BL | 2122 | 16% | 8255.181 BTU | 10.45827586 | 9.12 |
| Omega BL | 11077 | 84% | | 20.0218555 | 19.47 |
| | | 0% | | 0.974893268 | 1.53 |
| | 0 | 0% | | 10452.3087 | 10348 |
| | | | | 702 | 650 |
| NT | 13199 | | | | |

leftover

| | | | | |
|---|---|---|---|---|
| left Gobco BL | 0 | | | |
| left Omega BL | 10802.82 | | 83.33333333 | |
| left | 500 | | | |
| left | 0.00 | | | |



276







**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, D.C. 20004-1701
TELEPHONE: (202) 434-9950
FAX: (202) 434-9949

DEC 16 2013

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | CIVIL PENALTY PROCEEDING |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA), | : | Docket No. VA 2013-257 |
| Petitioner | : | A.C. No. 44-07303-315335 |
| | : | |
| v. | : | |
| | : | |
| POWER FUELS, LLC, | : | Power Fuel Blending Terminal |
| Respondent | : | |

ORDER

A hearing in this matter was concluded in Bristol, Virginia, on Tuesday, November 19, 2013. At the close of the record, the parties were afforded an opportunity to file briefs, and they agreed to do so. Accordingly, the parties shall file their briefs with me within thirty (30) days of the date of this order. No reply briefs will be entertained, except for good cause shown by the moving party.

In the event the parties decide not to file briefs, they are to immediately inform me. Further, the parties are not precluded from settling any of the alleged violations that were heard. Any settlement intentions shall be communicated to me within the aforementioned time.

George A. Koutras
Administrative Law Judge

Distribution:
Anthony D. Jones, Esq., U.S. Department of Labor, Office of the Solicitor, 1100 Wilson Boulevard, 22nd Floor, Arlington, VA 22209-2296

Wade W. Massie, Penn, Stuart, & Eskridge, P.O. Box 2288, Abingdon, VA 24212

280

Hon. George A. Koutras, Administrative Law Judge

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION, (MSHA), | ) ) ) ) | CIVIL PENALTY PROCEEDING |
| Petitioner, | ) ) | Docket No. VA 2013-403 A.C. No. 44-07303-323400 |
| v. | ) ) | |
| POWER FUELS, LLC, | ) ) | Power Fuels Blending Terminal Mine ID No. 44-07303 |
| Respondent, | ) | |
| | | |
| POWER FUELS, LLC, | ) ) | CONTEST PROCEEDINGS |
| Contestant, | ) ) | Docket No. VA 2013-312-R Citation No. 8204724; 4/9/13 |
| v. | ) ) ) | Docket No. VA 2013-313-R Citation No. 8204725; 4/9/13 |
| SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION (MSHA), | ) ) ) ) | Docket No. VA 2013-353-R Citation No. 8274726; 4/9/13 Power Fuels Blending Terminal |
| Respondent. | ) ) | Mine ID No. 44-07303 |

RESPONDENT'S POST-HEARING MEMORANDUM

Respondent, Power Fuels, LLC ("Power Fuels"), by counsel, respectfully submits this memorandum explaining why the citations should be vacated for lack of jurisdiction.

2

## I.    STATEMENT OF THE CASE

This case involves three citations that were issued to Power Fuels on April 9, 2013, by the Secretary of Labor, Mine Safety and Health Administration ("MSHA").  The Secretary assessed a civil penalty of $100 for each of these citations. Power Fuels has contested the citations and penalties on the ground that it is not the operator of a mine under the Federal Mine Safety and Health Act of 1997 ("Act"), 30 U.S.C. § 801, and that it is not subject to the Act.

The proceedings were assigned to Administrative Law Judge George A. Koutras who held a hearing on November 20, 2013.  Following the hearing, Judge Koutras took the cases under advisement and permitted the parties to file post-hearing memoranda on the jurisdictional issue.  Power Fuels now submits this memorandum in support of its position.

## II.    STATEMENT OF FACTS

Power Fuels owns and operates a blending terminal for Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion").  The terminal is located next to Dominion's Virginia City Hybrid Energy Center ("VCHEC") in Wise County, Virginia.  VCHEC is a 600 megawatt power plant that produces electricity from low BTU coal and biomass.  Transcript at 81, 93.  The plant began operations in 2011, and it employs state-of-the-art systems that reduce emissions.  *Id.* at 81, 93-94.  The plant is billed as one of the cleanest coal-fired plants in the world.  *Id.* at 93.

3

The plant burns approximately 10,000 tons of coal and coal refuse ("gob") a day.  Approximately 20% of this material is delivered directly to the plant by producers. *Id.* at 89.  The rest of the material is delivered by the producers to Power Fuels.  *Id.* Power Fuels then stores, blends, and delivers the material to the plant.  *Id.* at 89, 102-03.

Dominion purchases directly from the producers all of the coal and gob that is delivered to Power Fuels.  Transcript at 100-01.  The material is supplied by approximately 15 different producers.  *Id.* at 97.  Power Fuels does not own any of the coal or gob that comes onto its property.  *Id.* at 100.

Approximately 30-40% of the material consumed by the plant is gob.  *Id.* at 96.  The producers of the gob are recovering the material from old refuse sites, and, in the process, they are eliminating environmental hazards at these locations.  *Id.* at 95-96.

The producers hire the truckers that transport the coal and gob to Power Fuels.  *Id.* at 101.  Power Fuels hires the truckers that transport the material from its site to the plant across the road. *Id.* at 104.

Dominion contracts directly with the producers for the specifications of the coal and gob that it wants delivered to Power Fuels.  *Id.* at 101, 113-14.  The producers perform all necessary processing to meet Dominion's specifications.  *Id.* at 113.  Power Fuels does not do any crushing, sizing, screening, washing, or other processing on the coal or gob.  *Id.* at 114.  As Walter Crickmer, the manager of Power Fuels, explained,

> Power Fuels has never done anything to improve any quality of any fuel product. We've never screened it. We've never washed it. We've never sized it. We've never done anything

Abingdon: 875885-1

4

> to it other than take exactly what's been brought in there by
> Dominion and put it into a blend to fuel their furnace.

*Id.* at 123.

At its site, Power Fuels has four loaders, a dozer, and a stacking conveyer.

*Id.* at 92. When the material arrives at Power Fuels it is weighed, sampled, and dumped

in separate piles. *Id.* at 102-104. On instructions from Dominion, Power Fuels then uses

its equipment to blend the material to Dominion's specifications. *Id.* Power Fuels has no

discretion on whether or how to blend the material. Power Fuels blends only and

precisely as directed by Dominion. As Mr. Crickmer testified,

> Dominion directs us daily to take this quality coal, so much of
> this material and so much of that material and so much of this
> material and blend it together by one bucket of this, two
> buckets of that. Literally it says that.

*Id.* at 103.

At the hearing, Power Fuels introduced as Exhibit R-3 an example of the

blending instructions that Power Fuels receives from Dominion on a daily basis. *Id.* at

107. Consistent with Mr. Crickmer's testimony, the blending instructions from

Dominion provide precise directions as to how the material should be blended. Power

Fuels is required to do "100% what they [Dominion] tell us." *Id.* at 108.

Power Fuels performs its work for Dominion under a Terminalling

Agreement. *Id.* at 98; *see* Exhibit G-4. Under the Terminalling Agreement, Power Fuels

is required to blend the coal gob in accordance with the requirements of Dominion.

Exhibit G-4 at Section 3.05. Power Fuels may make recommendations as to how to

Abingdon: 875885-1

**284**

5

modify the blending instructions to meet Dominion's specifications, but Power Fuels cannot change the specifications on its own. *Id.*

Dominion pays Power Fuels on a cost plus basis. Transcript at 100. Dominion reimburses Power Fuels for its expenses, and it pays Power Fuels a fixed fee for each ton of material delivered to the plant. *Id.*

In addition to coal and gob, Power Fuels is also able to provide Dominion with biomass (wood products) for the plant. *Id.* at 93. Power Fuels is currently storing some biomass on its property for later sale to Dominion. The biomass is not part of the Terminalling Agreement. *Id.* at 129.

In contrast to the work performed by Power Fuels, coal preparation generally involves the washing, screening, and sizing of the coal. *Id.* at 122-23. Power Fuels does not do any work of that type. *Id.* at 123.

The blending work performed by Power Fuels is not generally performed by producers of coal. *Id.* at 124. This type of precision blending is usually performed by the consumer of the coal. *Id.* at 124-25. If Power Fuels did not perform this work for Dominion, Dominion would have to do the work itself. *Id.* at 125.

MSHA began its investigation of the Power Fuels site in May 2012 when a MSHA employee saw trucks delivering coal to the Power Fuels site instead of directly to the plant. *Id.* at 59-60, 67. MSHA assigned Robert Clay to investigate. Mr. Clay testified that if the trucks had been delivering the coal directly to the plant, MSHA would

6

not have asserted jurisdiction. *Id.* at 69-72. Mr. Clay was not aware of any instances where MSHA has asserted jurisdiction over power plant operations. *Id.* at 72.

The citations in question were issued for defects on inbound trucks. *Id.* at 46. These trucks were hired by the producers of the coal, not by Power Fuels. *Id.* at 101.

### III.   ARGUMENT

The critical question in this case is whether any mixing, storing, or loading of coal is subject to the jurisdiction of the Act, as contended by the Secretary, or whether the mixing, storing, and loading must be the type of work usually performed by the operator of a coal mine. If the Secretary is correct that any mixing, storing, or loading of coal is sufficient to establish MSHA jurisdiction, then any consumer who mixes, stores, or loads coal is the operator of a coal mine. While the Act confers broad jurisdiction on MSHA, it does not go that far. The work normally performed by consumers of coal is not subject to the Act. In this case, Power Fuels is doing blending work for the consumer of the coal, not for the producers of the coal. The work that Power Fuels is performing is the type of work that consumers perform. The fact that the consumer has contracted with Power Fuels to perform this work, instead of doing it with its own employees, does not change the character of the work or allow MSHA to assert jurisdiction.

### A.   *The Statutory Definitions*

Under 30 U.S.C. § 803, each "coal or other mine" engaged in commerce and each "operator" of such mine are subject to the jurisdiction of the Act.

Abingdon: 875885-1

7

Under 30 U.S.C. § 802(h)(1), "coal or other mine" means:

(A) an area of land from which minerals are extracted in
nonliquid form or, if in liquid form, are extracted with
workers underground, (B) private ways and roads appurtenant
to such area, and (C) lands, excavations, underground
passageways, shafts, slopes, tunnels and workings, structures,
facilities, equipment, machines, tools, or other property
including impoundments, retention dams, and tailings ponds,
on the surface or underground, used in, or to be used in, or
resulting from, the work of extracting such minerals from
their natural deposits in nonliquid form, or if in liquid form,
with workers underground, or used in, or to be used in, the
milling of such minerals, or the work of preparing coal or
other minerals, and includes custom coal preparation
facilities.

Under 30 U.S.C. § 802(h)(2), a "coal mine" means:

an area of land all structures, facilities, machinery, tools,
equipment, shafts, slopes, tunnels, excavations, and other
property, real or personal, placed upon, under, or above the
surface of such land by any person, used in, or to be used in,
or resulting from, the work of extracting in such area
bituminous coal, lignite, or anthracite from its natural
deposits in the earth by any means or method, and the work of
preparing the coal so extracted, and includes custom coal
preparation facilities.

Under §802(h)(1), land and equipment used for "the work of preparing coal

or other minerals" is a "coal or other mine."  And under § 802(h)(2), land and equipment

used for "the work of preparing the coal so extracted" is a "coal mine."  In both instances,

the definitions include "custom coal preparation facilities."

Under 30 U.S.C. § 802(i), the term "work of preparing the coal" means:

the breaking, crushing, sizing, cleaning, washing, drying,
mixing, sorting, and loading of bituminous coal, lignite, or

Abingdon: 875885-1

**287**

8

anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine.

### B.    Commission Cases

The Commission and its Administrative Law Judges have addressed the jurisdiction under the Act on numerous occasions. In *Secretary of Labor v. Oliver M. Elam, Jr., Co.*, 4 FMSHRC 5 (1982), the Commission decided a critical issue: what connection must exist between the work in question and the usual work of mining. Although the dock operator crushed and loaded coal onto barges, the Commission held that the dock was not a "coal or other mine." *Id.* at 6-7. Just because the dock operator handled coal did not mean it was engaged in "the work of preparing the coal." To fall within the definition, the work must involve more than the "breaking, crushing, sizing, cleaning, washing, drying, measuring, storing, [or] loading" of coal. The work must be the kind of work "usually performed by the mine operator engaged in the extraction of the coal or by custom preparation facilities. . . ." *Id.* at 8. Under the facts, the Commission found that the dock was not subject to the Act.

In *Secretary of Labor v. Mineral Coal Sales, Inc.*, 7 FMSHRC 615 (1985), the Commission addressed a different situation. In that case, the operator of a tipple at a siding stored, mixed, crushed, sized, and loaded coal in order to make it "suitable for a particular use or to meet market specifications." *Id.* at 620. The company processed the coal for brokers, not consumers. *Id.* at 616. The Commission held that the company's operations were subject to the Act.

9

In *Marion Docks, Inc. v. Secretary of Labor*, 10 FMSHRC 1598 (1988) (ALJ Koutras), the case involved "a coal loading tipple facility which loads and ships coal by river barges to several utility customers who purchase the coal from brokers." *Id.* at 1615. Marion Docks was not the consumer of the coal, and it did not work for the consumer of the coal. Marion Docks worked for brokers who sold the coal to utilities. *Id.* As a result, Marion Docks was subject to the Act. *Id.* at 1619.

In *Administration v. Consolidation Coal Co.*, 35 FMSHRC 439 (2013) (ALJ Koutras), the case involved two facilities, (1) a coal loading facility that was essentially an extension of the coal preparation plant and (2) a barge on to which the coal was loaded. The coal loading facility was held to be subject to the Act, but the barge was not. *Id.* at 465-468. The loading work included layering of the coal to meet the mine customer's specifications. *Id.* at 467. The barge simply transported the loaded coal.

   C.    *Court Cases*

Likewise, the Courts of Appeal have considered what constitutes a mine. The Secretary relies upon two cases. The first is *RNS Services, Inc. v. FMSHRC*, 115 F.3d 182 (3d Cir. 1997). In that case, RNS loaded coal refuse at a refuse site. In a 2-to-1 decision, the Third Circuit held that RNS was subject to the Act. The majority applied a functional analysis – focusing on the nature of the work being performed at the site. *Id.* at 184. Even so, the majority disclaimed the view that any loading of coal was subject to the Act. In order to constitute a mine, the coal must be loaded "at a place regularly used for that purpose, in preparation for further processing." *Id.* The majority further stated

Abingdon: 875885-1

**289**

10

that the "loading of the coal is a critical step in the processing of minerals extracted from the earth in preparation for their receipt by an end-user. . . ." *Id.* at 185. The dissent argued that the Commission had applied a per se ruling making any loading of coal subject to the Act. *See id.* at 192 (Alito, J., dissenting).

The Secretary also cites *Kinder Morgan Operating, L.P. v. Chao*, 78 F. App'x 462 (6th Cir. 2003) (unpublished). In that case, Kinder Morgan's marine loading facility was found to be subject to the Act. The evidence showed that the facility received and loaded coal, mostly for the Tennessee Valley Authority ("TVA"). *Id.* at 463. TVA purchased the coal from numerous producers. Kinder Morgan stored and blended the coal into different products for different plants. *Id.* The Commission split 2-2 on whether the Act applied to Kinder Morgan's operation. *Id.* at 464. On appeal, the Sixth Circuit found that the Act did apply and adopted the reasoning of the two Commissioners who voted to uphold jurisdiction. *Id.* at 465. In their opinion, the two Commissioners reasoned that Kinder Morgan was performing work "usually performed by the operator of a coal mine by undertaking the activities to make the coal suitable for a particular use or to meet market specifications." *Sec. of Labor v. Kinder Morgan Operating L.P. "C,"* 23 FMSHRC 1288, 1294 (2001).

As several opinions made clear, storing, loading, and mixing coal are themselves insufficient to support jurisdiction. Otherwise, anyone who handles coal would be covered by the Act. The storing, loading, and mixing must be part of a mine's operations. As the Eighth Circuit explained in *Herman v. Associated Elec. Coop. Inc.*,

Abingdon: 875885-1

**290**

11

172 F.3d 1078 (8th Cir. 1999), "not all businesses that perform tasks listed under the 'work of preparing coal' in *§ 802(i)* can be considered mines." *Id.* at 1082. While utilities may be subject to the Act if they maintain a presence at the mine and assist in mining or loading the coal or if they engage in coal preparation of the type performed by mine operators, "a utility that receives processed coal from a mine does not itself become a 'mine' by further processing the coal for combustion." *Id.* at 1083. Thus, once a producer delivers processed, marketable coal to a utility, the jurisdiction of MSHA ends, even though the utility may do further blending of the product. *Id.*

The Fourth Circuit made this same point in *United Energy Services, Inc. v. Federal Mine Safety & Health Review Commission*, 35 F.3d 971 (4th Cir. 1994). In that case, the operator of a power plant went onto mine property and loaded coal refuse from a pile and transported it to the plant. *Id.* at 973. Employing a functional analysis, the Fourth Circuit found that the plant operator was engaged in the work of preparing the coal. *Id.* at 975. The Court was careful to rule, however, that the same analysis would not apply once the coal was delivered to the plant.

> Although delivery of coal to a consumer after it is processed usually does not fall under the coverage of the Act, United Energy's activities occur a step earlier in the overall process. They involve the transportation of coal to the preparation facility and thus are part of the "work of preparing coal".

*Id.* at 975.

12

### D.  Analysis

The key facts in this case are uncontradicted:

1.  Dominion purchases coal from various producers.

2.  The coal is delivered to the Power Fuels site by contract truckers for the producers.

3.  Dominion owns all of the coal that is delivered to the site.

4.  Power Fuels is a contractor for Dominion under a Terminalling Agreement.

5.  Power Fuels weighs, samples, and stores the coal for Dominion.

6.  Dominion instructs Power Fuels how to blend and deliver the coal.

7.  Dominion does so to achieve the desired burn for the fuel going into its plant.

8.  Dominion is the sole consumer of the coal at the Power Fuels site.

9.  If Power Fuels did not store and blend the coal for Dominion, Dominion would have to do the work itself or find another contractor to do it.

10. The work performed by Power Fuels is work that is usually performed by utilities or other consumers of coal.  It is not the type of work performed by producers or brokers of coal.

The activities listed in 30 U.S.C. § 802(i) as being part of the "work of preparing the coal" are limited by the phrase "as is usually done by the operator of the coal mine."  If the storing, loading, and mining is the type of work usually performed by the mine operator, the work is subject to the Act.  On the other hand, if the work is not of

13

that type, but is work of the type usually performed by a utility or other consumer of the coal, the work is not subject to the Act.

In its investigation, the agency itself accepted this interpretation of the Act. As Investigator Robert Clay testified, had the activities in questions occurred on the property of Dominion, MSHA would not have considered them to be within its jurisdiction. In other words, if Dominion had done the work itself, the agency would not have asserted jurisdiction. If the activities are not subject to the Act when performed by Dominion, then they are not subject to the Act when performed by a contractor for Dominion. Any other interpretation would lead to the extreme and unreasonable position that MSHA has jurisdiction over everyone who receives and handles coal.

IV.  CONCLUSION

MSHA has no jurisdiction in this case, and the citations must be vacated.

POWER FUELS, LLC

By Counsel

Wade W. Massie
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
Telephone:  276/628-5151
Facsimile:  276/628-5621
wmassie@pennstuart.com

By _____
     Wade W. Massie

Abingdon: 875885-1

**293**

14

## CERTIFICATE

I hereby certify that a true copy of the foregoing has been mailed and emailed to Anthony D. Jones, Esq., U.S. Department of Labor, Office of the Solicitor, Division of Mine Safety and Health, 1100 Wilson Boulevard, 22nd Floor, Arlington, Virginia 22209-2296, this _13ᵗʰ_ day of January, 2014.

_____
Wade W. Massie

Abingdon: 875885-1

Honorable George A. Koutras

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
## OFFICE OF ADMINISTRATIVE LAW JUDGES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| **SECRETARY OF LABOR, MINE SAFETY** | : | **CIVIL PENALTY PROCEEDING** |
| **AND HEALTH ADMINISTRATION, (MSHA),** | : | |
| | : | Docket No. VA 2013-403 |
| | : | A.C. No.: 44-07303-323400 |
| Petitioner, | : | |
| | : | Power Fuels Blending Terminal |
| v. | : | |
| | : | |
| **POWER FUELS, LLC,** | : | |
| | : | |
| Respondent | : | |
| | : | |
| | : | |
| | : | |
| **POWER FUELS, LLC,** | : | **CONTEST PROCEEDINGS** |
| | : | |
| Contestant, | : | Docket No.: VA 2013-312-R |
| | : | Citation No.: 820474; 4/9/13 |
| v. | : | |
| | : | Docket No. VA 2013-313-R |
| **SECRETARY OF LABOR, MINE SAFETY** | : | Citation No.: 8204725; 4/9/13 |
| **AND HEALTH ADMINISTRATION (MSHA)** | : | |
| | : | Docket No. VA 2013-353-R |
| Respondent, | : | Citation No.: 8274726; 4/9/13 |
| | : | |
| | : | Power Fuels Blending Terminal |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## SECRETARY'S POST-HEARING BRIEF

**THOMAS E. PEREZ**, Secretary of Labor ("the Secretary"), United States Department of

Labor, by the undersigned attorney, hereby files this brief in support of his request that this Court

find jurisdiction over Respondent's mining operation and affirm the subject citations as issued.

1

## STATEMENT OF CASE

On April 9, 2013, pursuant to authority granted in Section 104(a) of the Federal Mine Safety and Health Act of 1977 ("the Mine Act" or "the Act"), the Mine Safety and Health Administration ("MSHA") issued citation nos. 820474, 820475, and 8204726, ("subject citations") to Respondent, Power Fuels, LLC, ("Power Fuels" or "Respondent"). These three Section 104(a) citations were for alleged violations of 30 C.F.R. § 77.1605(b), 30 C.F.R. § 77.410(c), and 30 C.F.R. § 77.1605(b). MSHA assessed a total proposed penalty of $300 for the subject citations. Power Fuels timely contested the issuance of the subject citations on the grounds that MSHA lacked enforcement jurisdiction over its operation. A Petition for Assessment of a Penalty was filed with the Federal Mine Safety and Health Review Commission ("the Commission") Docket Office on May 30, 2013. A hearing in the above-captioned matter was held in Abington, Virginia, on November 19, 2013.

## ISSUE PRESENTED

1) Whether MSHA properly asserted Mine Act inspection and enforcement jurisdiction over the Power Fuels Blending Terminal?

## PROPOSED FINDINGS OF FACT

The Secretary proposes the following findings of fact in support of the Mine Act enforcement jurisdiction over Respondent's blending operation. The Secretary also relies upon the Joint Stipulations of facts filed by the parties at the beginning of the hearing and accepted by the Court as ALJ Exhibit 1. Transcript ("Tr.") at 8.

MSHA Inspector Thomas R. Bower

2

**296**

1)    MSHA Inspector Thomas R. Bower has completed two regular inspections of Respondent's facility, which includes twelve total days of onsite inspections. Tr. at 22. Mr. Bower's first regular inspection occurred in December 2012 and his second regular inspection of Respondent's facility occurred in April 2013. Tr. at 24-25. Mr. Bower issued the citations at issue in this case during his April 2013 regular inspection. Government Exs. 1-3.

2)    During the course of Mr. Bower's inspections, he observed and became familiar with the nature of work that is performed at the Power Fuels Blending Terminal. Tr. at 22.

3)    Inspector Bower observed contract coal trucks deliver coal and coal byproducts (gob coal, midds and refuse material) from outside preparation plants to the Power Fuels facility. Tr. at 22-23.

4)    Inspector Bower observed the coal and coal byproducts that were trucked into the Power Fuels facility being weighed, sampled and stored in designated areas of the facility. Tr. at 22-23; Government Ex. 7.

5)    Inspector Bower observed the blending work that was performed at Respondent's facility. Mr. Bower testified that the blending work consisted of using front-end loaders to mix and combine different types of coal stored in separate stockpiles to create a custom coal blend. Tr. at 23.

MSHA Supervisory Special Investigator Robert D. Clay

6)    On May 22, 2012, Mr. Clay conducted an investigation of the Power Fuels facility. Tr. at 60. From outside the facility on a public, county road, Mr. Clay observed coal trucks going into Respondent's facility. Tr. at 59-60.

3

7)      While observing Respondent's facility from the county road, Investigator Clay was approached by a foreman for Power Fuels named Bobby Ketron who invited Mr. Clay onto the property and showed him around the facility.  Tr. at 60.

8)      While at the Power Fuels Facility, Investigator Clay observed a blending yard and signs indicating the location of the blending facility.  Mr. Clay observed a couple of front-end loaders, weighing scales, a coal sampling unit, a water tank and several coal trucks coming onto the property.  Tr. at 60-61; Government Exs. 5-7.

9)      Power Fuels Foreman Bobby Ketron informed Mr. Clay about the type of work that is performed at the Power Fuels facility.  Ketron admitted that coal trucks delivered coal to the blending yard, dumped coal on the yard and then front-end loaders blended coal together to meet certain specifications and the blended coal was stored and eventually transported to the Virginia Electric and Power Company Power Plant (Dominion Power) across the street from Respondent's facility.  Tr. at 61, 65-66.

Power Fuels Manager Walter B. Crickmer

10)      Walter B. Crickmer is the Manager of the Power Fuels Blending facility at issue in this case.  Tr. at 79.

11)      Mr. Crickmer testified that a contract called a  "Terminalling Agreement" between Power Fuels, LLC and  Dominion Power specified the terms and conditions of the relationship between Power Fuels and Dominion Power.  Tr. at 126-127; Government Ex. 4 (Terminalling Agreement).

12)      Article III of the Terminalling Agreement entitled "Services by Power Fuels" specifies that Power Fuels shall "blend Solid Fuel in accordance with the reasonable

4

requirements of the Customer" and shall "load trucks and ship Solid Fuel to [Dominion]." Tr. at

127-128; Government Ex. 4, pg. 4, §§ 3.01(a)(iv)-(v).

13)    The Terminalling Agreement defines "Solid Fuel" as "coal, coal refuse, coal mids,

or gob" and refers to Dominion Power as the "Customer" of Power Fuels, LLC. Government Ex.

4, pg. 1, 2; Tr. at 129.

14)    Mr. Crickmer testified that Power Fuels receives daily instructions, sometimes bi-

daily, from Dominion Power that directs Power Fuels on how to create a custom coal blend that

meets Dominion Power's specifications. Tr. at 108; Exhibit R-3. For example, Exhibit R-3

includes instructions from Dominion that directs Power Fuels to make a custom coal blend by

blending "5 buckets of Omega with 4 buckets of Gobco/ETI for pile Aa", "6 buckets of Omega

with 1 bucket of Gobco, for pile Ba",  "3 buckets of Pelver with 2 bucket of Gobco, 3 buckets of

IBSS and 1 bucket of South East for pile Ca." Dominion's instructions to Power Fuels also

include specifications for the BTU, ASH, sulfur and moisture content required for the custom

coal blend. Tr. at 103, 108; Exhibit R-3.

15)    Mr. Crickmer stated that it was "critical" for Power Fuels to make a custom coal

blend that meets Dominion's precise specifications. He testified that the custom coal blend is

critical for Dominion's power plant furnace to operate correctly. Tr. at 104, 109, 111, 124.

16)    Mr. Crickmer described the blending work performed by Power Fuels by stating

"All we do is take different fuels purchased by Dominion, which they own, and we blend to

whatever specifications they want for the next day burn at the power plant." Tr. at 114.

17)    Manager Crickmer testified that Power Fuels "provides a big service" for

Dominion because it stores large quantities of coal for Dominion. Power Fuels has the capacity

5

to store up to eight days' worth of power-plant-ready coal at its facility. This benefits Dominion by reducing Dominion's coal storage needs on its own premises. Tr. at 115, 126.

18)    The Power Fuels facility has four different Storage Areas: A Yard, B Yard, C Yard and D Yard. Tr. at 102; Government Ex. 7.

19)    Mr. Crickmer testified that Power Fuels routinely loads trucks with blended coal. The loaded trucks are taken to an auger sampler that tests the coal to make sure it meets Dominion's specifications. Tr. at 103, 126.

20)    Manager Crickmer stated that Power Fuels' custom blended coal is loaded and transported across the street to the Dominion Power Plant. Tr. at 126.

21)    Mr. Crickmer admitted that Power Fuels "is a custom blending facility" for Dominion Power. Tr. at 128.

22)    Power Fuels blends coal that it receives from approximately 16 different producing mines. Tr. at 97.

23)    Mr. Crickmer admitted that the work peformed by Power Fuels is done for the purpose of meeting the specifications and requirements of its customer Dominion Power. Tr. at 128.

## ARGUMENTS

**A.    The Mine Act's definition of "mine" includes custom coal blending operations like the Power Fuels Blending Terminal**

Under the plain language of the Mine Act, the Power Fuels blending facility is a

6

"mine" for purposes of Mine Act enforcement jurisdiction. Section 4 of the Mine Act provides that each "coal or other mine" whose products affect commerce shall be subject to the Act.

"Coal or other mine" is defined in § 3(h)(1) of the Mine Act to include:

> (C) lands...structures, facilities, equipment, machines, tools, or other property ...used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form...or used in, or to be used in, the milling of such minerals or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1). In addition § 3(i) defines "work of preparing the coal" as:

> ...the breaking, crushing, sizing, cleaning, washing, drying, **mixing, storing, and loading of bituminous coal,** lignite or anthracite, and such other work of preparing coal as is usually done by the operator of the coal mine.

30 U.S.C. § 802(i) (emphasis added). As the record in this case makes abundantly clear, Power Fuels is a custom coal preparation facility that is "used in" the "work of preparing coal." It is undisputed that Power Fuels mixes, blends, loads, weighs, samples, and stores bituminous coal for the sole purpose of meeting the specifications and requirements of its customer Dominion Power. Tr. at 22-23, 103, 108. These coal preparation activities confer Mine Act enforcement jurisdiction over the Power Fuels Blending Terminal. A plain reading of Section 4 of the Mine Act requires the conclusion that the Power Fuels operation is a "custom coal preparation facility" within the meaning of 30 U.S.C. § 802(h)(1). Indeed, Walter Crickmer, the Manager of the Power Fuels Terminal, openly admitted that Power Fuels "is a custom blending facility" for its customer Dominion Power. Tr. at 128.

**B.      The blending, storing and loading work performed at the Power Fuels facility meets the Mine Act's definition of the "work of preparing the coal"**

7

Numerous authorities from the Federal Mine Safety and Health Review Commission (Commission) have found Mine Act enforcement jurisdiction under facts similar to those of the instant case. In Mineral Coal Sales, Inc., 7 FMSHRC 615 (1985), the Commission affirmed ALJ Koutras' jurisdictional finding over an operation that performed coal preparation functions similar to the work performed by Power Fuels. The operation in Mineral Coal Sales, like Power Fuels, blended different types of coal together to meet customer specifications and stored and loaded the blended coal for transport. Id. at 616.  The Commission noted that Mineral Coal Sales performed activities such as blending, storing, loading, and crushing that are specifically listed in the Mine Act as constituting "the work of preparing the coal." Id. at 620.  However, the Commission recognized that merely performing one or more of the statutorily enumerated activities is not solely determinative of whether the facility is properly classified as a "mine." Rather, the inquiry must also focus on the nature of the operation performing the activities and whether the work is "undertaken to make coal suitable for a particular use or to meet market specifications." Id.[1] The Commission ultimately concluded that the operations taking place at Mineral Coal Sales, when viewed as a collective whole, indicated that the facility was a "mine" because it performed preparation work to make coal suitable for customer specifications. The Commission also rejected Mineral Coal Sales' contention that its work of merely blending different types of coal from different stockpiles under the direction and control of another entity does not constitute coal preparation.  Id. at 620-621.  The Commission specifically held that the coal preparation work performed at the Mineral Coal Sales facility, which is virtually identical to the blending work performed by Power Fuels, falls within MSHA's jurisdiction.  Id.

---

1 Quoting Oliver M. Elam, Jr., Co., 4 FMSHRC 5, 8 (1982) (establishing functional analysis test for jurisdiction).

8

In Marion Docks, Inc., 10 FMSHRC 1589, 1619 (1988), ALJ Koutras found Mine Act enforcement jurisdiction over a loading dock facility located near a river that performed blending, mixing, storing and loading activities. These coal preparation activities were done at the contestant's facility to make the coal suitable for customer specifications. In finding jurisdiction over the Marion Docks facility, ALJ Koutras held that the evidence established that coal was "mixed, crushed, sized, stored and loaded" and that "all of these activities fall within the statutory definition of 'coal preparation,' and brings the contestant within the Act's jurisdiction." Id at. 1619. Judge Koutras rejected the contestant's argument that it's handling and processing of the coal was done merely to facilitate its loading and unloading. On the contrary, Judge Koutras based his finding of Mine Act inspection and enforcement jurisdiction on the fact that Marion Docks "custom blended, mixed, crushed, and sized at the facility in order to meet a particular customer's needs and specifications." Id.

Here, Power Fuels performs multiple statutory preparation functions including mixing, custom blending, storing and loading of coal that the Commission has repeatedly held confers Mine Act enforcement jurisdiction. It is undisputed that mixing and blending of coal is the principal function that occurs at Respondent's facility. Tr. at 23, 114. In addition, the evidence in this case clearly establishes that Power Fuels performs all of its coal preparation activities for the purpose of meeting the specifications and requirements of its customer Dominion Power. Tr. at 104, 109, 111, 124; Government Ex. 4, pg. 4 (Terminalling Agreement). Under this well-settled line of Commission precedent, MSHA properly asserted its enforcement jurisdiction over the Power Fuels Blending Terminal. For these reasons, the Court should find MSHA inspection and enforcement jurisdiction over Respondent's facility.

9

**C.    The Secretary of Labor, as the policy maker and enforcer of the Mine Act, is entitled to deference on questions of Mine Act jurisdiction**

Assuming *arguendo* that the Court finds that §§ 802(h)(1)(C) and (i) are ambiguous with respect to whether they allow MSHA to assert enforcement jurisdiction over a custom coal preparation plant that engages in further preparation of previously processed coal to meet the specifications of the coal's ultimate consumer, the Secretary's reasonable interpretation of the Act is entitled to deference. *See generally*, Chevron v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). Many U.S. Courts of Appeal have specifically held that the Secretary of Labor is entitled to deference on questions of Mine Act jurisdiction provided the Secretary's interpretation is reasonable. *See* Secretary v. National Cement Co., 573 F.3d 788 (D.C. Cir. 2009) (deferring to MSHA's finding of Mine Act jurisdiction over a road leading up to a cement plant). *See also*, Secretary v. Carolina Stalite Co., 734 F.2d 1547 (D.C. Cir. 1984) (deferring to MSHA's jurisdictional determination that a slate gravel processing facility that did not extract slate but processed it for commercial purposes was a "mine" within the meaning of the Mine Act

Here, the Secretary's interpretation that the work performed at Respondent's facility constitutes the "work of preparing the coal" is reasonable and entitled to deference. The Secretary's interpretation is reasonable because the Commission and U.S. Courts of Appeal have found jurisdiction in cases with strikingly similar facts to the case at bar. *See, e.g.*, Mineral Coal Sales, Inc., supra and Kinder Morgan Operating, LP, 78 Fed. Appx. 462 (6th Cir. 2003) (affirming a Commission decision which found that a marine loading facility was engaged in the "work of preparing the coal" and was therefore subject to MSHA enforcement jurisdiction). Power Fuels makes a custom coal blend that meets the specifications of its customer Dominion Power and stores and loads coal on behalf of Dominion. Tr. at 104, 109, 111, 124. The Secretary's interpretation is also reasonable because it is undisputed that Power Fuels performs statutorily enumerated coal preparation activities including the "mixing, storing, and loading of bituminous coal" functions specified in 30 U.S.C. § 802(i).

10

**304**

The Secretary's interpretation of 30 U.S.C. §§ 802(h)(1)(C) and 802(i) is reasonable and furthers the purposes of the Mine Act. In enacting the Mine Act, Congress sought to prevent "unsafe and unhealthful conditions and practices in…coal or other mines." 30 U.S.C. § 801(b). It furthers the safety and health goals of the Act to cover, to the maximum extent consistent with the statutory terms, workers subject to the conditions, practices and hazards associated with coal preparation. Moreover, deference to the Secretary's interpretation is additionally warranted because 30 U.S.C. 802(h)(1)(C) "expressly authoriz[es] the Secretary to define what constitutes a 'mine.'" Otis Elevator Co. v. Secretary, 921 F.2d 1285, 1288 n.1 (D.C. Cir. 1990).

### D. Power Fuels introduced no facts or evidence to support its position that MSHA lacks jurisdiction over its blending facility

Power Fuels' principal defense against Mine Act jurisdiction is that its mixing, storing, and loading work is not the type of coal preparation work that "is usually done by the operator of the coal mine" and as such Power Fuels should be treated like the ultimate consumer of the coal instead of a mine operator. Tr. at 124-125. Respondent contends that if it did not perform the custom blending work for Dominion, Dominion would have to perform these coal preparation activities for itself. Tr. at 125. In short, Power Fuels is asking this Court to treat it as the ultimate consumer of the coal, instead of the contractor it actually is that prepares the coal to meet the specifications of the ultimate consumer. This argument has no basis in fact or logic and should be rejected.

The Secretary's interpretation would not, as Power Fuels suggests, result in a parade of horribles in which any place that does any mixing, storing or loading of coal would be subject to Mine Act jurisdiction. Tr. at 134. Under the Secretary's interpretation, simply storing or loading coal would not bring an end-user of coal under MSHA's scrutiny. Tr.

11

at 135. Rather, consistent with the Commission's analysis in Elam, supra, and this Court's reasoning in Mineral Coal Sales, supra, and the Third Circuit's holding in RNS Services, Inc., v. FMSHRC, 115 F.3d 182 (1997), such activities would only trigger MSHA jurisdiction where they are an integral part of an overall process to prepare the coal to make it suitable for a particular end use or to meet market specifications. *See also*, Kinder Morgan Operating, LP, supra, (affirming MSHA jurisdiction where coal storage and loading facility also engaged in blending and mixing of coal to meet customer specifications). The facts of this case speak for themselves. Power Fuels unequivocally testified that all of their coal preparation activities are "done to meet the requirements and specifications of Dominion Power." Tr. at 128. For this reason, and the fact that Power Fuels mixes, stores and loads coal, the Court should find jurisdiction over Respondent's operation.

## FACT OF VIOLATIONS

MSHA Inspector Thomas R. Bower issued Citations Nos. 8204724, 8204725 and 8204726 to Power Fuels on April 9, 2013. ALJ Ex. 1; Government Exs. 1-3. All of the citations involved alleged safety defects on contract coal haulage trucks that transported coal into the Power Fuels facility. Government Exs. 1-3. Citation Nos. 8204724 and 8204726 alleged violations of 30 C.F.R. § 77.1605(b) due to braking defects on two different tractor/trailers that traveled throughout Respondent's Terminal. Government Ex. 1, 3. Inspector Bower issued Citation No. 8204724 after he determined that the brakes on the Hills Trucking 9900 International tractor/trailer were defective because they had lost 25% of their braking force capacity. Tr. at 27. Bower issued Citation No. 8204724 because the defective brakes constituted a safety hazard to workers that traveled and/or worked near the Hills Trucking tractor/trailer. Tr.

12

at 28. Mr. Bower issued Citation Number 8204726 because he observed a Presley Trucking 379

Peterbilt tractor/trailer traveling throughout Respondent's facility with defective brakes that were

out of adjustment on the tractor portion of the vehicle. He also observed defective brakes on the

trailer portion of the vehicle that continuously leaked air due to a faulty air valve. Tr. at 38-39.

Inspector Bower issued Citation No. 8204726 because the defective brakes on both the tractor

and trailer constituted a safety hazard to workers that traveled and/or worked near the Presley

Trucking tractor/trailer. Tr. at 39.

Citation No. 8204725 alleged a violation of 30 U.S.C. § 77.410(c) due to an inoperable

back up alarm on a contract coal truck that was traveling on Respondent's premises.

Government Ex. 2. Inspector Bower issued Citation No. 8204725 because he determined that the

backup alarm failed to function when the tractor/trailer was placed in reverse. Tr. at 33. MSHA

proposed a $100 penalty for each of the three subject citations. The proposed penalty is

appropriate to the size of Respondent's operation and will not affect Respondent's ability to

continue in business. ALJ Ex. 1; Tr. at 139. The Negligence level on all of the subject citations

was rated low because the coal haulage trucks were owned and operated by independent

contractors and Power Fuels officials did not directly oversee the maintenance of the coal trucks.

Government Ex. 1-3, Tr. 32-33. Inspector Bower classified the gravity level of each citation as

Significant and Substantial because the potential injuries associated with hazards involving coal

trucks were reasonably likely to result in serious injuries. Government Exs. 1-3.

As previously indicated in the course of this litigation, the facts of the alleged violations

at issue in these proceedings are not in dispute. ALJ Ex. 1; Tr. at 6, 17. Respondent filed the

contests in these matters for the purpose of contesting MSHA's jurisdictional claims. Tr. at 6.

13

Under the circumstances, if the Court upholds the Secretary's jurisdictional claims, the Secretary respectfully requests the Court to affirm Citation Nos. 8204724, 8204725 and 8204726 as issued and assess their corresponding civil penalties.

14

## CONCLUSION

Based on the foregoing, the Secretary respectfully requests that this Court find that MSHA properly exercised inspection and enforcement jurisdiction over the Power Fuels Blending facility and affirm the subject citations as issued.

Respectfully submitted,

**M. PATRICIA SMITH**
Solicitor of Labor

**HEIDI W. STRASSLER**
Associate Solicitor

P.O. Address:                                    **ANTHONY D. JONES**
U.S. Department of Labor                         Attorney
Office of the Solicitor
1100 Wilson Blvd, 22nd Floor                     Attorneys for **THOMAS E. PEREZ**,
Arlington, VA 22209                              Secretary of Labor, United
(202) 693-9330                                   States Department of Labor, Petitioner
jones.anthony@dol.gov

15

**309**

## CERTIFICATE OF SERVICE

I certify that one (1) copy of the foregoing **Secretary's Post-Hearing Brief** has been served on Counsel for Power Fuels this 16th day of January, 2014, by sending the aforesaid copy by electronic mail to:

Wade W. Massie, Esq.
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, VA 24212
wmassie@pennstuart.com

**ANTHONY D. JONES**
**Attorney**

United States Department of Labor
One of the Attorneys for Petitioner

16

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

OFFICE OF ADMINISTRATIVE LAW JUDGES
1331 PENNSYLVANIA AVE., N.W., SUITE 520N
WASHINGTON, DC 20004-1710
TELEPHONE: 202-434-9958 / FAX: 202-434-9949

March 10, 2014

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | CIVIL PENALTY PROCEEDING |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION, (MSHA) | : | Docket No. VA 2013-403 |
| Petitioner | : | A.C. No. 44-07303-323400 |
| v. | : | |
| | : | |
| POWER FUELS, LLC, | : | Power Fuel Blending Terminal |
| Respondent | : | |
| | : | |
| POWER FUELS, LLC, | : | |
| Contestant | : | CONTEST PROCEEDINGS: |
| | : | |
| | : | Docket No.:  VA 2013-312-R |
| | : | Citation No.:  8204724; 4/9/13 |
| v. | : | |
| | : | Docket No.:  VA 2013-313-R |
| | : | Citation No.:  8204725; 4/9/13 |
| SECRETARY OF LABOR | : | |
| MINE SAFETY AND HEALTH | : | Docket No.:  VA-2013-353-R |
| Administration, (MSHA) | : | Citation No.:  8274726; 4/9/13 |
| Respondent | : | |
| | : | |
| | : | |
| | : | Power Fuel Blending Terminal |

## DECISION

Appearances:      Anthony D. Jones, Esq., U.S. Department of Labor, Office of the Solicitor, Arlington, Virginia, for the Secretary

                            Wade W. Massie, Esq., PENN, STUART & ESKRIDGE, Abingdon, Virginia, for the Respondent

Before:  Judge Koutras

1

## STATEMENT OF THE CASE

This civil penalty proceeding pursuant to the Federal Mine Safety and Health Act of 1977, 30 U.S.C. 802, et Seq. (2000), hereinafter the "Mine Act" concerns three Section 104(a) significant and substantial (S & S) citations served on the respondent on April 9, 2013, for alleged violations of the cited safety standards found at 30 C.F.R. 77.410(c), and 77.1605(b). The Secretary petitions the Court for a civil penalty assessment of $300, for the alleged violations.

In addition to the civil penalty issues presented in this case, the respondent challenges and contests the Secretary's asserted jurisdiction based on its contention that the respondent is not a mine operator, and that its facility is not engaged in any coal mine working activities that fall within the scope and intent of the Mine Act.

### Pre-trial Ruling

This case was initially designated as a Simplified Proceeding pursuant to the Commission's rules at 29 C.F.R. 2700.100, et. seq. Subsequently, the Secretary filed a motion to discontinue the "simplified" designation and to continue the matter under conventional rules. In support of the motion, the Secretary cited the jurisdictional issues raised by the respondent that involve complex issues of law and fact. The motion was granted pursuant to Rule 2700.104, without objection by the Court during a pre-trial telephone conference with the parties (Tr. 5-6)

As a result of the Court's ruling as discussed during the aforementioned conference, the respondent file a supplemental disclosure statement regarding the nature of its blending activities, and the Secretary filed a pre-hearing statement with respect to the issues in this matter including arguments in support of Secretarial (MSHA) jurisdiction. These filings and exchanges are part of the record.

### Stipulations

(1) The parties agreed to the admission into evidence of copies of the three contested citations, except as to jurisdiction (Ex. G-1, G-2, G-3; ALJ-1).
(2) The parties agreed that the proposed civil penalty assessment for the citations will not adversely affect the respondent's ability to continue in business.
(3) The parties agreed that a terminalling agreement between the respondent and Virginia Electric Power Company, d/b/a Dominion Power Company, is a true and authentic copy in effect at the time the citations and may be admitted in evidence (Ex. G-4).

At the conclusion of the hearing, the parties agreed that the respondent would be classified as a small mine under the regulations and the respondent's manager confirmed that twelve employees work at the site (Tr. 139).

### The Alleged Violations

The two Section 104(a) S & S Citation Nos. 8204724 and 8204726, April 9, 2013, citing C.F.R. 77.1605(b), describe defects in the braking systems on two contractor trucks that haul coal into the respondent's facility "under the direction of the mine operator" (Ex. G-1, G-3). The inspector determined the negligence level as "low" for both citations and the gravity level as "reasonably likely" and "permanently disabling" injuries.

The braking defects described for Citation No. 8204724, concern a steering axle brake out of adjustment on the truck tractor, and an inoperative rear axle brakes on a trailer being pulled by the tractor, with no braking force supplied by the brake pushrods that could not move. The braking defects described for Citation No. 8204726, in part state that the left truck steering axle brake was out of adjustment with a continuous air leak through a defective air brake value above the center trailer axle being pulled by the truck.

Citation No. 8204725, April 9. 2013. Citing 30 C.F.R. 77.410(c), states that the backup alarm provided on the cited contractor truck was not being maintained in a functional condition in that when the driver placed the vehicle in reverse, the backup alarm failed to function due to a broken wire. The truck is used to haul coal into the facility "under the direction of mine operator" (Ex. G-2). The inspector determined the negligence as "low", and the gravity level as "reasonably likely" and "permanently disabling" injuries.

Mandatory safety standard 30 C.F.R. 771605(b), requires mobile haulage equipment to be equipped with adequate brakes. Section 77.410(c) requires mobile equipment such as "tractors" and "trucks" to be equipped with a warning device that gives an audible alarm when put in reverse and be maintained in functional condition.

### The Secretary's Testimony

MSHA Inspector Thomas R. Bower testified that he has served in that capacity since January 7, 2007, and he described his education, including a bachelor's degree from the University of Virginia at Wise and his prior mining experience from 2001 through 2006 (Tr. 20-21). He confirmed that his initial visit to the respondent's facility was December 12, 2012, and that he conducted regular mine safety and health inspections over a period of 12 different days and was familiar with the work that is done there (Tr. 22). He observed contractor coal trucks, trailers, and tractors hauling coal, refuse materials, gob coal, and "midds", a coal byproduct from a preparation plant, coming into the site. The materials were weighed and sampled and then taken to designated stockpile areas. The truck drivers were told where to dump their loads by the loader operators and the foreman of the site (Tr. 22-23).

He further explained that the coal was stored, blended, and loaded as needed for Dominion's power plant, then taken back out, weighed again, sampled again, and then shipped to

3

**313**

the power plant (Tr. 23). He stated that front-end loaders were used to blend the coal from one stockpile to another that were marked for each type of analysis "so they'll know how to blend it." He confirmed that between the time the coal arrives at the site and the time it leaves, it is stored and blended in preparation for shipment to the power plant (Tr. 24). He confirmed that he began his second inspection at the site on April 1, 2013, and clarified that he was not at the site for a total of five months, and that his inspections last on and off approximately two to three weeks at a time and that two inspections were performed during two six-month intervals, and that he was at the site over a period of several month several times (Tr. 25).

Mr. Bower identified Exhibit G-1 as Citation No. 8204724, citing a violation of 30 C.F.R. 77.1605(b), for braking defects on a contractor's tractor trailer coal truck. He stated that there were numerous braking defects as stated in the condition or practice noted in item #8 of the citation, on both the tractor and the trailer that he considers as one unit, and he summarized the condition as "faulty brakes" (Tr. 26-27). He confirmed that he discussed the citation and his reasons for issuing it with the site foreman, Mike Hendrickson, and informed him that the truck was traveling the same roadways that mine personnel used and exposed them to the hazards while the truck was operated on the property (Tr. 27). The citation reflects that the truck was taken out of service pending repairs.

Mr. Bower stated he based his "S & S" determination on the fact that the cited truck and tractor unit had a 25 percent loss of braking power that exceed the guidelines fixed by the Commercial Vehicle Safety Alliance that any braking loss over 20 percent reaches its out-of-service criteria (Tr. 27-28, 30). He believed that two persons would be likely exposed to a hazard in the event of any accident, namely the driver and another miner, as well as others who may be on the roadway (Tr. 28-29).

Mr. Bower stated that he based his "reasonably likely" injury determination on his accident investigator experience involving truck accidents under similar defective conditions that resulted in disabling back and traumatic injuries, and broken bones. He agreed these examples are "worst case scenarios" and that lesser injuries were conceivable (Tr. 30-31). He confirmed that foreman Henderson was upset about the conditions of the truck brakes and that he called the trucking company and told them that they had to do better with their equipment (Tr. 31). He confirmed that he based his low negligence finding on the fact that the foreman may travel with the trucks at times during his shift but he did not directly oversee the truck maintenance, and that he also cited the contractor truck operator for the same violation (Tr. 32-33).

Mr. Bower stated that he also issued S & S Citation No. 8204725, a violation of 30 C.F.R. 77.410(c), because the backup alarm provided on a contractor trailer truck failed to function when the transmission was placed in reverse and the alarm did not sound (Ex. G-2, Tr. 33). He stated he determined an injury was reasonably likely because the truck traveled in congested areas, it was observed backing up in congested areas, and it had an obstructed rear

4

**314**

view pulling a 34 foot trailer. The truck backs up in congested areas where numerous people and other pieces of equipment are present.

Mr. Bower determined that any injury would be disabling if anyone was backed over by a 150,000 pound unit, and this included crushing injuries. He believed one person among those operating a loader or sampling the coal would be affected, and he also concluded it was an S & S violation because the cited trucker was in congested areas and it was observed backing up in those areas (Tr. 34). He based his low negligence on the same reason as the prior cited violation because the foreman was not responsible for truck maintenance and confirmed that he also cited the contractor truck operator for the same violation (Tr. 34-35).

Mr. Bower confirmed that he issued Citation No. 8204726 citing a violation of 30 C.F.R. 77.1605(b), because the same truck previously cited for a defective backup alarm had a brake out of adjustment on the tractor and a continuous air leak and defective air valve on the trailer being pulled as a unit (Ex. G-3; Tr. 38-39). He explained that the loss of air pressure would result in a loss of braking force to stop the unit because the brakes would not work as they are designed (Tr. 39).

Mr. Bower stated that he based his reasonably likely injury determination on the fact that a combination of a brake out of adjustment and a continued air leak makes it reasonably likely that a brake failure would occur and cause a wreck. He explained that the truck hauls heavy loads over inclined roads, traveling with other vehicles, and that any loss of brakes could result in a truck runaway over the top of other vehicles resulting in crushing injuries. Under these circumstances, he concluded that the violation was S & S and two persons, the truck driver and any other vehicle driver would be affected (Tr. 39-40). He confirmed that his low negligence determination was based on the same reason for all three citations, namely, the fact that the foreman was not directly responsible for any truck maintenance, but did travel sometime during the shift in the same area traveled by the trucks (Tr. 41).

On Cross-examination, Mr. Bower stated that his inspections were regular inspections, and that even though he is a surface inspector and accident investigator, he was not investigating any accidents when he issued all of the citations. He made no decisions whether the respondent's site was a mine within the meaning of the Mine Act and was simply following his instructions to cite any violations that he found (Tr. 44-45). He confirmed that when he issued the citations, he was not aware of the agreement between the respondent and Dominion, and did not interview anyone at Dominion about the respondent's job performance or operations. He explained that he spoke with the respondent's foreman, Mike Hendrickson, who was at the site on a daily basis, and Mr. Walter B. Crickmer, who has later identified as the manager of Power Fuels, LLC, the respondent (Tr. 45, 79).

5

**315**

Mr. Bower stated that the contractor trucks that he cited were inbound trucks that were bringing solid fuel from any producing facility to the respondent's site. He confirmed that a defective truck entering the site may not necessary, in and of itself, constitute a violation. However, pursuant to MSHA's policy, he is required to make a determination whether or not the respondent's personnel are exposed to any hazard, and if not, the violation would be attributable to the contractor if it did not involve the respondent's employees (Tr. 46-47).

Mr. Bower confirmed that he issued the violations to the respondent because trucks entering its site with defective brakes and a backup alarm potentially involved the respondent's employees. He did not know whether the trucks were contractors for the respondent or contractors for the producing mine entities. He further stated that while he was not aware who contracted the trucks, he was obligated to inspect them during his inspection at the site and that the question of who contracted them was not relevant (Tr. 48-49).

Mr. Bower did not know who owned the materials hauled into the site by the trucks, and did not believe this was relevant. He estimated that 30 – 40 trucks enter the site daily and that during one of the 12 days of his inspections, he may have randomly selected 10 to 12 trucks to inspect. He does not inspect every truck that comes onto the site and has inspected trucks that did not have any violations. As far as he knew, all of the cited trucks arrived safely while traveling inbound to the site (Tr. 50-51).

Mr. Bower confirmed that his statement in the citations that the trucks are "under the direction of the mine operator", referred to the respondent's foreman, Mr. Hendrickson, and because the trucks were on the site (Tr. 51). He stated that he has also observed some wood chips biomass product at the site and that it is handled by the same employees with the same equipment used for handling the solid fuel (Tr. 52-53). In reply to further questions, Mr. Bower stated that the material blending that he observed consisted of "coal, midds, gob, the refuse material blended together", coal and coal byproducts. He observed wood chips that were stored and never witnessed it being blended with those products (Tr. 53-54). He explained that the coal blending was accomplished by using bulldozers to stockpile the materials and front-end loaders moving it from one stockpile to another (Tr. 55).

Supervisory Special Investigator, Robert D. Clay testified that he has been employed with MSHA for 22 years and is responsible for violations of section 110 of the Act, and other duties as assigned by District 5, in Norton, Virginia. He detailed his prior 16 years of mining experience in the private sector, including mine foreman and equipment operator positions in surface and underground mines. He also performed duties with MSHA as an inspector and field office supervisor, and was familiar with the respondent's facility (Tr. 57-59).

Mr. Clay stated that he first became familiar with the respondent's site after an inspector informed the assistant district manager that he observed coal trucks coming off the state road that

6

were not going directly to Dominion's power plant and were turning off somewhere else. He was asked to investigate the respondent's operation because there was no known preparation plant at that location. He went to the location on May 22, 2012, and from his vantage point off the property on a country road he observed coal trucks going on the property. He could only observed what he believed was a small sampling unit that appeared to be sampling whatever went through the gate, and a small scale (Tr. 59-60).

Mr. Clay stated that he was approached by the respondent's foreman, Bobby Ketron, who invited him on the property and took him to the mine office consisting of a small trailer or building. Mr. Kentron then took him to a "yard" area that he called a "blending yard" where Mr. Clay observed signs posted indicating "There was a yard there, a blending facility, signs coming onto the property". He also observed end loaders, trucks coming on the property, a coal sampling unit, scales, and a water tank on an elevated roadway (Tr. 60-61). Mr. Kentron told him that coal trucks would deliver coal to the yard, dump it and that end loaders would blend the coal together for a certain specification. It would then be stored and eventually transported to Dominion's power plant directly across the small county road (Tr. 61).

Mr. Clay identified Exhibits G-6 and G-7 as photographs of two signs stating "Virginia City Fuel Blending Terminal, ¼ mile on right", and "Blend Yard Area A", and assumed they were created by the respondent. It was his understanding that the respondent referred to the facility as a blending terminal (Ex. G-6). He stated that what was stored in Area A appeared to be a pile of coal and the sign on the property pointed to the "blend yard storage Area A" (Ex. G-7). He explained that during his visit to the facility he observed several trucks stopping at a sampling area and a sample being removed from the coal truck trailers that drive across a set of scales. The tractor and trailer are then driven to yard storage A where the coal is dumped and pushed together and blended with the front end loaders. The blended coal is placed back in the truck with the same loaders and travel across a set of scales again and travel off the property that he assumes was taken across the road to Dominion's power plant (Tr. 65-66).

On cross-examination, Mr. Clay stated that he could observe portions of the respondent's property while parked by the road, and more of it after he was invited in by Mr. Ketron. He stated that the Dominion power plant was adjacent to the respondent's site across the road, and the trucks he observed were turning onto the respondent's site. He confirmed that he did not conduct any inspection on Dominion's property (Tr. 67-71).

Mr. Clay stated that he was not aware of any other power plants in MSHA's District 5, and that he was only requested to inspect the Dominion location. He speculated that in the event he observed the trucks turning into that plant, he probably would have inspected that area if requested to do so by his supervisor (Tr. 73). He confirmed that he was not aware of any discussions within his district concerning any "debate" about MSHA's jurisdiction over the respondent's site, or any other sites (Tr. 74-75). He confirmed that his inspection did not include

7

**317**

any interviews with anyone on Dominion's property, or the producers of the materials that were trucked into the respondent's site because he did not know who they were. He confirmed that he did not observe the handling of any biomass at that site because he was not sure what it was (Tr. 76).

Walter B. Crickmer, the respondent's co-owner and site manager, stated that the site is located on 106 acres across the road from the Virginia City Hybrid Energy Center (VCHEC), owned and operated by the Virginia Electric and Power Company that is commonly known as Dominion Power, of simply "Dominion" (Tr. 79-81). He identified Exhibit R-1 as an aerial photograph of the power plant, as well as the respondent's site labeled "Power Fuels LLC Fuel Handling Facility", and he was unaware of any citations issued on the plant property (Tr. 82-89).

Mr. Crickmer stated that he has a degree in Geology and is a geologist with previous coal mine experience that began in 1970, and served as president of the Clinchfield Coal Company that operated several mines and preparation plants. He also worked for the Pittston Coal Company drilling gas wells and was engaged in other enterprises processing wood chips and rebuilding mine equipment (Tr. 120, 122). For the past ten years he and several partners have owned and operated a business called Gobco that reclaims gob piles, and for the first eight years it supplied gob coal products to several companies such as Alpha, Taco, United, and Warscho. During that time, the company won many state reclamation awards and a Federal Department of the Interior award for its tree and "green history" (Tr. 121-122).

Mr. Crickmer described the Dominion plant as a 600 megawatt facility placed in operation two years earlier at the same time the respondent's site was placed in operation. He stated the plant was designed differently from most coal-fired power plants run with high BTU coal content and relies on a very critical BTU low, medium 7500 BTU, or as low as 6500-8000 product that changes daily for the size of the coal product that is going by conveyor belt into the furnaces that produce heat for its generation station. In order to maintain quality fuel, it is critical to maintain the low BTU coal content that supplies the furnaces (Tr. 81-82).

Mr. Crickmer stated that the plant burns 10,000 tons of fuel material a day. An average 8,000 tons is supplied by the respondent's facility that transports it by trucks to the site, and 2,000 tons is trucked directly to the plant from other locations (Tr. 89). Mr. Crickmer described the fixtures and facilities on the respondent's property as a terminal office, a set of scales, an auger sampler owned by a contractor. The respondent owns the office and scales, as well as a small block building for storing grease, lubricants and work parts, and a pump house for a water tank used for road dust control. He further confirmed respondent's ownership of four storage yards, a sediment pond, and a $40,000 bath house facility required by MSHA (Tr. 90-91). He described the equipment as four rubber-tired end loaders equipped with computerized bucket scales, a dozer, a water truck, street sweeper, a road maintenance truck, a mobile stacking conveyor, and a pickup truck (Tr. 92).

8

Mr. Crickmer stated that the respondent handles different kinds of fuels purchased by Dominion, including wash coal from preparation plants, run-of-mine-coal, coal refuse, and gob, biomass wood products. Also included is wood products and biomass consisting of trees, "week" and brush that is ground to a certain specification and blended in with solid fuel at Dominion's furnace. He stated "it's just wood that's been ground up, which is critical and it has to be sized properly to work in the plant" (Tr. 93).

Mr. Crickmer described the Dominion Power Plant as "a very special" operation designed to burn coal, biomass, blended in with limestone for emission control". He explained how the materials are processed and burned with the special specified fuel because all of the materials have to meet the proper specifications to react properly in the furnace burn chamber that may not otherwise be used at other power plants, and this includes coal refuse, gob, and wood (Tr. 94-95). He stated that the respondent currently receives coal or gob from approximately 15 to 16 Kentucky and Virginia producers. He confirmed that the respondent works for Dominion Power under the stipulated terminalling agreement (Tr. 96-98; Ex. G-4).

Mr. Crickmer stated that the respondent does not, and never has, owned any of the coal related materials delivered by contractor trucks to its site. Pursuant to the agreement with Dominion Power, the respondent is paid so much a ton for the materials as weighed at the scales. Further, all of the respondent's operational costs, including the wages of the foreman and hourly employees, except for the manager, are fully reimbursed by Dominion to the respondent. All fuel materials delivered to the site are paid for by Dominion directly to the producers (Tr. 100-101).

Mr. Crickmer explained that on any given day, the fuel materials ordered by Dominion Power to be trucked to the respondent's site are weighed and recorded by the computerized scales and sampled by a third party contracted by the respondent, and then trucked to any of four storage yard areas (A through D), where it is dumped, segregated, and stored into one particular pile for particular producers. The fuel delivered for that day is kept segregated for that day because it has a certain quality. This procedure is followed for all 16 producers who delivered the fuel materials that day. Dominion Power and the respondent would receive computerized reports reflecting the exact fuel quality for the fuel delivered that day (Tr. 102-103; Ex. R-3). Mr. Crickmer explained the fuel blending process that takes place as follows at (Tr. 103):

> So we keep that fuel segregated for that one particular day because it has a certain quality. And we do this for all 16 producers, whoever we have coming that day. And then we get all the qualities the next day. And then Dominion directs us daily to take this quality coal, so much of this material and so much of that material and so much of this material and blend it together by one bucket of this, two buckets of that. Literally is says that. You have the sheets there that come from Dominion Power that says that into a pile.

9

**319**

In the event the blending samples reflect a need to improve the quality of the material, it will be blended as described by Mr. Crickmer at (Tr. 104):

> So we will re-blend the entire pile again based upon their direction, add so much more of this pile to it, be it a higher BTU or a lower BTU, because that is so critical for the firing in the plant, this blended fuel spec, that it has to be right on the mark. So Dominion makes that call. And sometime we'll reblend a pile two or three times to get it exactly what they want before they take it across the street.

Mr. Crickmer stated after the fuel materials are blended at the desired quality range, the respondent uses two or three contractor truckers who are allowed on Dominion Power's property to deliver the desired daily tonnage ranging from 8,000 to 15,000 tons across the street to the plant. He stated that on any normal operating day the respondent will handle 300 to 500 tractor trailers coming in and out of its site and 150 to 200 truckloads a day will go to the plant (Tr. 104-105).

Mr. Crickmer identified Exhibit R-2 as a survey map of the respondent's property showing the locations of the four fuel material storage areas A through D, the truck scales, and the auger samples (Tr. 105-106). He further identified Exhibit R-3, as a typical example of a blending instruction sheet, provided to the respondent from Dominion every day, and sometimes bi-daily, identifying a particular storage pile and instructions to "Mix this blend, and it tells you exactly, and the moisture" (Tr. 107-108). Further examples are stated as follows at (Tr. 108):

> THE WITNESS: No, that's okay. This right here says "Please blend 908A –which is our product – "5 buckets of Omega with 4 buckets of Gobco/ETI for pile Aa."
> BTU should be 7950, 39 percent ash, 5.9 percent moisture. "I have attached a spreadsheet with calculations." In yard B —

Mr. Crickmer cited an example of blending calculations made by the respondent with respect to the fuel purchased by Dominion from all of its producers as follows: (Ex. 3, Tr. 109).

> THE WITNESS: This is how many buckets. There's 207.98 buckets in that pile. This is the percent. And in the blended pile they want two buckets of that. They want three buckets of Pevler. They want three buckets of IBCS and one bucket of South East. So it actually gives us a 6.5 moisture, a 39 ash, a .9 sulfur, and 7600 BTU. Now, these are all critical things for that power plant's furnace. That BTU has to be right on the money. That sulfur has to be within the limits required by the law. And, of course, ash is, you know, a byproduct of the BTU. (Ex. R-3; Tr. 109).

10

Mr. Crickmer further identified information received daily by the respondent from all of the coal fuel producers with respect to the different quality specifications utilized during its blending process. He stated the information is tracked by Dominion's computers "so that all these products are properly blended together" (Tr. 112). He explained that Dominion's plant is not a standard coal-fired plant that utilizes fuel that is blown into a furnace. He described Dominion's plant as "a fluidized bed plant" that utilizes other materials such as limestone for its furnace reaction chambers to insure the required critical combustion and the removal of emissions (Tr. 110-111). He stated that OSHA, EPA, and "DEQ" have jurisdiction over the plant's operations (Tr. 111).

Mr. Crickmer believed that the coal fuel delivered to the respondent's site has been crushed and sized, and he assumed that the producers of the coal have done this prior to its sale to Dominion in order to meet its specifications. No coal crushing, sizing, or washing is done at the respondent's site. He stated that "all we do is take different fuels purchased by Dominion, which they own, and we blend it to whatever specifications they want for the next day to burn at the plant on two days". He confirmed that the coal meets Dominion's preparatory size specifications, and if not, Dominion would reject the coal until it was properly sized (Tr. 114). He explained that the Dominion plant is unique in that all fuel material is trucked in daily, and when its inventory is full, it only has a nine to ten day supply, whereas most coal-fired plants have 60 to 90 day inventory. He stated that the respondent provides a service to Dominion by storing an additional eight days of purchased fuel on its site (Tr. 115).

Mr. Crickmer stated that the respondent has never been in the coal business, and that its site was designed to perform the daily work that he has described. He confirmed that he was familiar with the work performed at coal preparation plants and was responsible for such a plant when he worked at Clinchfield Coal. He explained that a preparation plant washes, screens, and sizes coal pursuant to the specified specifications from the customers it services (Tr. 122-123).

Mr. Crickmer stated that the respondent does nothing to improve the quality of any fuel product, and it never screens, washes, or sizes it "other than take exactly what's been brought in there by Dominion and put it in a blend to fuel their furnace" (Tr. 123). He explained that the coal was crushed and screened by the coal producers to meet Dominion's BTU, sulfur, or moisture specifications. He stated that the respondent furnishes approximately 80% of the fuel it handles and delivers directly to the Dominion plant, and that 20% of the material does not come to the respondent's site and is delivered directly by truckers ordered by Dominion (Tr. 123-124).

Mr. Crickmer stated that the "fine tuning" of the "spec fuel" that arrives at the respondent's site is not done by any of the coal producers, and the respondent receives a variety of coal blends purchased by Dominion that is to be blended before it can be delivered to its plant. He explained that coal blending, sampling, and analysis takes place at the respondent's site daily, and changes daily "six days a week all year long" (Tr. 124).

11

Mr. Crickmer stated that in the event the respondent did not do the blending work, Dominion would have to it because the plant requires the desired fuel specification (Tr. 125). He explained that when he established the respondent's site he consulted with the State Department of Mining Minerals and Energy and informed its director that the respondent "would work for Dominion to handle trucks, store their fuel, re-blend it to spec and haul it across the street". He stated that he was informed that he was not a coal mine, did not need a mine license, was not a wash plant, and was not subject to the State's jurisdiction, and was referred to OSHA signs, brochures, and forms for visitors to sign, and operated that way until MSHA appeared (Tr. 125-126).

On cross-examination , Mr. Crickmer confirmed that the respondent blends coal on behalf of Dominion, stores it at the respondent's facility and loads and delivers it across the street to the Dominion plant as directed. He confirmed that the stipulated Terminalling Agreement defines its work responsibilities on behalf of Dominion with respect to the blending and delivery of the coal to the plant. He stated that the respondent is a custom blending facility for Dominion and that the work it performs is done to meet Dominion's requirements and specifications (Tr. 127-128). He characterized this work and the term "custom" as follows:

A.   It makes a buyer's spec fuel that really changes daily or weekly. And they change it based upon the heat rate of the furnace. It's a custom fuel. And we do that work for Dominion. We make that spec fuel for them with fuels that they own. They buy fuels from many people and we take those fuels and we make that spec fuel. (Tr. 128).

Mr. Crickmer further confirmed that "solid fuel" is defined by the agreement as coal, coal refuse, and coal midds or gob (Tr. 129). He stated that the biomass handled by the respondent is covered by a separate agreement and it is the only product that it has ever purchased and owned for that business. He confirmed that it provides biomass for Dominion and ground end sized 1,000 truckloads of wood materials in 2012, to Dominion outside of the agreement (Tr. 129-130).

Mr. Crickmer explained that the respondent is not responsible for any erroneous blend or loss in a stockpile, and commented "that is all 100 percent Dominion", and "if they told me to blend it this way and it came out something they didn't like, it's not my responsibility. I only do what I'm told to do". He confirmed that Dominion can perform re-blending at its site through its reclaim systems that senses sulfur, moisture, or ash in both piles (Tr. 137-138).

12

<u>The Jurisdictional Issues</u>

The Secretary's Arguments

The Secretary relies on the testimony of MSHA Inspector Thomas C. Bower, who confirmed his site inspections in December 2012, and April 2013, when he observed the loaded coal trucks transporting the coal onto the property where it was weighed, sampled, and stored in designated areas, and blended using front-end loaders that mixed and combined different types of coal and stored in separate stockpiles to create a custom coal blend.

The Secretary further cites the testimony of MSHA Special Investigator Robert D. Clay, who initially observed coal trucks entering the site, and his further observations after he was invited onto to the property by site foreman Bobby Ketron. Mr. Clay observed front-end loaders, weighing scales, a coal sampling unit, a water tank, and several coal trucks coming onto the property. He testified that Mr. Kentron informed him that coal trucks delivered coal to the blending yard where front-end loaders blended the coal together to meet certain specifications. The blended coal was stored and eventually transported to the Dominion Power Plant across the street from the respondent's facility.

The Secretary further relies on the testimony of Walter B. Crickmer, the respondent's co-owner and facility manager who confirmed the Terminalling Agreement between the respondent and Dominion Power specifying the services provided by the respondent, including the blending of solid fuel in accordance with the requirements of the customer, and the loading of trucks and shipment of solid fuel to Dominion's plant (Tr. 127-128); Exhibit G-4, pg. 4.301(a)(iv)(v)).

The Secretary cites the definition of "solid fuel" in the Agreement as "coal, coal refuse, coal midds, or gob" and refers to Dominion Power as the "Customer" of Power Fuels, LLC (Ex. G-4, at 1, 2; Tr. 129). The Secretary cites Mr. Crickmer's testimony that the respondent receives daily instructions, sometimes bi-daily, from Dominion Power that directs it on how to create a custom coal blend that meets Dominion Power's specifications as noted in Exhibit R3.

The Secretary further cites Mr. Crickmer's testimony that it was "critical" for the respondent to make a custom coal blend that meets Dominion's precise specifications in order for the power plant furnace to operate correctly and his explanation that "All we do is take different fuels purchased by Dominion, which they own, and we blend to whatever specifications they want for the next day burn at the power plant" (Tr. 114). The Secretary refers to the following testimony and admissions by Mr. Crickmer:

1.  The respondent "provides a big service" for Dominion because it stores large quantities of coal, and that since Dominion can only store up to eight days of power-

13

**323**

plant-ready coal at its plant, storage at the respondent's facility reduces Dominion's storage needs on its own premises (Tr. 115, 126).

2.   The respondent's facility has four different storage areas where trucks are routinely loaded with blended coal and taken to an auger sampler that tests the coal to insure it meets Dominion's specifications and transported across the street to the Dominion Power Plant (Tr. 102-103, 126; Ex. G-7).

3.   The respondent "is a custom blending facility" for Dominion Power, blends coal that it receives from approximately 16 different producing mines, and that the work it performs is done for the purpose of meeting Dominion's specifications and requirements (Tr. 97, 126, 128).

The Secretary asserts that under the plain language of the Mine Act, the respondent's blending facility is a "mine" for purposes of Mine Act enforcement jurisdiction.  The Secretary cites Section 4 of the Act that each "coal or other mine" whose products affect commerce shall be subject to the Act, and that "Coal or other mine" is defined in Section 3(h)(1) of the Mine Act to include:

> (C) lands . . . structures, facilities, equipment, machines, tools, or other property . . . used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in non-liquid form . . . or used in, or to be used in, the milling of such minerals or the work of preparing coal or other minerals, and includes custom coal preparation facilities (30 U.S.C. 802(h)(i)).

The Secretary cites the definition of "work of preparing the coal" at Section 3(i) of the Mine Act as:

> . . . the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite or anthracite, and such other work of preparing coal as is usually done by the operator of the coal mine (30 U.S.C. 802(i)).

The Secretary asserts that the record in this case makes it abundantly clear that the respondent is a custom coal preparation facility that is "used in" the "work of preparing coal", and that it undisputed that it mixes, blends, loads, weighs, samples, and stores bituminous coal for the sole purpose of meeting the specifications and requirements of its customer Dominion Power.  The Secretary concludes that these coal preparation activities confer Mine Act enforcement jurisdiction over the respondent's blending terminal, and that a plain reading of Mine Act Section 4 requires the conclusion that the terminal operation is a "custom preparation facility" within 30 U.S.C. 802(h)(1).  In this regard, the Secretary cites Mr. Crickmer's

14

admission that the respondent "is a custom blending facility" for its customer Dominion Power (Tr. 128).

The Secretary cites the Commission's decision in Mineral Coal Sales, Inc., 7 FMSHRC 615 (1985), affirming my jurisdictional finding over a commercial loading facility, a railway siding that the Secretary states performed coal preparation function similar to the work performed by the respondent in the instant matter, namely the blending of different types of coal together to meet customer's specifications and loaded the blended coal for transport activities are specifically listed in the Mine Act as constituting "the work of preparing the coal". In that case, although the Commission stated that merely performing one or more of the statutorily enumerated activities is not solely determinative of whether the facility is properly classified as a "mine", it nonetheless noted that the inquiry must also focus on the nature of the operation performing the activities and whether the work is "undertaken to make coal suitable for a particular use or to meet market specifications".

The Secretary emphasizes that the Commission ultimately concluded that the operations taking place at Mineral Coal Sales, when viewed as a collective whole, indicated that the facility was a "mine" because it performed preparation work to make coal suitable for customer specifications, and rejected Mineral Coal Sales' contention that its work of merely blending different types of coal from different stockpiles under the direction and control of another entity does not constitute coal preparation. The Secretary concludes that the preparation work performed at the Mineral Coal Sales facility is virtually identical to the blending work performed by the respondent and falls within MSHA's jurisdiction.

The Secretary states that assuming arguendo that the court finds that Sections 802(h)(1)(C) and (i) are ambiguous with respect to whether they allow MSHA to assert enforcement jurisdiction over a custom coal preparation plant that engages in further preparation of previously processed coal to meet the specifications of the coal's ultimate consumer, the Secretary's reasonable interpretation of the Act is entitled to deference. Citing Secretary v. National Cement Co., 573 F.3d 788 (D.C. Cir. 2009I) (deferring to MSHA's finding of Mine Act jurisdiction over a road leading up to a cement plant), and Secretary v. Carolina Stalite Co., 734 F.2d 1547 (D.C. Cir. 1984) (deferring to MSHA's jurisdictional determination that a slate gravel processing facility that did not extract slate but processed it for commercial purposes was a "mine" within the meaning of the Mine Act.

The Secretary argues that his interpretation that the work performed at the respondent's blending facility constitutes the "work of preparing the coal" is reasonable and entitled to deference, citing the cases of Mineral Sales, Inc. and Kinder Morgan Operating, supra with "strikingly similar facts to the case as bar" with respect to the undisputed statutorily enumerated coal preparation activities performed by the respondent that include the "mixing, storing, and loading of bituminous coal" functions specified in 30 U.S.C. 802(i).

15

**325**

The Secretary maintains that his interpretation of 30 U.S.C. 802(h)(1)(C) and 802(i) is reasonable and that by enacting the Mine Act Congress sought to prevent "unsafe and unhealthful conditions and practices in . . . coal or other mines," 30 U.S.C. Section 801(b), and that it furthers the safety and health goals of the Act to cover, to the maximum extent consistent with the statutory terms, workers subject to the conditions, practices and hazards associated with coal preparation, and that deference to the Secretary's interpretation is additionally warranted because 30 U.S.C. 802(h)(1)(C) "expressly authorize(es) the Secretary to define what constitutes a "mine." Otis Elevator Co. v. Secretary, 921 F.2d 1285, 1288 n.1 (D.C. Cir. 1990).

The Secretary states that the respondent introduced no facts or evidence to support its contention that MSHA has no jurisdiction over its blending facility and rejects its principal defense that its mixing, storing, and loading work is not the type of coal preparation work that "is usually done by the operator of the coal mine", and as such should be treated like the ultimate consumer of the coal instead of a mine operator. The Secretary responds to the respondent's contention that if it did not perform the custom blending work for Dominion, Dominion would have to perform these coal preparation activities for itself , and takes the position that the respondent seeks to be treated as the ultimate consumer of the coal, instead of the contractor it actually is that prepares the coal to meet the specifications of the ultimate consumer, and that its argument has no basis in fact or logic and should be rejected.

In response to the respondent's suggestion that the Secretary's jurisdictional interpretation would expose any place that mixes, stores, or loads coal to MSHA's enforcement scrutiny, the Secretary states that simply storing or loading coal would not subject the coal end-user to MSHA's jurisdiction. The Secretary concludes that his asserted enforcement jurisdiction is consistent with the Commissions analysis in Elam, supra, and the reasoning stated in Mineral Coal Sales, supra, and Kinder Morgan Operating, supra.

The Secretary further cites the Third Circuit Federal Court of Appeals decision in RNS Service, Inc. v. FMSHRC, 115 F.3d 182 (1997), concerning a site that processed coal refuse that was delivered to a co-generation facility generating electricity and steam where it was further prepared in a useable form by its ultimate consumer. The Court affirmed the Commission's functional analysis holding that the loading and transportation of the coal that occurred at the site were sufficient to render the site a mine, and rejected the assertion by RNS Services that the Commission made a per se ruling that simply loading and transporting the coal rendered the site a "mine".

With respect to the facts supporting the alleged violations, the Secretary relies on the testimony of Inspector Bower as previously noted, including the joint stipulated evidentiary admission of the citations were received for the record, without objection, except as to

16

**326**

jurisdiction. Further, the Secretary takes the position that if MSHA's jurisdictional claims are affirmed, the citations and proposed civil penalty assessments should also be affirmed..

The Respondent's Arguments:

The respondent argues that the critical question in this case is whether any mixing, storing, or loading of coal is subject to the jurisdiction of the Act, as contended by the Secretary, or whether the mixing, storing, and loading must be the type of work usually performed by the operator of a coal mine. The respondent asserts that if the Secretary is correct that any mixing, storing, or loading of coal is sufficient to establish MSHA jurisdiction, then any consumer who mixes, stores, or loads coal is the operator of a coal mine. Conceding the fact that the Mine Act confers broad jurisdiction on MSHA, the respondent maintains that it does not go that far.

The respondent argues that the work normally performed by coal consumers is not subject to the Mine Act, and that in the instant case the respondent is doing blending work for the consumer of the coal, not for the producers of the coal. The respondent maintains that the work that it performs is the type of work that is generally performed by a consumer, and the fact that the consumer has contracted with the respondent to perform this work, instead of doing it with its own employees, does not change the character of the work or allow MSHA to assert jurisdiction.

The respondent relies on several Commission and ALJ jurisdictional issue decisions in support of its case. Addressing the critical issue with respect to the connection that must exist between the work in question and the usual work of mining, the respondent cites Secretary of Labor v. Oliver M. Jr., Co., 4 FMSHRC 51 (1982I), a case involving an operator of a commercial dock on the Ohio River, and affirming an ALJ decision that Elam's facility was not a "mine" subject to Mine Act jurisdiction.

The respondent states that although Elam crushed and loaded coal onto barges, the Commission held that the dock was not a "coal or other mine," and that just because it handled coal it did not mean it was engaged in "the work of preparing the coal." To fall within the definition, the Commission concluded that the work must involve more than the "breaking crushing, sizing, cleaning, washing, drying, measuring, storing, (or) loading" of coal. The work must be the kind of work "usually performed by the mine operator engaged in the extraction of the coal or by custom preparation facilities . . . ".

With regard to Secretary of Labor v. Mineral Coal Sales, Inc., 7 FMSHRC 615 (1985), the respondent points out that the Commission addressed a different situation involving a tipple operator at a siding that stored, mixed, crushed, sized, and loaded coal in order to make it "suitable for a particular use or to meet market specifications." The company processed the coal

for brokers, not consumers, and the Commission held that the company's operations were subject to the Act.

Citing my decision in Marion Docks, Inc. v. Secretary of Labor, 10 FMSHRC 1598 (1988), a case involving a coal loading tipple facility that loaded and shipped coal by river barges to several utility customers who purchase the coal from brokers, the respondent points out that the facility was not the consumer of the coal, and did not work for the consumer of the coal, and only worked for brokers who sold the coal to utilities.

The respondent cites my decision in Secretary v. Consolidation Coal Company, 35 FMSHRC 439 (2013), involving a coal loading facility that received processed coal from an adjacent preparation plant. The respondent states that the case involved two facilities, namely (1) a coal loading facility that was essentially an extension of the preparation plant, and (2) a barge onto which the coal was loaded. The respondent states that the loading facility where the work of loading work that included the layering of the coal to meet the mine customer's specifications was held to be subject to the Mine Act, "but the barge was not, . . . and simply transported the loaded coal" (pg. 9, post-hearing brief). The respondent further addresses two Federal Court of Appeals cases relied on by the Secretary with respect to what constitutes a mine. RNS Services, Inc. v. FMSHRC, 115 v. F. 3d 182 (3d Cir. 1997), and Kinder Morgan Operating, L.P. v. Chao, 78 F. App'x 462 (6th Cir. 2003) (unpublished); (Commission Decision at 23 FMSHRC 1288, 1294 (2001)).

With respect to RNS Services, Inc., the respondent states that RNS loaded coal refuse at a refuse site, and that the Court, in a 2-1 decision, the majority applied a functional analysis focusing on the nature of the work being performed at the site and held that RNS was subject to the Act. Even so, the respondent argues that the majority disclaimed the view that any loading of coal was subject to the Act, and that in order to constitute a mine, the coal must be loaded "at a place regularly used for the purpose, in preparation for further processing, and that the "loading of the coal is a critical step in the processing of minerals extracted from the earth in preparation for their receipt by an end-user. . . ." Id. At 185. The respondent notes the dissent argument that the Commission had applied a per se ruling making any loading of coal subject to the Act. Id. At 192 (Alito, J., dissenting).

With regard to the Kinder Morgan Operating decision, involving a marine loading facility that received and loaded coal, mostly for the Tennessee Valley Authority (TVA), and that the TVA purchased the coal from numerous producers, and that Kinder Morgan stored and blended the coal into different products for different plants. The respondent points out that the Commission split 2-2 on whether the Mine Act applied to Kinder Morgan's operation, and concedes that the 6th Circuit found MSHA jurisdiction and adopted the reasoning of the two Commissioners who voted to uphold jurisdiction based on their reasoning that Kinder Morgan was performing work "usually performed by the operator of a coal mine by undertaking the

18

**328**

activities to make the coal suitable for a particular use or to meet market specifications." 23 FMSHRC 1288, 1294 (2001).

The respondent cites several additional Court opinions that it believes make it clear that storing, loading, and mixing coal are themselves insufficient to support jurisdiction, and that otherwise, anyone who handles coal would be covered by the Act. The respondent concludes that the storing, loading, and mixing must be part of a mine's operations. In support of its argument, the respondent cites Herman v. Associated Elec. Coop. Inc., 172 F. 3d 1078 (8th Cir. 1999), stating "not all businesses that perform tasks listed under the 'work of preparing coal' in Section 802(i) can be considered mines." Id. At 1082, and that while utilities may be subject to the Act if they maintain a presence at the mine and assist in mining or loading the coal or if they engage in coal preparation of the type performed by mine operators, "a utility that receives processed coal from a mine does not itself become a 'mine' by further processing the coal for combustion." Id. At 1083. Thus, once a producer delivers processed, marketable coal to a utility, the jurisdiction of MSHA ends, even though the utility may do further blending of the product. Id.

The respondent argues that the Fourth Circuit made this same point in United Energy Services, Inc. v. MSHA, 35 F. 3d 971 (4th Cir. 1994), involving the operator of a power plant that went onto mine property and loaded coal refuse from a pile and transported it to the plant. Id at 973. Employing a functional analysis, the Fourth Circuit found that the plant operator was engaged in the work of preparing the coal. Id. At 975. The respondent asserts that the Court was careful to rule, however, that the same analysis would not apply once the coal was delivered to the plant.

The respondent asserts that the following facts are not contradicted:

1. Dominion purchases coal from various producers.
2. The coal is delivered to the Power Fuels site by contract truckers for the producers.
3. Dominion owns all of the coal that is delivered to the site.
4. Power Fuels is a contractor for Dominion under a Terminalling Agreement.
5. Power Fuels weighs, samples and stores the coal for Dominion.
6. Dominion instructs Power Fuels how to blend and deliver the coal.
7. Dominion does so to achieve the desired burn for the fuel going into its plant.
8. Dominion is the sole consumer of the coal at the Power Fuels site.
9. If Power Fuels did not store and blend the coal for Dominion, Dominion would have to do the work itself or find another contractor to do it.
10. The work performed by Power Fuels is work that is usually performed by utilities or other consumers of coal. It is not the type of work performed by producers or brokers of coal.

19

**329**

The respondent concludes that the activities listed in 30 U.S.C. Section 802(i) as being part of the "work of preparing the coal" are limited by the phrase "as is usually done by the operator of the coal mine." If the storing, loading, and mining is the type of work usually performed by the mine operator, the work is subject to the Act. On the other hand, if the work is not of that type, but is work of the type usually performed by a utility or other consumer of the coal, the work is not subject to the Act. In this regard, the respondent asserts that MSHA's Special Investigator Robert Clay testified that the activities in question occurred on the property of Dominion, MSHA would not have considered the to be within its jurisdiction. In other words, if Dominion had done the work itself, the agency would not have asserted jurisdiction. The respondent concludes that if the activities are not subject to the Act when performed by Dominion, then they are not subject to the Act when performed by a contractor for Dominion, and that any other interpretation would lead to the extreme and unreasonable position that MSHA has jurisdiction over everyone who receives and handles coal.

Findings and Conclusions

## Jurisdiction

The essence and focus of the respondent's jurisdictional argument is the statutory language defining a coal mine, and the meaning of the phrases "work of preparing the coal" , and "such other work of preparing such coal as is usually done by the operator of the coal mine". At hearing, the respondent's counsel argued that any work associated with the blending, mixing, and storage of coal does not ipso facto constitute "work of preparing the coal", and does not necessarily result in MSHA jurisdiction (Tr. 133-134).

The respondent maintains that "a line must be drawn", particularly in view of the statutory language requiring a showing that the kind of work performed is the kind that is usually done by a coal mine operator (Tr. 133-134). In support of its argument, the respondent relies on the dissenting judge (now Supreme Court Justice Alioto) in RNS Services, Inc., supra that not every mining, washing, sizing, or trucking of coal is a coal mine, and that the kind of work must be the kind done by the coal operator.

The respondent dismisses any suggestion that the work it performs is done for a customer, or that it was "some kind of a middle man custom blending coal to sell into a market", and asserts that it is in fact a contractor for the Dominion Power Plant that is not its customer "in a sales sense" (Tr. 137). In response to these arguments, the Secretary maintains that the case law cited and relied on in this case to support MSHA jurisdiction is clear that the line is drawn where the work of mixing, storage, and loading of coal is done to meet a customer's specifications (Tr. 135).

20

**330**

I reject the respondent's claim that Dominion Power is not its customer. The terminalling agreement specifically describes Dominion Power as a "customer" numerous times at pages one through eight (Ex. G-4). Further, the respondent's site manager Walter Crickmer in describing the blending of coal at the site pursuant to the agreement stated this is done "in accordance with the reasonable requirements of the customers" (Tr. 127). He also confirmed that the site is "a custom blending facility for Dominion Power", and that all work performed "is done to meet the requirements and specifications" of Dominion Power (Tr. 128). Accordingly, I conclude and find that Dominion Power is in fact the respondent's customer.

The respondent's assertion that Inspector Clay, at (Tr. 69-72), testified that in the event the trucks he observed were delivering coal directly to Dominion's power plant, MSHA would not have asserted jurisdiction must be considered in context. In fact, Mr. Clay testified that he had "no idea" because he does not inspect power company property unless MSHA jurisdiction is factually determined, and that was his understanding that MSHA's claim of site jurisdiction is based on the working activities he only observed taking place at the respondent's property (Tr. 69-70). Further, when asked if he would be present at the hearing in this case if he had observed the trucks going directly into the plant, inspector Clay stated he probably would be present at the hearing because MSHA's assistant district manager, his superior, "asked me to look into it and I reported to him what I found" (Tr. 73). Further, in response to whether MSHA has asserted its jurisdiction over other power plants in District 5, he confirmed that the only power plant he was asked to look at was Dominion's plant jurisdiction there" (Tr. 73).

The respondent's conclusion that in my Consolidation Coal case, I found the layer loading of coal at the loading dock at that facility location that includes a fixed barge constituted "work in preparing coal" to meet customer specifications is correct. However, the respondent's assertion that I found that "a barge on which the coal was loaded" was a "facility" not subject to MSHA jurisdiction because "it simply transported the coal is incorrect and mis-leading. I made no finding the barge was a "facility". The barge in issue was an empty barge on the Ohio River located away from the loading dock location where no layer loading was taking place.

I take particular note of the Court majority in RNS Services, Inc. supra, rejecting the dissenting opinion that the Commission applied a per se ruling in that case. Indeed, the Court noted that the Commission was cognizant of the fact that coal refuse was loaded at the site in question for delivery to its power generator facility and correctly applied a "functional analysis" test in determining that the coal loaded and store at that site was in fact loaded at a place regularly used for that purpose, and were sufficient to render the sites of these activities a "mine".

21

**331**

I conclude and find that the resolution of jurisdiction in this case is properly and reasonably made pursuant to a "functional analysis" as described in RNS Services, Inc., and Oliver M. Elam, as well as in Mineral Coal Sales, Inc., Marion Docks, Inc., and Kinder Morgan Operating Supra, decisions that I find persuasive and controlling precedents in this case.

Although the Court decisions in Herman v. Associated Elec. Coop., Inc. and United Energy Services, Inc. v. FMSHRC, supra, relied on by the respondent may support its argument that mixing, storage, and loading of coal work are not per se operational indicators supporting Mine Act jurisdiction, those cases dealt with consumer electrical power plant sites, and not sites similar to those at the respondent's facility. In Herman, the Court found its operations to be "manufacturing" subject to OSHA jurisdiction. In United Energy Services, Inc., the Court applied a functional analysis in concluding that a power plant operator that went on mine property and loaded refuse from a pile and transported it to its plant was engaged in coal preparation work that is subject to Mine Act jurisdiction.

I am not persuaded by the respondent's arguments that the work it performs for Dominion Power is work that is usually performed by utilities or other coal consumers, and is not the type of work performed by coal producers or brokers. The respondent is not a power plant, utility, consumer, or a coal producer or broker, and the fact that it does not engage in those activities is not relevant in this case.     The credible evidence and un-rebutted facts in this case clearly establishes that the respondent is a stand-alone coal blending facility identified as such by signs prominently displayed on its property. The site location includes mobile equipment such as several trucks, end-loaders, an office, a bath house, sampling and weight scales, clearly identified storage areas, and a water tank and trucks, all of which provide the logistical support for the employees as they perform their assigned duties related to the receipt, testing, weighing, blending, mixing, storage, and transportation of coal from that site in order to meet the coal specifications that are communicated to the respondent by Dominion Power on a daily continual basis.

I am not further persuaded by the respondent's argument that if it did not store and blend the coal for Dominion, Dominion would have to do the work itself or find another contractor to do it. In this case, no entity other than the respondent is the subject of MSHA's asserted jurisdiction and I assume it operates under a mine ID number assigned by MSHA to a mine operator pursuant to 30 C.F.R., Part 41. In any event, pursuant to Section 3(d) of the Mine Act, the definition of an "operator" includes any contractor performing services at a mine. Further, I find that the respondent cannot avoid the Secretary's enforcement scrutiny because it is contractually obligated to perform these services for Dominion Power.

22

Although the respondent's site manager, Walter Crickmer, testified that no sizing, screening, or crushing activities take place at the site and has "never done anything to improve the coal quality", he nonetheless admitted that the site does in fact blend the coal together on a daily basis using its end-loaders that mix and blend it "by one bucket of this, and two buckets of that", following the aforementioned detailed specifications as to how the coal should be blended. Contrary to Mr. Crickmer's opinion that the work performed at the site has nothing to do with the quality of the coal it processes, I find the credible evidence with respect to the testing, blending, and re-blending as necessary, are directly accomplished in order to insure and maintain the consistent quality of the coal pursuant to Dominion's quality specifications.

I conclude and find that the working activities taking place at the respondent's site, namely, the mixing, blending, weighing, sampling, storing, loading, and transporting coal to Dominion's plant clearly meets the Mine Act definition of "work of preparing the coal", and that this work is clearly done to meet the specifications of its customer, Dominion Power. I further conclude and find that the respondent's custom coal blending facility is a "coal or other mine" clearly within the statutory definitions found in the Mine Act, and is therefore subject to the Mine Act and the Secretary's enforcement jurisdiction. The respondent's arguments to the contrary ARE REJECTED.

<u>The Alleged Violations</u>

In support of the citations in issue, the Secretary relies on the testimony of MSHA Inspector Thomas Bower that I find credible and un-rebutted. The respondent availed itself of the opportunity to cross-examine the inspector, but focused primarily on questions related to jurisdiction rather than facts related to the conditions or practices that prompted the inspector to issue the citations with his findings noted on the face of the citations. The respondent presented no credible evidence to rebut the Secretary's position with respect to the facts associated to the violations in issue. In this regard, I informed the parties that I expected to hear testimony concerning the three alleged violations, as well as the jurisdictional issue. I further informed the parties that I did not intend to come back to try the three citations and the respondent clearly understood that this was the case (Tr. 19-20). Further, my hearing notice informed the parties that the issues to be addressed included testimony related to the violations.

The respondent's statement at page two of its post-hearing brief that I permitted the parties to file briefs "on the issue of jurisdiction" suggests that I limited any briefing to that issue alone is incorrect. My expectation of briefs was not limited to jurisdictional issues, with the exclusion of any arguments related to the alleged violations. At the conclusion of the hearing, the respondent stated that briefs would be helpful (Tr. 140).

23

**333**

Further, when asked if the respondent wished to discuss the violations, the counsel stated "no sir" and "we rest" (Tr. 138). Although the respondent could have called the foreman who received the citations to testify, it did not do so. During opening statements, the respondent stated "We think the citations are relevant on the jurisdictional issues" (Tr. 19). The Secretary stated his intention to initially establish jurisdiction and then proceed to each of the citations (Tr. 20).

The Secretary's assertions at page 13 of his post-hearing brief that "The facts of the alleged violations at issue in these proceedings are not in dispute", citing ALJ Exhibit 1, and the trial transcript at pages 6 and 17 are inaccurate. ALJ Exhibit 1 concerns a joint stipulation with respect to the admission of the citations in issue into evidence "without objection, except to jurisdiction". Each of the citations is described by the citation number, the date of issue, and the cited mandatory safety standard. I find nothing to suggest that the parties agreed that the factual conditions or practices described by the inspector on the face of each of the citations were not in dispute or otherwise agreed to by the parties.

At page 6 of the transcript, I commented that the principal issue concerned jurisdiction, and acknowledged the pre-trial position statement filed by the Secretary on November 15, 2013, with a copy furnished to the respondent. The Secretary's statement includes the intention to call the inspectors who testified in this case, with the expectation of eliciting testimony including the factual basis for the issuance of the citations. At page 3 of the statement, the Secretary acknowledged that the issues to be litigated also included gravity, negligence, and the proposed civil penalty assessments. The Secretary's reference to page 17 of the transcript reflects a comment by the Secretary's counsel stating "and as Mr. Massie said, the facts really aren't in dispute". I also note a statement by counsel at transcript page 11 that "there are going to be disputes about the facts . . . There will be differences about what the facts mean".

Based on all of the aforementioned circumstances, any suggestion that the respondent was not expected to address the fact of violations at the hearing, or was somehow misled, prejudiced, or treated unfairly for not doing so IS REJECTED. I conclude and find that the respondent has waived its right and opportunity to present a defense or to rebut the Secretary's evidence in support of the violations. I further find that the credible and unrebutted testimony of Inspector Bower establishes that the conditions and practices described in the citations constitute violations of the cited mandatory safety standards. Accordingly, the citations ARE AFFIRMED.

24

**334**

### History of Prior Violations

Exhibit A to the Secretary's petition for assessment of civil penalties reflects no prior or repeat violations, and no further information was received from the Secretary. Absent any evidence to the contrary, I find the respondent has a good compliance record.

### Good Faith Compliance

Based on the timely corrective actions as reflected in the citation termination notices, I find that the respondent abated all of the violations in good faith.

### Negligence

Based on the inspector's credible testimony that the respondent's foreman was not responsible for any maintenance of the trucks delivering coal to the site, I accept and adopt his "low negligence" determinations with respect to each of the citations.

### Size of Business and Effect of Civil Penalty Assessments on the Respondent's Ability to Remain in Business

The Secretary characterized the respondent as a small mine operator (Tr. 139), and the parties stipulated that the payment of the proposed civil penalty assessments for the citations will not adversely affect the respondent's ability to continue in business. I adopt and incorporate these agreements as my findings.

### Gravity

Inspector Bower confirmed that he was not aware of any difficulties encountered by the cited trucks inbound to the site, and to his knowledge they arrived safely (Tr. 51). While this may be true, the fact remains that his un-rebutted and credible testimony clearly supports the cited truck brake conditions and defective backup alarm. Accordingly, I find that the violations were serious and would reasonably likely result in injuries.

### Significant and Substantial Determinations

Inspector Bower determined that all of the citations were significant and substantial (S & S) violations. With respect to Citation No. 820074, he testified that the cited truck braking defects that he characterized as "faulty brakes, resulted in a 25% loss of breaking power". He confirmed that the conditions exposed employees who regularly traveled the site roads to injuries, and that employees operating equipment were reasonably likely to suffer broken bones

25

**335**

or disabling and traumatic injuries in the event of an accident. He conceded this was "a worst case" scenario and lesser injuries were conceivable (Tr. 30-36).

The inspector cited another truck after determining the brakes were out of adjustment and that a leaking and defective air value resulted in a loss of braking air pressure that would reasonably likely result in an accident. He stated that a "runaway truck" could result in a collision accident resulting in permanently disabling injuries. (Citation No 8204726; Tr. 39-40)

The inspector cited the same truck after it was observed operating in reverse in congested working areas where employees were present and the back-alarm did not sound. He confirmed that the vehicle had an obstructed view to the rear, and that if it backed up over people working in the area, they would be exposed to crushing and permanently disabling injuries (Citation No. 8204725; Tr. 33-34).

The established case precedents with respect to S & S violations, Cement Div. Nat'l Gypsum Co., 3 FMSHRC 822, 825 (Apr. 1981), Mathies Coal Co., 6 FMSHRC 1, 3-4 (Jan. 1984), and U.S. Steel Mining Co., Inc., 7 FMSHRC 1125, 1129 (Aug. 1985), and U.S. Steel Mining Co., Inc., 6 FMSHRC 1574 (July 1984), require proof of the following elements that must be considered in terms of continued mining operations:

> In order to establish that a violation of a mandatory safety standard is significant and substantial under National Gypsum, the Secretary of Labor must prove: (1) the underlying violation of a mandatory safety standard; (2) a discrete safety hazard that is, a measure of danger to safety contributed to by the violation; (3) a reasonable likelihood that the hazard contributed to will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature.

I conclude and find that the affirmance of the violations establishes the first Mathies prong. With respect to the second prong requiring a discrete safety hazard contributed to by the violation, I conclude and find that the credible unrebutted testimony of Inspector Bower describing the defective truck braking systems, as well as the cited inoperative trucks backup alarm, presented discrete safety hazards and measures of danger contributed to by the violations pursuant to the second Mathies prong.

The third Mathies prong requires the presence of a reasonable likelihood that the hazard contributed to will result in an injury. The evaluation of the risk of injury necessarily assumes the continuance of normal mining operations. The credible and unrebutted testimony of the inspectors establishes that 30 to 50 loaded trucks arrived and entered the respondent's site on a daily basis with frequent stops at the weighing scale, the storage areas where the coal is dumped and blended by end-loaders. The trucks also traveled over inclined roadways on the property and the same roads used by the work force on foot.

26

Inspector Bower testified credibly that the trucks backed up in congested areas where workers and pieces of equipment are present, and that the cited facility brake conditions could prevent the truck from stopping as intended or result in a truck "runaway". Based on the brake defects that he found, as well as his accident investigator experience involving truck accidents under similar defective braking systems, he concluded that it was reasonably likely that an accident would occur causing a wreck, with the resulting serious injuries that he described. One of these trucks was also cited for an inoperative backup alarm and the inspector concluded that if it backed over anyone, they would likely suffer crushing and disabling injuries.

I conclude and find that the hazardous defective truck brakes and backup alarm conditions would reasonably likely contribute to an accident resulting in serious injuries to employees at risk in the event they were to continue with their normal working duties. Accordingly, I conclude and find that the third and fourth <u>Mathies</u> prongs have also been established. Accordingly, all of the inspector's S & S determinations ARE AFFIRMED.


ORDER

Based on all of the aforementioned findings and conclusions in this case, including the civil penalty assessment criteria found in Section 110(i) of the Mine Act, all of the citations ARE AFFIRMED. Further, I accept and affirm the proposed penalty assessments of $100 for each of the citations (8204724, 8204725, and 8204726).

The respondent shall pay a civil penalty assessment of $300 for the violations within thirty (30) days of the date of this Order. Payment shall be submitted to the Mine Safety and Health Administration (MSHA), U.S. Department of Labor, Payment Office, P.O. Box 790390, St. Louis, MO 63179-0390, referencing the captioned docket numbers. Upon receipt of payment, these proceedings ARE DISMISSED.

*George A. Koutras*

George A. Koutras
Administrative Law Judge


Distribution:

Anthony D. Jones, Esq., U.S. Department of Labor, Office of the Solicitor, 1100 Wilson Boulevard, 22nd Floor, Arlington, VA 22209-2296

Wade W. Massie, Penn, Stuart, & Eskridge, P.O. Box 2288, Abingdon, VA 24212

27

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | |
|---|---|
| SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION, (MSHA), | ) CIVIL PENALTY PROCEEDING ) ) |
| Petitioner, | ) Docket No. VA 2013-403 ) A.C. No. 44-07303-323400 |
| v. | ) |
| POWER FUELS, LLC, | ) Power Fuels Blending Terminal ) Mine ID No. 44-07303 |
| Respondent. | ) |

| | |
|---|---|
| POWER FUELS, LLC, | CONTEST PROCEEDINGS ) |
| Contestant, | ) Docket No. VA 2013-312-R ) Citation No. 8204724; 4/9/13 |
| v. | ) ) Docket No. VA 2013-313-R ) Citation No. 8204725; 4/9/13 |
| SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION (MSHA), | ) Docket No. VA 2013-353-R ) Citation No. 8274726; 4/9/13 ) ) Power Fuels Blending Terminal |
| Respondent. | ) Mine ID No. 44-07303 |

## PETITION FOR DISCRETIONARY REVIEW BY POWER FUELS, LLC

Pursuant to 30 U.S.C. § 823(d)(2)(A), and 29 C.F.R. § 2700.70, Power Fuels, LLC ("Power Fuels"), by counsel, respectfully submits this petition for discretionary review of the decision issued by the Administrative Law Judge ("ALJ") on March 10, 2014 ("Decision").

**338**

I.    ISSUES ON APPEAL AND ASSIGNMENTS OF ERROR

1.    Whether the Mine Act applies to Power Fuels?  The ALJ erred in concluding that the Act applies to Power Fuels.

2.    Whether the ALJ's findings that Power Fuels is the operator of a "coal or other mine" and that it is engaged in the "work of preparing the coal" are supported by substantial evidence?  The ALJ erred in finding that Power Fuels is operator of a "coal or other mine" and that it is engaged in the "work of preparing the coal."  30 U.S.C. § 802(h)(1) and (i).

3.    Whether the ALJ's findings that Power Fuels is the operator of a "coal or other mine" and that it is engaged in the "work of preparing the coal" are based on erroneous legal conclusions?  The ALJ erred in extending the definitions in the Act beyond their stated limits.  *Id.*

4.    Whether the ALJ's statement, "I am not persuaded by the respondent's arguments that the work it performs for Dominion Power is work that is usually performed by utilities or other coal consumers, and is not the type of work performed by coal producers or brokers," is supported by substantial evidence?  (Decision at 22.)  The evidence clearly shows that the work being performed by Power Fuels is the type of work performed by Dominion and other utilities and is not the type of work performed by producers.

5.    Whether the ALJ's statement, "I am not further persuaded by the respondent's argument that if it did not store and blend the coal for Dominion, Dominion

would have done the work itself," is supported by substantial evidence? (Decision at 22.)
The evidence shows this is the type of work that Dominion would perform for itself.

      6.      Whether the ALJ's statement, "I find the credible evidence with
respect to the testing, blending, and re-blending as necessary, are directly accomplished
in order to assure and maintain consistent quality of the coal pursuant to Dominion's
quality specifications," is supported by substantial evidence? (Decision at 23.) The
evidence shows that the coal is blended to meet the daily specifications of Dominion.
The coal is not processed to remove impurities or to improve quality.

## II.   INTRODUCTION

      This case presents important issues about the extent of the Secretary's
jurisdiction under the Mine Act, 30 U.S.C. § 801, et seq. Power Fuels is a contractor for
a utility. It receives, stores, blends coal for the utility. The utility purchases and owns all
of the coal that is delivered to Power Fuels. Power Fuels blends the coal to the
specifications of the utility. All of the coal is then delivered to and consumed by the
utility at its plant, which is adjacent to Power Fuels. Power Fuels does not buy any coal,
it does not sell any coal, and it does not process any coal. It simply stores and blends the
coal as directed by the utility.

      The ALJ found that Power Fuels is the operator of a "coal or other mine"
because it stores and blends the coal. In reaching this conclusion, the ALJ extended the
Act beyond its statutory limits. A "coal or other mine" includes lands used in the "work
of preparing coal." 30 U.S.C. § 802(h)(1). And "work of preparing the coal" is defined

4

to include "mixing, storing, and loading" of coal. 30 U.S.C. § 802(i). But the activities are limited to the work of preparing the coal "as is usually done by the operator of the coal mine." *Id.* This limitation excludes mixing, storing, and loading of the type usually performed by utilities or other consumers of coal. Without this limitation, any consumer who mixes, stores, or loads coal would be subject to the Act, which is not what Congress intended.

### III.   STATEMENT OF THE CASE

This case involves three citations that were issued to Power Fuels on April 9, 2013, by the Secretary of Labor, Mine Safety and Health Administration ("MSHA"). The Secretary assessed a civil penalty of $100 for each of these citations. Power Fuels has contested the citations and penalties on the ground that it is not the operator of a mine under the Mine Act and that it is not subject to jurisdiction under the Act.

The proceedings were assigned to Administrative Law Judge George A. Koutras who held a hearing on November 19, 2013. Following the hearing, the ALJ took the cases under advisement and permitted the parties to file post-hearing memoranda on the jurisdictional issue. On March 10, 2014, the ALJ entered a decision, ruling that Power Fuels is an operator of a mine and is subject to jurisdiction under the Act, and affirming the penalties for each of the citations.

5

## IV.  STATEMENT OF FACTS

Power Fuels owns and operates a blending terminal for Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion").  The terminal is located next to Dominion's Virginia City Hybrid Energy Center ("VCHEC") in Wise County, Virginia.  VCHEC is a 600 megawatt power plant that produces electricity from low BTU coal and biomass.  (Tr. at 81, 93.)  The plant began operations in 2011, and it employs state-of-the-art systems that reduce emissions.  (Tr. at 81, 93-94.)  The plant is billed as one of the cleanest coal-fired plants in the world.  (Tr. at 93.)

The plant burns approximately 10,000 tons of fuel a day.  Approximately 20% of this material is delivered directly to the plant by producers.  (Tr. at 89.)  The rest of the material is delivered by the producers to Power Fuels.  (*Id.*)  The material consists of coal and coal refuse ("gob").  (Tr. at 93.)  Power Fuels then stores, blends, and delivers the material to the plant.  (Tr. at 102-04.)

Dominion purchases directly from the producers all of the coal and gob that is delivered to Power Fuels.  (Tr. at 100-02.)  The material is supplied by approximately 15 to 16 different producers.  (Tr. at 97.)  Power Fuels does not own any of the coal or gob that comes onto its property; Dominion owns it all.  (Tr. at 100-01.)  Power Fuels works exclusively for Dominion.  (Tr. at 97.)

Approximately 30-40% of the material consumed by the plant is gob.  (Tr. at 96.)  The producers of the gob are recovering the material from old refuse sites, and, in the process, they are eliminating environmental hazards at these locations.  (Tr. at 95-96.)

**342**

6

The producers hire the truckers that transport the coal and gob to Power Fuels. (Tr. at 101.) Power Fuels hires the truckers that transport the material from its site to the plant across the road. (Tr. at 104.)

Dominion contracts directly with the producers for the general specifications of the coal and gob that it wants delivered to Power Fuels. (Tr. at 101-02, 113-14.) The producers perform all necessary processing to meet Dominion's general specifications. (Tr. at 113.) Power Fuels does not do any crushing, sizing, screening, washing, or other processing of the coal or gob. (Tr. at 114.) As Walter Crickmer, the manager of Power Fuels, explained,

> Power Fuels has never done anything to improve any quality of any fuel product. We've never screened it. We've never washed it. We've never sized it. We've never done anything to it other than take exactly what's been brought in there by Dominion and put it into a blend to fuel their furnace.

(Tr. at 123.)

Dominion's plant is designed to burn low BTU coal and biomass. (Tr. at 81-82, 94-95.) All of the materials have to meet precise specifications to react properly in the furnace burn chamber. (*Id.*) Daily blending is critical to maintain the required low BTU content needed for the furnaces. (Tr. at 81-82.)

At its site, Power Fuels has four loaders, a dozer, and a stacking conveyor. (Tr. at 92.) When the material arrives at Power Fuels it is weighed, sampled, and dumped in separate piles. (Tr. at 102-04.) On instructions from Dominion, Power Fuels then uses its equipment to blend the material to Dominion's daily specifications. (*Id.*) Power Fuels

7

has no discretion on whether or how to blend the material. Power Fuels blends only and precisely as directed by Dominion. As Mr. Crickmer testified,

> Dominion directs us daily to take this quality coal, so much of this material and so much of that material and so much of this material and blend it together by one bucket of this, two buckets of that. Literally it says that.

(Tr. at 103.)

At the hearing, Power Fuels introduced as Exhibit R-3 an example of the blending instructions that Power Fuels receives from Dominion on a daily basis. (Tr. at 107.) The specifications change on a daily basis to meet the desired heat rate for the plant's furnace. (Tr. 124, 128.) Consistent with Mr. Crickmer's testimony, the blending instructions from Dominion provide specific directions as to how the material should be blended. Power Fuels is required to do "100% what they [Dominion] tell us." (Tr. at 108.)

Power Fuels performs its work for Dominion under a Terminalling Agreement. (Tr. at 98; *see* Exhibit G-4.) Under the Terminalling Agreement, Power Fuels is required to blend the coal gob in accordance with the requirements of Dominion. (Exhibit G-4 at Section 3.05.) Power Fuels may make recommendations as to how to modify the blending instructions to meet Dominion's specifications, but Power Fuels cannot change the specifications on its own. (*Id.*)

8

Dominion pays Power Fuels on a cost plus basis. (Tr. at 100.) Dominion reimburses Power Fuels for its expenses, and it pays Power Fuels a fixed fee for each ton of material delivered to the site. (*Id.*)

In addition to coal and gob, Power Fuels is also able to provide Dominion with biomass (wood products) for the plant. (Tr. at 93.) Power Fuels is currently storing some biomass on its property for later sale to Dominion. The biomass is not part of the Terminalling Agreement. (Tr. at 129.)

In contrast to the work performed by Power Fuels, coal preparation generally involves the washing, screening, and sizing of the coal. (Tr. at 122-23.) Power Fuels does not do any work of that type. (Tr. at 114, 123.) Power Fuels simply "take[s] different fuels purchased by Dominion, which they own, and we blend it to whatever specifications they want." (Tr. 114.)

Dominion's plant is unique in that it only has a 9 to 10 day supply of fuel when its inventory is full. (Tr. at 114-15.) Typical coal-fired plants have a 60 to 90 day inventory. (Tr. 115.) Power Fuels provides a service to Dominion by storing an additional 8 days of Dominion's fuel on site. (*Id.*)

The blending, sampling, and analysis work performed by Power Fuels according to the daily requirements of the plant's furnace is not the type of work performed by producers of coal. (Tr. at 124.) This type of precision blending is usually performed by the consumer of the coal. (Tr. at 122-25.) If Power Fuels did not perform this work for Dominion, Dominion would have to do the work itself. (Tr. at 125.)

9

MSHA began its investigation of the Power Fuels site in May 2012 when a MSHA employee saw trucks delivering coal to the Power Fuels site instead of directly to the plant. (Tr. at 59-60, 67.) MSHA assigned Robert Clay to investigate. Mr. Clay's observation of the trucks entering the site next to the plant, as opposed to the plant itself, is what prompted the investigation and citations. (Tr. at 73-74.) Mr. Clay was not aware of any instances where MSHA has asserted jurisdiction over power plant operations. (Tr. at 72.)

The citations in question were issued for defects on inbound trucks. (Tr. at 46.) These trucks were hired by the producers of the coal, not by Power Fuels. (Tr. at 101.)

## V.   ARGUMENT

The central question in this case is whether any mixing, storing, or loading of coal is subject to the jurisdiction of the Act, as contended by the Secretary and apparently accepted by the ALJ, or whether the mixing, storing, and loading must be the type of work usually performed by the operator of a coal mine. If any mixing, storing, or loading of coal is sufficient to establish MSHA jurisdiction, then any consumer who mixes, stores, or loads coal is the operator of a coal mine. While the Act confers broad jurisdiction on MSHA, it does not go that far. The work normally performed by consumers of coal is not subject to the Act. In this case, Power Fuels is doing blending work for the consumer of the coal, not for the producers of the coal. The work that Power Fuels is performing is the type of work that utilities perform. The fact that the

utility has contracted with Power Fuels to perform this work, instead of doing it with its own employees, does not change the character of the work or allow MSHA to assert jurisdiction.

### A.   AUTHORITIES

#### *1.   Statutes*

Under 30 U.S.C. § 803, each "coal or other mine" and each "operator" of such mine are subject to the jurisdiction of the Act.

Under 30 U.S.C. § 802(h)(1), "coal or other mine" means:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

Under § 802(h)(1), land and equipment used for "the work of preparing coal or other minerals" is a "coal or other mine." Under 30 U.S.C. § 802(i), the term "work of preparing the coal" means:

> the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal *as is usually done by the operator of the coal mine*.

(Emphasis added.)

### 2.     Commission Cases

The ALJ relied upon several Commission decisions addressing jurisdiction under the Act. In *Sec'y of Labor v. Oliver M. Elam, Jr., Co.*, 4 FMSHRC 5 (1982), the Commission decided a critical issue: what connection must exist between the work in question and the usual work of mining. Although the dock operator crushed and loaded coal onto barges, the Commission held that the dock was not a "coal or other mine." *Id.* at 6-8. Just because the dock operator handled coal did not mean it was engaged in "the work of preparing the coal." *Id.* at 7. To fall within the definition, the work must involve more than the "breaking, crushing, sizing, cleaning, washing, drying, measuring, storing, [or] loading" of coal. The work must be the kind of work "usually performed by the mine operator engaged in the extraction of the coal or by custom preparation facilities . . . ." *Id.* at 8. Thus, the Commission held that it was bound to make a two step inquiry: first, whether the facility "performs one or more of the listed work activities," and second, whether the work was "usually done by the operator." *Id.* at 7. Under this standard, the Commission found that the dock was not subject to the Act. *Id.* at 8.

12

In *Sec'y of Labor v. Mineral Coal Sales, Inc.*, 7 FMSHRC 615 (1985), the Commission addressed a different situation. That case involved the operator of a tipple that crushed coal and conveyed it onto railroad cars. The operator used front-end loaders to transfer coal from various stockpiles to the tipple. The operator stored, mixed, crushed, sized, and loaded coal in order to make it "suitable for a particular use or to meet market specifications." *Id.* at 620. The company processed the coal for brokers, not for consumers. *Id.* at 616. The Commission held that the company's operations were subject to the Act. The Commission reasoned that facilities should not be permitted to "avoid Mine Act coverage simply by adopting separate business identities along functional lines, with each performed only some part of what in reality, is one operation." *Id.* at 621. The Court found "pervasive intermingling of personnel and functions" between the operator of the tipple and the coal brokers who owned the coal and used the facility "with little or no apparent regard for business or contractual formalities. *Id.* In essence, the Commission determined that the facility at issue was used to perform the work of coal brokers or producers. *Id.* In contrast, Power Fuels does not do the work of coal brokers or producers, but the work of the consumer, Dominion.

### 3.    Court Cases

Likewise, the Courts of Appeal have considered what constitutes a mine. The ALJ relied upon several cases. One was *RNS Servs., Inc. v. Sec'y of Labor*, 115 F.3d 182 (3d Cir. 1997). In that case, RNS loaded coal refuse at a refuse site. In a 2-to-1 decision, the Third Circuit held that RNS was subject to the Act. The majority applied a

functional analysis – focusing on the nature of the work being performed at the site. *Id.* at 184. Even so, the majority disclaimed the view that any loading of coal was subject to the Act. In order to constitute a mine, the coal must be loaded "at a place regularly used for that purpose, in preparation for further processing." *Id.* The majority further stated that the "loading of the coal is a critical step in the processing of minerals extracted from the earth in preparation for their receipt by an end-user." *Id.* at 185. The dissent argued that the Commission had erroneously applied a per se ruling making any loading of coal subject to the Act. *See id.* at 189-92 (Alito, J., dissenting).

The ALJ also relied upon *Kinder Morgan Operating, L.P. "C" v. Chao*, 78 Fed. Appx. 462 (6th Cir. 2003) (unpublished). In that case, Kinder Morgan's marine loading facility was found to be subject to the Act. The evidence showed that the facility received and loaded coal, mostly for the Tennessee Valley Authority ("TVA"). *Id.* at 463. TVA purchased the coal from numerous producers. Kinder Morgan stored and blended the coal into different products for different plants. *Id.* The Commission split 2-2 on whether the Act applied to Kinder Morgan's operation. *Id.* at 464. On appeal, the Sixth Circuit found that the Act did apply and adopted the reasoning of the two Commissioners who voted to uphold jurisdiction. *Id.* at 465. In their opinion, the two Commissioners reasoned that Kinder Morgan was performing work "usually performed by the operator of a coal mine by undertaking the activities to make the coal suitable for a particular use or to meet market specifications." *Sec'y of Labor v. Kinder Morgan Operating L.P. "C,"* 23 FMSHRC 1288, 1294 (2001).

14

As several opinions made clear, mixing, storing, and loading coal are themselves insufficient to support jurisdiction. Otherwise, anyone who handles coal would be covered by the Act. The mixing, storing, and loading must be the type performed by a mine operator. As the Eighth Circuit explained in *Herman v. Associated Elec. Coop. Inc.*, 172 F.3d 1078 (8th Cir. 1999), "not all businesses that perform tasks listed under 'the work of preparing coal' in § 802(i) can be considered mines." *Id.* at 1082. While utilities may be subject to the Act if they maintain a presence at the mine and assist in mining or loading the coal or if they engage in coal preparation of the type performed by mine operators, "a utility that receives processed coal from a mine does not itself become a 'mine' by further processing the coal for combustion." *Id.* at 1083. Thus, once a producer delivers processed, marketable coal to a utility, the jurisdiction of MSHA ends, even though the utility may do further blending of the product. *Id.*

The Fourth Circuit made this same point in *United Energy Servs., Inc. v. Fed. Mine Safety Health Admin.*, 35 F.3d 971 (4th Cir. 1994). In that case, the operator of a power plant went onto mine property and loaded coal refuse from a pile and transported it to the plant. *Id.* at 973. Employing a functional analysis, the Fourth Circuit found that the plant operator was engaged in the work of preparing the coal. *Id.* at 975. The Court was careful to rule, however, that the same analysis would not apply once the coal was delivered to the plant.

> Although delivery of coal to a consumer after it is processed
> usually does not fall under the coverage of the Act, United
> Energy's activities occur a step earlier in the overall process.

**351**

15

They involve the transportation of coal to the preparation
facility and thus are part of the "work of preparing coal."

*Id.*

## B.    THE ALJ ERRED IN FINDING THAT THE MINE ACT APPLIES TO POWER FUELS

The key facts in this case are uncontradicted:

- Dominion purchases coal from various producers.  (Tr. at 100-02.)

- The coal is delivered to the Power Fuels site by truckers hired by the producers.  (Tr. at 101.)

- Dominion owns all of the coal that is delivered to the site.  (Tr. at 100-01, 114.)

- Power Fuels is a contractor for Dominion under a Terminalling Agreement.  (Tr. at 98; *see* Exhibit G-4.)

- Power Fuels works only for Dominion.  (Tr. at 97.)

- Dominion is the sole consumer of the coal at the Power Fuels site.  (Tr. at 100-01.)

- Power Fuels weighs, samples, and stores the coal for Dominion.  (Tr. at 102-04.)

- Dominion instructs Power Fuels how to precision blend and deliver the coal.  (Tr. at 103, 107-08.)

- Dominion's specifications for the fuel going into its plant change on daily basis to achieve the desired heat rate in the plant's furnace.  (Tr. at 81-82, 94, 124.)

- Power Fuels performs precision blending, sampling, and analysis work to meet the furnace's daily requirements.  (Tr. at 124-25.)

- Power Fuels does not do the type of work done by coal producers, such as washing, screening, or sizing coal.  (Tr. at 113-14, 122-23.)

16

- Typical coal-fired plants have a 60 to 90 day inventory of fuel, but Dominion has only a 9 to 10 day supply. Power Fuels provides a service to Dominion by storing an additional 8 days of Dominion's coal on site. (Tr. at 114-15.)

- If Power Fuels did not store and blend the coal for Dominion, Dominion would have to do the work itself or find another contractor to do it. (Tr. at 125.)

- The work of Power Fuels is not the type of work performed by producers of coal. (Tr. at 122-25.)

The activities listed in 30 U.S.C. § 802(i) as being part of the "work of preparing the coal" are limited by the phrase "as is usually done by the operator of the coal mine." If the mixing, storing, and loading is the type of work usually performed by the mine operator, the work is subject to the Act. On the other hand, if the work is not of that type, but is work of the type usually performed by a utility or other consumer of the coal, the work is not subject to the Act. Based on the undisputed evidence, the work of Power Fuels is not of the type usually performed by a mine operator. The Mine Act does not apply to Power Fuels.

        C.    THE ALJ'S DECISION THAT POWER FUELS IS THE OPERATOR OF A "COAL OR OTHER MINE" IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO THE EVIDENCE

The ALJ found that Power Fuels was the operator of a "coal or other mine" and was therefore subject to the Act. But the evidence showed that the unique work of Power Fuels is not the type usually performed by a mine operator or coal producer. Mine operators do not usually blend coal from other producers. On the other hand, utilities and

other consumers generally store their own inventory of coal and do precision blending, sampling, and analysis of coal products on their own. (Tr. at 114-15, 124-25.) In this case, Power Fuels does it for Dominion – and only for Dominion. (Tr. at 97.) And it does it with Dominion's own coal. (Tr. at 100-01.) The specialized work of Power Fuels to meet the day-to-day specifications of Dominion is not performed by coal producers. (Tr. at 124-25.) While mine and coal preparation plant operators sell coal based on a set of specifications, the general specifications are generally for the life of the contract. The mine and plant operators do not handle coal already owned by utilities, and they do not blend coal for the daily burns of the utility.

> D.   THE ALJ'S DECISION THAT POWER FUELS IS THE OPERATOR OF A "COAL OR OTHER MINE" WAS BASED ON AN ERRONEOUS LEGAL CONCLUSION

The ALJ erred in his interpretation of 30 U.S.C. § 802(i), which defines "work of preparing the coal." The ALJ concluded that any mixing, storing, or loading of coal constitutes the "work of preparing the coal" if it occurred "at a place regularly used for that purpose." (Decision at 21.) (emphasis added). Under the definition, it is not sufficient that such activities be regularly conducted at the site. To constitute the "work of preparing the coal," the activities must be the type of work usually performed by the operator of a coal mine, not the type of work usually performed by the operator of a power plant.

18

E.    THE ALJ ERRED IN STATING, "I AM NOT
PERSUADED BY THE RESPONDENT'S
ARGUMENTS THAT THE WORK IT PERFORMS FOR
DOMINION POWER IS WORK THAT IS USUALLY
PERFORMED BY UTILITIES OR OTHER COAL
CONSUMERS, AND IS NOT THE TYPE OF WORK
PERFORMED BY COAL PRODUCERS OR
BROKERS"

In the Decision, the ALJ was "not persuaded by [Power Fuels'] arguments

that the work it performs for Dominion Power is work that is usually performed by

utilities or other coal consumers, and is not the type of work performed by coal producers

or brokers." (Decision at 22.)  Power Fuels does not perform work that is usually done

by a mine operator.  This is not an argument but an uncontradicted fact.  The reason cited

by the ALJ for rejecting the point was that Power Fuels "is a stand-alone coal blending

facility" engaged in "receipt, testing, weighing, blending, mixing, storage, and

transportation of coal from that site in order to meet the coal specifications that are

communicated to the respondent by Dominion Power on a daily continual basis." (*Id.*)

But at this general level, anyone engaged in storing, blending, and related activities

would be subject to MSHA jurisdiction, including utilities and other consumers of coal.

Such activities do not bring Power Fuels under MSHA jurisdiction unless such activities

are of the sort usually performed by mine operators.

The ALJ found that Dominion is Power Fuels' "customer" under the

Terminalling Agreement.  (Decision at 21.)  Labeling Dominion a "customer" of Power

Fuels does not make Power Fuels a mine operator.  The issue is whether Power Fuels is

performing the work of a mine operator, not whether it is performing work for a customer.

The ALJ also improperly focused on the fact that the coal is handled and stored by Power Fuels at a place "regularly used for that purpose." (Decision at 21.) All utilities and other consumers of coal handle coal at places "regularly used for that purpose." This finding does not help determine whether the work is the type typically performed by a mine operator.

> F.  THE ALJ ERRED IN STATING, "I AM NOT FURTHER
> PERSUADED BY THE RESPONDENT'S ARGUMENT
> THAT IF IT DID NOT STORE AND BLEND THE
> COAL FOR DOMINION, DOMINION WOULD HAVE
> DONE THE WORK ITSELF"

The ALJ stated, "I am not further persuaded by [Power Fuels'] argument that if it did not store and blend the coal for Dominion, Dominion would have done the work itself or find another contractor to do it." (Decision at 22.) There was no evidence, however, to contradict the fact that if Power Fuels did not store and blend the coal for Dominion, Dominion would have to do the work itself. (Tr. at 124-25.) This, of course, is one of the key facts supporting the conclusion that Power Fuels did not perform the work of a mine operator and is not subject to the Act. The evidence at the hearing was uncontradicted. The work that Power Fuels does is the type of work performed by utilities, not by mine operators.

G.    THE ALJ ERRED IN STATING, "I FIND THE
CREDIBLE EVIDENCE WITH RESPECT TO THE
TESTING, BLENDING, AND RE-BLENDING AS
NECESSARY, ARE DIRECTLY ACCOMPLISHED IN
ORDER TO ASSURE AND MAINTAIN CONSISTENT
QUALITY OF THE COAL PURSUANT TO
DOMINION'S QUALITY SPECIFICATIONS"

The ALJ's stated that "I find the credible evidence with respect to the

testing, blending, and re-blending as necessary, are directly accomplished in order to

assure and maintain consistent quality of the coal pursuant to Dominion's quality

specifications." (Decision at 23.)  At the hearing, however, the evidence was that, unlike

mine operators and producers of coal, "Power Fuels has never done anything to improve

any quality of any fuel product." (Tr. at 123.)  Power Fuels does not screen, wash, or size

the coal.  (Tr. at 114, 123.)  Power Fuels simply takes coal "brought in there by

Dominion and put it into a blend to fuel their furnace." (Tr. at 123.)  The unique work

that Power Fuels does to meet the day-to-day burn for Dominion's furnace is not work

usually performed by coal producers.  (Tr. at 124-25.)  This fact is undisputed.

VI.   CONCLUSION

For the reasons stated, the Commission should grant discretionary review

and vacate the citations.

POWER FUELS, LLC

By Counsel

21

Wade W. Massie
Seth M. Land
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
Telephone: 276/628-5151
Facsimile: 276/628-5621
wmassie@pennstuart.com

By _*Wade W. Massie*_
     Wade W. Massie

## CERTIFICATE

I hereby certify that a true copy of the foregoing has been mailed and

emailed to Anthony D. Jones, Esq., U.S. Department of Labor, Office of the Solicitor,

Division of Mine Safety and Health, 1100 Wilson Boulevard, 22nd Floor, Arlington,

Virginia 22209-2296, this 25th day of March 2014.

_*Wade W. Massie*_
     Wade W. Massie

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

1331 PENNSYLVANIA AVENUE, NW, SUITE 520N

WASHINGTON, D.C. 20004-1710

APR 1 8 2014

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | Docket Nos. VA 2013-403 |
| | : | VA 2013-312-R |
| v. | : | VA 2013-313-R |
| | : | VA 2013-353-R |
| POWER FUELS, LLC | : | |
| | : | |

## NOTICE

A petition for discretionary review was filed by Power Fuels, LLC, on March 26, 2014. This petition was filed pursuant to section 113(d)(2) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 823(d)(2). That section provides that review of a decision of an Administrative Law Judge may be granted upon specified grounds and upon the affirmative vote of two Commissioners. Such review is discretionary. 30 U.S.C. § 823(d)(2)(A). However, no two Commissioners voted to grant the petition or to otherwise order review under 30 U.S.C. § 823(d)(2)(B). Consequently, the decision of Administrative Law Judge George A. Koutras dated March 10, 2014, is final as of 40 days after its issuance. 30 U.S.C. § 823(d)(1).

Jean H. Ellen
Chief Docket Clerk

14-04-13

359

Distribution:

Wade W. Massie, Esq.
Penn, Stuart & Eskridge
P.O. Box 2288
Abingdon, VA 24212
wmassie@pennstuart.com

Melanie Garris
Office of Civil Penalty Compliance
MSHA
U.S. Dept. Of Labor
1100 Wilson Blvd., 25th Floor
Arlington, VA 22209-3939

W. Christian Schumann, Esq.
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Blvd., Room 2220
Arlington, VA    22209-2296

Administrative Law Judge George A. Koutras
Federal Mine Safety & Health Review Commission
Office of Administrative Law Judges
1331 Pennsylvania Avenue, N. W., Suite 520N
Washington, D.C.  20004

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Case No.

_____

POWER FUELS, LLC,

Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
and SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION,

Respondents.

_____

PETITION FOR REVIEW

Petitioner, Power Fuels, LLC ("Power Fuels"), by counsel, hereby

petitions the Court for review of the following final decision and order of the

Federal Mine Safety and Health Review Commission in Docket Nos. VA 2013-

403, VA 2013-312-R, VA 2013-313-R, VA 2013-353-R:

On March 10, 2014, an Administrative Law Judge of the Commission

issued a decision affirming citations and proposed civil penalties against Power

Fuels. A copy of the decision is attached as Exhibit 1. On April 18, 2014, the

Commission issued a notice that the petition for discretionary review by Power

2

Fuels had not been granted. A copy of the notice is attached as Exhibit 2. As a result, the decision of the Administrative Law Judge became the final order of the Commission 40 days after its issuance, 30 U.S.C. § 823(d)(1), making the decision final on April 19, 2014. This petition is being filed within 30 days of the date the decision became a final order of the Commission. 30 U.S.C. § 816(a).

Pursuant to Local Rule 15(b), a list of respondents with service information is attached as Exhibit 3.

Upon review by the Court, Power Fuels respectfully requests that the decision of the Administrative Law Judge and Commission be reversed and that the citations be vacated and set aside. Fed. R. App. P. 15.

POWER FUELS, LLC

By Counsel

Wade W. Massie
 VSB No. 16616
Seth M. Land
 VSB No. 75101
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
Telephone: 276/628-5151
Facsimile: 276/628-5621
wmassie@pennstuart.com

By  _/s/ Wade W. Massie_
       Wade W. Massie

Abingdon: 888296-1

3

## CERTIFICATE

I hereby certify that a true copy of the foregoing Petition for Review has been mailed to Executive Director, Federal Mine Safety and Health Review Commission, 1331 Pennsylvania Ave., NW, Suite 520N, Washington, DC 20004-1710, and mailed and emailed to W. Christian Schumann, Esq., Office of the Solicitor, U.S. Department of Labor, 1100 Wilson Boulevard, Room 2220, Arlington, Virginia 22209-2296, this 6th day of May, 2014.

　　　　　　　　　　　　 /s/ Wade W. Massie
　　　　　　　　　　　　　Wade W. Massie

Abingdon: 888296-1

Power Fuels, LLC
v. Federal Mine Safety and Health Review Commission and
Secretary of Labor, Mine Safety and Health Administration


Exhibit 1
to Petition for Review

Decision dated March 10, 2014

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

OFFICE OF ADMINISTRATIVE LAW JUDGES
1331 PENNSYLVANIA AVE., N.W., SUITE 520N
WASHINGTON, DC 20004-1710
TELEPHONE: 202-434-9958 / FAX: 202-434-9949

March 10, 2014

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | CIVIL PENALTY PROCEEDING |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION, (MSHA) | : | Docket No. VA 2013-403 |
| Petitioner | : | A.C. No. 44-07303-323400 |
| v. | : | |
| | : | |
| POWER FUELS, LLC, | : | Power Fuel Blending Terminal |
| Respondent | : | |
| | : | |
| POWER FUELS, LLC, | : | |
| Contestant | : | CONTEST PROCEEDINGS: |
| | : | |
| | : | Docket No.: VA 2013-312-R |
| | : | Citation No.: 8204724; 4/9/13 |
| v. | : | |
| | : | Docket No.: VA 2013-313-R |
| | : | Citation No.: 8204725; 4/9/13 |
| SECRETARY OF LABOR | : | |
| MINE SAFETY AND HEALTH | : | Docket No.: VA-2013-353-R |
| Administration, (MSHA) | : | Citation No.: 8274726; 4/9/13 |
| Respondent | : | |
| | : | |
| | : | |
| | : | Power Fuel Blending Terminal |

## DECISION

Appearances:      Anthony D. Jones, Esq., U.S. Department of Labor, Office
                  of the Solicitor, Arlington, Virginia, for the Secretary

                  Wade W. Massie, Esq., PENN, STUART & ESKRIDGE,
                  Abingdon, Virginia, for the Respondent

Before:  Judge Koutras

1

STATEMENT OF THE CASE

This civil penalty proceeding pursuant to the Federal Mine Safety and Health Act of
1977, 30 U.S.C. 802, et Seq. (2000), hereinafter the "Mine Act" concerns three Section 104(a)
significant and substantial (S & S) citations served on the respondent on April 9, 2013, for
alleged violations of the cited safety standards found at 30 C.F.R. 77.410(c), and 77.1605(b).
The Secretary petitions the Court for a civil penalty assessment of $300, for the alleged
violations.

In addition to the civil penalty issues presented in this case, the respondent challenges
and contests the Secretary's asserted jurisdiction based on its contention that the respondent is
not a mine operator, and that its facility is not engaged in any coal mine working activities that
fall within the scope and intent of the Mine Act.

Pre-trial Ruling
This case was initially designated as a Simplified Proceeding pursuant to the
Commission's rules at 29 C.F.R. 2700.100, et. seq.  Subsequently, the Secretary filed a motion to
discontinue the "simplified" designation and to continue the matter under conventional rules.  In
support of the motion, the Secretary cited the jurisdictional issues raised by the respondent that
involve complex issues of law and fact.  The motion was granted pursuant to Rule 2700.104,
without objection by the Court during a pre-trial telephone conference with the parties (Tr. 5-6)

As a result of the Court's ruling as discussed during the aforementioned conference, the
respondent file a supplemental disclosure statement regarding the nature of its blending
activities, and the Secretary filed a pre-hearing statement with respect to the issues in this matter
including arguments in support of Secretarial (MSHA) jurisdiction.  These filings and exchanges
are part of the record.

Stipulations
(1) The parties agreed to the admission into evidence of copies of the three contested
    citations, except as to jurisdiction (Ex. G-1, G-2, G-3; ALJ-1).
(2) The parties agreed that the proposed civil penalty assessment for the citations will not
    adversely affect the respondent's ability to continue in business.
(3) The parties agreed that a terminalling agreement between the respondent and Virginia
    Electric Power Company, d/b/a Dominion Power Company, is a true and authentic
    copy in effect at the time the citations and may be admitted in evidence (Ex. G-4).

At the conclusion of the hearing, the parties agreed that the respondent would be
classified as a small mine under the regulations and the respondent's manager confirmed that
twelve employees work at the site (Tr. 139).

2

The Alleged Violations

The two Section 104(a) S & S Citation Nos. 8204724 and 8204726, April 9, 2013, citing C.F.R. 77.1605(b), describe defects in the braking systems on two contractor trucks that haul coal into the respondent's facility "under the direction of the mine operator" (Ex. G-1, G-3). The inspector determined the negligence level as "low" for both citations and the gravity level as "reasonably likely" and "permanently disabling" injuries.

The braking defects described for Citation No. 8204724, concern a steering axle brake out of adjustment on the truck tractor, and an inoperative rear axle brakes on a trailer being pulled by the tractor, with no braking force supplied by the brake pushrods that could not move. The braking defects described for Citation No. 8204726, in part state that the left truck steering axle brake was out of adjustment with a continuous air leak through a defective air brake value above the center trailer axle being pulled by the truck.

Citation No. 8204725, April 9. 2013. Citing 30 C.F.R. 77.410(c), states that the backup alarm provided on the cited contractor truck was not being maintained in a functional condition in that when the driver placed the vehicle in reverse, the backup alarm failed to function due to a broken wire. The truck is used to haul coal into the facility "under the direction of mine operator" (Ex. G-2). The inspector determined the negligence as "low", and the gravity level as "reasonably likely" and "permanently disabling" injuries.

Mandatory safety standard 30 C.F.R. 771605(b), requires mobile haulage equipment to be equipped with adequate brakes. Section 77.410(c) requires mobile equipment such as "tractors" and "trucks" to be equipped with a warning device that gives an audible alarm when put in reverse and be maintained in functional condition.

The Secretary's Testimony

MSHA Inspector Thomas R. Bower testified that he has served in that capacity since January 7, 2007, and he described his education, including a bachelor's degree from the University of Virginia at Wise and his prior mining experience from 2001 through 2006 (Tr. 20-21). He confirmed that his initial visit to the respondent's facility was December 12, 2012, and that he conducted regular mine safety and health inspections over a period of 12 different days and was familiar with the work that is done there (Tr. 22). He observed contractor coal trucks, trailers, and tractors hauling coal, refuse materials, gob coal, and "midds", a coal byproduct from a preparation plant, coming into the site. The materials were weighed and sampled and then taken to designated stockpile areas. The truck drivers were told where to dump their loads by the loader operators and the foreman of the site (Tr. 22-23).

He further explained that the coal was stored, blended, and loaded as needed for Dominion's power plant, then taken back out, weighed again, sampled again, and then shipped to

3

the power plant (Tr. 23). He stated that front-end loaders were used to blend the coal from one stockpile to another that were marked for each type of analysis "so they'll know how to blend it." He confirmed that between the time the coal arrives at the site and the time it leaves, it is stored and blended in preparation for shipment to the power plant (Tr. 24). He confirmed that he began his second inspection at the site on April 1, 2013, and clarified that he was not at the site for a total of five months, and that his inspections last on and off approximately two to three weeks at a time and that two inspections were performed during two six-month intervals, and that he was at the site over a period of several month several times (Tr. 25).

Mr. Bower identified Exhibit G-1 as Citation No. 8204724, citing a violation of 30 C.F.R. 77.1605(b), for braking defects on a contractor's tractor trailer coal truck. He stated that there were numerous braking defects as stated in the condition or practice noted in item #8 of the citation, on both the tractor and the trailer that he considers as one unit, and he summarized the condition as "faulty brakes" (Tr. 26-27). He confirmed that he discussed the citation and his reasons for issuing it with the site foreman, Mike Hendrickson, and informed him that the truck was traveling the same roadways that mine personnel used and exposed them to the hazards while the truck was operated on the property (Tr. 27). The citation reflects that the truck was taken out of service pending repairs.

Mr. Bower stated he based his "S & S" determination on the fact that the cited truck and tractor unit had a 25 percent loss of braking power that exceed the guidelines fixed by the Commercial Vehicle Safety Alliance that any braking loss over 20 percent reaches its out-of-service criteria (Tr. 27-28, 30). He believed that two persons would be likely exposed to a hazard in the event of any accident, namely the driver and another miner, as well as others who may be on the roadway (Tr. 28-29).

Mr. Bower stated that he based his "reasonably likely" injury determination on his accident investigator experience involving truck accidents under similar defective conditions that resulted in disabling back and traumatic injuries, and broken bones. He agreed these examples are "worst case scenarios" and that lesser injuries were conceivable (Tr. 30-31). He confirmed that foreman Henderson was upset about the conditions of the truck brakes and that he called the trucking company and told them that they had to do better with their equipment (Tr. 31). He confirmed that he based his low negligence finding on the fact that the foreman may travel with the trucks at times during his shift but he did not directly oversee the truck maintenance, and that he also cited the contractor truck operator for the same violation (Tr. 32-33).

Mr. Bower stated that he also issued S & S Citation No. 8204725, a violation of 30 C.F.R. 77.410(c), because the backup alarm provided on a contractor trailer truck failed to function when the transmission was placed in reverse and the alarm did not sound (Ex. G-2, Tr. 33). He stated he determined an injury was reasonably likely because the truck traveled in congested areas, it was observed backing up in congested areas, and it had an obstructed rear

4

view pulling a 34 foot trailer. The truck backs up in congested areas where numerous people and other pieces of equipment are present.

Mr. Bower determined that any injury would be disabling if anyone was backed over by a 150,000 pound unit, and this included crushing injuries. He believed one person among those operating a loader or sampling the coal would be affected, and he also concluded it was an S & S violation because the cited trucker was in congested areas and it was observed backing up in those areas (Tr. 34). He based his low negligence on the same reason as the prior cited violation because the foreman was not responsible for truck maintenance and confirmed that he also cited the contractor truck operator for the same violation (Tr. 34-35).

Mr. Bower confirmed that he issued Citation No. 8204726 citing a violation of 30 C.F.R. 77.1605(b), because the same truck previously cited for a defective backup alarm had a brake out of adjustment on the tractor and a continuous air leak and defective air valve on the trailer being pulled as a unit (Ex. G-3; Tr. 38-39). He explained that the loss of air pressure would result in a loss of braking force to stop the unit because the brakes would not work as they are designed (Tr. 39).

Mr. Bower stated that he based his reasonably likely injury determination on the fact that a combination of a brake out of adjustment and a continued air leak makes it reasonably likely that a brake failure would occur and cause a wreck. He explained that the truck hauls heavy loads over inclined roads, traveling with other vehicles, and that any loss of brakes could result in a truck runaway over the top of other vehicles resulting in crushing injuries. Under these circumstances, he concluded that the violation was S & S and two persons, the truck driver and any other vehicle driver would be affected (Tr. 39-40). He confirmed that his low negligence determination was based on the same reason for all three citations, namely, the fact that the foreman was not directly responsible for any truck maintenance, but did travel sometime during the shift in the same area traveled by the trucks (Tr. 41).

 On Cross-examination, Mr. Bower stated that his inspections were regular inspections, and that even though he is a surface inspector and accident investigator, he was not investigating any accidents when he issued all of the citations. He made no decisions whether the respondent's site was a mine within the meaning of the Mine Act and was simply following his instructions to cite any violations that he found (Tr. 44-45). He confirmed that when he issued the citations, he was not aware of the agreement between the respondent and Dominion, and did not interview anyone at Dominion about the respondent's job performance or operations. He explained that he spoke with the respondent's foreman, Mike Hendrickson, who was at the site on a daily basis, and Mr. Walter B. Crickmer, who has later identified as the manager of Power Fuels, LLC, the respondent (Tr. 45, 79).

5

Mr. Bower stated that the contractor trucks that he cited were inbound trucks that were bringing solid fuel from any producing facility to the respondent's site. He confirmed that a defective truck entering the site may not necessary, in and of itself, constitute a violation. However, pursuant to MSHA's policy, he is required to make a determination whether or not the respondent's personnel are exposed to any hazard, and if not, the violation would be attributable to the contractor if it did not involve the respondent's employees (Tr. 46-47).

Mr. Bower confirmed that he issued the violations to the respondent because trucks entering its site with defective brakes and a backup alarm potentially involved the respondent's employees. He did not know whether the trucks were contractors for the respondent or contractors for the producing mine entities. He further stated that while he was not aware who contracted the trucks, he was obligated to inspect them during his inspection at the site and that the question of who contracted them was not relevant (Tr. 48-49).

Mr. Bower did not know who owned the materials hauled into the site by the trucks, and did not believe this was relevant. He estimated that 30 – 40 trucks enter the site daily and that during one of the 12 days of his inspections, he may have randomly selected 10 to 12 trucks to inspect. He does not inspect every truck that comes onto the site and has inspected trucks that did not have any violations. As far as he knew, all of the cited trucks arrived safely while traveling inbound to the site (Tr. 50-51).

Mr. Bower confirmed that his statement in the citations that the trucks are "under the direction of the mine operator", referred to the respondent's foreman, Mr. Hendrickson, and because the trucks were on the site (Tr. 51). He stated that he has also observed some wood chips biomass product at the site and that it is handled by the same employees with the same equipment used for handling the solid fuel (Tr. 52-53). In reply to further questions, Mr. Bower stated that the material blending that he observed consisted of "coal, midds, gob, the refuse material blended together", coal and coal byproducts. He observed wood chips that were stored and never witnessed it being blended with those products (Tr. 53-54). He explained that the coal blending was accomplished by using bulldozers to stockpile the materials and front-end loaders moving it from one stockpile to another (Tr. 55).

Supervisory Special Investigator, Robert D. Clay testified that he has been employed with MSHA for 22 years and is responsible for violations of section 110 of the Act, and other duties as assigned by District 5, in Norton, Virginia. He detailed his prior 16 years of mining experience in the private sector, including mine foreman and equipment operator positions in surface and underground mines. He also performed duties with MSHA as an inspector and field office supervisor, and was familiar with the respondent's facility (Tr. 57-59).

Mr. Clay stated that he first became familiar with the respondent's site after an inspector informed the assistant district manager that he observed coal trucks coming off the state road that

6

were not going directly to Dominion's power plant and were turning off somewhere else. He was asked to investigate the respondent's operation because there was no known preparation plant at that location. He went to the location on May 22, 2012, and from his vantage point off the property on a country road he observed coal trucks going on the property. He could only observed what he believed was a small sampling unit that appeared to be sampling whatever went through the gate, and a small scale (Tr. 59-60).

Mr. Clay stated that he was approached by the respondent's foreman, Bobby Ketron, who invited him on the property and took him to the mine office consisting of a small trailer or building. Mr. Kentron then took him to a "yard" area that he called a "blending yard" where Mr. Clay observed signs posted indicating "There was a yard there, a blending facility, signs coming onto the property". He also observed end loaders, trucks coming on the property, a coal sampling unit, scales, and a water tank on an elevated roadway (Tr. 60-61). Mr. Kentron told him that coal trucks would deliver coal to the yard, dump it and that end loaders would blend the coal together for a certain specification. It would then be stored and eventually transported to Dominion's power plant directly across the small county road (Tr. 61).

Mr. Clay identified Exhibits G-6 and G-7 as photographs of two signs stating "Virginia City Fuel Blending Terminal, ¼ mile on right", and "Blend Yard Area A", and assumed they were created by the respondent. It was his understanding that the respondent referred to the facility as a blending terminal (Ex. G-6). He stated that what was stored in Area A appeared to be a pile of coal and the sign on the property pointed to the "blend yard storage Area A" (Ex. G-7). He explained that during his visit to the facility he observed several trucks stopping at a sampling area and a sample being removed from the coal truck trailers that drive across a set of scales. The tractor and trailer are then driven to yard storage A where the coal is dumped and pushed together and blended with the front end loaders. The blended coal is placed back in the truck with the same loaders and travel across a set of scales again and travel off the property that he assumes was taken across the road to Dominion's power plant (Tr. 65-66).

On cross-examination, Mr. Clay stated that he could observe portions of the respondent's property while parked by the road, and more of it after he was invited in by Mr. Ketron. He stated that the Dominion power plant was adjacent to the respondent's site across the road, and the trucks he observed were turning onto the respondent's site. He confirmed that he did not conduct any inspection on Dominion's property (Tr. 67-71).

Mr. Clay stated that he was not aware of any other power plants in MSHA's District 5, and that he was only requested to inspect the Dominion location. He speculated that in the event he observed the trucks turning into that plant, he probably would have inspected that area if requested to do so by his supervisor (Tr. 73). He confirmed that he was not aware of any discussions within his district concerning any "debate" about MSHA's jurisdiction over the respondent's site, or any other sites (Tr. 74-75). He confirmed that his inspection did not include

7

any interviews with anyone on Dominion's property, or the producers of the materials that were trucked into the respondent's site because he did not know who they were. He confirmed that he did not observe the handling of any biomass at that site because he was not sure what it was (Tr. 76).

Walter B. Crickmer, the respondent's co-owner and site manager, stated that the site is located on 106 acres across the road from the Virginia City Hybrid Energy Center (VCHEC), owned and operated by the Virginia Electric and Power Company that is commonly known as Dominion Power, of simply "Dominion" (Tr. 79-81). He identified Exhibit R-1 as an aerial photograph of the power plant, as well as the respondent's site labeled "Power Fuels LLC Fuel Handling Facility", and he was unaware of any citations issued on the plant property (Tr. 82-89).

Mr. Crickmer stated that he has a degree in Geology and is a geologist with previous coal mine experience that began in 1970, and served as president of the Clinchfield Coal Company that operated several mines and preparation plants. He also worked for the Pittston Coal Company drilling gas wells and was engaged in other enterprises processing wood chips and rebuilding mine equipment (Tr. 120, 122). For the past ten years he and several partners have owned and operated a business called Gobco that reclaims gob piles, and for the first eight years it supplied gob coal products to several companies such as Alpha, Taco, United, and Warscho. During that time, the company won many state reclamation awards and a Federal Department of the Interior award for its tree and "green history" (Tr. 121-122).

Mr. Crickmer described the Dominion plant as a 600 megawatt facility placed in operation two years earlier at the same time the respondent's site was placed in operation. He stated the plant was designed differently from most coal-fired power plants run with high BTU coal content and relies on a very critical BTU low, medium 7500 BTU, or as low as 6500-8000 product that changes daily for the size of the coal product that is going by conveyor belt into the furnaces that produce heat for its generation station. In order to maintain quality fuel, it is critical to maintain the low BTU coal content that supplies the furnaces (Tr. 81-82).

Mr. Crickmer stated that the plant burns 10,000 tons of fuel material a day. An average 8,000 tons is supplied by the respondent's facility that transports it by trucks to the site, and 2,000 tons is trucked directly to the plant from other locations (Tr. 89). Mr. Crickmer described the fixtures and facilities on the respondent's property as a terminal office, a set of scales, an auger sampler owned by a contractor. The respondent owns the office and scales, as well as a small block building for storing grease, lubricants and work parts, and a pump house for a water tank used for road dust control. He further confirmed respondent's ownership of four storage yards, a sediment pond, and a $40,000 bath house facility required by MSHA (Tr. 90-91). He described the equipment as four rubber-tired end loaders equipped with computerized bucket scales, a dozer, a water truck, street sweeper, a road maintenance truck, a mobile stacking conveyor, and a pickup truck (Tr. 92).

8

Mr. Crickmer stated that the respondent handles different kinds of fuels purchased by Dominion, including wash coal from preparation plants, run-of-mine-coal, coal refuse, and gob, biomass wood products. Also included is wood products and biomass consisting of trees, "week" and brush that is ground to a certain specification and blended in with solid fuel at Dominion's furnace. He stated "it's just wood that's been ground up, which is critical and it has to be sized properly to work in the plant" (Tr. 93).

Mr. Crickmer described the Dominion Power Plant as "a very special" operation designed to burn coal, biomass, blended in with limestone for emission control". He explained how the materials are processed and burned with the special specified fuel because all of the materials have to meet the proper specifications to react properly in the furnace burn chamber that may not otherwise be used at other power plants, and this includes coal refuse, gob, and wood (Tr. 94-95). He stated that the respondent currently receives coal or gob from approximately 15 to 16 Kentucky and Virginia producers. He confirmed that the respondent works for Dominion Power under the stipulated terminalling agreement (Tr. 96-98; Ex. G-4).

Mr. Crickmer stated that the respondent does not, and never has, owned any of the coal related materials delivered by contractor trucks to its site. Pursuant to the agreement with Dominion Power, the respondent is paid so much a ton for the materials as weighed at the scales. Further, all of the respondent's operational costs, including the wages of the foreman and hourly employees, except for the manager, are fully reimbursed by Dominion to the respondent. All fuel materials delivered to the site are paid for by Dominion directly to the producers (Tr. 100-101).

Mr. Crickmer explained that on any given day, the fuel materials ordered by Dominion Power to be trucked to the respondent's site are weighed and recorded by the computerized scales and sampled by a third party contracted by the respondent, and then trucked to any of four storage yard areas (A through D), where it is dumped, segregated, and stored into one particular pile for particular producers. The fuel delivered for that day is kept segregated for that day because it has a certain quality. This procedure is followed for all 16 producers who delivered the fuel materials that day. Dominion Power and the respondent would receive computerized reports reflecting the exact fuel quality for the fuel delivered that day (Tr. 102-103; Ex. R-3). Mr. Crickmer explained the fuel blending process that takes place as follows at (Tr. 103):

> So we keep that fuel segregated for that one particular day because it has a certain quality. And we do this for all 16 producers, whoever we have coming that day. And then we get all the qualities the next day. And then Dominion directs us daily to take this quality coal, so much of this material and so much of that material and so much of this material and blend it together by one bucket of this, two buckets of that. Literally is says that. You have the sheets there that come from Dominion Power that says that into a pile.

9

In the event the blending samples reflect a need to improve the quality of the material, it will be blended as described by Mr. Crickmer at (Tr. 104):

> So we will re-blend the entire pile again based upon their direction, add so much more of this pile to it, be it a higher BTU or a lower BTU, because that is so critical for the firing in the plant, this blended fuel spec, that it has to be right on the mark. So Dominion makes that call. And sometime we'll reblend a pile two or three times to get it exactly what they want before they take it across the street.

Mr. Crickmer stated after the fuel materials are blended at the desired quality range, the respondent uses two or three contractor truckers who are allowed on Dominion Power's property to deliver the desired daily tonnage ranging from 8,000 to 15,000 tons across the street to the plant. He stated that on any normal operating day the respondent will handle 300 to 500 tractor trailers coming in and out of its site and 150 to 200 truckloads a day will go to the plant (Tr. 104-105).

Mr. Crickmer identified Exhibit R-2 as a survey map of the respondent's property showing the locations of the four fuel material storage areas A through D, the truck scales, and the auger samples (Tr. 105-106). He further identified Exhibit R-3, as a typical example of a blending instruction sheet, provided to the respondent from Dominion every day, and sometimes bi-daily, identifying a particular storage pile and instructions to "Mix this blend, and it tells you exactly, and the moisture" (Tr. 107-108). Further examples are stated as follows at (Tr. 108):

> THE WITNESS: No, that's okay. This right here says "Please blend 908A –which is our product – "5 buckets of Omega with 4 buckets of Gobco/ETI for pile Aa."
> BTU should be 7950, 39 percent ash, 5.9 percent moisture. "I have attached a spreadsheet with calculations." In yard B —

Mr. Crickmer cited an example of blending calculations made by the respondent with respect to the fuel purchased by Dominion from all of its producers as follows: (Ex. 3, Tr. 109).

> THE WITNESS: This is how many buckets. There's 207.98 buckets in that pile. This is the percent. And in the blended pile they want two buckets of that. They want three buckets of Pevler. They want three buckets of IBCS and one bucket of South East. So it actually gives us a 6.5 moisture, a 39 ash, a .9 sulfur, and 7600 BTU. Now, these are all critical things for that power plant's furnace. That BTU has to be right on the money. That sulfur has to be within the limits required by the law. And, of course, ash is, you know, a byproduct of the BTU. (Ex. R-3; Tr. 109).

10

Mr. Crickmer further identified information received daily by the respondent from all of the coal fuel producers with respect to the different quality specifications utilized during its blending process. He stated the information is tracked by Dominion's computers "so that all these products are properly blended together" (Tr. 112). He explained that Dominion's plant is not a standard coal-fired plant that utilizes fuel that is blown into a furnace. He described Dominion's plant as "a fluidized bed plant" that utilizes other materials such as limestone for its furnace reaction chambers to insure the required critical combustion and the removal of emissions (Tr. 110-111). He stated that OSHA, EPA, and "DEQ" have jurisdiction over the plant's operations (Tr. 111).

Mr. Crickmer believed that the coal fuel delivered to the respondent's site has been crushed and sized, and he assumed that the producers of the coal have done this prior to its sale to Dominion in order to meet its specifications. No coal crushing, sizing, or washing is done at the respondent's site. He stated that "all we do is take different fuels purchased by Dominion, which they own, and we blend it to whatever specifications they want for the next day to burn at the plant on two days". He confirmed that the coal meets Dominion's preparatory size specifications, and if not, Dominion would reject the coal until it was properly sized (Tr. 114). He explained that the Dominion plant is unique in that all fuel material is trucked in daily, and when its inventory is full, it only has a nine to ten day supply, whereas most coal-fired plants have 60 to 90 day inventory. He stated that the respondent provides a service to Dominion by storing an additional eight days of purchased fuel on its site (Tr. 115).

Mr. Crickmer stated that the respondent has never been in the coal business, and that its site was designed to perform the daily work that he has described. He confirmed that he was familiar with the work performed at coal preparation plants and was responsible for such a plant when he worked at Clinchfield Coal. He explained that a preparation plant washes, screens, and sizes coal pursuant to the specified specifications from the customers it services (Tr. 122-123).

Mr. Crickmer stated that the respondent does nothing to improve the quality of any fuel product, and it never screens, washes, or sizes it "other than take exactly what's been brought in there by Dominion and put it in a blend to fuel their furnace" (Tr. 123). He explained that the coal was crushed and screened by the coal producers to meet Dominion's BTU, sulfur, or moisture specifications. He stated that the respondent furnishes approximately 80% of the fuel it handles and delivers directly to the Dominion plant, and that 20% of the material does not come to the respondent's site and is delivered directly by truckers ordered by Dominion (Tr. 123-124).

Mr. Crickmer stated that the "fine tuning" of the "spec fuel" that arrives at the respondent's site is not done by any of the coal producers, and the respondent receives a variety of coal blends purchased by Dominion that is to be blended before it can be delivered to its plant. He explained that coal blending, sampling, and analysis takes place at the respondent's site daily, and changes daily "six days a week all year long" (Tr. 124).

11

Mr. Crickmer stated that in the event the respondent did not do the blending work, Dominion would have to it because the plant requires the desired fuel specification (Tr. 125). He explained that when he established the respondent's site he consulted with the State Department of Mining Minerals and Energy and informed its director that the respondent "would work for Dominion to handle trucks, store their fuel, re-blend it to spec and haul it across the street". He stated that he was informed that he was not a coal mine, did not need a mine license, was not a wash plant, and was not subject to the State's jurisdiction, and was referred to OSHA signs, brochures, and forms for visitors to sign, and operated that way until MSHA appeared (Tr. 125-126).

    On cross-examination , Mr. Crickmer confirmed that the respondent blends coal on behalf of Dominion, stores it at the respondent's facility and loads and delivers it across the street to the Dominion plant as directed. He confirmed that the stipulated Terminalling Agreement defines its work responsibilities on behalf of Dominion with respect to the blending and delivery of the coal to the plant. He stated that the respondent is a custom blending facility for Dominion and that the work it performs is done to meet Dominion's requirements and specifications (Tr. 127-128). He characterized this work and the term "custom" as follows:

> A.    It makes a buyer's spec fuel that really changes daily or weekly. And they change it based upon the heat rate of the furnace. It's a custom fuel. And we do that work for Dominion. We make that spec fuel for them with fuels that they own. They buy fuels from many people and we take those fuels and we make that spec fuel. (Tr. 128).

    Mr. Crickmer further confirmed that "solid fuel" is defined by the agreement as coal, coal refuse, and coal midds or gob (Tr. 129). He stated that the biomass handled by the respondent is covered by a separate agreement and it is the only product that it has ever purchased and owned for that business. He confirmed that it provides biomass for Dominion and ground end sized 1,000 truckloads of wood materials in 2012, to Dominion outside of the agreement (Tr. 129-130).

Mr. Crickmer explained that the respondent is not responsible for any erroneous blend or loss in a stockpile, and commented "that is all 100 percent Dominion", and "if they told me to blend it this way and it came out something they didn't like, it's not my responsibility. I only do what I'm told to do". He confirmed that Dominion can perform re-blending at its site through its reclaim systems that senses sulfur, moisture, or ash in both piles (Tr. 137-138).

<u>The Jurisdictional Issues</u>

The Secretary's Arguments

The Secretary relies on the testimony of MSHA Inspector Thomas C. Bower, who confirmed his site inspections in December 2012, and April 2013, when he observed the loaded coal trucks transporting the coal onto the property where it was weighed, sampled, and stored in designated areas, and blended using front-end loaders that mixed and combined different types of coal and stored in separate stockpiles to create a custom coal blend.

The Secretary further cites the testimony of MSHA Special Investigator Robert D. Clay, who initially observed coal trucks entering the site, and his further observations after he was invited onto to the property by site foreman Bobby Ketron. Mr. Clay observed front-end loaders, weighing scales, a coal sampling unit, a water tank, and several coal trucks coming onto the property. He testified that Mr. Kentron informed him that coal trucks delivered coal to the blending yard where front-end loaders blended the coal together to meet certain specifications. The blended coal was stored and eventually transported to the Dominion Power Plant across the street from the respondent's facility.

The Secretary further relies on the testimony of Walter B. Crickmer, the respondent's co-owner and facility manager who confirmed the Terminalling Agreement between the respondent and Dominion Power specifying the services provided by the respondent, including the blending of solid fuel in accordance with the requirements of the customer, and the loading of trucks and shipment of solid fuel to Dominion's plant (Tr. 127-128); Exhibit G-4, pg. 4.301(a)(iv)(v)).

The Secretary cites the definition of "solid fuel" in the Agreement as "coal, coal refuse, coal midds, or gob" and refers to Dominion Power as the "Customer" of Power Fuels, LLC (Ex. G-4, at 1, 2; Tr. 129). The Secretary cites Mr. Crickmer's testimony that the respondent receives daily instructions, sometimes bi-daily, from Dominion Power that directs it on how to create a custom coal blend that meets Dominion Power's specifications as noted in Exhibit R3.

The Secretary further cites Mr. Crickmer's testimony that it was "critical" for the respondent to make a custom coal blend that meets Dominion's precise specifications in order for the power plant furnace to operate correctly and his explanation that "All we do is take different fuels purchased by Dominion, which they own, and we blend to whatever specifications they want for the next day burn at the power plant" (Tr. 114). The Secretary refers to the following testimony and admissions by Mr. Crickmer:

1.  The respondent "provides a big service" for Dominion because it stores large quantities of coal, and that since Dominion can only store up to eight days of power-

13

plant-ready coal at its plant, storage at the respondent's facility reduces Dominion's storage needs on its own premises (Tr. 115, 126).

2.  The respondent's facility has four different storage areas where trucks are routinely loaded with blended coal and taken to an auger sampler that tests the coal to insure it meets Dominion's specifications and transported across the street to the Dominion Power Plant (Tr. 102-103, 126; Ex. G-7).

3.  The respondent "is a custom blending facility" for Dominion Power, blends coal that it receives from approximately 16 different producing mines, and that the work it performs is done for the purpose of meeting Dominion's specifications and requirements (Tr. 97, 126, 128).

The Secretary asserts that under the plain language of the Mine Act, the respondent's blending facility is a "mine" for purposes of Mine Act enforcement jurisdiction. The Secretary cites Section 4 of the Act that each "coal or other mine" whose products affect commerce shall be subject to the Act, and that "Coal or other mine" is defined in Section 3(h)(1) of the Mine Act to include:

> (C) lands . . . structures, facilities, equipment, machines, tools, or other property . . . used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in non-liquid form . . . or used in, or to be used in, the milling of such minerals or the work of preparing coal or other minerals, and includes custom coal preparation facilities (30 U.S.C. 802(h)(i)).

The Secretary cites the definition of "work of preparing the coal" at Section 3(i) of the Mine Act as:

> . . . the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite or anthracite, and such other work of preparing coal as is usually done by the operator of the coal mine (30 U.S.C. 802(i)).

The Secretary asserts that the record in this case makes it abundantly clear that the respondent is a custom coal preparation facility that is "used in" the "work of preparing coal", and that it undisputed that it mixes, blends, loads, weighs, samples, and stores bituminous coal for the sole purpose of meeting the specifications and requirements of its customer Dominion Power. The Secretary concludes that these coal preparation activities confer Mine Act enforcement jurisdiction over the respondent's blending terminal, and that a plain reading of Mine Act Section 4 requires the conclusion that the terminal operation is a "custom preparation facility" within 30 U.S.C. 802(h)(1). In this regard, the Secretary cites Mr. Crickmer's

14

admission that the respondent "is a custom blending facility" for its customer Dominion Power (Tr. 128).

The Secretary cites the Commission's decision in Mineral Coal Sales, Inc., 7 FMSHRC 615 (1985), affirming my jurisdictional finding over a commercial loading facility, a railway siding that the Secretary states performed coal preparation function similar to the work performed by the respondent in the instant matter, namely the blending of different types of coal together to meet customer's specifications and loaded the blended coal for transport activities are specifically listed in the Mine Act as constituting "the work of preparing the coal". In that case, although the Commission stated that merely performing one or more of the statutorily enumerated activities is not solely determinative of whether the facility is properly classified as a "mine", it nonetheless noted that the inquiry must also focus on the nature of the operation performing the activities and whether the work is "undertaken to make coal suitable for a particular use or to meet market specifications".

The Secretary emphasizes that the Commission ultimately concluded that the operations taking place at Mineral Coal Sales, when viewed as a collective whole, indicated that the facility was a "mine" because it performed preparation work to make coal suitable for customer specifications, and rejected Mineral Coal Sales' contention that its work of merely blending different types of coal from different stockpiles under the direction and control of another entity does not constitute coal preparation. The Secretary concludes that the preparation work performed at the Mineral Coal Sales facility is virtually identical to the blending work performed by the respondent and falls within MSHA's jurisdiction.

The Secretary states that assuming arguendo that the court finds that Sections 802(h)(1)(C) and (i) are ambiguous with respect to whether they allow MSHA to assert enforcement jurisdiction over a custom coal preparation plant that engages in further preparation of previously processed coal to meet the specifications of the coal's ultimate consumer, the Secretary's reasonable interpretation of the Act is entitled to deference. Citing Secretary v. National Cement Co., 573 F.3d 788 (D.C. Cir. 2009) (deferring to MSHA's finding of Mine Act jurisdiction over a road leading up to a cement plant), and Secretary v. Carolina Stalite Co., 734 F.2d 1547 (D.C. Cir. 1984) (deferring to MSHA's jurisdictional determination that a slate gravel processing facility that did not extract slate but processed it for commercial purposes was a "mine" within the meaning of the Mine Act.

The Secretary argues that his interpretation that the work performed at the respondent's blending facility constitutes the "work of preparing the coal" is reasonable and entitled to deference, citing the cases of Mineral Sales, Inc. and Kinder Morgan Operating, supra with "strikingly similar facts to the case as bar" with respect to the undisputed statutorily enumerated coal preparation activities performed by the respondent that include the "mixing, storing, and loading of bituminous coal" functions specified in 30 U.S.C. 802(i).

15

The Secretary maintains that his interpretation of 30 U.S.C. 802(h)(1)(C) and 802(i) is reasonable and that by enacting the Mine Act Congress sought to prevent "unsafe and unhealthful conditions and practices in . . . coal or other mines," 30 U.S.C. Section 801(b), and that it furthers the safety and health goals of the Act to cover, to the maximum extent consistent with the statutory terms, workers subject to the conditions, practices and hazards associated with coal preparation, and that deference to the Secretary's interpretation is additionally warranted because 30 U.S.C. 802(h)(1)(C) "expressly authorize(es) the Secretary to define what constitutes a "mine." Otis Elevator Co. v. Secretary, 921 F.2d 1285, 1288 n.1 (D.C. Cir. 1990).

The Secretary states that the respondent introduced no facts or evidence to support its contention that MSHA has no jurisdiction over its blending facility and rejects its principal defense that its mixing, storing, and loading work is not the type of coal preparation work that "is usually done by the operator of the coal mine", and as such should be treated like the ultimate consumer of the coal instead of a mine operator.  The Secretary responds to the respondent's contention that if it did not perform the custom blending work for Dominion, Dominion would have to perform these coal preparation activities for itself , and takes the position that the respondent seeks to be treated as the ultimate consumer of the coal, instead of the contractor it actually is that prepares the coal to meet the specifications of the ultimate consumer, and that its argument has no basis in fact or logic and should be rejected.

In response to the respondent's suggestion that the Secretary's jurisdictional interpretation would expose any place that mixes, stores, or loads coal to MSHA's enforcement scrutiny, the Secretary states that simply storing or loading coal would not subject the coal end-user to MSHA's jurisdiction.  The Secretary concludes that his asserted enforcement jurisdiction is consistent with the Commissions analysis in Elam, supra, and the reasoning stated in Mineral Coal Sales, supra, and Kinder Morgan Operating, supra.

The Secretary further cites the Third Circuit Federal Court of Appeals decision in RNS Service, Inc. v. FMSHRC, 115 F.3d 182 (1997), concerning a site that processed coal refuse that was delivered to a co-generation facility generating electricity and steam where it was further prepared in a useable form by its ultimate consumer.  The Court affirmed the Commission's functional analysis holding that the loading and transportation of the coal that occurred at the site were sufficient to render the site a mine, and rejected the assertion by RNS Services that the Commission made a per se ruling that simply loading and transporting the coal rendered the site a "mine".

With respect to the facts supporting the alleged violations, the Secretary relies on the testimony of Inspector Bower as previously noted, including the joint stipulated evidentiary admission of the citations were received for the record, without objection, except as to

16

jurisdiction. Further, the Secretary takes the position that if MSHA's jurisdictional claims are affirmed, the citations and proposed civil penalty assessments should also be affirmed..

The Respondent's Arguments:

The respondent argues that the critical question in this case is whether any mixing, storing, or loading of coal is subject to the jurisdiction of the Act, as contended by the Secretary, or whether the mixing, storing, and loading must be the type of work usually performed by the operator of a coal mine. The respondent asserts that if the Secretary is correct that any mixing, storing, or loading of coal is sufficient to establish MSHA jurisdiction, then any consumer who mixes, stores, or loads coal is the operator of a coal mine. Conceding the fact that the Mine Act confers broad jurisdiction on MSHA, the respondent maintains that it does not go that far.

The respondent argues that the work normally performed by coal consumers is not subject to the Mine Act, and that in the instant case the respondent is doing blending work for the consumer of the coal, not for the producers of the coal. The respondent maintains that the work that it performs is the type of work that is generally performed by a consumer, and the fact that the consumer has contracted with the respondent to perform this work, instead of doing it with its own employees, does not change the character of the work or allow MSHA to assert jurisdiction.

The respondent relies on several Commission and ALJ jurisdictional issue decisions in support of its case. Addressing the critical issue with respect to the connection that must exist between the work in question and the usual work of mining, the respondent cites Secretary of Labor v. Oliver M. Jr., Co., 4 FMSHRC 51 (1982l), a case involving an operator of a commercial dock on the Ohio River, and affirming an ALJ decision that Elam's facility was not a "mine" subject to Mine Act jurisdiction.

The respondent states that although Elam crushed and loaded coal onto barges, the Commission held that the dock was not a "coal or other mine," and that just because it handled coal it did not mean it was engaged in "the work of preparing the coal." To fall within the definition, the Commission concluded that the work must involve more than the "breaking crushing, sizing, cleaning, washing, drying, measuring, storing, (or) loading" of coal. The work must be the kind of work "usually performed by the mine operator engaged in the extraction of the coal or by custom preparation facilities . . . ".

With regard to Secretary of Labor v. Mineral Coal Sales, Inc., 7 FMSHRC 615 (1985), the respondent points out that the Commission addressed a different situation involving a tipple operator at a siding that stored, mixed, crushed, sized, and loaded coal in order to make it "suitable for a particular use or to meet market specifications." The company processed the coal

17

for brokers, not consumers, and the Commission held that the company's operations were subject to the Act.

Citing my decision in Marion Docks, Inc. v. Secretary of Labor, 10 FMSHRC 1598 (1988), a case involving a coal loading tipple facility that loaded and shipped coal by river barges to several utility customers who purchase the coal from brokers, the respondent points out that the facility was not the consumer of the coal, and did not work for the consumer of the coal, and only worked for brokers who sold the coal to utilities.

The respondent cites my decision in Secretary v. Consolidation Coal Company, 35 FMSHRC 439 (2013), involving a coal loading facility that received processed coal from an adjacent preparation plant. The respondent states that the case involved two facilities, namely (1) a coal loading facility that was essentially an extension of the preparation plant, and (2) a barge onto which the coal was loaded. The respondent states that the loading facility where the work of loading work that included the layering of the coal to meet the mine customer's specifications was held to be subject to the Mine Act, "but the barge was not, . . . and simply transported the loaded coal" (pg. 9, post-hearing brief). The respondent further addresses two Federal Court of Appeals cases relied on by the Secretary with respect to what constitutes a mine. RNS Services, Inc. v. FMSHRC, 115 v. F. 3d 182 (3d Cir. 1997), and Kinder Morgan Operating, L.P. v. Chao, 78 F. App'x 462 (6th Cir. 2003) (unpublished); (Commission Decision at 23 FMSHRC 1288, 1294 (2001)).

With respect to RNS Services, Inc., the respondent states that RNS loaded coal refuse at a refuse site, and that the Court, in a 2-1 decision, the majority applied a functional analysis focusing on the nature of the work being performed at the site and held that RNS was subject to the Act. Even so, the respondent argues that the majority disclaimed the view that any loading of coal was subject to the Act, and that in order to constitute a mine, the coal must be loaded "at a place regularly used for the purpose, in preparation for further processing, and that the "loading of the coal is a critical step in the processing of minerals extracted from the earth in preparation for their receipt by an end-user. . . ." Id. At 185. The respondent notes the dissent argument that the Commission had applied a per se ruling making any loading of coal subject to the Act. Id. At 192 (Alito, J., dissenting).

With regard to the Kinder Morgan Operating decision, involving a marine loading facility that received and loaded coal, mostly for the Tennessee Valley Authority (TVA), and that the TVA purchased the coal from numerous producers, and that Kinder Morgan stored and blended the coal into different products for different plants. The respondent points out that the Commission split 2-2 on whether the Mine Act applied to Kinder Morgan's operation, and concedes that the 6th Circuit found MSHA jurisdiction and adopted the reasoning of the two Commissioners who voted to uphold jurisdiction based on their reasoning that Kinder Morgan was performing work "usually performed by the operator of a coal mine by undertaking the

18

activities to make the coal suitable for a particular use or to meet market specifications." 23 FMSHRC 1288, 1294 (2001).

The respondent cites several additional Court opinions that it believes make it clear that storing, loading, and mixing coal are themselves insufficient to support jurisdiction, and that otherwise, anyone who handles coal would be covered by the Act. The respondent concludes that the storing, loading, and mixing must be part of a mine's operations. In support of its argument, the respondent cites Herman v. Associated Elec. Coop. Inc., 172 F. 3d 1078 (8th Cir. 1999), stating "not all businesses that perform tasks listed under the 'work of preparing coal' in Section 802(i) can be considered mines." Id. At 1082, and that while utilities may be subject to the Act if they maintain a presence at the mine and assist in mining or loading the coal or if they engage in coal preparation of the type performed by mine operators, "a utility that receives processed coal from a mine does not itself become a 'mine' by further processing the coal for combustion." Id. At 1083. Thus, once a producer delivers processed, marketable coal to a utility, the jurisdiction of MSHA ends, even though the utility may do further blending of the product. Id.

The respondent argues that the Fourth Circuit made this same point in United Energy Services, Inc. v. MSHA, 35 F. 3d 971 (4th Cir. 1994), involving the operator of a power plant that went onto mine property and loaded coal refuse from a pile and transported it to the plant. Id at 973. Employing a functional analysis, the Fourth Circuit found that the plant operator was engaged in the work of preparing the coal. Id. At 975. The respondent asserts that the Court was careful to rule, however, that the same analysis would not apply once the coal was delivered to the plant.

The respondent asserts that the following facts are not contradicted:

1. Dominion purchases coal from various producers.
2. The coal is delivered to the Power Fuels site by contract truckers for the producers.
3. Dominion owns all of the coal that is delivered to the site.
4. Power Fuels is a contractor for Dominion under a Terminalling Agreement.
5. Power Fuels weighs, samples and stores the coal for Dominion.
6. Dominion instructs Power Fuels how to blend and deliver the coal.
7. Dominion does so to achieve the desired burn for the fuel going into its plant.
8. Dominion is the sole consumer of the coal at the Power Fuels site.
9. If Power Fuels did not store and blend the coal for Dominion, Dominion would have to do the work itself or find another contractor to do it.
10. The work performed by Power Fuels is work that is usually performed by utilities or other consumers of coal. It is not the type of work performed by producers or brokers of coal.

19

The respondent concludes that the activities listed in 30 U.S.C. Section 802(i) as being part of the "work of preparing the coal" are limited by the phrase "as is usually done by the operator of the coal mine." If the storing, loading, and mining is the type of work usually performed by the mine operator, the work is subject to the Act. On the other hand, if the work is not of that type, but is work of the type usually performed by a utility or other consumer of the coal, the work is not subject to the Act. In this regard, the respondent asserts that MSHA's Special Investigator Robert Clay testified that the activities in question occurred on the property of Dominion, MSHA would not have considered the to be within its jurisdiction. In other words, if Dominion had done the work itself, the agency would not have asserted jurisdiction. The respondent concludes that if the activities are not subject to the Act when performed by Dominion, then they are not subject to the Act when performed by a contractor for Dominion, and that any other interpretation would lead to the extreme and unreasonable position that MSHA has jurisdiction over everyone who receives and handles coal.

<u>Findings and Conclusions</u>

<u>Jurisdiction</u>

The essence and focus of the respondent's jurisdictional argument is the statutory language defining a coal mine, and the meaning of the phrases "work of preparing the coal" , and "such other work of preparing such coal as is usually done by the operator of the coal mine". At hearing, the respondent's counsel argued that <u>any work</u> associated with the blending, mixing, and storage of coal does not ipso facto constitute "work of preparing the coal", and does not necessarily result in MSHA jurisdiction (Tr. 133-134).

The respondent maintains that "a line must be drawn", particularly in view of the statutory language requiring a showing that the kind of work performed is the kind that is <u>usually </u>done by a coal mine operator (Tr. 133-134). In support of its argument, the respondent relies on the dissenting judge (now Supreme Court Justice Alioto) in <u>RNS Services, Inc.</u>, <u>supra</u> that not <u>every</u> mining, washing, sizing, or trucking of coal is a coal mine, and that the kind of work <u>must </u>be the kind done by the coal operator.

The respondent dismisses any suggestion that the work it performs is done for a <u>customer</u>, or that it was "some kind of a middle man custom blending coal to sell into a market", and asserts that it is in fact a contractor for the Dominion Power Plant that is not its customer "in a sales sense" (Tr. 137). In response to these arguments, the Secretary maintains that the case law cited and relied on in this case to support MSHA jurisdiction is clear that the line is drawn where the work of mixing, storage, and loading of coal is done to meet a customer's specifications (Tr. 135).

20

I reject the respondent's claim that Dominion Power is not its customer. The terminalling agreement specifically describes Dominion Power as a "customer" numerous times at pages one through eight (Ex. G-4). Further, the respondent's site manager Walter Crickmer in describing the blending of coal at the site pursuant to the agreement stated this is done "in accordance with the reasonable requirements of the customers" (Tr. 127). He also confirmed that the site is "a custom blending facility for Dominion Power", and that all work performed "is done to meet the requirements and specifications" of Dominion Power (Tr. 128). Accordingly, I conclude and find that Dominion Power is in fact the respondent's customer.

The respondent's assertion that Inspector Clay, at (Tr. 69-72), testified that in the event the trucks he observed were delivering coal directly to Dominion's power plant, MSHA would not have asserted jurisdiction must be considered in context. In fact, Mr. Clay testified that he had "no idea" because he does not inspect power company property unless MSHA jurisdiction is factually determined, and that was his understanding that MSHA's claim of site jurisdiction is based on the working activities he only observed taking place at the respondent's property (Tr. 69-70). Further, when asked if he would be present at the hearing in this case if he had observed the trucks going directly into the plant, inspector Clay stated he probably would be present at the hearing because MSHA's assistant district manager, his superior, "asked me to look into it and I reported to him what I found" (Tr. 73). Further, in response to whether MSHA has asserted its jurisdiction over other power plants in District 5, he confirmed that the only power plant he was asked to look at was Dominion's plant jurisdiction there" (Tr. 73).

The respondent's conclusion that in my Consolidation Coal case, I found the layer loading of coal at the loading dock at that facility location that includes a fixed barge constituted "work in preparing coal" to meet customer specifications is correct. However, the respondent's assertion that I found that "a barge on which the coal was loaded" was a "facility" not subject to MSHA jurisdiction because "it simply transported the coal is incorrect and mis-leading. I made no finding the barge was a "facility". The barge in issue was an empty barge on the Ohio River located away from the loading dock location where no layer loading was taking place.

I take particular note of the Court majority in RNS Services, Inc. supra, rejecting the dissenting opinion that the Commission applied a per se ruling in that case. Indeed, the Court noted that the Commission was cognizant of the fact that coal refuse was loaded at the site in question for delivery to its power generator facility and correctly applied a "functional analysis" test in determining that the coal loaded and store at that site was in fact loaded at a place regularly used for that purpose, and were sufficient to render the sites of these activities a "mine".

21

I conclude and find that the resolution of jurisdiction in this case is properly and reasonably made pursuant to a "functional analysis" as described in RNS Services, Inc., and Oliver M. Elam, as well as in Mineral Coal Sales, Inc., Marion Docks, Inc., and Kinder Morgan Operating Supra, decisions that I find persuasive and controlling precedents in this case.

Although the Court decisions in Herman v. Associated Elec. Coop., Inc. and United Energy Services, Inc. v. FMSHRC, supra, relied on by the respondent may support its argument that mixing, storage, and loading of coal work are not per se operational indicators supporting Mine Act jurisdiction, those cases dealt with consumer electrical power plant sites, and not sites similar to those at the respondent's facility. In Herman, the Court found its operations to be "manufacturing" subject to OSHA jurisdiction. In United Energy Services, Inc., the Court applied a functional analysis in concluding that a power plant operator that went on mine property and loaded refuse from a pile and transported it to its plant was engaged in coal preparation work that is subject to Mine Act jurisdiction.

I am not persuaded by the respondent's arguments that the work it performs for Dominion Power is work that is usually performed by utilities or other coal consumers, and is not the type of work performed by coal producers or brokers. The respondent is not a power plant, utility, consumer, or a coal producer or broker, and the fact that it does not engage in those activities is not relevant in this case.     The credible evidence and un-rebutted facts in this case clearly establishes that the respondent is a stand-alone coal blending facility identified as such by signs prominently displayed on its property. The site location includes mobile equipment such as several trucks, end-loaders, an office, a bath house, sampling and weight scales, clearly identified storage areas, and a water tank and trucks, all of which provide the logistical support for the employees as they perform their assigned duties related to the receipt, testing, weighing, blending, mixing, storage, and transportation of coal from that site in order to meet the coal specifications that are communicated to the respondent by Dominion Power on a daily continual basis.

I am not further persuaded by the respondent's argument that if it did not store and blend the coal for Dominion, Dominion would have to do the work itself or find another contractor to do it. In this case, no entity other than the respondent is the subject of MSHA's asserted jurisdiction and I assume it operates under a mine ID number assigned by MSHA to a mine operator pursuant to 30 C.F.R., Part 41. In any event, pursuant to Section 3(d) of the Mine Act, the definition of an "operator" includes any contractor performing services at a mine. Further, I find that the respondent cannot avoid the Secretary's enforcement scrutiny because it is contractually obligated to perform these services for Dominion Power.

22

Although the respondent's site manager, Walter Crickmer, testified that no sizing, screening, or crushing activities take place at the site and has "never done anything to improve the coal quality", he nonetheless admitted that the site does in fact blend the coal together on a daily basis using its end-loaders that mix and blend it "by one bucket of this, and two buckets of that", following the aforementioned detailed specifications as to how the coal should be blended. Contrary to Mr. Crickmer's opinion that the work performed at the site has nothing to do with the quality of the coal it processes, I find the credible evidence with respect to the testing, blending, and re-blending as necessary, are directly accomplished in order to insure and maintain the consistent quality of the coal pursuant to Dominion's quality specifications.

I conclude and find that the working activities taking place at the respondent's site, namely, the mixing, blending, weighing, sampling, storing, loading, and transporting coal to Dominion's plant clearly meets the Mine Act definition of "work of preparing the coal", and that this work is clearly done to meet the specifications of its customer, Dominion Power. I further conclude and find that the respondent's custom coal blending facility is a "coal or other mine" clearly within the statutory definitions found in the Mine Act, and is therefore subject to the Mine Act and the Secretary's enforcement jurisdiction. The respondent's arguments to the contrary ARE REJECTED.

<u>The Alleged Violations</u>

In support of the citations in issue, the Secretary relies on the testimony of MSHA Inspector Thomas Bower that I find credible and un-rebutted. The respondent availed itself of the opportunity to cross-examine the inspector, but focused primarily on questions related to jurisdiction rather than facts related to the conditions or practices that prompted the inspector to issue the citations with his findings noted on the face of the citations. The respondent presented no credible evidence to rebut the Secretary's position with respect to the facts associated to the violations in issue. In this regard, I informed the parties that I expected to hear testimony concerning the three alleged violations, as well as the jurisdictional issue. I further informed the parties that I did not intend to come back to try the three citations and the respondent clearly understood that this was the case (Tr. 19-20). Further, my hearing notice informed the parties that the issues to be addressed included testimony related to the violations.

The respondent's statement at page two of its post-hearing brief that I permitted the parties to file briefs "on the issue of jurisdiction" suggests that I limited any briefing to that issue alone is incorrect. My expectation of briefs was not limited to jurisdictional issues, with the exclusion of any arguments related to the alleged violations. At the conclusion of the hearing, the respondent stated that briefs would be helpful (Tr. 140).

23

Further, when asked if the respondent wished to discuss the violations, the counsel stated "no sir" and "we rest" (Tr. 138). Although the respondent could have called the foreman who received the citations to testify, it did not do so. During opening statements, the respondent stated "We think the citations are relevant on the jurisdictional issues" (Tr. 19). The Secretary stated his intention to initially establish jurisdiction and then proceed to each of the citations (Tr. 20).

The Secretary's assertions at page 13 of his post-hearing brief that "The facts of the alleged violations at issue in these proceedings are not in dispute", citing ALJ Exhibit 1, and the trial transcript at pages 6 and 17 are inaccurate. ALJ Exhibit 1 concerns a joint stipulation with respect to the admission of the citations in issue into evidence "without objection, except to jurisdiction". Each of the citations is described by the citation number, the date of issue, and the cited mandatory safety standard. I find nothing to suggest that the parties agreed that the factual conditions or practices described by the inspector on the face of each of the citations were not in dispute or otherwise agreed to by the parties.

At page 6 of the transcript, I commented that the principal issue concerned jurisdiction, and acknowledged the pre-trial position statement filed by the Secretary on November 15, 2013, with a copy furnished to the respondent. The Secretary's statement includes the intention to call the inspectors who testified in this case, with the expectation of eliciting testimony including the factual basis for the issuance of the citations. At page 3 of the statement, the Secretary acknowledged that the issues to be litigated also included gravity, negligence, and the proposed civil penalty assessments. The Secretary's reference to page 17 of the transcript reflects a comment by the Secretary's counsel stating "and as Mr. Massie said, the facts really aren't in dispute". I also note a statement by counsel at transcript page 11 that "there are going to be disputes about the facts . . . There will be differences about what the facts mean".

Based on all of the aforementioned circumstances, any suggestion that the respondent was not expected to address the fact of violations at the hearing, or was somehow misled, prejudiced, or treated unfairly for not doing so IS REJECTED. I conclude and find that the respondent has waived its right and opportunity to present a defense or to rebut the Secretary's evidence in support of the violations. I further find that the credible and unrebutted testimony of Inspector Bower establishes that the conditions and practices described in the citations constitute violations of the cited mandatory safety standards. Accordingly, the citations ARE AFFIRMED.

24

History of Prior Violations

Exhibit A to the Secretary's petition for assessment of civil penalties reflects no prior or repeat violations, and no further information was received from the Secretary. Absent any evidence to the contrary, I find the respondent has a good compliance record.

Good Faith Compliance

Based on the timely corrective actions as reflected in the citation termination notices, I find that the respondent abated all of the violations in good faith.

Negligence

Based on the inspector's credible testimony that the respondent's foreman was not responsible for any maintenance of the trucks delivering coal to the site, I accept and adopt his "low negligence" determinations with respect to each of the citations.

Size of Business and Effect of Civil Penalty Assessments on the Respondent's Ability to Remain in Business

The Secretary characterized the respondent as a small mine operator (Tr. 139), and the parties stipulated that the payment of the proposed civil penalty assessments for the citations will not adversely affect the respondent's ability to continue in business. I adopt and incorporate these agreements as my findings.

Gravity

Inspector Bower confirmed that he was not aware of any difficulties encountered by the cited trucks inbound to the site, and to his knowledge they arrived safely (Tr. 51). While this may be true, the fact remains that his un-rebutted and credible testimony clearly supports the cited truck brake conditions and defective backup alarm. Accordingly, I find that the violations were serious and would reasonably likely result in injuries.

Significant and Substantial Determinations

Inspector Bower determined that all of the citations were significant and substantial (S & S) violations. With respect to Citation No. 820074, he testified that the cited truck braking defects that he characterized as "faulty brakes, resulted in a 25% loss of breaking power". He confirmed that the conditions exposed employees who regularly traveled the site roads to injuries, and that employees operating equipment were reasonably likely to suffer broken bones

25

or disabling and traumatic injuries in the event of an accident. He conceded this was "a worst case" scenario and lesser injuries were conceivable (Tr. 30-36).

The inspector cited another truck after determining the brakes were out of adjustment and that a leaking and defective air value resulted in a loss of braking air pressure that would reasonably likely result in an accident. He stated that a "runaway truck" could result in a collision accident resulting in permanently disabling injuries. (Citation No 8204726; Tr. 39-40)

The inspector cited the same truck after it was observed operating in reverse in congested working areas where employees were present and the back-alarm did not sound. He confirmed that the vehicle had an obstructed view to the rear, and that if it backed up over people working in the area, they would be exposed to crushing and permanently disabling injuries (Citation No. 8204725; Tr. 33-34).

The established case precedents with respect to S & S violations, Cement Div. Nat'l Gypsum Co., 3 FMSHRC 822, 825 (Apr. 1981), Mathies Coal Co., 6 FMSHRC 1, 3-4 (Jan. 1984), and U.S. Steel Mining Co., Inc., 7 FMSHRC 1125, 1129 (Aug. 1985), and U.S. Steel Mining Co., Inc., 6 FMSHRC 1574 (July 1984), require proof of the following elements that must be considered in terms of continued mining operations:

In order to establish that a violation of a mandatory safety standard is significant and substantial under National Gypsum, the Secretary of Labor must prove: (1) the underlying violation of a mandatory safety standard; (2) a discrete safety hazard that is, a measure of danger to safety contributed to by the violation; (3) a reasonable likelihood that the hazard contributed to will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature.

I conclude and find that the affirmance of the violations establishes the first Mathies prong. With respect to the second prong requiring a discrete safety hazard contributed to by the violation, I conclude and find that the credible unrebutted testimony of Inspector Bower describing the defective truck braking systems, as well as the cited inoperative trucks backup alarm, presented discrete safety hazards and measures of danger contributed to by the violations pursuant to the second Mathies prong.

The third Mathies prong requires the presence of a reasonable likelihood that the hazard contributed to will result in an injury. The evaluation of the risk of injury necessarily assumes the continuance of normal mining operations. The credible and unrebutted testimony of the inspectors establishes that 30 to 50 loaded trucks arrived and entered the respondent's site on a daily basis with frequent stops at the weighing scale, the storage areas where the coal is dumped and blended by end-loaders. The trucks also traveled over inclined roadways on the property and the same roads used by the work force on foot.

26

Inspector Bower testified credibly that the trucks backed up in congested areas where workers and pieces of equipment are present, and that the cited facility brake conditions could prevent the truck from stopping as intended or result in a truck "runaway". Based on the brake defects that he found, as well as his accident investigator experience involving truck accidents under similar defective braking systems, he concluded that it was reasonably likely that an accident would occur causing a wreck, with the resulting serious injuries that he described. One of these trucks was also cited for an inoperative backup alarm and the inspector concluded that if it backed over anyone, they would likely suffer crushing and disabling injuries.

I conclude and find that the hazardous defective truck brakes and backup alarm conditions would reasonably likely contribute to an accident resulting in serious injuries to employees at risk in the event they were to continue with their normal working duties. Accordingly, I conclude and find that the third and fourth Mathies prongs have also been established. Accordingly, all of the inspector's S & S determinations ARE AFFIRMED.

ORDER

Based on all of the aforementioned findings and conclusions in this case, including the civil penalty assessment criteria found in Section 110(i) of the Mine Act, all of the citations ARE AFFIRMED. Further, I accept and affirm the proposed penalty assessments of $100 for each of the citations (8204724, 8204725, and 8204726).

The respondent shall pay a civil penalty assessment of $300 for the violations within thirty (30) days of the date of this Order. Payment shall be submitted to the Mine Safety and Health Administration (MSHA), U.S. Department of Labor, Payment Office, P.O. Box 790390, St. Louis, MO 63179-0390, referencing the captioned docket numbers. Upon receipt of payment, these proceedings ARE DISMISSED.

_George A. Koutras_

George A. Koutras
Administrative Law Judge

Distribution:

Anthony D. Jones, Esq., U.S. Department of Labor, Office of the Solicitor, 1100 Wilson Boulevard, 22nd Floor, Arlington, VA  22209-2296

Wade W. Massie, Penn, Stuart, & Eskridge, P.O. Box 2288, Abingdon, VA  24212

27

Power Fuels, LLC
v. Federal Mine Safety and Health Review Commission and
Secretary of Labor, Mine Safety and Health Administration


Exhibit 2
to Petition for Review

Notice dated April 18, 2014

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

### 1331 PENNSYLVANIA AVENUE, NW, SUITE 520N
### WASHINGTON, D.C. 20004-1710

**APR 1 8 2014**

| | | |
|---|---|---|
| SECRETARY OF LABOR,<br>  MINE SAFETY AND HEALTH<br>  ADMINISTRATION (MSHA) | :<br>:<br>: | Docket Nos. VA 2013-403<br>VA 2013-312-R |
| v. | :<br>: | VA 2013-313-R<br>VA 2013-353-R |
| POWER FUELS, LLC | :<br>: | |

### <u>NOTICE</u>

A petition for discretionary review was filed by Power Fuels, LLC, on March 26, 2014. This petition was filed pursuant to section 113(d)(2) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 823(d)(2). That section provides that review of a decision of an Administrative Law Judge may be granted upon specified grounds and upon the affirmative vote of two Commissioners. Such review is discretionary. 30 U.S.C. § 823(d)(2)(A). However, no two Commissioners voted to grant the petition or to otherwise order review under 30 U.S.C. § 823(d)(2)(B). Consequently, the decision of Administrative Law Judge George A. Koutras dated March 10, 2014, is final as of 40 days after its issuance. 30 U.S.C. § 823(d)(1).

Jean H. Ellen
Chief Docket Clerk

14-04-13

Distribution:

Wade W. Massie, Esq.
Penn, Stuart & Eskridge
P.O. Box 2288
Abingdon, VA 24212
wmassie@pennstuart.com

Melanie Garris
Office of Civil Penalty Compliance
MSHA
U.S. Dept. Of Labor
1100 Wilson Blvd., 25th Floor
Arlington, VA 22209-3939

W. Christian Schumann, Esq.
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Blvd., Room 2220
Arlington, VA    22209-2296

Administrative Law Judge George A. Koutras
Federal Mine Safety & Health Review Commission
Office of Administrative Law Judges
1331 Pennsylvania Avenue, N. W., Suite 520N
Washington, D.C.  20004

Power Fuels, LLC
v. Federal Mine Safety and Health Review Commission and
Secretary of Labor, Mine Safety and Health Administration


Exhibit 3
to Petition for Review

List of Respondents

LIST OF RESPONDENTS

Pursuant to Fourth Circuit Court of Appeals Local Rule 15(b), Petitioner

Power Fuels, LLC ("Power Fuels"), by counsel, states that the following is a list of

respondents' names and the addresses where respondents may be served with copies of

Power Fuels' petition for review:

1. Federal Mine Safety and Health Review Commission

   Executive Director
   Federal Mine Safety and Health Review Commission
   1331 Pennsylvania Avenue, NW, Suite 520N
   Washington, D.C. 20004-1710

2. Secretary of Labor, Mine Safety and Health Administration

   W. Christian Schumann, Esq.
   Office of the Solicitor
   U.S. Department of Labor
   1100 Wilson Boulevard, Room 2220
   Arlington, VA 22209-2296